**IN THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT**

---

**No. 25-1899**

---

**WHITEHALL FIDUCIARY LLC, AS TRUSTEE OF WHITEHALL TRUST
U/T/A DATED AUGUST 1, 2007, AND SAUCON VALLEY TRUST U/T/A
DATED AUGUST 1, 2007,**
***Appellants,***
v.
**LEHIGH VALLEY 1 LLC, SUCCESSOR BY ASSIGNMENT TO
WINDSTREAM CAPITAL LLC, SUCCESSOR BY ASSIGNMENT TO THE
UNITED STATES SECRETARY OF HOUSING AND URBAN
DEVELOPMENT, SUCCESSOR BY ASSIGNMENT TO M&T REALTY
CAPITAL CORPORATION,**

---

**RESPONSE OF PLAINTIFF/APPELLEE IN OPPOSITION TO
APPELLANTS' MOTION TO STAY DISTRICT COURT ORDER
APPOINTING RECEIVER**

---

Appellee Lehigh Valley 1 LLC ("LV1") respectfully submits this opposition

to Appellants' Motion for Stay Pending Appeal of the district court's receivership

order. For the reasons set forth below, the motion should be denied.

## I.      INTRODUCTION AND FACTUAL BACKGROUND

This appeal arises from the District Court's proper appointment of a receiver

to manage and preserve two nursing home properties during mortgage foreclosure

proceedings. The undisputed record establishes the compelling case requiring the Receiver's immediate actions, not the continued delay again requested by Defendants/Appellants.

Appellants have not made a single mortgage payment since February 2021—over four and 1/2 years of continuous default on loans exceeding $35 million. The mortgage agreements expressly provide for **receivership "as a matter of right and without notice" upon default**, and Appellants waived all defenses to such appointment. See Mortgage at page 20 of 25, para. 11.

Despite the repeated requests from both LV1 and from the District Court, Appellants have failed and refused to provide current financial statements (the most recent are from 2021, showing defaults and operating losses); failed and refused to provide unredacted evidence of insurance coverage on the two collateral properties; failed and refused to provide proof of current tax payments (which are not being made!); and failed and refused to provide any plan to cure their defaults.

Most critically, one property located at 1050 Main Street, Hellertown, Pennsylvania was recently scheduled for tax sale on August 8, 2025. This imminent threat, created by Appellants' failure and refusal to pay any real estate taxes from 2023 to the current date, and their related tenant operators'

mismanagement, would have resulted in complete loss of LV1's collateral, and the extinguishment of Plaintiff's mortgage lien, if not for a last minute stay of said sale.

However, the monthly 2023 tax payments due from the Defendants are now being made (only since July 2025) by the related tenant entity in exchange for an offset of rent due. A true and correct copy of the letter from tenant's counsel that outlines this new relationship is attached hereto and made a part hereof as Exhibit "1". Thus, not only did the Defendants/Appellants fail and refuse to pay real estate taxes for the years 2023-current, but the Defendants/Appellants are not receiving needed funds from the lease, nor are current real estate taxes being paid. This arrangement continues to reflect the Defendants/Appellants' financial distress. Despite the stay of the scheduled August 8, 2025 tax sale, both collateral properties remain severely in default of real estate and school taxes, and face the scheduling of new tax sales this year.

Both collateral properties house vulnerable elderly residents receiving medical and memory care services in heavily regulated healthcare facilities, making professional management essential for both financial and humanitarian reasons.

The procedural history is straightforward and undisputed. After Appellants' defaults in 2020, the loans were assigned through HUD and Windstream Capital to LV1. Appellee LV1 subsequently filed foreclosure actions in June 2024.

While Appellants' predecessor's confessed judgments were stricken in state court for procedural issues concerning the warrant of attorney provisions in the promissory notes, the Appellants do not dispute the underlying debt nor their default. LV1 moved for appointment of a receiver in July 2024. After full briefing and oral argument, the District Court properly granted the motions on May 2, 2025, issuing a detailed eleven-page opinion that methodically addressed every relevant factor under Third Circuit law. Appellants filed an appeal, and after the District Court denied their Motion to Stay the Receiver's Actions, the Appellants now seek the extraordinary remedy of a stay pending appeal before this Court. A true and correct copy of the District Court's Order Denying Defendants/Appellants' Stay request, with the full analysis as to why the requested is improper is attached hereto and made a part hereof as Exhibit "2".

## II.    LEGAL STANDARD

A stay pending appeal is an extraordinary remedy requiring the movant to satisfy all four factors: (1) a strong showing of likelihood of success on the merits;

(2) irreparable injury absent a stay; (3) no substantial injury to other parties; and (4) that the public interest favors a stay. *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991); *In re Revel AC, Inc.*, 802 F.3d 558, 568-71 (3d Cir. 2015). The burden is on the movant to establish that all four factors favor granting a stay. *In re Revel AC, Inc.*, 802 F.3d at 565. This is a difficult burden requiring more than mere assertions or speculation. *Id.* at 571. If the movant fails to make the requisite showing on either of the first two factors, the inquiry ends and the stay must be denied. *Id.*

Critically, Federal Rule of Civil Procedure 62(c) provides that receivership orders are "not stayed after being entered, even if an appeal is taken" unless the court orders otherwise.

This presumption against stays reflects the urgent nature of receivership proceedings and the need to preserve property pending litigation. Courts regularly deny motions to stay receivership actions pending appeal, recognizing that such stays would frustrate the very purpose of appointing a receiver. See *Wells Fargo Bank, N.A. v. CCC Atl., LLC*, No. 12-521, 2013 U.S. Dist. LEXIS 20761 (D.N.J. Feb. 15, 2013) (denying motion for stay pending appeal where defendant had not demonstrated strong likelihood of success); *Howard v. Gutterman*, 3 B.R. 393

(S.D.N.Y. 1980) (finding stay would frustrate judicial administration and harm receiver's interest in marshaling assets quickly).

## III.   ARGUMENT

### A. Appellants Cannot Show Likelihood of Success on the Merits

The Third Circuit reviews the appointment of a receiver for abuse of discretion, not de novo. *Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942); *KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*, 781 F. App'x 119, 121 (3d Cir. 2019). The District Court's decision must stand unless it "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *EEOC v. City of Long Branch*, 866 F.3d 93, 97-98 (3d Cir. 2017).

### 1.    The Contractual Right to Receivership

The mortgage agreements unequivocally provide for receivership as a matter of right, and without notice upon default.  Further, in the contractual provisions for the appointment of a Receiver, the Appellants expressly waived all defenses and specifically consented to such appointment!

Courts in this Circuit give "considerable weight" to such provisions, especially where, as here, the mortgagor has expressly waived defenses. *Wells Fargo Bank, N.A. for Morgan Stanley Cap. I Inc., Com. Mortg. Pass-through Certificates, Series 2006-IQ12 v. Lichter Gateway IV, LLC,* 2017 U.S. Dist. LEXIS 198162, 2017 WL 5957072, at *6 (D.N.J. Dec. 1, 2017) ("The presence of a contractual stipulation to the appointment of a receiver 'is given considerable weight in the court's evaluation of whether a rent receiver should be appointed.'"). As the court explained in *Wells Fargo Bank, N.A. v. CCC Atl., LLC,* 905 F. Supp. 2d 604 (D.N.J. 2012), "where the parties have agreed ex ante that, in the event of a default, the lender has the right to all rent payments and to the appointment of a receiver... appointment of a receiver is not such a drastic remedy."

This Circuit recently addressed similar provisions in multiple cases within this district. *See Deutsche Bank Tr. Co. Ams. v. Royersford Hotel Grp. LLC,* No. 24-5769, 2024 U.S. Dist. LEXIS 219041 (E.D. Pa. Dec. 4, 2024) (applying factors "in a less stringent manner" where contractual provisions exist); *ICON PSG 1 FL, LLC v. Jenkins Court Realty Co., L.P.,* No. 25-0044, 2025 U.S. Dist. LEXIS 30906 (E.D. Pa. Feb. 21, 2025) (finding prolonged default combined with lack of financial transparency demonstrates financial instability warranting receivership); *Wilmington Trust, National Association v. Cedar Crest Professional Park VII LP,*

No. 5:24-cv-04627 (E.D. Pa. Jun. 6, 2025) (court retains equitable discretion to fashion receivership orders that effectively preserve collateral).

## 2.     Likelihood of Success on the Foreclosure Claims

The District Court properly found that "the continuing failure of both Whitehall and Saucon to make monthly mortgage payments shows that Lehigh is likely to succeed on its mortgage foreclosure claims."

This finding is unassailable given the Defendants' undisputed four and 1/2 year default, as Defendants have failed to make a single mortgage payment since February 2021. Appellants' vague assertions about HUD's handling of reserve accounts do not negate the Defendants' obligation to make mortgage payments. *See Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*, 540 F. Supp. 3d 491, 499-500 (E.D. Pa. 2021) (likelihood of success considers "the legal principles controlling the claim and the potential defenses available").

Further, HUD had made mortgage payments and the past due <u>2021</u> and <u>2022</u> unpaid tax payments from the reserve accounts to prevent potential tax sales for those unpaid years.

8

### 3. The District Court's Comprehensive Analysis

Contrary to Appellants' assertion that the District Court "collapsed" the analysis into a single factor, the court methodically examined each relevant factor: the contractual provision for receivership, the likelihood of success, the financial condition, the risk of diminution in value, the inadequacy of legal remedies, the balance of interests, and other equitable considerations. The court's findings are supported by undisputed evidence of Defendants'/Appellants' prolonged defaults (and failure to make any mortgage payments for 2023-2025), their failure to provide financial information, the recent tax liens (and failure to pay any taxes prior to the appointment of the Receiver), the operating losses, and the imminent tax sales threatening total loss of the collateral properties.

### B. Appellants Will Not Suffer Irreparable Harm

Irreparable harm must be "actual and imminent," not remote or speculative. *In re Revel AC, Inc.*, 802 F.3d at 571. Purely economic injury does not constitute irreparable harm unless it threatens the very existence of the movant's business. *Minard Run Oil Co. v. United States Forest Serv.,* 670 F.3d 236 (3d Cir. 2011). "Grounds for irreparable injury include loss of control of reputation, loss of trade,

and loss of good will," but only where these cannot be compensated by monetary damages. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004).

Courts routinely reject claims of irreparable harm in receivership cases where the harm is self-inflicted. In *Fifth Third Bank v. Metal Foundations, LLC*, the court dismissed the debtor's unsubstantiated claims to allegedly support a request to restrict the role of the receiver, emphasizing that the receiver's role was "to collect the collateral and assess its value in order to determine how best to satisfy some portion of the Bank's $20 million judgment." *In re Fifth Third Bank*, No. 10-0353, 2011 U.S. Dist. LEXIS 46811 (W.D. Pa. May 2, 2011).

Appellants' complaint about alleged "confusion" regarding the receiver's authority has already been addressed. When Defendants'/Appellants' counsel first raised concerns, the Receiver "agreed not to take any action that would impede or harm the Tenant Operators' success." This demonstrates both the receiver's responsiveness and that any alleged confusion has been resolved. Moreover, Appellants cannot credibly claim confusion when they have ignored their clear contractual obligations for over four years and continue to violate Paragraph V(15) of the Receiver Order, which explicitly enjoins them from "interfering with the

Receiver, directly or indirectly, in the management and operation of the Properties."

## C. A Stay Would Substantially Harm LV1

The risk of substantial injury to LV1 is both acute and catastrophic. Most critically, one property was recently scheduled for tax sale on August 8, 2025. The Receiver's appointment and the Receiver's requirement that prior 2023 real estate/school taxes be paid stayed the sale. If this tax sale had proceeded while Appellants pursue their appeal, LV1's mortgage lien would have been extinguished entirely, resulting in total loss of collateral securing over $35 million in debt. Moreover, the properties remain severely tax delinquent, no current taxes are being paid, and the properties could be scheduled for tax sale at any time. This is not some theoretical risk, but an immediate threat requiring urgent Receiver intervention.

Each day without the Receiver compounds the harm through accumulating tax liens with penalties and interest, potential insurance lapses (Appellants have already demonstrated their inability to maintain adequate coverage and continue to fail and refuse to turn over unredacted copies of the insurance to actually show what coverage actually exists on the two properties), deferred maintenance (four

years of financial distress suggests maintenance has been deferred), lost rents that should service the debt, and self-dealing in related-party arrangements. As established in *LVL Co., LLC v. Abraham Atiyeh, et al.*, No. 19-3406 (E.D. Pa.), and further detailed in *LVL Co., LLC v. Abraham Atiyeh, Nimita Kapoor Atiyeh, et al.*, 469 F. Supp. 3d 390 (E.D. Pa. 2020), there are significant conflicts of interest where the wife of Abraham Atiyeh (Abraham is the manager of Defendant Whitehall Fiduciary, LLC and the manager of Defendant Saucon Management, LLC, the Trustee for Defendant Saucon Trust in this matter) allegedly operates the tenant businesses, creating inherent risks of self-dealing that require receiver oversight.

Courts have emphasized that receivership is essential to prevent further mismanagement and asset dissipation. *See, e.g., KeyBank Nat'l Ass'n v. Fleetway Leasing Co.,* No. 18-667, 2019 U.S. Dist. LEXIS 177015 (E.D. Pa. Oct. 11, 2019). In *In re Innovative Communications*, 390 B.R. 184, 200-01 (Bankr. D.V.I. 2008), the court denied a stay where cessation of trustees' ability to act "would waste these efforts, cause a waste of estate resources and result in unwarranted expense, all of which would cause substantial harm to the creditors."

Further, and previously unknown to Appellee, Abraham Atiyeh and his wife had entered into lease amendments wherein the rents due from the tenant on the two properties were eliminated for 2024, and the rental rates were reduced dramatically below market levels for 2025-2028.  This self-dealing results in the reduction of rent payments by over $1 million for each property per year! Further, the Defendants/Appellants have the tenant paying the Defendants' 2023 taxes with the right to offset those payments from the reduced current rents.  <u>See</u> Exhibit "1". The Defendants are receiving very little at this time from the tenants to make any payments on their obligations.

### D. The Public Interest Strongly Favors Denial of a Stay

The public interest in preserving property and ensuring professional management of healthcare facilities housing vulnerable elderly residents overwhelmingly favors denying the Defendants' requested receivership stay. In *In re Mocco*, 176 B.R. 335, 343-44 (Bankr. D.N.J. 1995), the court denied a stay where the public interest in remedying a severe health hazard "overwhelmingly and irrebuttably" outweighed any alleged harm.

The receivership order ensures responsible property management for the sake of senior citizens who depend on these facilities for medical and memory care

services. The District Court's order preserves the status quo by allowing professional management while ensuring bills are paid, insurance is maintained, and properties are not lost to tax sale. This is consistent with precedent from this district. In *Deutsche Bank Trust Company Americas v. Greenfield of Perkiomen Valley, LLC*, No. 2:23-cv-01439-TJS (E.D. Pa. 2023), involving another senior living facility, the receiver properly took control and replaced the third-party management company to ensure proper operations.

## IV.    APPELLANTS' ARGUMENTS ARE MERITLESS

### A. No Evidentiary Hearing Was Required

An evidentiary hearing is not required where the material facts are undisputed and documented. *Leone Industries v. Associated Packaging, Inc.*, 795 F. Supp. 117, 120 n.6 (D.N.J. 1992) ("an evidentiary hearing need not be held beforehand when the record discloses sufficient facts to warrant appointment of a receiver"); *FTE Networks, Inc. v. Szkaradek*, No. CV 22-785-WCB, 2023 WL 8650002, at *7 (D. Del. Dec. 14, 2023) (hearing necessary where "briefing does not permit a confident conclusion"). The material facts here—mortgage terms, admitted defaults, duration of default, acceleration of loans, and failure to provide financial information—are all undisputed and documented.

14

Appellants controlled all relevant financial information and could have provided it at any time. Defendants/Appellants strategic decision to withhold this information (and to continue to withhold this information) while opposing the receivership cannot now justify an evidentiary hearing.

## B. The Receivership Scope Is Appropriate

The scope of the receivership appropriately matches both the contractual authorization and the equitable needs of preserving healthcare facilities. Courts recognize that effective preservation requires broad management authority. *See, e.g., Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d at 615.

The precedent from *Deutsche Bank Trust Company Americas v. Greenfield of Perkiomen Valley, LLC* is directly on point. There, the receiver of a senior living facility "terminated Greenfield's role as property manager" and "distributed a welcome letter to the residents and their families and held a welcome meeting with employees." This demonstrates that receivers routinely have authority over property operations, particularly where related-party conflicts exist.

Further, the Tenants in this matter signed Lessee Security Agreements which specifically allowed the secured creditor (now Receiver) to terminate the Lessee affiliated entities, to take control over all licenses, and to operate the facilities.

The Lessee Security Agreements further allow the secured party to continue to operate and maintain the project for its approved use in Lessee's name, place, and stead.  Finally, the Lessee Security Agreement grants the secured creditor with the power of attorney wherein the Lessee irrevocably appoints the secured party, and/or its successors and assigns, as Lessee's lawful attorney in fact to do all things necessary or required.  True and correct copies of the Lessee Security Agreements are attached hereto and made a part hereof as Exhibit "3" and Exhibit "4".  See paragraphs 9(e) of Exhibits "3" and "4".

## V.     ANY STAY MUST BE CONDITIONED ON A SUBSTANTIAL SUPERSEDEAS BOND

Even if this Court were inclined to grant a stay—which it should not— Federal Rule of Civil Procedure 62(d) requires that the Defendants post a supersedeas bond. Given the substantial debt (over $35 million), monthly accruing interest, imminent tax sale, and demonstrated risk to collateral, any bond would need to be substantial. Appellants make no mention of their ability or willingness to post such security. Their demonstrated inability to make mortgage payments for four and 1/2 years or to pay taxes for 2023-current (with only two monthly tax payments for 2023 recently made by the Tenant, and with no current tax payments

being made) strongly suggests that the Defendants/Appellants lack the resources to post adequate security.

## VI.    CONCLUSION

Appellants have failed to meet their heavy burden on any of the four required factors for a stay pending appeal. They have shown no likelihood of success given the undisputed default, express contractual provisions, and proper application of law. Defendants/Appellants will suffer no irreparable harm from the professional management of properties that they have mismanaged for years.

It is Plaintiff/Appellee LV1 that faces immediate and catastrophic harm from the severely delinquent taxes on the real properties and the fact that new tax sales could be scheduled at any moment. The public interest strongly favors protecting elderly residents and preserving essential healthcare facilities.

The District Court's well-reasoned decision should not be stayed merely because Appellants filed an appeal. The Receiver must be permitted to take immediate action to prevent tax sales, and to preserve these critical properties, all as set forth in the District Court's Order Appointing the Receiver. For all these reasons, Appellants' motion for stay pending appeal should be DENIED.

Respectfully submitted,
**BERGER LAW GROUP, P.C.**

By: *Phillip D. Berger*

Phillip D. Berger, Esq.
Attorney I.D. No. 58942
Matthew R. Kaufmann, Esq.
Attorney I.D. No. 206991
919 Conestoga Road
Building 3, Suite 100
Bryn Mawr, PA 19010
(610) 668-0774

DATED:     August 15, 2025          Attorneys for Plaintiff/Appellee

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 27 because it contains 3,535 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 27,

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

By: *Phillip D. Berger*
Phillip D. Berger, Esquire


**CERTIFICATE OF BAR MEMBERSHIP**

I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

By: *Phillip D. Berger*
Phillip D. Berger, Esquire

# CERTIFICATION OF COMPLIANCE – PUBLIC ACCESS

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Dated: August 15, 2025

*Phillip D. Berger*

Phillip D. Berger, Esquire
Attorney I.D. No. 58942
Matthew R. Kaufmann, Esq.
Attorney I.D. No. 206991
BERGER LAW GROUP, P.C.
919 Conestoga Road
Building 3, Suite 100
Bryn Mawr, PA 19010
(610) 668-0774
(610) 668-2800
Attorneys for Plaintiff/Appellee

**EXHIBIT 1**

T: (610) 997-5097
F: (610) 988-7214
joel.wiener@stevenslee.com

June 20, 2025

Jeffrey Kelly, Esq.
Portnoff Law Associates
Via Email to JKelly@portnoffonline.com

      RE: 1050 Main Street, Hellertown, PA (Unit 1)
      Your collection for Saucon Valley School District

Dear Jeff:

This letter is to confirm that the payment plan set forth in your email of June 10, 2025 was accepted by Saucon Valley Manor, Inc., the tenant, under which it will make the monthly payments under the plan to allow for it to remain in occupancy by not having the property exposed to Sheriff Sale (C-48-CV-2024-6488). The Receiver for the Property Owner, Saucon Trust, is advised to have been informed of the plan to avoid the Sheriff Sale, by the tenant making the monthly payments directly to your firm of $22,090.40 to be applied to the payment of 2023-24 and 2024-25 Saucon Valley School District taxes due, and the tenant taking a credit for the amounts so paid against rental as may now be due and as comes due under its lease.

The first payment shall be made on July 1, 2025 to your office.

      Very truly yours
      STEVENS & LEE

      *JB Wiener*

      Joel B. Wiener

Copy:
Robert Daday, Esq. (rdaday@portnoffonline.com)
Saucon Valley Manor, Inc.
Ray Lahoud, Esq.

**EXHIBIT 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEHIGH VALLEY 1, LLC, successor by** | : | |
| **assignment to WINDSTREAM CAPITAL** | : | |
| **LLC, successor by assignment to the** | : | **CIVIL ACTION** |
| **UNITED STATES SECRETARY OF** | : | |
| **HOUSING AND URBAN DEVELOPMENT,** | : | |
| **successor by assignment to M&T REALTY** | : | |
| **CAPITAL CORPORATION** | : | **NO.  24-2627** |
| | : | |
| **v.** | : | |
| | : | |
| **WHITEHALL FIDUCIARY LLC, as** | : | |
| **TRUSTEE OF WHITEHALL TRUST U/T/A** | : | |
| **DATED AUGUST 1, 2027** | : | |

| | | |
|---|---|---|
| **LEHIGH VALLEY 1, LLC, successor by** | : | |
| **assignment to WINDSTREAM CAPITAL** | : | |
| **LLC, successor by assignment to the** | : | **CIVIL ACTION** |
| **UNITED STATES SECRETARY OF** | : | |
| **HOUSING AND URBAN DEVELOPMENT,** | : | |
| **successor by assignment to M&T REALTY** | : | **NO. 24-2709** |
| **CAPITAL CORPORATION** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SAUCON TRUST, U/T/A DATED** | : | |
| **OCTOBER 1, 2007** | : | |

## ORDER

**AND NOW**, this 9th day of June 2025, upon consideration of Defendants' Motions to Stay

Appointment of Receiver Pending Resolution of Appeals (Docket No. 68 in case number 24-2627

and Docket No. 61 in case number 24-2709) and Plaintiff's oppositions thereto, it is hereby

**ORDERED** that Defendants' Motions are **DENIED.**[1]

---

[1] On May 2, 2025, I entered an Order appointing a receiver to manage the two Properties at issue in these consolidated mortgage foreclosure matters. On that same day, Defendants filed an appeal of that Order. A receivership appointment is not automatically stayed pending appeal (see Fed. R. Civ. P. 62(c)), and thereafter, on May 27, 2025, Defendants filed a motion in which they seek to stay the appointment of the receiver pending resolution of their appeals.

In examining whether to grant a stay, Courts in the Third Circuit have identified the following four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).

In support of the first factor and their claim that they have a strong likelihood of success on the merits, Defendants set forth only one argument. They assert that because the appointment of a receiver "is an example of judicial discretion where courts can weigh factors differently," (Docket No. 68, p. 12) it is "entirely plausible that the Third Circuit could adopt a different framework, apply a broader or narrower set of considerations, or arrive at a different conclusion even under the same set of facts." (*Id.*, p. 13.) They claim to have shown a "reasonable likelihood of success on the merits because the applicable legal standard invites differing conclusions among reasonable minds." (*Id.*) However, it is important to note that the Third Circuit "review[s] the decision to appoint a receiver for abuse of discretion." *KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*, 781 F. App'x 119, 121 (3d Cir. 2019), citing *Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942). A court abuses its discretion if its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact." *EEOC v. City of Long Branch*, 866 F.3d 93, 97-98 (3d Cir. 2017) (citation omitted).

In reviewing Defendants' argument regarding their likelihood of success on the merits, it is telling that they do not identify any erroneous factual finding that I made in my opinion appointing a receiver, nor do they identify any error of law that was made. In addition, they offer no evidence to support any improper application of law to fact. Defendants' motion presents nothing that would lead to the conclusion that the Third Circuit will find that I abused my discretion by appointing a receiver in this matter. Accordingly, I find that Defendants cannot show a likelihood of success on the merits.

As to irreparable harm, Defendants claim that absent a stay, there will be "encroachment into the operations of tenant businesses." (Docket No. 68, p. 13.) In support of this argument, Defendants claim the receivership order is ambiguous and confusing for their "Tenant Operators," as the order does not contain an express limitation preventing the Receiver from interfering with the businesses of tenants. (*Id.*, p. 14.) I find this contention to be unpersuasive for several reasons. First, the Receivership Order clearly establishes the powers of the Receiver and contains no ambiguity. Second, the Receiver does in fact have some authority over the tenant operators, as the Receivership order clearly provides the Receiver with the authority to "retain a reputable management company" to operate the Properties. (Docket No. 58, Para III(6)(g)). Third, even if the order did result in some confusion, Defendants have not provided any evidence of actual harm. In addition, to the extent Defendants are arguing that their loss of control over the Properties is irreparable harm, I find that argument to also be unpersuasive. Defendants themselves have for years been in the best position to prevent this alleged harm by paying their mortgages, which they have continuously failed to do. Their own failure to meet their contractual obligations cannot serve as proof of their harm.

Next, I must examine whether a stay would substantially harm Plaintiff. As I discussed in detail in the opinion granting the receivership, Defendants' actions have caused a risk of damage to the Properties and therefore, a risk of damage to Plaintiff's collateral. The Receiver was appointed in large part due to this very risk of substantial harm to Plaintiff. Obviously, a stay of this matter during which the Receiver is prevented from performing its necessary duties could potentially cause significant harm to Plaintiff.

Lastly, I find that the public interests favor denying a stay in this matter. These Properties house healthcare facilities that provide medical and memory care services to elderly patients. Defendants have failed to make mortgage payments in over four years, and the Properties allegedly have deficient insurance and unpaid taxes. The Properties require responsible property management for the sake of these senior citizens, and Defendants' inability to do so could result in harm to this vulnerable population, including possible displacement from their residences. Accordingly, the appointment of a receiver is necessary to preserve the status quo and protect the residents of these healthcare facilities, which is clearly in the public interest.

BY THE COURT:

*/s/ Catherine Henry*

**CATHERINE HENRY, J.**

---

As all four of the factors necessary for Defendants to obtain a stay pending appeal are resolved in favor of Plaintiff, Defendants' Motions to Stay will be denied. Defendants must permit the Receiver to fulfill its duties as set forth in the May 2, 2025, Order while Defendants' appeal proceeds.

**EXHIBIT 3**

### SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (the "Agreement") is made, entered into and dated as of the 1st day of December 2012, by and between **SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,** a trust formed under the laws of the State of Pennsylvania, whose principal place of business is located at 1050 Main Street, Hellertown, Pennsylvania 18055 ("Debtor"); and **M&T REALTY CAPITAL CORPORATION,** a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

**A.** Contemporaneously with this Agreement, the Secured Party has made a loan to the Debtor in the maximum principal amount of $19,462,800.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Debtor in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Saucon Valley Manor, FHA Project No. 034-22096 (the "Project") located at 1050 Main Street, Hellertown, Pennsylvania 18055, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Project is the subject of the Regulatory Agreement between the Debtor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Regulatory Agreement").

**B.** As security, in part, for the Obligations (as defined below), the Debtor (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage") and (ii) is entering into this Agreement with the Secured Party. The Note, the Mortgage, this Agreement, the Regulatory Agreement and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Debtor to the Secured Party and/or HUD in connection with, or related to, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

**C.** As used herein, "Healthcare Assets" means (i) any and all licenses, permits, and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement), (ii) any and all Medicare and Medicaid provider agreements and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

## Statement of Agreement

**1.    SECURITY INTEREST; SETOFF.**

(a)    To secure the full, prompt and complete payment and performance of all Obligations, the Debtor hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Debtor's right, title and interest in and to the property described on Exhibit B attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Debtor to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

(b)    In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Debtor of, any and all funds, monies, securities and other property held in escrow or for the account of the Debtor pursuant to the Loan Documents, against any amount payable by the Debtor under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Debtor).

(c)    Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

(d)    The Debtor hereby assigns and transfers to Secured Party all of Debtor's rights, titles and interests in, to and under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Project and all of Debtor's rights, titles and interests in the collateral described therein.

**2.    REPRESENTATIONS; GENERAL COVENANTS.**

(a)    To induce the Secured Party to make the Loan, the Debtor promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Debtor has good title to, and is the sole and lawful owner of, the Collateral; (iii) the Debtor has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19 hereof and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security

interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Debtor keeps all tangible Collateral at the Property; (vi) all trade names, assumed names, fictitious names and other names used by the Debtor during the five year period preceding the date of this Agreement are set forth on <u>Exhibit C</u>, and the Debtor has not, during the preceding five year period, except as may be set forth on <u>Exhibit C</u>, acquired any of its assets in any bulk transfer; (vii) Debtor's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Debtor's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Debtor's exact legal name is as set forth in the first paragraph of this Agreement; (x) Debtor's organizational number (if any) as assigned by the State in which Debtor is organized is the number identified as Debtor's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on <u>Exhibit C</u>, the Debtor has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

      (b)     Debtor will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any) and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Debtor will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party and Permitted Liens and except to the extent expressly permitted pursuant to Section 19 hereof. The Debtor, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

      (c)     The Collateral will only be used by the Debtor in the operation of the Project. Until an Event of Default (as defined below) occurs, the Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Debtor will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Debtor will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Debtor, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in favor of the Secured Party and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will automatically become a part of the Collateral under this Agreement). The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements

or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below. Immediately on demand therefor by the Secured Party, the Debtor will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Debtor will give the Secured Party not less than 30 days prior written notice of any change of (A) Debtor's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Debtor will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Debtor may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Debtor's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Debtor will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Debtor is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Debtor will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Debtor will not merge or consolidate with or into any other Person without the prior written consent of Secured Party.

(i)    The provisions of this Section 2(i) shall only apply in the event that the Debtor operates the Project. As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Debtor with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below). The Debtor will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on <u>Exhibit C</u>) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party consistent with the Debtor's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Debtor, the Secured Party and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to

4

herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Debtor will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Debtor. The Debtor authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Debtor receives no Government Payments, the Debtor will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Debtor will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Debtor shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Debtor shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Debtor in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Debtor that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Debtor will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Debtor shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Debtor to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

3. **COMPLIANCE WITH LAWS.** The Debtor will comply with the requirements of all valid and applicable federal, state and local laws.

4. **TAXES; EXPENSES.** The Debtor will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Debtor will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for

preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Debtor to Secured Party under this Section 4 will be paid by the Debtor upon the Secured Party's demand therefor.

5. **INSPECTION; NOTICES.** Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Debtor's records pertaining to the Collateral. The Debtor will keep accurate and complete records of the Collateral. The Debtor will give the Secured Party prompt notice of any Event of Default.

6. **INSURANCE.** The Debtor will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. In addition, the Debtor will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. The Debtor covenants to pay to the Secured Party, together with monthly payments under the Note, installments on account of the premiums that will next become due and payable on such liability and business interruption insurance, the payment amounts to be determined in the same manner and the payments to be applied in the same priority as specified in the Mortgage with respect to payments of property insurance premiums. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Debtor will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

7. **DISCHARGE OF LIENS.** At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Debtor will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

8. **EVENTS OF DEFAULT.** Each of the following events or circumstances, whether or not caused by or within the control of the Debtor, will be an "Event of Default" under this Agreement:

(a)    The Debtor does not pay when due any of the Obligations, subject to any grace period provided under the Note;

(b)    The Debtor does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c).    A default or breach under any of the Loan Documents (exclusive of this Agreement, which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)    Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Debtor proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)    The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)    There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Debtor, which may materially impair the value of the Collateral or the Project;

(g)    Filing by or against the Debtor of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Debtor's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Debtor without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Debtor for the benefit of creditors, or the Debtor dissolves or is the subject of any dissolution, winding up or liquidation;

(h)    The Debtor is dissolved and liquidation of the Debtor is commenced in accordance with the Debtor's organizational documents and/or the law of the jurisdiction of organization; or

(i)    The Debtor changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

9.    **REMEDIES ON DEFAULT.**

(a)    If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Debtor expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as

7

defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in <u>Exhibit B</u>), the rights of Debtor thereto and shares of Debtor therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Debtor to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)     Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Debtor, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Debtor hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)     If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Debtor agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)     The Debtor further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Debtor hereby waiving the application of any doctrine of marshaling.

(e)     The Debtor shall cooperate in any legal and lawful manner necessary or required to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Debtor's name, place and stead. For this purpose and to the extent not prohibited by applicable law with respect to Healthcare Assets, Debtor irrevocably appoints the Secured Party, its successors and assigns, as Debtor's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Debtor. This power is coupled with an interest.

## 10.    NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.

(a)    No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)    Neither the Debtor nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

## 11.    BINDING EFFECT; JOINT OBLIGATIONS. All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Debtor will bind its heirs, personal representatives and permitted successors and assigns; however, the Debtor may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party. If there be more than one Debtor, their obligations, agreements and duties under this Agreement are made jointly and severally.

## 12.    GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.

(a)    This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or

9

superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements, amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural and conversely. The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO DEBTOR, SECURED PARTY AND DEBTOR EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. DEBTOR FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

**13.    TERM OF AGREEMENT.** The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Debtor until the date that all of the Obligations are fully and finally paid and satisfied.

**14.    PERFECTION; FURTHER ASSURANCES.** The Debtor agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof. At any time and from time to time, the Debtor, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Debtor and to name therein the Debtor as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Debtor as debtor and the Secured Party and/or HUD as secured parties. The Debtor hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Debtor, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Debtor and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Debtor under this Agreement. The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Debtor to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and/or HUD's interests in the Collateral. Without limiting the generality of the

foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Debtor's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Debtor will, on Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

15.    **INTEREST.** Any amounts payable by the Debtor under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Debtor to the Secured Party; however, nothing in this Agreement will be deemed to give to the Debtor the right to withhold payment in consideration of the payment of such interest.

16.    **DELIVERY OF NOTICES.** All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

17.    **REVIVAL OF SECURITY INTEREST.** If the Debtor makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

18.    **CLAIMS AGAINST SECURED PARTY.**

(a)    <u>Notification.</u>  The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Debtor shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Debtor alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    <u>Remedies.</u>  If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Debtor as a result thereof.

(c)    _Limitations_.  In no event, however, shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, for any other damages, including, without limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents.  In no event shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, unless a written notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

19.    **PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.**  This Section 19 shall apply when the Debtor operates the Project, and there is no lease of the Premises.  In all other instances, there shall be no accounts receivable financing under this Section.

(a)    _Definitions_.  The following words and terms shall have the meanings hereinafter set forth:

"_Accounts_" shall mean all right, title and interest of the Debtor in and to the following, in each case arising from the Debtor's operation of the Project in the ordinary course of the Debtor's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c).  Notwithstanding the foregoing, "_Accounts_" do not include accounts rising from the sale of the Debtor's equipment, inventory or other goods, other than accounts arising from the sale of Debtor's inventory in the ordinary course of the Debtor's business.

"_Eligible AR Lender_" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Debtor.

"_Eligible AR Loan_" means a loan or line of credit obtained by the Debtor from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"_Required Intercreditor Agreement_" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender and the Debtor, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    _Eligible AR Loan_.  Subject to the written approval of the Secured Party and HUD, the Debtor may obtain and maintain at any time one, and only one, Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral"

(composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

   (i) in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

   (ii) without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

   (iii) with respect to any existing Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

   (iv) with respect to any other Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

   (v) the Eligible AR Loan, the collateral therefor and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

   (vi) until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s).  As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

  (c) <u>Required Intercreditor Agreement</u>. Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect.  The Debtor shall comply at all times with the Required Intercreditor Agreement then in effect.

  (d) <u>Information</u>. Debtor shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Debtor regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of

any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

**20.    PROJECT CAPITAL NEEDS ASSESSMENTS.** Debtor agrees to pay the cost of Project Capital Needs Assessments ("PCNA Reports") that may be required after the date hereof by HUD (for periodic ten (10) year re-evaluation of the amount of deposits to the reserve fund for replacements created under the Regulatory Agreement), pursuant to any HUD requirement (including, but not limited to, the commitment issued by HUD to insure the Loan). Without limiting the above obligation, Debtor authorizes Secured Party to make withdrawals for this purpose from the reserve fund for replacements created under the Regulatory Agreement. The Debtor shall cooperate in any legal and lawful manner necessary to obtain PCNA Reports, including, but not limited to, providing access to the Property and copies of all reports, documents relating to past capital expenditures and any other information reasonably requested by the party preparing the PCNA Reports, the Secured Party and/or HUD.

**21.    MISCELLANEOUS.**

(a)    This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)    In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)    It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

(d)    This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Debtor with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents may be amended, altered or changed other than in a writing signed by the Secured Party and the Debtor. The Debtor's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Debtor with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)    This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

**22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.**

(a)    Debtor and Secured Party hereby agree that HUD shall be an additional

secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)     To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF**, the Debtor and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

### DEBTOR:

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC,
a Pennsylvania limited liability company,
Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

## COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

### SECURED PARTY:

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _____

Name: Christine R. Chandler
Title: Vice President

## EXHIBIT A TO SECURITY AGREEMENT

### LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715
Being more fully bounded as set forth on attached page

## DESCRIPTION OF 1050 MAIN STREET

.ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.  South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.  North 03' 14'23" West 59.03 feet;

3.  North 86' 41'33" East 18.00 feet;

4.  North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.  North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.  South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.      2.7000 Acres

## EXHIBIT B TO SECURITY AGREEMENT

All of the following described property and interests in property, whether now owned or existing or hereafter acquired, arising or created:

a.    All fixtures, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the premises described in Exhibit A to this Security Agreement (the "Premises"), including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment (except that telephone equipment leased from a telephone company); all piping, tubing, and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm, and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not the same are now or hereafter attached to the Premises in any manner;

b.    All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

c.    All rents, leases, lease contracts, lease agreements, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

d.    All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

e.    All land surveys, plans and specifications, drawings, briefs and other work product of the Debtor or its employees, contractors or agents, and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

f.    All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, including, but not limited to, nursing home and/or assisted living facility licenses, certificates of need, "bed authority" and Medicare and Medicaid provider agreements; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder;

g.    Any and all funds, monies, securities, and other property held in escrow or as reserves, and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities, or other property held in escrow or as a reserve, including, but not limited to, all of Debtor's rights (if any) to any and all funds or amounts held in reserves or accounts created under the Regulatory Agreement, including, but not limited to, replacement reserve accounts and residual receipts accounts;

h.    All of the Debtor's accounts (including, but not limited to, health-care-insurance receivables and other accounts receivable), general intangibles (including, but not limited to, payment intangibles, tax refunds, tax refund claims and low income housing tax credits, if any, applicable to the Premises), chattel paper (including, but not limited to, tangible chattel paper and electronic chattel paper), leases, lease contracts, lease agreements, instruments, documents, inventory, as-extracted collateral, cash, money, deposit accounts, lock boxes, blocked accounts, certificates of deposit, investment property, insurance policies, letter-of-credit rights, judgments, liens, causes of action, warranties, guaranties, supporting obligations, and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h) or elsewhere in this Exhibit B;

i.    All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically, optically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles;

j.    All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, waters, watercourses, and appurtenances related to or benefiting the Premises, and all rights-of-way, streets, alleys and roads which may have been or in the future may be vacated;

k.    All contracts, options and other agreements for the sale of the Premises or the improvements thereon, entered into by the Debtor now or in the future, including cash or securities or other security deposited to secure performance by the parties of their obligations, and all construction contracts, architectural and engineering agreements and management

contracts now or in the future existing pertaining to the construction, rehabilitation, development, repair, operation, ownership, equipping or management of the Premises;

l.    Any and all rights of Debtor in tenant security deposits which have not been forfeited by any tenant under any lease;

m.    All names under or by which any part of the Premises may be operated or known, and all trademarks, trade names, and goodwill relating to any part of the Premises;

n.    The interest of the Debtor in and to any and all funds and monies created or established and held pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Premises;

o.    All rights, titles and interests of the Debtor under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Premises and all of the Debtor's rights, titles and interests in the collateral described therein; and

p.    All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, investment property, letter-of-credit rights, leases, lease contracts, lease agreements, instruments, inventory, documents, deposit accounts, supporting obligations or cash proceeds.

## EXHIBIT C TO SECURITY AGREEMENT

**Other Names Used by Debtor in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Debtor's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*: **None**

*Letters of Credit*: **None**

*Electronic Chattel Paper*: **None**

*Commercial Tort Claims*: **None**

*Instruments (including promissory notes)*: **None**

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g., operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| N/A | | | |

Note: Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits. See Section 2(i) of the Agreement for the Debtor's obligations in this regard.

C-1

## LESSEE SECURITY AGREEMENT

**THIS LESSEE SECURITY AGREEMENT** (the "Agreement") is made, entered into and dated as of the lst day of December, 2012, by and between **SAUCON VALLEY MANOR, INC.**, a corporation organized and existing under the laws of the state of Pennsylvania, whose principal place of business is located at 1050 Main Street, Hellertown, Pennsylvania 18055 (the "Lessee" or "Debtor"); and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

**A.**    Contemporaneously with this Agreement, the Secured Party has made a loan to **SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007** (the "Borrower") in the maximum principal amount of $19,462,800.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Borrower in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Saucon Valley Manor, FHA Project No. 034-22096 (the "Project") located at 1050 Main Street, Hellertown, Pennsylvania 18055, as more particularly described in <u>Exhibit A</u> attached hereto and incorporated herein by reference (the "Premises"). The Premises are leased to the Lessee by the Borrower pursuant to a Lease dated January 1, 2006, as amended (the "Lease"), and are the subject of the Regulatory Agreement Nursing Homes between the Lessee and the Federal Housing Commissioner, dated as of even date herewith (the "Regulatory Agreement Nursing Homes").

**B.**    As security, in part, for the Obligations (as defined below), the Borrower (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage"), (ii) entered into a Security Agreement, dated as of even date herewith, with the Secured Party (the "Borrower Security Agreement") and (iii) entered into a Regulatory Agreement with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Borrower Regulatory Agreement"). As additional security, the Lessee has entered into this Agreement with the Secured Party. The Note, the Mortgage, the Borrower Security Agreement, the Borrower Regulatory Agreement, this Agreement, the Regulatory Agreement Nursing Homes and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Borrower to the Secured Party and/or HUD, or by or on behalf of the Lessee to the Secured Party and/or HUD, in connection with, or related to, the Lease, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

**C.**    The Lessee is affiliated with and/or shares common ownership with the Borrower, and shall benefit directly from the making of the Loan.

**D.**     As used herein, "Healthcare Assets" means (i) any and all licenses, permits and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement Nursing Homes), (ii) any and all Medicare and Medicaid provider agreements, and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

### Statement of Agreement

**1.     SECURITY INTEREST; SETOFF.**

(a)     To secure the full, prompt and complete payment and performance of all Obligations, the Lessee hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Lessee's right, title and interest in and to the property described on Exhibit B attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Borrower and/or the Lessee to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

(b)     In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Borrower and/or Lessee of, any and all funds, monies, securities and other property held in escrow or for the account of the Borrower and/or the Lessee pursuant to the Loan Documents, against any amount payable by the Borrower and/or the Lessee under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Lessee).

(c)     Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

**2.     REPRESENTATIONS; GENERAL COVENANTS.**

(a)     To induce the Secured Party to make the Loan, the Lessee promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Lessee has good title to, and is the sole and lawful owner of, the Collateral; (iii) the Lessee has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19

hereof, rights granted to the Borrower under the Lease, if any, which are subordinate to the liens in favor of the Secured Party ("Subordinate Lease Rights") and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Lessee keeps all tangible Collateral at the Premises; (vi) all trade names, assumed names, fictitious names and other names used by the Lessee during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Lessee has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Lessee's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Lessee's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Lessee's exact legal name is as set forth in the first paragraph of this Agreement; (x) Lessee's organizational number (if any) as assigned by the State in which Lessee is organized is the number identified as Lessee's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Lessee has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

(b)     The Lessee will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any), and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Lessee will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party, Permitted Liens, and Subordinate Lease Rights, and except to the extent expressly permitted pursuant to Section 19 hereof. The Lessee, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

(c)     The Collateral will only be used by the Lessee in the operation of the Project. Until an Event of Default (as defined below) occurs, the Lessee may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Lessee will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Lessee will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Lessee, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in favor of the Secured Party and Subordinate Lease Rights and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will

automatically become a part of the Collateral under this Agreement).  The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below.  Immediately on demand therefor by the Secured Party, the Lessee will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title).  The Lessee will give the Secured Party not less than 30 days prior written notice of any change of (A) Lessee's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Lessee will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Lessee may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Lessee's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Lessee will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Lessee is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Lessee will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of the Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Lessee will not merge or consolidate with or into any other Person without the prior written consent of the Secured Party.

(i)    As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Lessee with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below).  The Lessee will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on <u>Exhibit C</u>) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party consistent with the Lessee's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Lessee, the Secured Party

and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Lessee will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Lessee. The Lessee authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Lessee receives no Government Payments, the Lessee will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Lessee will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Lessee shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Lessee shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Lessee in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Lessee that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Lessee will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Lessee shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Lessee to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

**3.    COMPLIANCE WITH LAWS.** The Lessee will comply with the requirements of all valid and applicable federal, state and local laws.

**4.    TAXES; EXPENSES.** Lessee will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Lessee will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and

expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Lessee to Secured Party under this Section 4 will be paid by the Lessee upon the Secured Party's demand therefor.

5.    **INSPECTION; NOTICES.**  Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Lessee's records pertaining to the Collateral. The Lessee will keep accurate and complete records of the Collateral. The Lessee will give the Secured Party prompt notice of any Event of Default.

6.    **INSURANCE.**  The Lessee will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. The Lessee will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Lessee will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

7.    **DISCHARGE OF LIENS.**  At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Lessee will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

8.    **EVENTS OF DEFAULT.**  Each of the following events or circumstances, whether or not caused by or within the control of the Lessee, will be an "Event of Default" under this Agreement:

(a)    Any of the Obligations are not paid on or before the date when due, subject to any grace period provided under the Note;

(b)    The Lessee does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)    A default or breach under the Lease or under any of the Loan Documents (exclusive of this Agreement which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)    Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Lessee proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)    The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)    There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Lessee or the Borrower, which may materially impair the value of the Collateral or the Project;

(g)    Filing by or against the Lessee of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Lessee's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Lessee without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Lessee for the benefit of creditors, or the Lessee dissolves or is the subject of any dissolution, winding up or liquidation;

(h)    The Lessee is dissolved and liquidation of the Lessee is commenced in accordance with the Lessee's organizational documents and/or the law of the jurisdiction of organization; or

(i)    The Lessee changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

## 9.    REMEDIES ON DEFAULT.

(a)    If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Lessee expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in Exhibit B), the rights of Lessee thereto and shares of

-7-

Lessee therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Lessee to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)　　Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Lessee, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Lessee hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)　　If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Lessee agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)　　The Lessee further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or any other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or any other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Lessee hereby waiving the application of any doctrine of marshaling.

(e)　　The Lessee shall cooperate in any legal and lawful manner necessary or required, to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Lessee's name, place and stead. For this purpose, and to the extent not prohibited by applicable law with respect to Healthcare Assets, Lessee irrevocably appoints the Secured Party, its successors and assigns, as Lessee's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Lessee. This power is coupled with an interest.

## 10.　NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.

(a)　　No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan

Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)     Neither the Lessee nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or any other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

**11.     BINDING EFFECT.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Lessee will bind its heirs, personal representatives and permitted successors and assigns; however, the Lessee may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party.

**12.     GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)     This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements, amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural

and conversely. The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO BORROWER, SECURED PARTY AND LESSEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. LESSEE FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

**13.    TERM OF AGREEMENT.** The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Lessee until the date that all of the Obligations are fully and finally paid and satisfied.

**14.    PERFECTION; FURTHER ASSURANCES.** The Lessee agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof. At any time and from time to time, the Lessee, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Lessee and to name therein the Lessee as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Lessee as debtor and the Secured Party and/or HUD as secured parties. The Lessee hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Lessee, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Lessee and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Lessee under this Agreement. The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Lessee to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and or HUD's interests in the Collateral. Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Lessee's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Lessee will, on Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

**15.    INTEREST.**  Any amounts payable by the Lessee under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Lessee to the Secured Party; however, nothing in this Agreement will be deemed to give to the Lessee the right to withhold payment in consideration of the payment of such interest.

**16.    DELIVERY OF NOTICES.**  All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address).  Notice given in any other manner will not be considered delivered or given unless and until actually received.  A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

**17.    REVIVAL OF SECURITY INTEREST.**  If the Lessee makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

**18.    CLAIMS AGAINST SECURED PARTY.**

(a)    <u>Notification</u>.  The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Lessee shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Lessee alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    <u>Remedies</u>.  If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Lessee as a result thereof.

(c)    <u>Limitations</u>.  In no event, however, shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, for any other damages, including, without limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents.  In no event shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, unless a written

notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

**19.    PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.** Written approval from HUD and Secured Party must be obtained prior to the Lessee's obtaining any accounts receivable financing, as set forth in paragraph (b) of this Section.

(a)    <u>Definitions</u>.  The following words and terms shall have the meanings hereinafter set forth:

"<u>Accounts</u>" shall mean all right, title and interest of the Lessee in and to the following, in each case arising from the Lessee's operation of the Project in the ordinary course of the Lessee's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c).  Notwithstanding the foregoing, "<u>Accounts</u>" do not include accounts rising from the sale of the Lessee's equipment, inventory or other goods, other than accounts arising from the sale of Lessee's inventory in the ordinary course of the Lessee's business.

"<u>Eligible AR Lender</u>" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Lessee.

"<u>Eligible AR Loan</u>" means a loan or line of credit obtained by the Lessee from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"<u>Required Intercreditor Agreement</u>" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender, the Lessee and the Borrower, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    <u>Eligible AR Loan</u>.  Provided that prior written approval of HUD and Secured Party is obtained, the Lessee may obtain and maintain an Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral" (composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

(i)    no more than one Eligible AR Loan shall be maintained at any time;

(ii)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

(iii)    without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

(iv)    with respect to any existing Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

(v)    with respect to any other Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

(vi)    the Eligible AR Loan, the collateral therefor, and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

(vii)    until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s). As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c)    <u>Required Intercreditor Agreement.</u>    Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect. The Lessee shall comply at all times with the Required Intercreditor Agreement then in effect.

(d)    <u>Information.</u>    Lessee shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Lessee regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

## 20.    WAIVERS.

(a)    No act or thing need occur to establish the liability of the Lessee hereunder, and no act or thing, except full payment and discharge of all of the Obligations, shall

in any way exonerate the Lessee or modify, reduce, limit or release the liability of the Lessee hereunder.

(b)    The Lessee will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the Lessee against any Person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

(c)    Whether or not any existing relationship between the Lessee and the Borrower has been changed or ended and whether or not this Agreement has been terminated, the Secured Party may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Obligations without any consent or approval by the Lessee and without any notice to the Lessee. The liability of the Lessee shall not be affected or impaired by any of the following acts or things (which the Secured Party is expressly authorized to do, omit or suffer from time to time, both before and after termination of this Agreement, without notice to or consent or approval by the Lessee): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue Borrower or any other Person liable in respect of any Obligations; (v) any discharge of any evidence of Obligations or the acceptance of any instrument in renewal thereof of substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or any evidence thereof; (ix) any order of application of any payments of credits upon Obligations; (x) any election by Secured Party under §1111(b)(2) of the United States Bankruptcy Code.

(d)    The Lessee waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Obligations, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Lessee will not assert, plead or enforce against Secured Party any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other Person liable in respect of any indebtedness, or any setoff available against Secured Party to Borrower or any such other Person, whether or not on account of a related transaction. The Lessee expressly agrees that the Lessee shall be and remain liable, to the extent of the Collateral, for any deficiency remaining after foreclosure of any security interest securing the Obligations, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

(e)     The Lessee waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing the Obligations. To the extent of the Collateral, this Agreement constitutes an absolute, unlimited, unconditional and continuing guaranty of payment, not collection. The Secured Party shall not be required first to resort for payment of the Obligations to Borrower, or any other Persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Agreement.

(f)     The liability of the Lessee under this Agreement is in addition to and shall be cumulative with all other liabilities of the Lessee to Secured Party as obligor or otherwise, without any limitation as to amount, and all other liabilities of any other Person who guarantees all or any portion of the Obligations, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(g)     This Agreement shall be effective upon delivery to Secured Party, without further act, condition or acceptance by Secured Party. Any invalidity or unenforceability of any provision of application of this Agreement shall not affect other lawful provisions and application hereof, and to this end the provisions of this Agreement are declared to be severable.

(h)     Lessee hereby covenants that this Agreement will not be discharged except by complete performance of the obligations contained in this Agreement. Lessee waives all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of, and reliance on, this Agreement. Lessee further waives all (i) notices of the existence, creation or incurring of new or additional indebtedness, arising either from additional loans extended to Lessee or Borrower, or otherwise, (ii) notices that the principal amount, or any portion thereof (and any interest thereon), of the Loan or any of the other Obligations is due, (iii) notices of any and all proceedings to collect from Lessee and/or Borrower of all or any part of the Obligations, or from anyone else, (iv), to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to Secured Party to secure payment of all or any part of the Obligations, and (v) defenses based on suretyship or impairment of collateral.

## 21.    MISCELLANEOUS.

(a)     This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)     In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)     It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

-15-

(d)     This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Lessee with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents to which Lessee is a party may be amended, altered or changed other than in a writing signed by the Secured Party and the Lessee. The Lessee's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Lessee with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)     This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

## 22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.

(a)    . Lessee and Secured Party hereby agree that HUD shall be an additional secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)     To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF**, the Lessee and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

## COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

**THE LESSEE:**

**SAUCON VALLEY MANOR, INC.,**
a Pennsylvania corporation

By: _____

Name: Nimita Kapoor Atiyeh
Title: President

## COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

### THE SECURED PARTY:

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _____

Name: Christine R. Chandler
Title: Vice President

## EXHIBIT A TO LESSEE SECURITY AGREEMENT

LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1. South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2. North 03' 14'23" West 59.03 feet;

3. North 86' 41'33" East 18.00 feet;

4. North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5. North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6. South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

Exhibit A

## EXHIBIT B TO LESSEE SECURITY AGREEMENT

All of the following described property and interests in property, whether now in existence or hereafter arising, and relating to, situated or located on or used or usable in connection with the maintenance and/or operation of the property described in Exhibit A (hereafter referred to as the "Premises").

(a) All fixtures, furniture, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the Premises, including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, radiators, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment, and fixtures, fans and switchboards; all telephone equipment; all piping, tubing and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not all of the above are now or hereafter acquired or attached to the Premises in any manner;

(b) All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

(c) All rents, leases, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments or money;

(d) All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts, or money;

(e) All land surveys, plans and specifications, drawings, briefs and other work product and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

(f) All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, any nursing home license, assisted living facility license, any and all Medicaid/Medicare Provider Agreements, and any other license necessary for the provision of services at the Premises; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder.

(g) All funds, monies, securities and other property held in escrow, lock boxes, depository or blocked accounts or as reserves and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities or property held in escrow, lock boxes, depository or blocked accounts or as reserves, including, but not limited to, all of Debtor's rights (if any) to any funds or amounts in that certain reserve funds and/or residual receipts accounts created under the Regulatory Agreement required by the Secretary of Housing and Urban Development or the Federal Housing Administration Commissioner;

(h) All accounts, accounts receivable, general intangibles, chattel paper, instruments, documents, inventory, goods, cash, bank accounts, certificates of deposits, securities, insurance policies, letters of credit, deposits, judgments, liens, causes of action, warranties, guaranties and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h).  As used herein, the term "accounts receivable" shall include (i) all healthcare insurance receivables, including, but not limited to Medicaid and Medicare receivables, Veterans Administration or other governmental receivables, private patient receivables, and HMO 10 receivables; (ii) any payments due or to be made to the Debtor relating to the Premises or (iii) all other rights of the Debtor to receive payment of any kind with respect to the Premises;

(i) All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles.

(j) Any and all security or other deposits which have not been forfeited by any tenant under any lease; and

(k) All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, securities, leases, instruments, inventory, documents, deposit accounts or cash.

## EXHIBIT C TO LESSEE SECURITY AGREEMENT

**Other Names Used by Lessee in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Lessee's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*:  None

*Letters of Credit*: None

*Electronic Chattel Paper*: None

*Commercial Tort Claims*: None

*Instruments (including promissory notes)*: None

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g.; operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| | | | |

Note:  Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits.  See Section 2(i) of the Agreement for the Lessee's obligations in this regard.

C-1

**EXHIBIT 4**

### SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (the "Agreement") is made, entered into and dated as of the ___26th___ day of January, 2012 by and between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007**, a trust organized and existing under the laws of the Commonwealth of Pennsylvania, whose principal place of business is located at 1177 Sixth Street, Whitehall, Pennsylvania 18052 ("Debtor"); and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

**A.** Contemporaneously with this Agreement, the Secured Party has made a loan to the Debtor in the maximum principal amount of $15,788,700.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Debtor in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Whitehall Manor Senior Living, FHA Project No. 034-22084 (the "Project") located at 1177 Sixth Street, Whitehall, Pennsylvania 18052, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Project is the subject of the Regulatory Agreement between the Debtor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Regulatory Agreement").

**B.** As security, in part, for the Obligations (as defined below), the Debtor (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage") and (ii) is entering into this Agreement with the Secured Party. The Note, the Mortgage, this Agreement, the Regulatory Agreement and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Debtor to the Secured Party and/or HUD in connection with, or related to, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

**C.** As used herein, "Healthcare Assets" means (i) any and all licenses, permits, and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement), (ii) any and all Medicare and Medicaid provider agreements and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

**Statement of Agreement**

1.    **SECURITY INTEREST; SETOFF.**

        (a)    To secure the full, prompt and complete payment and performance of all Obligations, the Debtor hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Debtor's right, title and interest in and to the property described on Exhibit B attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Debtor to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

        (b)    In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Debtor of, any and all funds, monies, securities and other property held in escrow or for the account of the Debtor pursuant to the Loan Documents, against any amount payable by the Debtor under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Debtor).

        (c)    Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

        (d)    The Debtor hereby assigns and transfers to Secured Party all of Debtor's rights, titles and interests in, to and under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Project and all of Debtor's rights, titles and interests in the collateral described therein.

2.    **REPRESENTATIONS; GENERAL COVENANTS.**

        (a)    To induce the Secured Party to make the Loan, the Debtor promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Debtor has good title to, and is the sole and lawful owner of, the Collateral; (iii) the Debtor has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19 hereof and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security

interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Debtor keeps all tangible Collateral at the Property; (vi) all trade names, assumed names, fictitious names and other names used by the Debtor during the five year period preceding the date of this Agreement are set forth on <u>Exhibit C</u>, and the Debtor has not, during the preceding five year period, except as may be set forth on <u>Exhibit C</u>, acquired any of its assets in any bulk transfer; (vii) Debtor's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Debtor's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Debtor's exact legal name is as set forth in the first paragraph of this Agreement; (x) Debtor's organizational number (if any) as assigned by the State in which Debtor is organized is the number identified as Debtor's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on <u>Exhibit C</u>, the Debtor has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

(b)     Debtor will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any) and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Debtor will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party and Permitted Liens and except to the extent expressly permitted pursuant to Section 19 hereof. The Debtor, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

(c)     The Collateral will only be used by the Debtor in the operation of the Project. Until an Event of Default (as defined below) occurs, the Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Debtor will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Debtor will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Debtor, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in favor of the Secured Party and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will automatically become a part of the Collateral under this Agreement). The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements

or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below. Immediately on demand therefor by the Secured Party, the Debtor will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Debtor will give the Secured Party not less than 30 days prior written notice of any change of (A) Debtor's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Debtor will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Debtor may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Debtor's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Debtor will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Debtor is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Debtor will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Debtor will not merge or consolidate with or into any other Person without the prior written consent of Secured Party.

(i)    The provisions of this Section 2(i) shall only apply in the event that the Debtor operates the Project. As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Debtor with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below). The Debtor will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on <u>Exhibit C</u>) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party consistent with the Debtor's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Debtor, the Secured Party and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to

4

herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Debtor will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Debtor. The Debtor authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Debtor receives no Government Payments, the Debtor will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Debtor will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Debtor shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Debtor shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Debtor in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Debtor that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Debtor will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Debtor shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Debtor to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

3.    **COMPLIANCE WITH LAWS.** The Debtor will comply with the requirements of all valid and applicable federal, state and local laws.

4.    **TAXES; EXPENSES.** The Debtor will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Debtor will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for

preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Debtor to Secured Party under this Section 4 will be paid by the Debtor upon the Secured Party's demand therefor.

**5.    INSPECTION; NOTICES.**    Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Debtor's records pertaining to the Collateral. The Debtor will keep accurate and complete records of the Collateral. The Debtor will give the Secured Party prompt notice of any Event of Default.

**6.    INSURANCE.**    The Debtor will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. In addition, the Debtor will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. The Debtor covenants to pay to the Secured Party, together with monthly payments under the Note, installments on account of the premiums that will next become due and payable on such liability and business interruption insurance, the payment amounts to be determined in the same manner and the payments to be applied in the same priority as specified in the Mortgage with respect to payments of property insurance premiums. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Debtor will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

**7.    DISCHARGE OF LIENS.**    At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Debtor will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

**8.    EVENTS OF DEFAULT.**    Each of the following events or circumstances, whether or not caused by or within the control of the Debtor, will be an "Event of Default" under this Agreement:

(a)    The Debtor does not pay when due any of the Obligations, subject to any grace period provided under the Note;

(b)    The Debtor does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)    A default or breach under any of the Loan Documents (exclusive of this Agreement, which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)    Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Debtor proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)    The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)    There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Debtor, which may materially impair the value of the Collateral or the Project;

(g)    Filing by or against the Debtor of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Debtor's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Debtor without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Debtor for the benefit of creditors, or the Debtor dissolves or is the subject of any dissolution, winding up or liquidation;

(h)    The Debtor is dissolved and liquidation of the Debtor is commenced in accordance with the Debtor's organizational documents and/or the law of the jurisdiction of organization; or

(i)    The Debtor changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

## 9.    REMEDIES ON DEFAULT.

(a)    If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Debtor expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as

defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in <u>Exhibit B</u>), the rights of Debtor thereto and shares of Debtor therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Debtor to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)    Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Debtor, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Debtor hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)    If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Debtor agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)    The Debtor further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Debtor hereby waiving the application of any doctrine of marshaling.

(e)    The Debtor shall cooperate in any legal and lawful manner necessary or required to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Debtor's name, place and stead. For this purpose and to the extent not prohibited by applicable law with respect to Healthcare Assets, Debtor irrevocably appoints the Secured Party, its successors and assigns, as Debtor's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Debtor. This power is coupled with an interest.

**10.    NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.**

(a)   No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)   Neither the Debtor nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

**11.    BINDING EFFECT; JOINT OBLIGATIONS.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Debtor will bind its heirs, personal representatives and permitted successors and assigns; however, the Debtor may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party. If there be more than one Debtor, their obligations, agreements and duties under this Agreement are made jointly and severally.

**12.    GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)   This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by

9

death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements, amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural and conversely. The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO DEBTOR, SECURED PARTY AND DEBTOR EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. DEBTOR FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

13.    **TERM OF AGREEMENT.** The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Debtor until the date that all of the Obligations are fully and finally paid and satisfied.

14.    **PERFECTION; FURTHER ASSURANCES.** The Debtor agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof. At any time and from time to time, the Debtor, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Debtor and to name therein the Debtor as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Debtor as debtor and the Secured Party and/or HUD as secured parties. The Debtor hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Debtor, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Debtor and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Debtor under this Agreement. The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Debtor to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and/or HUD's interests in the Collateral. Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Debtor's rights, titles and interests in deposit

10

accounts, investment property, electronic chattel paper and letter-of-credit rights, the Debtor will, on Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

15.    **INTEREST.** Any amounts payable by the Debtor under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Debtor to the Secured Party; however, nothing in this Agreement will be deemed to give to the Debtor the right to withhold payment in consideration of the payment of such interest.

16.    **DELIVERY OF NOTICES.** All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

17.    **REVIVAL OF SECURITY INTEREST.** If the Debtor makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

18.    **CLAIMS AGAINST SECURED PARTY.**

(a)    <u>Notification</u>.  The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Debtor shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Debtor alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    <u>Remedies</u>.  If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Debtor as a result thereof.

(c)    Limitations. In no event, however, shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, for any other damages, including, without limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents. In no event shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, unless a written notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

**19.    PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.** This Section 19 shall apply when the Debtor operates the Project, and there is no lease of the Premises. In all other instances, there shall be no accounts receivable financing under this Section.

(a)    Definitions. The following words and terms shall have the meanings hereinafter set forth:

"Accounts" shall mean all right, title and interest of the Debtor in and to the following, in each case arising from the Debtor's operation of the Project in the ordinary course of the Debtor's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to, accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c). Notwithstanding the foregoing, "Accounts" do not include accounts rising from the sale of the Debtor's equipment, inventory or other goods, other than accounts arising from the sale of Debtor's inventory in the ordinary course of the Debtor's business.

"Eligible AR Lender" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Debtor.

"Eligible AR Loan" means a loan or line of credit obtained by the Debtor from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"Required Intercreditor Agreement" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender and the Debtor, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    Eligible AR Loan. Subject to the written approval of the Secured Party and HUD, the Debtor may obtain and maintain at any time one, and only one, Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral"

(composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

      (i)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

      (ii)    without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

      (iii)    with respect to any existing Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

      (iv)    with respect to any other Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

      (v)    the Eligible AR Loan, the collateral therefor and all of the terms and conditions thereof. shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

      (vi)    until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s). As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

      (c)    <u>Required Intercreditor Agreement</u>.    Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect. The Debtor shall comply at all times with the Required Intercreditor Agreement then in effect.

      (d)    <u>Information</u>.    Debtor shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Debtor regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of

any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

**20.   PROJECT CAPITAL NEEDS ASSESSMENTS.** Debtor agrees to pay the cost of Project Capital Needs Assessments ("PCNA Reports") that may be required after the date hereof by HUD (for periodic ten (10) year re-evaluation of the amount of deposits to the reserve fund for replacements created under the Regulatory Agreement), the first such report to be obtained on or before October 1, 2018, pursuant to any HUD requirement (including, but not limited to, the commitment issued by HUD to insure the Loan). Without limiting the above obligation, Debtor authorizes Secured Party to make withdrawals for this purpose from the reserve fund for replacements created under the Regulatory Agreement.  The Debtor shall cooperate in any legal and lawful manner necessary to obtain PCNA Reports, including, but not limited to, providing access to the Property and copies of all reports, documents relating to past capital expenditures and any other information reasonably requested by the party preparing the PCNA Reports, the Secured Party and/or HUD.

**21.   MISCELLANEOUS.**

(a)   This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)   In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)   It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

(d)   This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Debtor with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement.  Neither this Agreement nor any of the other Loan Documents may be amended, altered or changed other than in a writing signed by the Secured Party and the Debtor.  The Debtor's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Debtor with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)   This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

**22.   RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.**

(a)   Debtor and Secured Party hereby agree that HUD shall be an additional

secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)    To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF**, the Debtor and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

## COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

**DEBTOR:**

**WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST**
**u/t/a dated August 1, 2007**

By: _____
Abraham R. Atiyeh, Manager

COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

**SECURED PARTY:**

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _____
    Christine R. Chandler, Vice President

17

## EXHIBIT A TO SECURITY AGREEMENT

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.**

**PARCEL ID NO.  5498 9378 8632-1**

**Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.**

## EXHIBIT B TO SECURITY AGREEMENT

All of the following described property and interests in property, whether now owned or existing or hereafter acquired, arising or created:

a.    All fixtures, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the premises described in Exhibit A to this Security Agreement (the "Premises"), including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment (except that telephone equipment leased from a telephone company); all piping, tubing, and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm, and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not the same are now or hereafter attached to the Premises in any manner;

b.    All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

c.    All rents, leases, lease contracts, lease agreements, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

d.    All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

e.      All land surveys, plans and specifications, drawings, briefs and other work product of the Debtor or its employees, contractors or agents, and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

f.      All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, including, but not limited to, nursing home and/or assisted living facility licenses, certificates of need, "bed authority" and Medicare and Medicaid provider agreements; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder;

g.      Any and all funds, monies, securities, and other property held in escrow or as reserves, and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities, or other property held in escrow or as a reserve, including, but not limited to, all of Debtor's rights (if any) to any and all funds or amounts held in reserves or accounts created under the Regulatory Agreement, including, but not limited to, replacement reserve accounts and residual receipts accounts;

h.      All of the Debtor's accounts (including, but not limited to, health-care-insurance receivables and other accounts receivable), general intangibles (including, but not limited to, payment intangibles, tax refunds, tax refund claims and low income housing tax credits, if any, applicable to the Premises), chattel paper (including, but not limited to, tangible chattel paper and electronic chattel paper), leases, lease contracts, lease agreements, instruments, documents, inventory, as-extracted collateral, cash, money, deposit accounts, lock boxes, blocked accounts, certificates of deposit, investment property, insurance policies, letter-of-credit rights, judgments, liens, causes of action, warranties, guaranties, supporting obligations, and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h) or elsewhere in this Exhibit B;

i.      All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically, optically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles;

j.      All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, waters, watercourses, and appurtenances related to or benefiting the Premises, and all rights-of-way, streets, alleys and roads which may have been or in the future may be vacated;

k.      All contracts, options and other agreements for the sale of the Premises or the improvements thereon, entered into by the Debtor now or in the future, including cash or securities or other security deposited to secure performance by the parties of their obligations, and all construction contracts, architectural and engineering agreements and management

contracts now or in the future existing pertaining to the construction, rehabilitation, development, repair, operation, ownership, equipping or management of the Premises;

l. Any and all rights of Debtor in tenant security deposits which have not been forfeited by any tenant under any lease;

m. All names under or by which any part of the Premises may be operated or known, and all trademarks, trade names, and goodwill relating to any part of the Premises;

n. The interest of the Debtor in and to any and all funds and monies created or established and held pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Premises;

o. All rights, titles and interests of the Debtor under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Premises and all of the Debtor's rights, titles and interests in the collateral described therein; and

p. All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, investment property, letter-of-credit rights, leases, lease contracts, lease agreements, instruments, inventory, documents, deposit accounts, supporting obligations or cash proceeds.

## EXHIBIT C TO SECURITY AGREEMENT

**Other Names Used by Debtor in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Debtor's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*:  **None**

*Letters of Credit*: **None**

*Electronic Chattel Paper*: **None**

*Commercial Tort Claims*: **None**

*Instruments (including promissory notes)*: **None**

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g., operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| None | | | |

Note: Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits. See Section 2(i) of the Agreement for the Debtor's obligations in this regard.

## LESSEE SECURITY AGREEMENT

**THIS LESSEE SECURITY AGREEMENT** (the "Agreement") is made, entered into and dated as of the  26th  day of January, 2012, by and between **WHITEHALL MANOR, INC.**, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, whose principal place of business is located at 1177 Sixth Street, Whitehall, Pennsylvania 18052 (the "Lessee" or "Debtor"); and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

**A.**     Contemporaneously with this Agreement, the Secured Party has made a loan to Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust u/t/a dated August 1, 2007 (the "Borrower") in the maximum principal amount of $15,788,700.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Borrower in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Whitehall Manor Senior Living, FHA Project No. 034-22084 (the "Project") located at 1177 Sixth Street, Whitehall, Pennsylvania 18052, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Premises are leased to the Lessee by the Borrower pursuant to a Lease Agreement dated on or about August, 2008, as amended by a First Amendment to Lease Agreement dated as of January 1, 2010 and a Second Amendment to Lease Agreement dated as of January 1, 2012 (collectively, the "Lease"), and are the subject of the Regulatory Agreement Nursing Homes between the Lessee and the Federal Housing Commissioner, dated as of even date herewith (the "Regulatory Agreement Nursing Homes").

**B.**     As security, in part, for the Obligations (as defined below), the Borrower (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage"), (ii) entered into a Security Agreement, dated as of even date herewith, with the Secured Party (the "Borrower Security Agreement") and (iii) entered into a Regulatory Agreement with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Borrower Regulatory Agreement"). As additional security, the Lessee has entered into this Agreement with the Secured Party. The Note, the Mortgage, the Borrower Security Agreement, the Borrower Regulatory Agreement, this Agreement, the Regulatory Agreement Nursing Homes and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Borrower to the Secured Party and/or HUD, or by or on behalf of the Lessee to the Secured Party and/or HUD, in connection with, or related to, the Lease, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

**C.**    The Lessee is affiliated with and/or shares common ownership with the Borrower, and shall benefit directly from the making of the Loan.

**D.**    As used herein, "Healthcare Assets" means (i) any and all licenses, permits and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement Nursing Homes), (ii) any and all Medicare and Medicaid provider agreements, and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

<u>**Statement of Agreement**</u>

**1.    SECURITY INTEREST; SETOFF.**

(a)    To secure the full, prompt and complete payment and performance of all Obligations, the Lessee hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Lessee's right, title and interest in and to the property described on <u>Exhibit B</u> attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Borrower and/or the Lessee to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

(b)    In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Borrower and/or Lessee of, any and all funds, monies, securities and other property held in escrow or for the account of the Borrower and/or the Lessee pursuant to the Loan Documents, against any amount payable by the Borrower and/or the Lessee under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Lessee).

(c)    Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

**2.    REPRESENTATIONS; GENERAL COVENANTS.**

(a)    To induce the Secured Party to make the Loan, the Lessee promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Lessee has good title to, and is the sole and lawful owner of, the

-2-

Collateral; (iii) the Lessee has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19 hereof, rights granted to the Borrower under the Lease, if any, which are subordinate to the liens in favor of the Secured Party ("Subordinate Lease Rights") and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Lessee keeps all tangible Collateral at the Premises; (vi) all trade names, assumed names, fictitious names and other names used by the Lessee during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Lessee has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Lessee's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Lessee's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Lessee's exact legal name is as set forth in the first paragraph of this Agreement; (x) Lessee's organizational number (if any) as assigned by the State in which Lessee is organized is the number identified as Lessee's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Lessee has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

(b)     The Lessee will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any), and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Lessee will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party, Permitted Liens, and Subordinate Lease Rights, and except to the extent expressly permitted pursuant to Section 19 hereof. The Lessee, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

(c)     The Collateral will only be used by the Lessee in the operation of the Project. Until an Event of Default (as defined below) occurs, the Lessee may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Lessee will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Lessee will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Lessee, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in

-3-

favor of the Secured Party and Subordinate Lease Rights and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will automatically become a part of the Collateral under this Agreement). The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below. Immediately on demand therefor by the Secured Party, the Lessee will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Lessee will give the Secured Party not less than 30 days prior written notice of any change of (A) Lessee's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Lessee will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Lessee may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Lessee's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Lessee will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Lessee is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Lessee will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of the Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Lessee will not merge or consolidate with or into any other Person without the prior written consent of the Secured Party.

(i)    As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Lessee with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below). The Lessee will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on Exhibit C) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party

consistent with the Lessee's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Lessee, the Secured Party and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Lessee will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Lessee. The Lessee authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Lessee receives no Government Payments, the Lessee will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Lessee will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Lessee shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Lessee shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Lessee in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Lessee that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Lessee will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Lessee shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Lessee to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

   **3.    COMPLIANCE WITH LAWS.** The Lessee will comply with the requirements of all valid and applicable federal, state and local laws.

**4.    TAXES; EXPENSES.**  Lessee will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Lessee will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Lessee to Secured Party under this Section 4 will be paid by the Lessee upon the Secured Party's demand therefor.

**5.    INSPECTION; NOTICES.**  Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Lessee's records pertaining to the Collateral. The Lessee will keep accurate and complete records of the Collateral. The Lessee will give the Secured Party prompt notice of any Event of Default.

**6.    INSURANCE.**  The Lessee will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. The Lessee will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Lessee will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

**7.    DISCHARGE OF LIENS.**  At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Lessee will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

**8.    EVENTS OF DEFAULT.**  Each of the following events or circumstances, whether or not caused by or within the control of the Lessee, will be an "Event of Default" under this Agreement:

(a) The Lessee does not pay when due any of the Obligations, subject to any grace period provided under the Note;

(b) The Lessee does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c) A default or breach under the Lease or under any of the Loan Documents (exclusive of this Agreement which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d) Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Lessee proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e) The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f) There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Lessee or the Borrower, which may materially impair the value of the Collateral or the Project;

(g) Filing by or against the Lessee of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Lessee's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Lessee without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Lessee for the benefit of creditors, or the Lessee dissolves or is the subject of any dissolution, winding up or liquidation;

(h) The Lessee is dissolved and liquidation of the Lessee is commenced in accordance with the Lessee's organizational documents and/or the law of the jurisdiction of organization; or

(i) The Lessee changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

## 9.    REMEDIES ON DEFAULT.

(a) If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Lessee expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as

defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in Exhibit B), the rights of Lessee thereto and shares of Lessee therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Lessee to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)     Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Lessee, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Lessee hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)     If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Lessee agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)     The Lessee further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or any other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or any other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Lessee hereby waiving the application of any doctrine of marshaling.

(e)     The Lessee shall cooperate in any legal and lawful manner necessary or required, to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Lessee's name, place and stead. For this purpose, and to the extent not prohibited by applicable law with respect to Healthcare Assets, Lessee irrevocably appoints the Secured Party, its successors and assigns, as Lessee's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Lessee. This power is coupled with an interest.

**10.    NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.**

(a)    No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)    Neither the Lessee nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or any other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

**11.    BINDING EFFECT.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Lessee will bind its heirs, personal representatives and permitted successors and assigns; however, the Lessee may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party.

**12.    GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)    This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements,

amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural and conversely. The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO BORROWER, SECURED PARTY AND LESSEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. LESSEE FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

13.    **TERM OF AGREEMENT.** The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Lessee until the date that all of the Obligations are fully and finally paid and satisfied.

14.    **PERFECTION; FURTHER ASSURANCES.** The Lessee agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof. At any time and from time to time, the Lessee, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Lessee and to name therein the Lessee as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Lessee as debtor and the Secured Party and/or HUD as secured parties. The Lessee hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Lessee, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Lessee and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Lessee under this Agreement. The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Lessee to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and or HUD's interests in the Collateral. Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Lessee's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Lessee will, on

-10-

Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

**15.    INTEREST.** Any amounts payable by the Lessee under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Lessee to the Secured Party; however, nothing in this Agreement will be deemed to give to the Lessee the right to withhold payment in consideration of the payment of such interest.

**16.    DELIVERY OF NOTICES.** All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

**17.    REVIVAL OF SECURITY INTEREST.** If the Lessee makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

**18.    CLAIMS AGAINST SECURED PARTY.**

(a)    _Notification._ The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Lessee shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Lessee alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    _Remedies._ If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Lessee as a result thereof.

(c)    _Limitations._ In no event, however, shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, for any other damages, including, without

limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents. In no event shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, unless a written notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

### 19.    PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.

(a)    <u>Definitions</u>.   The following words and terms shall have the meanings hereinafter set forth:

"<u>Accounts</u>" shall mean all right, title and interest of the Lessee in and to the following, in each case arising from the Lessee's operation of the Project in the ordinary course of the Lessee's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c). Notwithstanding the foregoing, "<u>Accounts</u>" do not include accounts rising from the sale of the Lessee's equipment, inventory or other goods, other than accounts arising from the sale of Lessee's inventory in the ordinary course of the Lessee's business.

"<u>Eligible AR Lender</u>" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Lessee.

"<u>Eligible AR Loan</u>" means a loan or line of credit obtained by the Lessee from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"<u>Required Intercreditor Agreement</u>" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender, the Lessee and the Borrower, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    <u>Eligible AR Loan</u>.   Subject to the written approval of Secured Party and HUD, the Lessee may obtain and maintain at any time one, and only one, Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral" (composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

(i)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

(ii)     without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

(iii)    with respect to any existing Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

(iv)    with respect to any other Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

(v)     the Eligible AR Loan, the collateral therefor and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

(vi)    until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s). As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c)     <u>Required Intercreditor Agreement</u>.    Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect. The Lessee shall comply at all times with the Required Intercreditor Agreement then in effect.

(d)     <u>Information</u>. Lessee shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Lessee regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

20.     **WAIVERS.**

(a)     No act or thing need occur to establish the liability of the Lessee hereunder, and no act or thing, except full payment and discharge of all of the Obligations, shall

-13-

in any way exonerate the Lessee or modify, reduce, limit or release the liability of the Lessee hereunder.

(b)    The Lessee will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the Lessee against any Person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

(c)    Whether or not any existing relationship between the Lessee and the Borrower has been changed or ended and whether or not this Agreement has been terminated, the Secured Party may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Obligations without any consent or approval by the Lessee and without any notice to the Lessee.  The liability of the Lessee shall not be affected or impaired by any of the following acts or things (which the Secured Party is expressly authorized to do, omit or suffer from time to time, both before and after termination of this Agreement, without notice to or consent or approval by the Lessee): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue Borrower or any other Person liable in respect of any Obligations; (v) any discharge of any evidence of Obligations or the acceptance of any instrument in renewal thereof of substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or any evidence thereof; (ix) any order of application of any payments of credits upon Obligations; (x) any election by Secured Party under §1111(b)(2) of the United States Bankruptcy Code.

(d)    The Lessee waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Obligations, except the defense of discharge by payment in full.  Without limiting the generality of the foregoing, the Lessee will not assert, plead or enforce against Secured Party any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other Person liable in respect of any indebtedness, or any setoff available against Secured Party to Borrower or any such other Person, whether or not on account of a related transaction.  The Lessee expressly agrees that the Lessee shall be and remain liable, to the extent of the Collateral, for any deficiency remaining after foreclosure of any security interest securing the Obligations, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

(e)    The Lessee waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing the Obligations. To the extent of the Collateral, this Agreement constitutes an absolute, unlimited, unconditional and continuing guaranty of payment, not collection. The Secured Party shall not be required first to resort for payment of the Obligations to Borrower, or any other Persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Agreement.

(f)    The liability of the Lessee under this Agreement is in addition to and shall be cumulative with all other liabilities of the Lessee to Secured Party as obligor or otherwise, without any limitation as to amount, and all other liabilities of any other Person who guarantees all or any portion of the Obligations, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(g)    This Agreement shall be effective upon delivery to Secured Party, without further act, condition or acceptance by Secured Party. Any invalidity or unenforceability of any provision of application of this Agreement shall not affect other lawful provisions and application hereof, and to this end the provisions of this Agreement are declared to be severable.

(h)    Lessee hereby covenants that this Agreement will not be discharged except by complete performance of the obligations contained in this Agreement. Lessee waives all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of, and reliance on, this Agreement. Lessee further waives all (i) notices of the existence, creation or incurring of new or additional indebtedness, arising either from additional loans extended to Lessee or Borrower, or otherwise, (ii) notices that the principal amount, or any portion thereof (and any interest thereon), of the Loan or any of the other Obligations is due, (iii) notices of any and all proceedings to collect from Lessee and/or Borrower of all or any part of the Obligations, or from anyone else, (iv), to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to Secured Party to secure payment of all or any part of the Obligations, and (v) defenses based on suretyship or impairment of collateral.

## 21.    MISCELLANEOUS.

(a)    This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)    In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)    It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.