No. 25-1899

# United States Court of Appeals

## FOR THE THIRD CIRCUIT



**WHITEHALL FIDUCIARY LLC, AS TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007, AND SAUCON VALLEY TRUST U/T/A DATED AUGUST 1, 2007,**
*Appellants,*

*v.*

**LEHIGH VALLEY 1 LLC, SUCCESSOR BY ASSIGNMENT TO WINDSTREAM CAPITAL LLC, SUCCESSOR BY ASSIGNMENT TO THE UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, SUCCESSOR BY ASSIGNMENT TO M&T REALTY CAPITAL CORPORATION,**
*Appellee.*

_____

### MOTION TO STAY DISTRICT
### COURT ORDER APPOINTING RECEIVERS

Appellees, Whitehall Fiduciary, LLC as Trustee of Whitehall Trust U/T/A Dated August 1, 2007 ("Whitehall") and Saucon Trust, U/T/A Dated October 1, 2007 ("Saucon") move the Court to stay the District Court's Order Appointing Receivers, pending the Court's decision on Appellants appeal of the District Court's order granting the Motions of Appellant, Lehigh Valley 1 LLC ("Appellant" or "LV1") for the Appointment of Receivers.

## I.    <u>JURISDICTION TO CONSIDER MOTION TO STAY</u>

Rule 8(a)(2) of the Federal Rules of Appellate Procedure permits a party to move a Court of Appeals to stay the judgment or order of a district court pending appeal.  While a party "must ordinarily move first in the district court for. . . a stay of the judgment or order of a district court pending appeal," a Circuit Court will consider a motion to stay a district court judgment or order pending appeal if the moving party shows either: (1) moving for a stay before a district court is impracticable; or (2) that a district court considered a motion to stay a judgment or order of the district court, but denied or failed to afford the relief requested.  Fed. R. App. P. 8(a)(2).

Here, Appellants first moved the District Court to stay its Order granting Appellee's Motions to Appoint Receivers.  <u>See</u> Ex. A, Order of the District Court Granting Motions to Appoint Receivers; <u>see</u> <u>also</u> Ex. B, Opinion of District Court Granting Motions to Appoint Receivers; Ex. C, Order of the District Court Denying Appellants' Motion to Stay Order Granting Motions to Appoint Receivers.  The District Court, however, denied Appellants' request.  <u>See</u> Ex. C.

## II.    <u>DECISION OF THE DISTRICT COURT</u>

On June 9, 2025, the District Court denied Appellants' Motion to Stay the District Court's order appointing a receiver for each of the Properties (the same receiver was appointed for both Properties) until this Court renders its decision on

appeal. Id.  The District Court's decision was premised on assumptions, innuendos, and on conclusions lacking any factual support.  The District Court stated the factors Appellants were required to prove for the grant of a stay but did little to analyze those factors.  See Ex. C (citing Republic of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991)).

The District Court first found that Appellants did not establish a likelihood of success of the appeal before this Court.  Id.  The District Court did not elaborate further, nor did the District Court conduct any cognizable analysis.  Id.

Second, the District Court reviewed the question of irreparable harm absent a stay upon Appellants and if a stay was granted, upon Appellee.  Id.  The District Court dismissed Appellants' arguments and unfairly minimized the serious impact on Appellants absent a stay and failed to even consider the fact that the impact on Appellants is not economic, but core to reputation, corporate existence, and good will—each of which lacks a monetary remedy.  Id.  As for Appellee, the District Court relied only on the economic interests that are easily remedied through monetary means.  Id.

Finally, the District Court, erroneously and without any factual support, held that public interest would not be served without a receiver.  This finding lacked any logic as the Lessees of both Properties were and are serving hundreds of seniors with

licensed and high-quality memory and health care as licensed providers.  Further,

Appellee did not raise one <u>real</u> public concern that was ever at issue or then at issue.

## III.   <u>FACTUAL HISTORY</u>

Appellants are the owners of property located at 1177 6th Street, Whitehall,

Pennsylvania (the "<u>Whitehall Property</u>") and a property located at 1050 Main Street,

Hellertown, Pennsylvania (the "<u>Saucon Property</u>"), respectively.  <u>See</u> Ex. B. The

Whitehall and Saucon Properties currently and historically have operated (through

Tenant Operators) as nursing care facilities, each with memory care components. <u>Id</u>.

The Tenant Operators are licensed through the Commonwealth and subject to

various regulations for continued operation.  The Tenant Operators have maintained

licensure and continued operations during the pendency of the State Court Cases and

the pending litigation. <u>Id</u>.

Appellants entered into mortgage loan transactions with M&T Realty Capital

Corporation ("<u>M&T</u>") that were insured by the United States Department of Housing

and Urban Development ("<u>HUD</u>") pursuant to Section 232 of the National Housing

Act ("<u>NHA</u>"), 12 U.S.C. § 1701 et seq.   In connection with the aforesaid loan

transactions, Appellants entered into Regulatory Agreements with HUD (the

"<u>Regulatory Agreements</u>").   For each Appellant, M&T was the lender, and HUD

agreed to insure the loans, and each Appellant was obligated to maintain compliance

with federal and state regulations governing nursing home facilities on the respective

properties. Pursuant to the Regulatory Agreements, in the event that either Appellant was unable to make a scheduled mortgage payment, HUD had discretion to authorize M&T to draw funds from an established reserve account to prevent a default. In fact, HUD exercised this discretion multiple times during the COVID-19 pandemic to preserve loan performance.

Commencing in 2020, as a direct result of the COVID-19 pandemic, the Tenant Operators experienced significant financial hardship due to increased costs of personal protective equipment and restrictions on evicting non-paying residents. This directly impacted both Appellants' cash flows and their ability to service their respective mortgage loans.

Appellants pursued options under the CARES Act and Emergency Declarations issued by then-President Donald J. Trump, which included a forbearance on mortgage payments for federally backed loans. They also requested that HUD continue drawing payments from the reserve accounts, which contained substantial sums previously deposited by the Appellants. Initially, HUD complied, making three payments from each reserve account during the crisis. However, without prior notice and despite the continued insurance of the loans under Section 232, HUD abruptly ceased making payments from the reserve accounts. This marked a material deviation from past practice and precipitated purported defaults under the mortgage loans.

Despite numerous attempts by Appellants to engage HUD in good-faith discussions or negotiate workout agreements, HUD refused. Instead, in July 2023, HUD notified Appellants of HUD's intent to sell the Mortgage Loans at auction, prohibiting Appellants or their affiliates from participating. At the same time, HUD improperly depleted the reserve accounts to reduce the balances due, without applying such funds toward a cure of the alleged defaults.

HUD ultimately sold the Whitehall and Saucon Property Mortgage Loans to Windstream Capital, LLC ("Windstream"), closing the sale in September 2023. On October 5, 2023, Windstream notified each Appellant of the assignments and immediately commenced the proceedings in the Courts of the Commonwealth of Pennsylvania with the intention of foreclosing on the Whitehall and Saucon Properties.

On May 15, 2024, the loans were further assigned to Appellee for the sole purpose of establishing diversity jurisdiction and commencing foreclosure proceedings in the Eastern District of Pennsylvania.  During this time, Tenant Operators maintained continuous operations and remained in compliance with federal and state regulations related to the operation of nursing care facilities.  At no time have Appellants or Tenant Operators been notified of any default of Tenant Operators obligations related to the operation of the nursing care facilities.  In addition, Whitehall and Saucon Properties have maintained continuous insurance

coverage and are not subject to any adverse action by any taxing authority due to non-payment of real estate taxes.

Notwithstanding the foregoing, Appellee immediately filed Motions to Appoint a Receiver for both Whitehall and Saucon Properties (the "Properties"), prior to the exchange of any discovery and without any evidence of any threat to the properties. As set forth herein, the District Court's grant of Appellee's Motions to Appoint a Receiver was unsupported, premature and over-reaching and must be overturned.

## IV.   **PROCEDURAL HISTORY**

Appellee's predecessor, Windstream, initially commenced litigation to foreclose on the Whitehall and Saucon Properties, through alleged confessions of judgment, before the Courts of the Commonwealth of Pennsylvania shortly after purchasing the notes in 2023. Appellants contested the alleged confessions of judgments. Arguments were held before the Court of Common Pleas for Lehigh County as to the Whitehall Property and the Court of Common Pleas for Northampton County as to the Saucon Property. Both Courts ordered that Windstream's confessed judgments be stricken. Thereafter, Windstream assigned

the loans to the Appellee and Appellee initiated the underlying action in the Eastern District of Pennsylvania on June 14, 2024.[1]

Appellee filed Amended Complaints in response to Appellants' Motions to Dismiss and immediately, before Appellants filed Answers to the Amended Complaint and before any discovery was conducted, Appellee also filed Motions to Appoint Receivers for both the Whitehall and Saucon Properties.  Appellants filed Motions to Dismiss the Amended Complaints, which were ultimately denied by the District Court.  Appellants also opposed the Motions to Appoint a Receiver.

Oral arguments on the Motions to Appoint Receivers were held and an Order granting the Motions to Appoint Receivers was entered on May 2, 2025.  Notice of Appeal of the Order was filed on the same day before this Court.

## V.    STANDARD OF REVIEW

When evaluating requests to stay certain proceedings or orders, the Court considers "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest." Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 562 F.3d 553, 556 (3d Cir.2009).

---

[1] Appellee commenced two civil proceedings, one for each Appellant.  Those matters were later consolidated and are now proceeding under the same docket.

## VI.  <u>ARGUMENT</u>

### A.  APPELLANTS ARE LIKELY TO SUCEED ON THE MERITS.

Appellants are likely to succeed on the merits of the appeal of the order appointing a receiver.

1.  <u>The Factors the District Court Considered and Its Incorrect Analysis of Those Factors.</u>

The "appointment of a receiver is an extraordinary, a drastic and … an 'heroic' remedy." <u>KeyBank Nat'l Ass'n v. Fleetway Leasing Co.</u>, 781 F. App'x 119, 122 (3d Cir. 2019) (quoting <u>Maxwell v. Enter. Wall Paper Mfg. Co.</u>, 131 F.2d 400, 403 (3d Cir. 1942)). <u>Rule</u> 66 of the <u>Federal Rule of Civil Procedure</u> mandates that "the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule." Fed. R. Civ. P. 66.  Because federal receivership is a creation of the federal civil rules, in diversity actions, courts must follow federal rather than state law.  <u>Midwest Bank v. Goldsmith</u>, 467 F. Supp. 3d 242, 248 (M.D. Pa. 2020).

In the Third Circuit, there is no precise formula for deciding whether to appoint a receiver, but district courts analyze the following factors: (1) whether the property is adequate security for the loan, (2) whether the mortgage contract allows a receiver to be appointed, (3) whether the mortgagor is in default, (4) whether it is probable that default will be delayed, (5) whether the mortgagor is financially stable,

and (6) whether the mortgagor has misused project funds.  <u>Wells Fargo Bank, N.A.</u>

<u>v. CCC Atl., LLC,</u> 905 F. Supp. 2d 604, 614 (D.N.J. 2012).  Additionally, where a

lender seeks to appoint a receiver who will "not only collect rents and profits but

will also manage and operate the mortgaged property pending foreclosure," courts

consider additional factors.  <u>Id</u>.  These additional factors include (1) whether there

is a danger of waste, (2) whether the mortgagor has engaged in fraud, whether there

is imminent danger of loss of the property, (3) whether the plaintiff will suffer more

harm through lack of a receiver than the defendant or other parties will suffer from

the appointment of a receiver, and (4) whether the plaintiff will probably succeed in

the underlying action.  <u>Id</u>.

Here, when deciding whether to appoint a receiver, the District Court

considered the following factors, in turn:

a) the presence of a contractual provision for receivership;
b) Appellee's likelihood of success in a foreclosure action;
c) Appellants' financial health/status;
d) potential diminution of value in the subject properties;
e) the inadequacy of other legal remedies;
f) the balance of interests, and;
g) various other factors, including misuse of project funds by Appellees, inadequacy of security for the loan, and presence of fraudulent activity.

<u>See generally</u> Ex. B.

It is clear, however, from the opinion of the District Court that the Court only truly considered two factors – the contractual provision and Appellants' default.  Ex. B at 6.  The Court, without significant analysis, found that there was no evidence of misuse of project funds, inadequacy of security, or fraudulent activity.  Id.  After analyzing the contract provision factor, the Court below determined that while that factor weighed in favor of receivership, the other factors were still relevant of consideration.  For each of the remaining factors which the Court analyzed, the overriding consideration was the default, which, according to the Court's logic, raised the possibility of the threatened harm.  Because the threatened harm of each factor was possible, according to the District Court, that factor weighed in favor of receivership.

### a.  Contractual Provision

The first factor that the District Court examined was the contractual provisions allowing for the appointment of a receiver in the event of a default.  As the District Court correctly noted, this factor is worthy of consideration, but it is not dispositive.  Ex. B at 4.  However, the contractual clauses at issue are significantly more limited than the expansive receivership that the District Court established.

As the District Court noted, the mortgages attached to the properties have receivership clauses.  These clauses state that "the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a Receiver of the rents and

profits of the mortgaged premises as a matter of right and without notice, with power to collect the rents, issues, and profits of said mortgaged premises." Id.  Essentially, in the event of default and foreclosure, the holder of the mortgage is entitled to appointment of a receiver who collect the "rents, issues, and profits" of the properties.  This receivership clause, however, does not allow the creditor to control the Appellants' businesses, let alone to interfere with the operations of the tenants who are operating health facilities at the property.

By contrast, the District Court appointed a receiver with breathtaking authority.  Rather than merely appointing a receiver who could collect the income from the properties, the District Court appointed a receiver with no fewer than 30 individual powers, including but not limited to the power to take possession of the property, to use the office and equipment at the properties, "to take all actions necessary to preserve, maintain, operate, and manage the Property," to modify or terminate existing agreements including leases between Appellants and their tenants and other third parties, to review mail directed to the Appellants, and to borrow money from Appellee and establish a new secured lien in favor of Appellee on the properties. Ex. B at 4-10.

The District Court's error of analysis here is patent.  The District Court flatly found that the existence of a contractual provision favored appointment of a receiver but then appointed a receiver with powers expanding far beyond the contractual

provision.  The District Court would have been correct that this factor favors appointing a receiver <u>but only if the District Court had appointed a receiver within the contemplated limits of the mortgages</u>.  For the District Court to appoint a receiver with broader powers than contemplated by the mortgages, the District Court should have found that the lack of such broad receivership provisions counseled <u>against</u> the appointment of a receiver.

In <u>Manufacturers & Traders Tr. Co. v. Minuteman Spill Response, Inc.</u>, 999 F. Supp. 2d 805 (W.D. Pa. 2013), a District Court confronted a situation where a creditor and a debtor had a contractual clause allowing appointment of a receiver. However, the creditor, rather than seeking a receiver merely to "manage or collect rents from the mortgaged properties," sought instead an expansive appointment which would have allowed the receiver to "<u>take possession and control of Defendants and their assets and operations.</u>"  <u>Id</u>. at 826-27 (emphasis in original). As the court explained, "[b]ecause [the creditor] seeks a receiver to control the entire business operation … the Court finds that the mortgage documents are inapposite to this case."  <u>Id</u>. at 827.

Similarly, here, the District Court should not have found that the mortgage document is controlling where the party seeking the receiver sought a receiver with powers far beyond the mortgage the receivership provisions in the mortgage.  As other courts in this circuit have noted, in the absence of an applicable contractual

provision, the party seeking receivership must rely only on equitable considerations. The "importance of these contractual provisions cannot be underestimated because they set apart this commercial foreclosure case from the traditional scenario in which a receiver is sought at equity and no such contractual provisions exist." Wells Fargo Bank, N.A. v. CCC Atl., LLC, 905 F. Supp. 2d 604, 615 (D.N.J. 2012). The District Court's application of an extremely limited contractual provision to the broad receivership which was ultimately applied was error. The Court should have considered this factor to weigh not only against appointment of a receiver, but heavily against.

### b. *Likelihood of Success*

Another important factor for a court to consider in deciding whether to appoint a receiver is whether the party seeking the appointment has a likelihood of success on the merits of their foreclosure claim. However, to conduct this analysis, a court must not only consider the relevant legal principles but also weigh the available defenses. "In determining whether success is likely, the Court must look to the legal principles controlling the claim and the potential defenses available to the opposing party." Ecosave Automation, Inc. v. Delaware Valley Automation, LLC, 540 F. Supp. 3d 491, 499–500 (E.D. Pa. 2021) (emphasis added).

Here, however, the District Court's analysis began and ended with the fact that the Appellants were behind on their mortgage payments: "[t]he continuing

failure of both Whitehall and Saucon to make monthly mortgage payments shows that [Appellee] is likely to succeed on its mortgage foreclosure claims." Ex. B at 6-7.  According to the District Court, this prima facie showing that the Appellee could make their affirmative case was dispositive of this factor.  Id.  The District Court did not engage in any analysis of the defenses raised by Appellants.  Id.

But the Appellants have raised defenses, in both the case below and in the related state-court cases which cast grave doubt on the Appellees ultimate success.  Among other defenses raised by the Appellants were that the security interests which allow repossession were properly assigned to the Appellee.  See Ex. D, Excerpts of Transcripts, Date of Hearing: Feb. 13, 2025; see also Ex. E, Excerpts of Transcripts, Date of Hearing: Feb. 18, 2025.  Appellants also challenged federal subject matter jurisdiction, and the standing of the Appellees.  Further, Appellants brought counterclaims against Appellee and a third-party complaint against HUD.  Id.  The District Court did not consider either.  Although the District Court properly recognized that it would have been premature to make an actual merit ruling, the Court simply did not consider whether any of the Appellants' defenses, counter claim, and third-party complaint could prevail.

These defenses were raised in the Appellants' Answer to the Amended Complaint as well as at oral argument on the Motion at issue.  See generally Ex. B; see also generally Exs. D, E.  At oral argument, Counsel for Appellants repeatedly

asserted that those defenses would be meritorious and thus counseled against the appointment of a receiver.  <u>See</u> Exs. D, E.

But the District Court did not consider any of Appellants' defenses, counter claims, or third-party complaint.  Beyond being an error, this is prejudicial to the Appellants.  Had the District Court done so, Appellants could attempt to argue about why the District Court's analysis was in error.  But here, there is simply no analysis on this key issue.  Without considering the defenses raised by the Appellants, the counter claims, or the third-party complaint, the District Court should have weighed this factor as neutral at most.

c.  *Financial Health/Status*

Here, once again, the District Court's analysis was one-dimensional. According to the District Court, Appellants were in default, and therefore in poor financial health, and thus in need of a receiver.  <u>See</u> Ex. B at 7-9.  For this factor, the District Court did consider other evidence, but misconstrued evidence which tends to favor the Appellants as favoring the Appellees.  <u>Id</u>.  That is, evidence that Appellants had recently freed themselves from tax and municipal liens was taken as evidence not of improving financial health but of a deteriorating condition.

The District Court applied the following syllogism: the Appellants were in default, financial statements from 2021 indicated the Appellants' poor financial health, and the Appellants had recently been under tax and municipal liens, therefore

the Appellants are in poor financial health now.  Id.  Even beyond the fact that the District Court never considered that Appellants, as so many businesses suffered from economic troubles during COVID and is now improving, it is clear that the final premise was misapplied.  Removing the liens demonstrates an _improving_ financial outlook, and this should have given the court pause.  The District Court noted that the Appellants sought discovery to bring to the court's attention more recent financial statements but concluded that that would not be necessary because Appellants were in default: "Defendants continued failure to make monthly payments on the Mortgages is further evidence of their financial positions."  Ex. B at 8.  In sum, once again, rather than fully analyzing this factor, the District Court considered only that Appellants were in default, and found this factor weighed in favor of appointing a receiver.  Without discovery or some kind of evidentiary hearing which could bolster this conclusion, this factor should have been neutral.

    *d. Diminution of Value*

    Here, the District Court flatly stated that "[t]here is no question that [Appellee] has grounds to be concerned about a possible diminution of the value of its collateral."  Id. at 9.  First, this fundamentally misstates the standard, which is not that grounds merely exist that give rise to concerns about "possible" diminution of value.  Rather, the standard requires "_imminent danger_ that property [will] be lost, concealed, injured, diminished in value, or squandered."  CCC Atl., 905 F. Supp. 2d

at 614 (first emphasis added; second alteration in original) (quoting <u>Chase Manhattan Bank, N. A. v. Turabo Shopping Ctr., Inc.</u>, 683 F.2d 25, 26–27 (1st Cir. 1982)).  Although there is little case law explaining what "imminent danger" means in the specific context of receivership, case law regarding imminent danger in the broader equitable context makes clear that "grounds for concern" about "possible" danger does not constitute "imminent danger."  "[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of <u>immediate</u> irreparable harm.'" <u>Campbell Soup Co. v. ConAgra, Inc.</u>, 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in original) (quoting <u>Hohe v. Casey</u>, 868 F.2d 69, 72 (3d Cir. 1989)).

It is clear from the District Court's opinion that the Court was not focused on actual, imminent and particularized harm, but rather was focused on potential, speculative harm.  <u>See</u> Ex. B at 9.  However, and second, even had the District Court focused on real harm rather than grounds for potential concern, the Court still did not properly analyze the question.  <u>Id</u>.  This is because the only evidence that the Court considered was the lack of evidence concerning "the status of any leases that the entities have entered, how much rent is being collected, if the taxes are paid and up to date, if there are unpaid bills, if the Properties are insured or if there are liens entered against the Properties."  <u>Id</u>.  But this turns the standard on its head: rather than requiring the party seeking a receiver to produce evidence that a receiver is

needed, the District Court inferred from the default that all other factors, including the imminent danger factor, and required Appellants to provide evidence that a receiver was not needed. That the Court did not weigh and analyze the available evidence manifests the backwardness of the analysis. This was in error.

e. *Inadequate Legal Remedy*

The District Court's analysis of this factor mirrors the court's analysis of the diminution of value question. <u>See</u> Ex. B at 9. The court stated that "[Appellee] has shown that the defaults of Whitehall and Saucon may be decreasing the value of [Appellee's] collateral." <u>Id</u>. This is, as above, the same speculation that the District Court used to conclude that there was "imminent" harm of diminution of value. And once again, the Court relies heavily on the lack of evidence which might show that a receiver is unnecessary. After stating that Appellants failed to provide evidence of payment of taxes and insurance, the Court stated that this represents a "risk that the value of the collateral will decrease." <u>Id</u>.

This logic is faulty because it is simply a replay of the foregoing diminution factor. According to this logic, if a debtor is in default, there is obvious potential for diminution, which, extended to the next logical step, lessens the creditor's potential remedy in foreclosure. Once again, the only truly necessary factor is the debtor's default. This gives short shrift to the crux if this factor, which is not to determine whether the debtor is in default, but to determine whether foreclosure (or some other

action for damages) could make the creditor whole, and thus obviate the need for equitable relief.

Here, the legal remedy is clear: foreclosure. That is the remedy to which the purported security interests at issue here entitle the creditor, Appellee. And, as the security interests would be fully satisfied with foreclosure, it is an adequate legal remedy. The only circumstance in which a receiver would be justified is where " the plaintiff clearly and satisfactorily shows that an emergency exists and the receiver is needed to protect the property interests of the plaintiff." Comerica Bank v. State Petroleum Distributors, Inc., No. 3:08-CV-678, 2008 WL 2550553, at *4 (M.D. Pa. June 2, 2008). Again, the burden is on the party seeking the receiver, not the party opposing it. And here, the District Court simply never analyzed whether Appellants' actions were causing the value of LV1's collateral to decrease in value. It was enough to the District Court that Appellants might have done so. "Foreclosure will not serve to prevent the damage that may be done to the Properties while the case is running its course through the legal system." Ex. B at 9. It is particularly noteworthy that the District Court concluded that there were no adequate legal remedies, while at the same time acknowledging that "there is no evidence of . . . inadequacy of security for the loan." Id. at 9 (emphasis added). The District Court made no attempt to explain this discrepancy. Id.

As Appellants have attempted to emphasize to the Court, a receivership is a drastic and extreme remedy, and the party seeking a receivership bears the burden to prove the emergency condition that necessitates it.  See generally Exs. D, E.  The Court below reversed this burden and reduced "emergency" to mean not damage that is currently happening to the properties, but damage that "may be done" to the properties.  This does not mean the high standard for appointment of a receiver, and this Court should reverse.

### f.  Balance of the Interests

In analyzing this factor, the District Court gave a short shrift to the harm caused by a receivership.  Id. at 10.  The Court determined that a receivership would benefit both parties, because "[a] receiver would assure that the Properties will have bills paid on time and be properly insured, and that the physical structures located on the Properties will be maintained."  Id.  Once again, although Appellants are concededly in default of their mortgage obligation, there is simply no evidence on the record below that bills are not being paid on time, that the properties are not insured, and that the physical structures on the properties are not being maintained.  The District Court's logic here is the same as above: having shown default, the creditor is relieved of obligation to show any other actual harm.  The court essentially assumed, on the basis of default, that Appellants are not maintaining the property.

In fact, the District Court ignored the obvious indicia that insurance and bills are being paid, and that required maintenance is being undertaken.  As the District Court understood, the properties at issue are the sites of assisted living facilities.  Id. at 48. These facilities are heavily regulated at the federal, state, and local levels.  The District Court focused on the alleged possibility that required maintenance was unpaid, while ignoring the reality that these properties are subject to regular inspection by federal and state regulators and local health inspectors.  Even if Appellants (and their tenants) so desired, it would be impossible for them to fail to maintain and insure these facilities or they would be swiftly shut down.

Beyond that, the District Court's analysis did not include compensation of the receiver.  The court's order entitles the receiver to $975 per hour with no monthly cap on compensation.  See Ex. A at 13.  The District Court conceded that receivership would interfere with Appellants' ability to operate the properties and ultimately concluded this factor was neutral.  However, proper consideration that a receiver was not necessary to ensure payment of tax and insurance bills but does necessitate payment of tens of thousands of dollars per month to the receiver would have led to a different outcome.  This factor clearly weighs against receivership.

g. *Other Factors*

Finally, the District Court considered additional factors and found that "there is no evidence of misuse of project funds by the mortgagor, inadequacy of security

for the loan, nor fraudulent conduct on behalf of Defendants." Ex. B at 10.  Although the District Court did not specifically state so, presumably these factors weighed against appointment of a receiver.  Id.  As noted above, if the District Court believed that the security for the loan was adequate, the court should, at the very minimum, have determined that there was an adequate legal remedy.

2.    <u>The District Court Erred in Not Ordering Discovery or an Evidentiary Hearing.</u>

As shown above, the District Court collapsed the analysis of nearly every relevant factor into a single question: whether Appellants were in default of their mortgage.  Satisfied that Appellants were in default, the Court accepted this as <u>prima facie</u> evidence that the other factors were met.  According to this logic, default, of itself, automatically implies that Appellee is likely to succeed in a foreclosure action, that Appellants are otherwise in poor financial condition, that the Properties will be diminished in value, that Appellee has no other legal remedy available, and that the Appellants are not paying taxes, insurance, or maintaining the property.

In addition to improperly combining most of the factors into a single question, the District Court overlooked that there was no need to make any inferences or presumptions.  Rather, the District Court could have ordered discovery or at least an evidentiary hearing.  This would have given LV1 the opportunity to prove the relevant factors, as well as given the Appellants the opportunity to rebut them.  Faced

with all relevant evidence, the District Court could have analyzed each factor on its own and produced a ruling which addressed each factor fulsomely.

Discovery or an evidentiary hearing is not necessary where "where the facts support the appointment of a receiver." United States v. Berk & Berk, 767 F. Supp. 593, 597 (D.N.J. 1991). However, where genuine questions of fact exist, a court should defer a decision until discovery is completed. Tanzer v. Huffines, 315 F. Supp. 1140, 1143 (D. Del. 1970). This is particularly relevant where the party seeking the appointment of a receiver cannot determine the total present value of the mortgaged estate. Midwest Bank v. Goldsmith, 467 F. Supp. 3d 242, 250 (M.D. Pa. 2020). Without this type of evidence on the record, a court cannot determine whether the creditor will suffer irreparable injury or whether the secured asset is sufficient to satisfy the debt. Id.

An evidentiary hearing is not required before the appointment of a receiver if there is sufficient evidence on the record to support the appointment. Leone Indus. v. Associated Packaging, Inc., 795 F. Supp. 117, 120 n.6 (D.N.J. 1992). However, where the parties' "briefing does not permit a confident conclusion as to whether the requirements for appointment of a receiver have been met," a hearing is "necessary to determine whether appointment of a receiver is required." FTE Networks, Inc. v. Szkaradek, No. CV 22-785-WCB, 2023 WL 8650002, at *7 (D. Del. Dec. 14, 2023). The decision of whether to hold an evidentiary hearing is in the discretion of the

district court.  An "abuse of discretion exists where the District Court's decision rests upon a clearly erroneous finding of fact, and errant conclusion of law, or an improper application of law to fact." Meyer v. CUNA Mut. Ins. Soc., 648 F.3d 154, 169 (3d Cir. 2011) (quoting A.C.L.U. of New Jersey v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1476 (3d Cir.1996)).

Courts in this Circuit have routinely deferred the decision of whether to appoint a receiver until after discovery or an evidentiary hearing.  In Zinke-Smith, Inc. v. Marlowe, 323 F. Supp. 1151, 1151 (D.V.I. 1971), creditors of a corporation that was undergoing apparent financial distress sought appointment of a receiver.  At the time of the motion for receiver, the district court acknowledged that "some evidence … suggests mismanagement of the defendant corporation by the principal individual defendant, and … on the evidence thus far adduced the corporation is apparently in financial difficulty."  Id.  However, the Court also recognized the extreme nature of judicial receivership, and delayed appointment of a receiver until after an evidentiary hearing.  The "determination as to the claimed mismanagement or fraud which would justify appointment of a receiver must await a further evidentiary hearing. At that time, a more thorough exploration of the corporation's financial condition can be conducted." Id. at 1151–52.

By contrast, in the case below, the District Court refused to conduct an evidentiary hearing or allow discovery.  Rather, the court explained that "[u]pon

reviewing the above factors and applying them to the facts of this matter, I find that no evidentiary hearing is necessary, and the balance of factors weighs in favor of appointing a receiver." Ex. B at 4.  Notwithstanding this, the Court stated repeatedly that there was insufficient record evidence to thoroughly analyze those factors.  In examining Appellants financial status, the Court reasoned that the <u>lack</u> of recent financial status indicated poor financial health.  <u>Id</u>. at 7-8.  As to the diminution of value factor, the Court stated that Appellee, the party seeking the receiver, "has no information as to the status of any leases that the entities have entered, how much rent is being collected, if the taxes are paid and up to date, if there are unpaid bills, if the Properties are insured or if there are liens entered against the Properties." <u>Id</u>. at 9.  And the court assumed without explanation that a receiver was necessary to "assure that the Properties will have bills paid on time and be properly insured, and that the physical structures located on the Properties will be maintained." <u>Id</u>. at 10.

A receivership is an extraordinary remedy, reserved for those cases where some kind of financial emergency threatens the secured collateral of a creditor, and imminent action is necessary to preserve those assets.  Here, the Court below did not require any discovery, or even an evidentiary hearing, to determine whether those exigencies existed.  Instead, relying only on the speculative allegations of Appellee and the fact that Appellants are in default, appointed a receiver.  This, regrettably, was an abuse of discretion.

3.   <u>The District Court's Order Is Too Broad in Scope.</u>

As explained in depth in <u>supra</u>, the contractual clauses which allow for appointment of a receiver bear almost no resemblance to the receiver that the District Court ultimately appointed.  The relevant mortgage clauses contemplate a receiver who has the power to collect rents, profits, and interest.  The receiver appointed by the Court below, by contrast, has nearly unbridled authority, including controlling the business operations of Appellants' tenants, who are not even parties to the matters before the District Court.

Indeed, in an order dated June 9, 2025, denying Appellants' Motion to Stay appointment of the receiver pending appeal, the District Court went so far as to assert the receiver's authority over the tenants which operate the businesses at the subject properties.  <u>See</u> Ex. C.  "[T]he Receivership Order clearly establishes the powers of the Receiver and contains no ambiguity. … [T]he Receiver does in fact have some authority over the tenant operators, as the Receivership order clearly provides the Receiver with the authority to 'retain a reputable management company' to operate the Properties."  <u>Id</u>. 1-2, fn. 1.  Given, as explained above, the contractual receiver provisions allow for a receiver to collect rents, profits, and income, it is startling that the District Court has asserted and even clarified that the receiver has authority to operate the businesses of tenants who are not party to this action.

Once again, in justification for this, the District Court explains that <u>potential</u>, rather than actual and ongoing, harms are present:

> These Properties house healthcare facilities that provide medical and memory care services to elderly patients. Defendants have failed to make mortgage payments in over four years, and <u>the Properties allegedly have deficient insurance and unpaid taxes</u>. The Properties require responsible property management for the sake of these senior citizens, and Defendants' inability to do so <u>could result in harm</u> to this vulnerable population, including possible displacement from their residences. Accordingly, the appointment of a receiver is necessary to preserve the status quo and protect the residents of these healthcare facilities, which is clearly in the public interest.

<u>Id</u>. (emphasis added). The District Court assumes, without requiring evidence, that there <u>could be</u> some kind of emergency situation which might lead to possible displacement of the elderly population. Based on these hypotheticals, the District Court has not only appointed a receiver but has purported to exercise authority over entities that are not party to this case.

The District Court's order granting the Motions to Appoint Receivers was flawed, conclusory, and unsupported by facts, but reliant on assumptions. As a result, Appellants are likely to succeed on the merits of the appeal before this Court.

**B.    APPELLANTS AND OTHERS WILL SUFFER IRREPERABLE HARM ABSENT A STAY OF THE ORDER GRANTING THE MOTIONS TO APPOINT RECEIVERS.**

Appellants, Tenant Operators, and seniors who are tenants of Tenant Operators will suffer irreparable harm. The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." Adams v. Freedom Forge Corp., 204 F.3d 475, 484–85 (3d Cir. 2000). Mere economic harm is insufficient; rather, "the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir.1989). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 726 (3d Cir.2004) (internal quotation marks omitted).

First, the receivership order which was granted without hearing and before the close of discovery; vests sweeping control in the hands of the receiver, who is empowered to act in the name of the Appellants, access bank accounts and records, enforce agreements, terminate agreements, and direct the operations of the Properties. Yet the order contains no express limitation preventing the Receiver from intruding upon or interfering with the businesses of the Tenant Operators, which are legally distinct entities. The resulting ambiguity has already caused real confusion:

29

the Receiver believes it has authority over the Tenants Operators as well as to the private, health information of those that the Tenant Operators serve.

Still, the very existence of this confusion, coupled with the overbroad language of the order, places the tenant businesses in an uncertain and precarious position. Defendants' tenants face the prospect of having to comply with directives from the Receiver who may not have lawful authority over them—but who may appear to, based on the Court's order. That ambiguity, and the risk of disruption to business operations that are not under the Court's jurisdiction, poses a serious threat not only to the tenants' rights, but also to Defendants' contractual relationships and ongoing business viability.

Second, the receiver has already attempted to take drastic steps that will have consequences that cannot be remedied through monetary damages but will result in permanent harm to Appellants, Tenant Operators, and those to who Tenant Operators provide senior living care. The actions already taken and that Receiver intends to take will cause irreparable harm to the reputation of Appellants and Tenant Operators, will end the very existence of Tenant Operators and Appellants, and will cause Tenant Operators a complete loss of trade and, quite simply prevent any ability to continue operations.

For example, the Receiver attempted to nullify and still claims to have nullified lawful lease amendments between Appellants and Tenant Operators,

relying on false assumptions rather than facts.  The Receiver's attempt to nullify and continued belief that receiver can nullify valid and enforceable lease amendments relating to the Properties will lend to a loss of the bargained for agreements that maintain, for the time being, the status quo with respect to Tenant Operators and the ability of Tenant Operators to conduct business.  What results are further depressions of the continuity of Appellants' very existence as well as that of Tenant Operators.

Further, the Receiver has already informed Appellants and Tenant Operators of its intent to commence eviction proceedings, which includes not only the evicting Tenant Operators, but also hundreds of senior care residents – many of whom suffer from severe health conditions, including, but not limited to Alzheimer's.  These ill seniors that rely on Tenant Operators to provide critical care will be thrown out of their affordable residences that Tenant Operators provide and left on the street, given that many lack any family, friends, or funds appropriate to relocate.  There is no plan in place if this were to happen, other than receiver's conclusionary statements.  Such an outcome will forever destroy the goodwill that Tenant Operators and Appellants have built and maintained in the region for over two decades.  Such a loss cannot be reversed or compensated for through monetary damages.

Moreover, the receiver, though parties unknown to Appellants has already entered the Properties, without consent of the Tenant Operators, walked through the Properties, and, in doing so, jeopardized the privacy of the Tenant Operators tenants

who suffer from the most severe health and memory issues. Records of Tenant Operators' employees have been demanded by receiver as have records of the Tenant Operators' tenants. This is part of receiver's attempt to broaden the scope of receiver's authority to levels beyond the actual Appellants, but to take over and destroy the very existence of Tenant Operators (and Appellants). Receiver is not maintaining a status quo but has given notice that actions will be taken that are irreversible and cannot be measured through monetary damages.

Actions of receiver, specifically receiver's entry into the leased Properties, without notice and making demands for documents to Tenant Operators' employees have already led to anxiety and fears among employees of Tenant Operators as well as a number of residents under the care of Tenant Operators. These fears are lending to serious concerns as to the loss of a number of Tenant Operators' critical employees, and comments by Tenant Operators' tenants about the future of Tenant Operators. The consequences of one random site visit by receiver has already impacted the goodwill and reputation of both Appellants and Tenant Operators. Moreover, receiver has been given broad authority to conduct random site visits, without notice or consent of Properties that are leased to organizations that are not privy or parties to the matter before the District Court. To allow the very random, serious, and permanent nature of receiver's actions while the Court reviews the

matter in controversy will cause irreparable harm to the good will, reputation, operations, and existence of Appellants and Tenant Operators.

Further, the receiver's actions while the Court considers this appeal will destroy the reputation of Tenant Operators as the regions leading providers of senior living – a reputation that Tenant Operators will never be able to regain and cannot be restored through any amount of money.

Most importantly, the Receiver's actions, as noted, <u>supra</u>, will end the very existence of Tenant Operators as well as Appellants, as the actions of receiver and threats of actions do not intend to maintain the status quo, but are a means to the permanent destruction of both Appellants and Tenant Operators.  Absent a stay of the District Court's order appointment a receiver, the very permanent outcome of receiver's actions cannot be remedied by monetary compensation.

Third, Appellants have been stripped of operational control over the Properties without the opportunity to test LV1's claims through discovery, assert defenses, or challenge standing and default at a hearing. These are harms that cannot be undone by monetary damages after the fact.

Fourth, Appellants have brought legitimate third-party complaints against HUD that the District Court failed to consider when rendering its erroneous decision to prematurely appoint a receiver.  Appellants raises claims that call into question HUD's very actions in its note sale process, its failure to follow its own procedures,

policies, and federal law as well as the same relate to HUD's sale of notes. The third-party action, if successful at any level, will lend to the undoing—the rejection—of the note sale that led to the foreclosure action before the District Court. Absent a stay, the receiver's actions and threats of certain actions could very well render the legitimate claims against HUD moot as the damage to Appellants and Tenant Operators would have already exceeded extreme, negative, and irreparable harm to a level that the possible rejection and recission of the note sales would be too little, too late.

Finally, judicial control over third-party tenant businesses—absent formal joinder or due process—raises serious constitutional concerns. If the receiver oversteps even slightly, the injury to those businesses (and to Appellants' legal interests in protecting their contracts, licenses, and revenue streams) will be difficult if not impossible to reverse.

### C.    APPELLEE WILL NOT SUFFER IRREPERABLE HARM AS ANY IMPACT ON APPELLEE IS ECONOMIC AND NOTHING MORE.

Unlike Appellants, Appellee will not suffer irreparable harm or injury that cannot be remedied through monetary means. There exists no evidence of that Appellants are causing any damage or waste to the Properties. Quite the contrary, the Properties are in well maintained conditions—so much so that the Tenant Occupants have been licensed by the Commonwealth of Pennsylvania to operate

senior living facilities, with inspections conducted by the Commonwealth of Pennsylvania several times per year.

As noted, <u>supra</u>, the receiver's actions and threatened actions clearly indicate receiver's intent to end the very existence of Appellants and Tenant Operators, not to maintain the status quo. Rather than allow the underlying litigation proceed in a manner that ensures due process for Appellants, receiver's actions and threats of actions seemingly attempt to expedite the underling litigation by pressuring Appellants and Tenant Operators into positions from which no return is possible. Receiver seeks to accelerate Appellee's return on investment, rather than maintain the status quo. As a result, the rights of Appellants to due process through legitimate and fair proceedings before the District Court will, like Appellants and Tenant Operators, become nonexistent or impossible to pursue.

The impact on Appellee, however, is a delay in its return on its investment and nothing more. This is a monetary concern that can, without doubt, be remedied through monetary means – means that will simply be delayed, not extinguished. Any harm to Appellees is not irreparable, can be resolved through monetary means, is not permanent (only delayed), and is only economic and nothing more.

### D.    STAYING THE DISTRICT COURT'S APPOINTMENT OF A RECEIVER SERVES THE PUBLIC INTEREST.

Public interest is best served by granting a stay, particularly given the sensitive nature of the Properties' operations and the confusion surrounding the scope of the receivership order. This factor considers the broader consequences of the stay beyond the parties in the litigation. S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP, 927 F.3d 763, 772 (3d Cir. 2019).  Further, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 n. 8 (3d Cir.1994).

First, Appellants demonstrate, supra, both a likelihood of success on the merits and irreparable injury.  As a result, the public interests favor Appellants. Id.

Second, the Properties are not passive income-generating assets with respect to Tenant Operators.  Rather, the Properties are acute care and nursing facilities that provide essential and sophisticated medical and memory care services to elderly patients. These services are not optional or easily transferrable; they are governed by an intricate web of federal and state regulations, including those administered by the Centers for Medicare & Medicaid Services ("CMS"), the Pennsylvania Department of Health, and HIPAA. Maintaining compliance with these regulations is critical. This is not only to the continued licensure but also to the health, safety, and dignity of the patients Tenant Operators serve.

Tenant Operators have spent years building and refining the internal systems, trained personnel, and audit protocols necessary to navigate this highly regulated environment. These are not static structures. Instead, they are dynamic, highly specialized processes that require continuity of oversight and subject-matter expertise. The appointment of a receiver; risks disrupting this delicate regulatory balance. Even brief missteps could result in non-compliance, penalties, or worse, a decline in the quality of care. That outcome is not merely a business inconvenience—this is a matter of life and death.

Further, the receivership order as written has led to confusion. It does not clearly distinguish between the property owners and the licensed operating entities. This ambiguity has already caused confusion, with the Receiver initially believing the order granted authority over the tenant businesses, including the healthcare operators. Even now, that boundary remains unclear. Allowing the receiver to proceed under such uncertain terms risks not only legal overreach but operational instability that could endanger licensure or interfere with the delivery of patient care in matters of life and death. That is precisely the kind of harm the public interest protects against.

Granting a stay would protect the integrity of the care being provided while allowing the Court to clarify the appropriate scope of the District Court's order. It would prevent unnecessary disruption to a regulated healthcare facility and avoid

injecting further uncertainty into an environment where regulatory continuity is paramount. The public interest lies not in the premature execution of ambiguous receiverships, particularly where human lives and health are at stake.

## VII.  **CONCLUSION**

For the reasons set forth herein, Appellants, Whitehall Fiduciary, LLC as Trustee of Whitehall Trust U/T/A Dated August 1, 2007 and Saucon Trust, U/T/A Dated October 1, 2007, respectfully request that the Court enter an Order granting this Motion and Staying the District Court Order appointing a receiver pending the outcome of the appeal now before the Court.

Respectfully Submitted,

**LAHOUD LAW GROUP, P.C.**

Date: August 11, 2025

/s/ Raymond G. Lahoud
Raymond G. Lahoud, Esquire
600 Hamilton Street
Suite 300
Allentown, PA 18101
P:    (484) 544-0022
E:    rgl@raylahoud.com

## **STATEMENT OF APPELLEE OPPOSITION**

I, Raymond G. Lahoud, Esquire, hereby certify that on August 7, 2025, I conferred with Counsel for Appellee who expressed opposition to this Motion to Stay District Court Order Appointment Receiver.

Respectfully Submitted,

**LAHOUD LAW GROUP, P.C.**

Date: August 11, 2025

/s/ Raymond G. Lahoud
Raymond G. Lahoud, Esquire
600 Hamilton Street
Suite 300
Allentown, PA 18101
P:    (484) 544-0022
E:    rgl@raylahoud.com

## CERTIFICATE OF SERVICE

I, Raymond G. Lahoud, Esquire, hereby certify that on August 11, 2025, I filed a true and correct copy of Appellants' Motion to Stay District Court Order Appointing Receiver with the Clerk of the Court for the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system.

I further certify that Counsel for Appellee is a registered CM/ECF user, and that service will be accomplished on the date set forth herein via the Court's CM/ECF system.

Respectfully Submitted,

**LAHOUD LAW GROUP, P.C.**

Date: August 11, 2025

/s/ Raymond G. Lahoud
Raymond G. Lahoud, Esquire
600 Hamilton Street
Suite 300
Allentown, PA 18101
P:    (484) 544-0022
E:    rgl@raylahoud.com

**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LEHIGH VALLEY 1 LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : : : : : : : : | **CIVIL ACTION**<br><br>**NO.  24-2627** |
| v. | : : | |
| WHITEHALL FIDUCIARY LLC, as TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2027 | : : : | |

| | | |
|---|---|---|
| LEHIGH VALLEY 1, LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : : : : : : : | **CIVIL ACTION**<br><br>**NO.  24-2709** |
| v. | : : : | |
| SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007 | : : | |

<u>**ORDER**</u>

**AND NOW**, this 2nd day of May 2025, upon consideration of Plaintiff's Motion for Appointment of a Receiver (Docket No. 8 (24-2627) and Docket No. 17 (24-2709)), Defendants' opposition thereto, as well as all replies and sur-replies, and after oral argument being held, it is hereby **ORDERED** that Plaintiff's Motions are **GRANTED**. It is further **ORDERED** as follows:

**I.    APPOINTMENT OF THE RECEIVER**

1.    Duane Morris LLP through Erin Duffy, Esq. is appointed as Receiver with the usual powers and directions for the benefit of the Plaintiff of all the rents and profits now due and unpaid or to become due during the pendency of this mortgage foreclosure action, effective

EXHIBIT A, PAGE 001

immediately for all real and personal, tangible and intangible property (including, without limitation, all structures, leases, fixtures and moveable personal property, in addition to all of the property set forth in paragraph 6(a) hereof) owned by Whitehall Fiduciary LLC, as Trustee of Whitehall Trust U/T/A Dated August 1, 2007 ("Whitehall") at 1177 6th Street, Whitehall, PA and Saucon Trust U/T/A Dated October 1, 2007 ("Saucon") at 1050 Main Street, Unit # 1, Hellertown, PA (collectively the "Properties"); with respect to income of any kind; and with respect to any and all other property and property interests pledged or assigned to Plaintiff under the Loan Documents, as defined in the Complaints.

## II.    TERM OF THE RECEIVER

2.    The Receiver shall serve as the receiver for the Properties for a period which shall commence on the date of this Order and shall continue, notwithstanding the entry of judgment in favor of Lehigh Valley 1 LLC (by consent or otherwise), subject to the terms of paragraph 3 below, until the earliest to occur of: (i) the termination of such appointment by a subsequent Order of Court; (ii) Lehigh Valley 1 LLC's (or its nominee's, designee's or assignee's) acquisition of title to the Leasehold Estate through the delivery to Lehigh Valley 1 LLC (or its nominee, designee or assignee) of a sheriff's assignment or by assignment in lieu of foreclosure; or (iii) full payment of all sums due and owing under the "Loan Documents" (as defined in Plaintiff's Complaints).

3.    Notwithstanding the terms of paragraph 2, at Lehigh Valley 1 LLC's request, and upon Court approval, following the occurrence of the events described in part (iii) of paragraph 2, the Receiver shall continue the receivership for such reasonable period as may be necessary to wind up the receivership.

4.    The receivership may be terminated at any time by Lehigh Valley 1 LLC filing with the Court and serving upon the Receiver, Whitehall, and Saucon a Notice of Request to Terminate Appointment of the Receiver (a "Termination Request").

EXHIBIT A, PAGE 002

5.      Within 30 days after the termination of the receivership, the Receiver shall file with the Court and serve upon Lehigh Valley 1 LLC, Whitehall and Saucon its final report and accounting for the receivership, and the Receiver or Lehigh Valley 1 LLC may request that the Court enter an Order approving such final report and accounting and discharging the Receiver from its duties under this Order.

### III.    POWERS AND DUTIES OF THE RECEIVER

6.      The Receiver shall have all necessary powers to manage the rents and profits of the Property, including the following powers:

(a)      To enter and take immediate possession of the Property, and to demand, collect and receive the rents, income, revenues, proceeds and profits derived from tenants at the Property, their sublessees or any occupants in possession, including maintenance fees, management fees, special assessments and/or other charges relating to the Property, which are now due and unpaid or which may become due hereafter (collectively, the "Rents"), and all personal property owned or utilized by Lehigh Valley 1 LLC that relates to the management or operation of the Property, including all books, records, bank accounts, reserve accounts, cash on hand, keys, and combinations for locks or other access information in the possession of or reasonably available to Whitehall, Saucon or their property managers (collectively, the "Receivership Properties");

(b)      To access and use office equipment at the Properties used by Whitehall, Saucon or their property managers, including computer equipment, software programs and passwords;

(c)      To take all actions necessary to preserve, maintain, operate, and manage the Property. The Receiver must obtain Lehigh Valley 1 LLC's prior written consent before any such expenditures are made;

(d)      To employ counsel and, with the consent of Lehigh Valley 1 LLC, accountants or other professionals, contractors and support personnel and other persons necessary

3

EXHIBIT A, PAGE 003

in order to carry out its duties as the Receiver and to preserve, maintain and operate the Property, and to compensate such persons at competitive rates, without further Order of this Court, at their respective hourly rates, plus reimbursement of all reasonable and necessary out-of- pocket expenses;

(e)    To commence, prosecute, continue or defend actions at law or in equity (in its own name or in the names of Whitehall or Saucon) that the Receiver deems necessary to protect or preserve the Property, to recover possession of the Property, to collect the rents, or to evict or eject any tenants or occupants in accordance with applicable state laws;

(f)    To continue in effect, modify or terminate (if and to the extent terminable without penalty or premium unless such termination penalty or premium shall be paid by the Receiver) agreements, contracts, understandings or commitments entered into by Whitehall or Saucon with respect to the Properties, to the extent permitted by applicable law, and to make additional agreements and contracts reasonably necessary for the operation and preservation of the Properties;

(g)    To retain a reputable management company (including, but not limited to, an affiliate of the Receiver), maintenance personnel, broker, leasing agent and/or marketing agent to operate and manage the Properties, and to market the Properties for rent, without further order of this Court, but with the consent of Lehigh Valley 1 LLC, and at competitive rates plus reimbursement of its reasonable and necessary out-of-pocket expenses;

(h)    To pay all past-due and current insurance premiums, taxes, assessments, sewer and utility charges levied against the Properties, and (with the consent of Lehigh Valley 1 LLC) to purchase merchandise, construction and other materials, supplies and services as the Receiver deems necessary and advisable to assist the Receiver in performing its duties and to pay the ordinary and usual rates and prices;

(i)    To open and utilize any new bank accounts as the Receiver deems necessary

4

EXHIBIT A, PAGE 004

or desirable in connection, and the Receiver is authorized, empowered and directed to use Whitehall's and/or Saucon's tax identification number in connection with the revenue and expenses with respect to the Properties;

(j)    To make, enter into, enforce, terminate, modify or accept a surrender of any of the Leases (as defined in the Mortgage); to obtain and evict occupants (subject to applicable laws and regulations); to bring or defend any suits in connection with the Leases or Rents in its own name or in the name of Whitehall or Saucon; to compromise any Rents or other payments, income or proceeds that may become due; and to sue for or otherwise collect and receive all Rents, including those past due and unpaid. Rents and Leases shall be turned over to Receiver and the Defendant shall be enjoined and restrained from collecting the Rents and Leases of the Properties or interfering with Receiver's ability to collect said Rents and Leases. Tenants, **occupants, and licensees** of the Properties are enjoined from paying any rent or lease payment to the Defendant, its agents, servants or attorneys, and if they do so, they may be held liable to Receiver and Plaintiff for these sums;

(k)    To present for payment any checks, money orders or other forms of payment made payable to Whitehall, Saucon, their property managers, or any other agent, assignee or nominee of Whitehall or Saucon, which constitute Rents, endorse and collect the proceeds, to be used and maintained as elsewhere provided;

(l)    To keep the Properties insured (whether by the existing insurance coverages or new coverages), each of which insurance policy shall name the Receiver and Lehigh Valley 1 LLC as additional insureds, if permitted by the insurer, and shall comply, at a minimum, with the terms of the Loan Documents;

(m)    As Receiver, to use for any such purpose any funds of Whitehall or Saucon, including the Rents;

EXHIBIT A, PAGE 005

(n)     To notify all local, state and federal government agencies, all vendors and suppliers, and any and all others who provide goods and services to the Properties of its appointment as the Receiver;

(o)     Receiver is authorized to apply income from the Properties, subject to the lien rights of Lehigh Valley 1 LLC, as follows and in the following order to the extent funds are available: first, to pay Receiver's approved fees and expenses which include the Receiver's attorneys' fees related to the receivership; second, to pay all operating expenses with respect to the Properties (other than the obligations owed to Plaintiff under the Loan Documents); third, to pay all capital obligations with respect to the Properties; fourth, to fund reasonable reserves for anticipated operating expenses and capital obligations with respect to the Properties; and lastly, to pay the obligations owed to Plaintiff under the Loan Documents;

(p)     To take any and all steps necessary to receive, collect and review all mail or other parcels relating to the Properties addressed to Whitehall, Saucon and/or their property managers, including, but not limited to, mail or other parcels addressed to any post office boxes held in the name of Whitehall, Saucon, their property managers, or any other agent, assignee or nominee of Whitehall or Saucon, and to instruct the U.S. Postmaster and any other mail or parcel carrier or service to re-route, hold, and/or release said mail or other parcels to the Receiver; provided that any mail and other parcels addressed to Whitehall or Saucon that do not relate to the Properties and reviewed by the Receiver in the performance of its duties will be forwarded to Whitehall, Saucon or their property managers by the Receiver after its review;

(q)     With prior written consent and authorization from Lehigh Valley 1 LLC to delegate or assign any and all rights and powers of the Receiver set forth herein, in the reasonable discretion of the Receiver;

(r)     To apply to this Court for further direction and for such further powers as may be necessary to enable the Receiver to fulfill its duties;

6

EXHIBIT A, PAGE 006

(s)    To keep a true and accurate account of any and all receipts and expenditures for the Properties;

(t)    Receiver shall, within 30 days of qualification and appointment, provide Lehigh Valley 1 LLC, Whitehall and Saucon with an inventory of all property of which Receiver has taken possession. If Receiver subsequently comes into possession of additional property, Receiver will provide Lehigh Valley 1 LLC, Whitehall and Saucon with a supplemental inventory;

(u)    In addition to any financial, operating, and other reports and information required to be delivered pursuant to the Loan Documents, Receiver shall provide the following documents for the immediate preceding calendar month, which documents are believed by the Receiver as being true, correct, and complete as of the reporting date;

(i) a balance sheet, statement of income and expenses, statement of cash flows for the Properties and on a consolidated basis for all Properties;

(ii) a detailed rent roll for the Properties showing the occupancy of the respective Properties, name of each tenant, occupant, or customer and, for each tenant, occupant, or customer, the space occupied, the lease or occupancy commencement and expiration dates, the rent or fee payable, the rent or fee paid to date and the security deposit being held for such tenant, if any, and a leasing or rental activity report for the Properties each in detail reasonably satisfactory to Petitioner;

(iii) an aged payables report and an aged receivables report for the Properties;

(iv) a capital expenditure report for the Properties;

(v) all bank statements with monthly reconciliations; and

(vi) each of the above will be provided to Plaintiff on a monthly basis.

7

EXHIBIT A, PAGE 007

(v)     To pay all ordinary and reasonable costs associated with the Properties arising on or after the date of the Complaint, that were not invoiced by the vendor or provider prior to the date of this Order;

(w)     To open any new customer accounts necessary to effectively manage the Properties and/or to require Whitehall and/or Saucon to identify the Receiver as an authorized account user for any existing accounts;

(x)     To pay any pre-receivership obligations of Whitehall and Saucon authorized by Lehigh Valley 1 LLC;

(y)     To execute a W-9 as an attorney-in-fact for Whitehall and Saucon;

(z)     To notify tenants and other persons now or hereafter in possession of all or any portion of the Properties to pay all Rents directly to the Receiver;

(aa)    To exercise commercially reasonable discretion in determining whether to refund security deposit to a tenant, in whole or in part, in accordance with the applicable leases or agreements, and to pay any such funds from security deposits turned over from Whitehall, Saucon or (for tenancies arising after the date of this Order) security deposits paid by or on behalf of a tenant first, and then from cash flow generated from Rents, issues, profits, and income from the Properties.

(bb)    Receiver and Lehigh Valley 1 LLC are authorized to enter transactions by which Lehigh Valley 1 LLC may lend monies to Receiver (on a nonrecourse basis as to Receiver) to enable Receiver to perform its duties, which shall be secured by a first and prior lien and security interest on the Properties and on all other collateral of Lehigh Valley 1 LLC, in favor of Lehigh Valley 1 LLC as security for such on the same terms and conditions set forth in the Mortgage, subject, however, to the terms of paragraph (cc) below.

(cc)    Whitehall and Saucon shall hold in trust for Receiver (and not sell, transfer, assign, lend, pledge, hypothecate, return, reject, revoke or in any other way actually or

8

EXHIBIT A, PAGE 008

constructively dispose of, without Court approval or the written consent of Plaintiff), any certificate, deposit, fund, account, trademark, benefit, liquor or food license or permit, or other right or interest owned by it and used in connection with the Properties, and shall assign (to the extent assignable) any of the same to Receiver upon Receiver's written request.

(dd)   Notwithstanding anything contained in this Order, (1) any obligation or liability incurred by the Receiver during the receivership shall not be a personal obligation or liability of Whitehall or Saucon, but shall be collectible only out of the Properties, and the Receiver shall include the foregoing in each agreement, purchase order and other contract it enters into pursuant hereto, and (2) neither Whitehall, Saucon nor any of their affiliates shall be liable for any action or inaction of the Receiver. Receiver covenants not to sue or bring any claim, demand action or suit against Whitehall or Saucon directly or indirectly that is inconsistent with the foregoing and the nonrecourse nature of the obligations of Whitehall and Saucon pursuant to the terms and provisions of the Loan Agreement and other similar provisions contained in the Loan Documents.

7.   Neither the Receiver nor any person or entity employed by the Receiver (collectively, the "Receiver Parties") shall be liable to Whitehall, Saucon or to any third party for any act or omission which he, she, it or they have undertaken in good faith; provided, however, nothing contained herein shall release or limit the liability of the Receiver Parties arising from the gross negligence or willful misconduct of the Receiver Parties. The Receiver shall be entitled to all defenses and immunities provided under applicable law, including under *Barton v. Barbour*, 104 U.S. 126 (1881) and its progeny, for acts or omissions within the scope of the Receiver's appointment.

8.   Except as provided in this Order, the Receiver shall not be responsible for the payment of any services commissioned or incurred, or goods purchased, prior to the date of this Order, including utility invoices (including electricity, gas, water, sewer, garbage, phone/internet,

EXHIBIT A, PAGE 009

etc.), payroll and property vendors, all of which shall remain the responsibility of Whitehall or Saucon.

9.      No utility may terminate service to the Properties because of non-payment of pre-receivership obligations without prior order of this Court, nor may the continuation of any utility be conditioned upon the Receiver's payment of any pre-receivership consumption, charges or fees.

10.     No insurance company may cancel its existing current-paid policy without prior order of this Court.

## IV.      TURNOVER BY WHITEHALL AND SAUCON

11.     Whitehall, Saucon and all persons acting under their direction are ordered to immediately deliver to Receiver possession of the Properties and each of the following, to the extent owned by Whitehall or Saucon, in the possession or control of Whitehall or Saucon, and relating to the Properties without any right of offset or recoupment:

(a) Property-related information and other property management database files,

(b) All cash collateral for the indebtedness owed by Whitehall or Saucon to Plaintiff (whether consisting of cash on hand, cash in any and all bank accounts or other accounts, all rights to security deposits, if any, including but not limited to amounts that Whitehall or Saucon may have deposited with utility companies, and all other cash and cash equivalents);

(c) All keys to the Properties;

(d) All security deposits, rent, prepaid rent and other sums relating to the use, enjoyment, possession, improvement or occupancy of all or any part of the Properties, in each case, to the extent received by Whitehall or Saucon and any accounts in which any of the foregoing are deposited;

(e) A current list of the occupants of the Properties;

(f) Any and all current Properties accounts receivable and accounts payable reports;

EXHIBIT A, PAGE 010

(g) Any and all contracts in effect with respect to the Properties, **and** any material related correspondence;

(h) Any and all payroll records and other materials reasonably requested by Receiver and related to persons employed by Whitehall, Saucon or their property managers at the Properties;

(i) Certificates evidencing the insurance policies covering the Properties;

(j) Records showing any insured losses to the Properties in the past five years;

(k) Any and all bank statements relating to any accounts maintained by Whitehall or Saucon with respect to the Properties;

(l) The tax identification numbers of Whitehall and Saucon;

(m) Any and all other records pertaining to the management of the Properties to the extent such records are maintained; and

(n) All licenses, certificates, surveys, reports, communications and correspondence from the Commonwealth of Pennsylvania related to the Properties or operations of the Properties for the past twenty-four (24) months.

12.    From and after the date Whitehall and Saucon deliver possession of the Properties to Receiver, Whitehall and Saucon shall continue to perform ·or cause to be performed at the sole cost and expense of Whitehall and Saucon all actions necessary for Whitehall and Saucon to keep their organizational status in good standing with their state of organization and the state where the Properties are located, if different, including, without limitation, the timely filing of all required annual reports, tax returns and other similar state and local filings and paying any required fees and charges.

13.    Whitehall, Saucon and all persons acting under their direction are ordered to cooperate and use their best efforts to ensure a smooth transition of the management and operation of the Properties to the Receiver, including, but not limited to, requests for information or

EXHIBIT A, PAGE 011

documents that pertain to the maintenance, operation or leasing of the Properties or any efforts to collect any sums due;

14.    Within three (3) days from the date of this Order, provide the Receiver with the name, title, address, telephone number and email address of a designated representative of Whitehall and Saucon with whom the Receiver shall communicate about the obligations expressed in this Order, and promptly notify the Receiver of any changes.

## V.    NON-INTERFERENCE BY WHITEHALL AND SAUCON

15.    Whitehall, Saucon and their officers, directors, general partners, limited partners, agents, property managers, architects, contractors, subcontractors and employees, and all other persons with actual or constructive knowledge of this Order and their agents and employees, are enjoined from:

(a) Interfering with the Receiver, directly or indirectly, in the management and operation of the Properties or in the collection of Rents;

(b) Extending, dispersing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in or disposing of the whole or any part of the Properties (including the Rents) without the prior written consent of the Receiver;

(c) Doing any act which will, or will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Properties (including the Rents and licenses or certificates) or the interest of Lehigh Valley 1 LLC in the Properties or the Rents;

(d) Undertaking any efforts to cancel, terminate or modify the coverage provided by any existing insurance policies relating to the Properties before their respective expiration dates; or

(e) Transferring, selling, assigning, revoking, returning, terminating or canceling, or taking or failing to take any action that would compromise, without the consent of the Receiver, any contract, permit, approval, license, privilege, or right necessary for the operation

EXHIBIT A, PAGE 012

of business at or use and occupancy of the Properties.

16.     In the event Whitehall or Saucon fail to comply with the terms of this Order, the Receiver may seek assistance from the U.S. Marshal to enforce the same.

## VI.   RECEIVER'S COMPENSATION

17.     The Receiver shall be compensated at its standard hourly rates. The Receiver's fee will be $975 per hour and said monthly fee shall be deducted directly from the rents, income and revenue received by Receiver.

18.     In addition to the Receiver's fees, the Receiver shall be reimbursed for its reasonable costs, including legal fees, travel expenses, and other business expenses associated with the Receivership. The Receiver may pay itself from Rents, the Receivership Properties, and from the sale of the Properties, if any.

19.     The Receiver shall file monthly reports with the Court disclosing its compensation and reimbursement.

## VII.   BANKRUPTCY OF WHITEHALL AND/OR SAUCON

20.     If Whitehall and/or Saucon files a bankruptcy case during the receivership, Lehigh Valley 1 LLC shall give notice of the bankruptcy case to the Court and the Receiver. If the Receiver receives notice that the bankruptcy has been filed and that part of the bankruptcy estate includes the Properties (or any part of them) that are the subject of this Order, the Receiver shall have the following duties:

(a) The Receiver shall give prompt notice of the bankruptcy case to Lehigh Valley 1 LLC.

(b) The Receiver shall immediately contact Lehigh Valley 1 LLC and determine whether Lehigh Valley 1 LLC intends to move in the bankruptcy court for an order for: (i) relief from the automatic stay; and (ii) relief from the Receiver's obligation to turn over the Properties (11 U.S.C. § 543). If Lehigh Valley 1 LLC disclaims in writing any intention to make such a

EXHIBIT A, PAGE 013

motion or fails to file such motion within ten court days following its receipt of notice of the bankruptcy filing, the Receiver shall immediately turn over the Properties (or applicable portion thereof) to the appropriate entity (either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession) and otherwise comply with 11 U.S.C. § 543.

If Lehigh Valley 1 LLC intends to seek relief immediately from both the automatic stay and the Receiver's obligation to turn over the Properties, the Receiver may remain in possession and preserve the Properties pending the ruling on those motions unless otherwise ordered by the Bankruptcy Court. (11 U.S.C. § 543(a).) The Receiver's authority to preserve the Properties shall be limited as follows: (i) the Receiver may continue to collect Rents and other income; (ii) the Receiver may make only those disbursements necessary to preserve and protect the Properties; (iii) the Receiver shall not execute any new leases or other long-term contracts without the approval of this Court and the Bankruptcy Court; and (iv) the Receiver shall do nothing that would effect a material change in the circumstances of the Properties.

## VIII.  MISCELLANEOUS

21.    Without limiting any of the general or specific powers granted herein, Receiver is vested with all the powers, rights, and duties provided to receivers under applicable law, and may act in the name of Whitehall and/or Saucon without the approval or consent of the members, managers, directors, officers, partners, or other persons that would be legally required in the absence of the Receiver's appointment to approve or consent to such action.

22.    The Receiver shall notify all known creditors of Whitehall or Saucon of the entry of this Order by sending a copy of the Order to the creditor at its last known mailing address.

23.    Entry of this Order shall operate as a stay applicable to all persons and entities of:

(a) Any act, including without limitation the commencement or continuation of a judicial, administrative, or other action or proceeding including the issuance of process to obtain possession of Receivership Properties or to interfere with or exercise control over Receivership

EXHIBIT A, PAGE 014

to comply with federal and state law or directives regarding the operations of the Properties

or to comply with state statutory and regulatory requirements.

BY THE COURT:

*s/ Catherine Henry*

CATHERINE HENRY, J.

Appendix 21

EXHIBIT A, PAGE 015

**EXHIBIT B**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEHIGH VALLEY 1 LLC, successor by   :
assignment to WINDSTREAM CAPITAL   :
LLC, successor by assignment to the     :   **CIVIL ACTION**
UNITED STATES SECRETARY OF     :
HOUSING AND URBAN DEVELOPMENT, :
successor by assignment to M&T REALTY  :
CAPITAL CORPORATION         :   **NO. 24-2627**
                                  :
        **v.**                  :
                                    :
WHITEHALL FIDUCIARY LLC, as     :
TRUSTEE OF WHITEHALL TRUST U/T/A :
DATED AUGUST 1, 2027           :

LEHIGH VALLEY 1, LLC, successor by  :
assignment to WINDSTREAM CAPITAL   :
LLC, successor by assignment to the     :   **CIVIL ACTION**
UNITED STATES SECRETARY OF     :
HOUSING AND URBAN DEVELOPMENT, :
successor by assignment to M&T REALTY  :   **NO. 24-2709**
CAPITAL CORPORATION         :
                                  :
        **v.**                  :
                                    :
SAUCON TRUST, U/T/A DATED     :
OCTOBER 1, 2007              :

## <u>MEMORANDUM OPINION</u>

Henry, J. *s/CH*                                         **May 2, 2025**

      The instant matter involves two mortgage foreclosure actions brought by Plaintiff, Lehigh

Valley 1 LLC ("Lehigh"), against Defendant, Whitehall Fiduciary LLC ("Whitehall"), and

Defendant, Saucon Trust ("Saucon"). Both mortgages are virtually identical aside from the

amounts of the loans, and the action against Whitehall and the action against Saucon are virtually

identical mortgage foreclosure actions. Therefore, these matters were consolidated. In both cases,

Lehigh filed identical motions in which it sought appointment of a receiver to manage the

**EXHIBIT B, PAGE 001**

Properties, both of which house residential senior living facilities encumbered by the mortgages. Lehigh contends a receiver is necessary because both mortgages are in default and have been for over 4 years, the financial health of both Whitehall and Saucon is dire, and there is a concern about diminution in value of the Properties. Both Whitehall and Saucon, represented by the same law firm, have opposed the motions, arguing that Plaintiff has not met the burden for appointment of a receiver.

## I.    **BACKGROUND**

On January 26, 2012, M&T Realty Capital Corporation ("M&T") provided a loan to Defendant Whitehall in the amount of $15,788,700 secured by a mortgage on real property located at 1177 6th Street, Whitehall PA. (Docket No. 7, Am. Compl., ¶ 15, (24-2627)). On December 1, 2012, M&T provided a loan to Defendant Saucon in the amount of $19,462,800 secured by a mortgage on real property located at 1050 Main Street, Unit #1, Hellertown, PA. (Docket No. 9, Am. Compl., ¶ 11 (24-2790)). Both the Whitehall property and the Hellertown property house senior living facilities and both loans are secured by a mortgage and a note.

Both notes and mortgages were assigned by M&T to the United States Secretary of Housing and Urban Development ("HUD") effective November 16, 2022. HUD assigned both notes and mortgages to Windstream Capital on September 20, 2023, and Windstream Capital assigned both notes and mortgages to Lehigh on May 15, 2024. (Am. Compls., Exs. D-I.)

There is no real dispute that Whitehall and Saucon are in default, as both entities have failed to make their required monthly debt payments since at least February of 2021. Due to Defendants' defaults, both Loans were accelerated, and demand was made for the immediate

EXHIBIT B, PAGE 002

payment of all amounts due and owing in full on October 5, 2023. (Docket No. 31, Am. Compl.,

Ex. J (24-2627)). [1]

Lehigh alleges that Whitehall and Saucon are in poor financial condition, have failed to

pay taxes on the Properties, have failed to provide Lehigh with evidence of insurance on the

Properties, and have failed to provide Lehigh with a current financial report. (Docket Nos. 8 (24-

2627) and 12 (24-2709). In response, neither Whitehall nor Saucon argue that they are not in

default. Rather, they argue that the parties must do discovery before a receiver can be appointed,

that Lehigh has an adequate security interest in the Properties, that there is no allegation of

Whitehall or Saucon engaging in fraudulent conduct, that Lehigh's evidence of Defendants'

weak financial positions is old and outdated, and that Lehigh has not shown any danger of the

Properties being diminished in value. (Docket Nos. 10 (24-2627) and 19 (24-2790)).

## II.    ANALYSIS

It is true that receivership is an extraordinary equitable remedy that is not routinely

granted. *Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 980 (8th Cir. 2020); see

also *Maxwell v. Enterprise Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942). However, a

district court is given "broad discretion" in the decision to appoint a receiver. *Wilmington Tr.*

*N.A. v. Pavilion Apts. PENN LLC*, No. 22-3985, 2023 WL 187568, at *3 (E.D. Pa. Jan. 13,

2023). There is "no exhaustive or dispositive list of factors" to be used by a court in determining

whether to appoint a receiver. *Deutsche Bank Tr. Co. Americas v. Greenfield of Perkiomen*

*Valley, LLC*, No. 23-1439, 2024 WL 38040, at *2 (E.D. Pa. Jan. 3, 2024), citing *Wells Fargo*

---

[1] Both Lehigh's Complaint and Amended Complaint in Case no. 24-2709 against Saucon are identical to the
Complaint and Amended Complaint in case no. 24-2627 against Whitehall. However, in 24-2709, Lehigh's
Complaint and Amended Complaint reference a demand letter being sent to Saucon and state that a copy of the letter
is attached to the pleadings as Exhibit J. However, there is no Exhibit J attached to the Complaint or Amended
Complaint in 24-2709. Although the document is missing, it can be assumed that it is identical to Exhibit J attached
to the Amended Complaint in 24-2627, as every other document in these two cases is identical. However, for the
purposes of the instant motion, whether an October 5, 2023, demand letter was sent to Saucon or not is immaterial.

EXHIBIT B, PAGE 003

*Bank, N.A. v. CCC Atl., LLC*, 905 F.Supp.2d 604, 614 (D.N.J. 2012). District courts in this Circuit commonly use the factors set forth in *Wells Fargo Bank v. CCC Atlantic*, but no one factor is dispositive, nor is the list of factors exhaustive. *CCC Atlantic*, 905 F.Supp.2d at 614. In the mortgage foreclosure context, the Court will consider whether "the property is inadequate security for the loan; the mortgage contract contains a clause granting the mortgagee the right to a receiver; the continued default of the mortgagor; and the misuse of project funds by the mortgagor." *CCC Atl.*, 905 F.Supp.2d at 614. (quotation omitted) (cleaned up). In addition, when the receiver will manage the property as well as collect rent, the Court will assess "the danger of waste; ... the defendant's fraudulent conduct; imminent danger that property will be lost, concealed, injured, diminished in value, or squandered; the inadequacy of available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property." *Id.* at 614–15 (quotation omitted); see also *Deutsche Bank Trust Co. v. Greenfield*, 2004 WL 38040, at *2. In addition, "[n]o hearing is necessary where the facts support the appointment of a receiver." *MSCI 2006-IQ11 Logan Blvd. Ltd. Partnership v. Greater Lewistown Shopping Plaza, L.P.*, No. 16-2090, 2017 WL 485958, *1 (M.D. Pa. Feb. 6, 2017), citing *United States v. Berk & Berk*, 767 F.Supp. 593, 597 (D.N.J. 1991). Upon reviewing the above factors and applying them to the facts of this matter, I find that no evidentiary hearing is necessary, and the balance of factors weighs in favor of appointing a receiver.

### A.    Contractual Provision

First and foremost, the strongest factor weighing in favor of appointing a receiver is the fact that the Mortgages for both Properties contemplate such a remedy. Specifically, they state:

EXHIBIT B, PAGE 004

"[T]he holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of

a Receiver of the rents and profits of the mortgaged premises as a matter of right and without

notice, with power to collect the rents, issues, and profits of said mortgaged premises." (Docket

No. 7, Ex. B, p. 6 (24-2627); Docket No. 9, Ex. B, p. 20 (24-2709)). It continues: "The

Mortgagor for itself and any subsequent owner hereby waives any and all defenses to the

application for a Receiver and hereby specifically consents to such appointment ..." *Id.*

Provisions granting a right to the appointment of a receiver weigh heavily in favor of

appointing one, though they do not eliminate the Court's discretion. *Wilmington Tr., N.A. as Tr.*

*of $29,615,000 Philadelphia Auth. for Indus. Dev. Senior Hous. Revenue Bonds v. Pavilion*

*Apartments PENN LLC*, No. 22-3985, 2023 WL 187568, at *3 (E.D. Pa. Jan. 13, 2023); see also

*Wilmington Tr., N.A., as Tr. for the Benefit of the Registered Holders of Wells Fargo*

*Commercial Mortgage Trust 2019-C50, Commercial Mortgage Pass-Through Certificates,*

*Series 2019-C50 v. M.P. Mgmt. LLC*, No. 21-5498, 2021 WL 4786117, at *7 (D.N.J. Oct. 14,

2021) (provisions which merely permit mortgagee to apply for appointment are "relevant but not

dispositive," whereas a "full, self-executing consent to appointment of a receiver for any and all

purposes upon default" is given "considerable weight"). "The importance of these contractual

provisions" in the Court's decision to appoint a receiver "cannot be underestimated because they

set apart this commercial foreclosure case from the traditional scenario in which a receiver is

sought at equity and no such contractual provisions exist." *CCC Atl.*, 905 F. Supp.2d at 615.

"[W]here the parties have agreed *ex ante* that, in the event of a default, the lender has the right to

all rent payments and to the appointment of a receiver.... appointment of a receiver is not such a

drastic remedy." *Id.* at 616.

There is no dispute that neither Whitehall nor Saucon have made a mortgage payment in years; accordingly, both Defendants are in default. These defaults triggered Lehigh's right to move for appointment of a receiver as set forth in the Mortgages. Both Defendants oppose the appointment of a receiver, despite agreeing to one in the event of default in their respective Mortgages. In the instant matter, "[i]t is evident . . . that by the plain language of the mortgage contract[s], the parties have agreed to a receivership of the subject property." *MSCI 2006-IQ11 Logan Boulevard Ltd. P'ship v. Greater Lewistown Shopping Plaza, L.P.*, No. 16-2090, 2017 WL 485958, at \*4 (M.D. Pa. Feb. 6, 2017). The "terms of a mortgage agreement are binding on the parties," *Metropolitan Life Ins. Co. v. Liberty Center Venture*, 650 A.2d 887, 891 (Pa. Super. Ct. 1994), and the parties in the instant matter are no different. Based upon the clear language of the Mortgages, as well as Defendants' unquestionable defaults, I conclude that this factor weighs very strongly in favor of appointment of a receiver. However, this factor is not dispositive, and I must analyze the remaining factors in determining whether to appoint a receiver.[2]

**B.    Likelihood of Success**

The continuing failure of both Whitehall and Saucon to make monthly mortgage payments shows that Lehigh is likely to succeed on its mortgage foreclosure claims. In Pennsylvania, "[i]n an action regarding a note secured by a mortgage, the lender 'presents a prima facie case by showing the execution and delivery of the note and its nonpayment.'" *Wilmington Trust v. Pavilion Apartments PENN LLC*, 2023 WL 187568, \*6, citing *Wells Fargo Bank, N.A. v. Chun Chin Yung*, 317 F. Supp.3d 879, 885 (E.D. Pa. 2018) (citations omitted). The Notes as to both Whitehall and Saucon were attached to the respective complaints, and neither

---

[2] Unsurprisingly, Defendants very much try to downplay the importance of the contractual provisions that they consented to that permit the appointment of a receiver. However, they do admit, as they must, that contractual consent to the appointment of a receiver is a factor that I may consider. (Docket No. 10-1, p. 4 (24-2627), Docket No. 19-3, pp. 4-5 (24-2709)).

6

EXHIBIT B, PAGE 006

Defendant has suggested that their required mortgage payments were made in a timely fashion. Lehigh alleges that Whitehall and Saucon have not made a monthly mortgage payment since February of 2021. Because of Defendants' defaults, Lehigh accelerated both Loans and demanded the immediate payment of all amounts due in full; Defendants continued to refuse to make a single monthly payment. Because of Defendants' long-term, ongoing failures to pay the monthly amounts due on the Loans, secured by the Mortgages, Lehigh is likely to succeed in its mortgage foreclosure action.

Defendants argue that this factor does not support appointment of a receiver, because Lehigh has not yet obtained a judgment in the foreclosure action. This argument is unpersuasive, because the factor examines Lehigh's **likelihood** of success on the merits, not whether it **has** succeeded on the merits. Accordingly, I find that this factor weighs in favor of appointing a receiver.

### C.    Defendants' Financial Health/Status

As discussed above, Defendants have failed to make payments when due for over four years. A borrower's inability to make payments when due reveals its poor financial condition, suggesting a need to preserve the property. *Deutsche Bank Tr. Co. Americas v. Greenfield of Perkiomen Valley, LLC,* 2024 WL 38040, at *3; *Federal Nat'l Mortgage Ass'n v. Maple Creek Gardens, LLC,* 09-14703, 2010 WL 374033, *3 (E.D. Mich. Jan. 25, 2010); see e.g., *CCC Atlantic*, 905 F. Supp. 2d at 616.

Further, Lehigh produced 2021 audited financial statements for both Whitehall and Saucon. Both statements note that "At (sic) December 31, 2021, the Trust was in default with its mortgage note. In addition, [the operating entities for Defendants] continue to report operating losses. These conditions raise substantial doubt about the Trust's ability to continue as a going

EXHIBIT B, PAGE 007

concern within one year after the issuance date of the financial statements…" Whitehall and Saucon 2021 Audited Financial Statements, p. 8.[3]

Lehigh further notes that both Properties, until recently, were subject to significant tax and municipal liens which created the risk that the Properties could be lost at tax sale. Also, neither Whitehall nor Saucon have provided financial reporting to Lehigh in numerous years, despite said disclosure being required by the Loan Documents. These updated financial statements would allow Lehigh to determine the condition of its collateral; without them, Lehigh has no way to determine the financial status of Defendants and the safety of its collateral.

Further, neither Whitehall nor Saucon make any argument regarding what either entity will do to resolve their defaults, nor do they offer any proof of their financial stability. Further, neither entity makes any representation that they will begin making payments any time soon.

Defendants argue that their financial positions cannot be considered until discovery is completed into these matters. However, that argument ignores the reality that evidence of Defendants' financial positions from 2021 is available in the form of the audited financial statements that show significant losses. Further, Defendants continued failure to make monthly payments on the Mortgages is further evidence of their financial positions. If Defendants were concerned about discovery into their current financial status, they could have produced an updated financial statement in response to Lehigh's demand in July of 2024. But they did not. Accordingly, this factor demonstrates both entities' poor financial health and weighs in favor of appointing a receiver.

---

[3] Due to their confidential nature, Lehigh emailed Defendants' 2021 financial statements directly to the Court for my review. Lehigh also emailed a redacted insurance policy received from Whitehall, a Statement of Multi-Family Mortgage Account sent by HUD to Whitehall, a Certificate of Compliance of Whitehall demonstrating how many occupants the property may have, and the Payment History for Whitehall received from HUD. I have reviewed all these documents prior to authoring this opinion.

EXHIBIT B, PAGE 008

**D.    Diminution of Value**

There is no question that Lehigh has grounds to be concerned about a possible diminution in the value of its collateral. Despite Lehigh's request prior to filing the instant suits, (Docket No. 8, Ex. J (24-2627) and Docket No. 12, Ex. J (24-2709)), Whitehall and Saucon continue to refuse to provide updated financial statements to Lehigh. Accordingly, Lehigh has no information as to the status of any leases that the entities have entered, how much rent is being collected, if the taxes are paid and up to date, if there are unpaid bills, if the Properties are insured or if there are liens entered against the Properties. Any one of these issues could potentially diminish the value of the Properties, thereby diminishing the value of Lehigh's collateral. Therefore, this factor also weighs in favor of appointing a receiver.

**E.    Inadequate Legal Remedy**

As stated by Judge Savage in *Deutsche Bank Trust Co. v. Greenfield*, where there is no danger of the property being devalued and legal remedies are adequate, there is no need for the appointment of a receiver. 2024 WL 38040, *5, citing *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 826 (3d Cir. 1959). However, when normal remedies are frustrated, appointment of a receiver may be more appropriate. *Id.* In this matter, Lehigh has shown that the defaults of Whitehall and Saucon may be decreasing the value of Lehigh's collateral. Further, neither Whitehall nor Saucon will provide Lehigh with recent financial statements or any proof that the taxes on the Properties have been paid or that the Properties are properly insured. There is a high risk that the value of the collateral will decrease. Foreclosure will not serve to prevent the damage that may be done to the Properties while the case is running its course through the legal system. Accordingly, the legal remedy of foreclosure is inadequate, and this factor weighs in favor of appointing a receiver.

EXHIBIT B, PAGE 009

F.    **Balance of the Interests**

In situations where appointing a receiver could cause more harm than good, the balance of the interests should be found to weigh against the appointment of a receiver. In the instant matter, Lehigh argues that a receiver is necessary to manage the Properties. A receiver would assure that the Properties will have bills paid on time and be properly insured, and that the physical structures located on the Properties will be maintained. Clearly, that is a benefit to both Lehigh and Defendants. However, Defendants both argue that appointing a receiver would do more harm than good because it "unquestionably interferes" with their right to control their property. (Docket No. 10, pp. 15-16 (24-2627) and Docket No. 19-3, p. 15 (24-2709), citing *Mintzer*, 263 F.2d at 825.) Although the benefits of appointing a receiver are obviously great, Defendants are correct that such an appointment would impair their ability to control the Properties. Accordingly, I find that this factor is neutral, as the potential harm is approximately equal to the possible benefits.

G.    **Other Factors**

There are other factors that courts may consider, none of which are relevant to the instant matter. As stated previously, the list of factors that courts can consider is not exhaustive, nor is it dispositive. Using my discretion, as I am permitted to do in this matter, I find there is no evidence of misuse of project funds by the mortgagor, inadequacy of security for the loan, nor fraudulent conduct on behalf of Defendants.

H.    **Identity of Receiver**

Lehigh requests the appointment of Ryan Stumphauzer of Stumphauzer Kolaya Nadler & Sloman, PLLC as the receiver in this matter. Although I find that the appointment of a receiver is indeed necessary, I would prefer to appoint a more local individual as the receiver, as Mr.

EXHIBIT B, PAGE 010

Stumphauzer is located in Florida. Accordingly, I appoint Duane Morris LLP through Erin Duffy, Esq. as the Receiver for both Whitehall and Saucon, and she will proceed pursuant to the terms set forth in the attached Order.

**III.    CONCLUSION**

For all the reasons set forth above, I find that the appointment of a receiver in these matters is warranted. An appropriate order follows.

EXHIBIT B, PAGE 011

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEHIGH VALLEY 1, LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : : : : : : : : | CIVIL ACTION<br><br>NO. 24-2627 |
| v. | : : : | |
| WHITEHALL FIDUCIARY LLC, as TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2027 | : : : | |

| | | |
|---|---|---|
| LEHIGH VALLEY 1, LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : : : : : : : | CIVIL ACTION<br><br>NO. 24-2709 |
| v. | : : : | |
| SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007 | : : | |

## ORDER

**AND NOW**, this 9th day of June 2025, upon consideration of Defendants' Motions to Stay Appointment of Receiver Pending Resolution of Appeals (Docket No. 68 in case number 24-2627 and Docket No. 61 in case number 24-2709) and Plaintiff's oppositions thereto, it is hereby **ORDERED** that Defendants' Motions are **DENIED**.[1]

---

[1] On May 2, 2025, I entered an Order appointing a receiver to manage the two Properties at issue in these consolidated mortgage foreclosure matters. On that same day, Defendants filed an appeal of that Order. A receivership appointment is not automatically stayed pending appeal (see Fed. R. Civ. P. 62(c)), and thereafter, on May 27, 2025, Defendants filed a motion in which they seek to stay the appointment of the receiver pending resolution of their appeals.

EXHIBIT C, PAGE 001

In examining whether to grant a stay, Courts in the Third Circuit have identified the following four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).

In support of the first factor and their claim that they have a strong likelihood of success on the merits, Defendants set forth only one argument. They assert that because the appointment of a receiver "is an example of judicial discretion where courts can weigh factors differently," (Docket No. 68, p. 12) it is "entirely plausible that the Third Circuit could adopt a different framework, apply a broader or narrower set of considerations, or arrive at a different conclusion even under the same set of facts." (*Id.*, p. 13.) They claim to have shown a "reasonable likelihood of success on the merits because the applicable legal standard invites differing conclusions among reasonable minds." (*Id.*) However, it is important to note that the Third Circuit "review[s] the decision to appoint a receiver for abuse of discretion." *KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*, 781 F. App'x 119, 121 (3d Cir. 2019), citing *Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942). A court abuses its discretion if its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact." *EEOC v. City of Long Branch*, 866 F.3d 93, 97-98 (3d Cir. 2017) (citation omitted).

In reviewing Defendants' argument regarding their likelihood of success on the merits, it is telling that they do not identify any erroneous factual finding that I made in my opinion appointing a receiver, nor do they identify any error of law that was made. In addition, they offer no evidence to support any improper application of law to fact. Defendants' motion presents nothing that would lead to the conclusion that the Third Circuit will find that I abused my discretion by appointing a receiver in this matter. Accordingly, I find that Defendants cannot show a likelihood of success on the merits.

As to irreparable harm, Defendants claim that absent a stay, there will be "encroachment into the operations of tenant businesses." (Docket No. 68, p. 13.) In support of this argument, Defendants claim the receivership order is ambiguous and confusing for their "Tenant Operators," as the order does not contain an express limitation preventing the Receiver from interfering with the businesses of tenants. (*Id.*, p. 14.) I find this contention to be unpersuasive for several reasons. First, the Receivership Order clearly establishes the powers of the Receiver and contains no ambiguity. Second, the Receiver does in fact have some authority over the tenant operators, as the Receivership order clearly provides the Receiver with the authority to "retain a reputable management company" to operate the Properties. (Docket No. 58, Para III(6)(g)). Third, even if the order did result in some confusion, Defendants have not provided any evidence of actual harm. In addition, to the extent Defendants are arguing that their loss of control over the Properties is irreparable harm, I find that argument to also be unpersuasive. Defendants themselves have for years been in the best position to prevent this alleged harm by paying their mortgages, which they have continuously failed to do. Their own failure to meet their contractual obligations cannot serve as proof of their harm.

Next, I must examine whether a stay would substantially harm Plaintiff. As I discussed in detail in the opinion granting the receivership, Defendants' actions have caused a risk of damage to the Properties and therefore, a risk of damage to Plaintiff's collateral. The Receiver was appointed in large part due to this very risk of substantial harm to Plaintiff. Obviously, a stay of this matter during which the Receiver is prevented from performing its necessary duties could potentially cause significant harm to Plaintiff.

Lastly, I find that the public interests favor denying a stay in this matter. These Properties house healthcare facilities that provide medical and memory care services to elderly patients. Defendants have failed to make mortgage payments in over four years, and the Properties allegedly have deficient insurance and unpaid taxes. The Properties require responsible property management for the sake of these senior citizens, and Defendants' inability to do so could result in harm to this vulnerable population, including possible displacement from their residences. Accordingly, the appointment of a receiver is necessary to preserve the status quo and protect the residents of these healthcare facilities, which is clearly in the public interest.

EXHIBIT C, PAGE 002

BY THE COURT:

*/s/ Catherine Henry*
CATHERINE HENRY, J.

---

As all four of the factors necessary for Defendants to obtain a stay pending appeal are resolved in favor of Plaintiff, Defendants' Motions to Stay will be denied. Defendants must permit the Receiver to fulfill its duties as set forth in the May 2, 2025, Order while Defendants' appeal proceeds.

EXHIBIT C, PAGE 003

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEHIGH VALLEY 1 LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION, . . . . . . . Plaintiff, | . CIVIL ACTION . . NO. 5:24-cv-02627-CH . . . . . 601 Market Street |
| v. | . Philadelphia, PA 19106 . |
| WHITEHALL FIDUCIARY LLC, as TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007, Defendant. | . Thursday, . February 13, 2025 . 10:30 a.m. . |

. . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| LEHIGH VALLEY 1 LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION, . . . . . . Plaintiff, | . CIVIL ACTION . . NO. 5:24-cv-02709-CH . . . . . . |
| v. | . . |
| SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, Defendant. | . . . |

. . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION TO APPOINT RECEIVER
BEFORE THE HONORABLE CATHERINE HENRY
UNITED STATES DISTRICT COURT JUDGE

Audio Operator:          Susan Flaherty, ECR

Transcription Company:   RedDoor Legal Services, LLC
                         44 Valley Forge Road
                         Bordentown, N.J. 08505
                         (973)985-3668
                         www.reddoorlegalservices.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1

EXHIBIT D, PAGE 001

APPEARANCES:

For the Plaintiff,       Berger Law Group P.C.
Lehigh Valley 1, LLC:    By:  PHILLIP D. BERGER, ESQ.
                           919 Conestoga Road
                           Building 3
                           Suite 114
                           Bryn Mawr, PA 19010
                           (610) 668-0800

For the Defendant,      Norris McLaughlin, P.A.
Whitehall Fiduciary,    By:  REBECCA J. PRICE, ESQ.
LLC:                      BENJAMIN P. SHEPPARD, ESQ.
                           515 West Hamilton Street
                           Suite 502
                           Allentown, PA 18101
                           (610) 391-1800

1  paying other vendors or whether we have a bigger problem where

2  other people are going to start filing lawsuits and failing to

3  give services to the facility.

4         Receiver would -- if the defendant is struggling

5  financially, then there's probably lesser-quality food.

6  There's probably pest control that's not being handled

7  properly.  There's probably snow removal that may or may not be

8  occurring.  There's issues with maintaining the building that

9  may or may not be occurring if there's this financial struggle

10  which the 2021 says there were dire financial straits.  And

11  again, since receiving the PPP money, they have not paid

12  anything.

13         Placing a receiver into an assisted living facility

14  happens all the time.  This is not uncommon.  Putting a

15  receiver in place to oversee the financial health, to make sure

16  that there's insurance in place, to pay the tax bills, to pay

17  the vendor bills, to pay the mortgage bills does not

18  automatically void the license.

19         The independent receiver -- because it's going to be

20  an independent receiver; we gave a proposal of somebody that we

21  thought -- that has been a receiver and that we would

22  recommend.  We have no allegiance to him.  I've got no contract

23  with him.  I don't know him.  If I walk down the street --

24         THE COURT:  Okay.

25         MR. BERGER:  -- he's just a person that has had an

1  ability and has run -- has been appointed receiver in a number

2  of assisted living facilities.  He would be -- the receiver, as

3  I understand it, from Health and Human Services, or the

4  department that reviews all -- that handles all the licensing,

5  the way this would go forward, if Your Honor grants a receiver,

6  is the receiver would -- while handling the finances would, at

7  least for the time being, keep the operating company in place.

8         If the receiver finds that there's any kind of fraud

9  or issues or finds mismanagement and the receiver wants to

10  change the management company, the receiver would enter -- with

11  the Court's authorization, the receiver would enter into a new

12  management company with someone like Gardant or whoever they

13  may choose.  Again, we have no dog in this fight as to who's

14  chosen.  But the receiver would enter into a new management

15  contract, and that management company would apply to the state

16  for their license.  And once that license comes through,

17  because they show that they've got policies and procedures in

18  place, they've got background, that they've got bonding,

19  they've got whatever, they are then put in.

20         So there's not a single time where any of the people

21  would be thrown out on the street or anything would be shut

22  down.  The receiver would just be managing this, getting to the

23  bottom of all the issues that I've laid out, and then making a

24  determination whether that current management company should

25  stay in or whether there should be a new management company

1  that should be put in to properly run this facility while

2  paying bills.  Or the receiver will come back to Your Honor and

3  say, we can't pay bills.  It just does not run profitably.

4  This is just not a profitable venture, and then we can take it

5  from there.

6         So again, we suggested Ryan Stumphauzer.  He's before

7  the Court -- he can certainly come before the Court.  He's in

8  Florida, but he's just someone that has been appointed by

9  courts previously in assisted living facilities.  If the Court

10  wants somebody else, that's absolutely fine.  I'm not -- again,

11  not an issue with us.

12         The plaintiff, Lehigh Valley 1, wants this facility

13  to run.  We are not looking to shut this facility down.  We

14  want this facility to run.  This is how we're going to

15  hopefully start getting mortgage payments.  We want taxes to be

16  paid.  We want the people in that facility to be cared for.  We

17  want the insurance to be in place.  Following the foreclosure,

18  which is pending in this matter, plaintiff plans to run this

19  facility and to keep on running this facility.  So this is not

20  a case where this is a money grabber just trying to get

21  something and shut it down and make a quick turnaround on it.

22  This is something that they have in -- their plan, when

23  purchasing this loan, was to continue to run this.  But they

24  can't run it under the -- but this can't continue to run under

25  the current situation.

EXHIBIT D, PAGE 005

1  insurance and a patient is not being treated properly, that

2  could be harm.  The next one is -- so we believe we meet this

3  threshold.

4          The next one is inadequacy of security to satisfy the

5  debt.  The mortgage complaint that was filed back in June of

6  2024, so it's going on nine months now, showed that there was

7  $13,832,000 that was due plus interest which is accruing and

8  costs which are accruing.  So the amount of liability that's

9  accruing on this, plus the taxes which somehow have to be paid,

10  plus all the other things, the amount of liability on this is

11  increasing, and there could be third-party harm based on the

12  insurance issues.

13          So failure to make any payment, failure to pay

14  vendors, potential issues of insurance, failures to pay taxes,

15  I think that goes to show the inadequacy of the security to

16  satisfy this $15.8 million debt.

17          Sorry.

18          THE COURT:  Okay.

19          MR. BERGER:  Next factor is the probability of

20  fraudulent conduct.

21          THE COURT:  I mean, that's your weakest one, right?

22  At this point, you don't have any paperwork, so you can't

23  really.

24          MR. BERGER:  We have no idea.

25          THE COURT:  Right.

1            MR. BERGER:  But I do know that they've been

2      receiving rents, and they refuse to tell us where those rents

3      have gone.  They refuse to show us what has happened with the

4      monies they've collected.

5            It may be that everything's being handled properly

6      and they just can't run this property efficiently.  They can't

7      run this property viably.  That may be the case.  But if you're

8      not paying anything and you haven't paid anything for four

9      years, it also could be the case that everything's being

10     diverted.  That's why we need a receiver in to see what is

11     going on.  So I'm not claiming fraud.

12            THE COURT:  Um-hum.

13            MR. BERGER:  But there's a potential for fraud, and

14     that's why the receiver needs to review what is going on.

15            THE COURT:  Okay.

16            MR. BERGER:  The two last things, which is the lack

17     of a less drastic equitable remedy, we're not seeking to kick

18     out any tenants.  We're not seeking to close this down.  The

19     most drastic remedy is to continue to allow the defendant to

20     continue to mismanage this property, not pay bills, potentially

21     not have liability insurance, and potentially have a

22     significant event happen there.

23            We need the receiver to provide clarity, to have the

24     facility properly managed.  And the receiver is the least

25     drastic remedy.

EXHIBIT D, PAGE 007

1          The last one is the likelihood appointing receiver

2   will do more harm than good.  That kind of dovetails into my

3   just-previous statement.  If the receiver properly manages this

4   facility, makes sure that the patients are being properly

5   treated, makes sure that there's proper insurance, makes sure

6   that insurance is being paid, makes sure the vendors are being

7   paid, makes sure that the property is being repaired as needed,

8   that is -- the appointed receiver will do much more good than

9   harm.

10         Those are what's in our motions.  At this point, Your

11  Honor, if Your Honor would like, I can just kind of review some

12  of the defendant's claims and their responses, or I can wait

13  until after defendant --

14         THE COURT:  I'd like to hear from them, and then I'll

15  give you a chance to come back up.

16         MR. BERGER:  Thank you very much.

17         THE COURT:  Sure.

18         Okay.

19         MS. PRICE:  Good morning, Your Honor.

20         THE COURT:  Good morning.

21         MS. PRICE:  I guess I'm going to start -- I wasn't

22  planning on this, but I do want to give you a little bit of

23  background just because it didn't come up at all during

24  Mr. Berger's presentation that at the time that this motion was

25  filed and my client filed a response, we had a motion to

1    dismiss pending.  So we hadn't filed any type of response to

2    the allegations in the complaint, although we had alluded to

3    Judge Schmehl when we were before him in November, and I think

4    even in the documents that are before the Court that this is

5    not just a mortgage foreclosure.  This isn't just a bank that

6    gave us money and we've defaulted and we're buying time here.

7          We have legitimate defenses to the allegations in

8    this complaint starting with the fact that this default, as

9    Mr. Berger alleges, happened during COVID which, as you know

10   and everyone in this room knows, everybody in this world knows,

'11   was an unprecedented event that impacted negatively many small

12   businesses.  And part of our argument and part of our defenses

13   is that my client was bound by various government regulations

14   that limited its ability to collect payment from its residents

15   while also then was denied access to government regulations

16   that were intended to keep my client operating while all of

17   this mess was being sorted out.

18          THE COURT:  Can you expand on that a little bit?

19          MS. PRICE:  Yes.

20          THE COURT:  Okay.

21          MS. PRICE:  So during the COVID-19 pandemic, there

22   were numerous regulations that were passed by the federal

23   government and by HUD, specifically, that were intended to

24   provide abatement to businesses who had HUD-backed loans like

25   mine.  One specific abatement that was provided was that if

1    there was a reserve account, which we had a reserve account

2    that had close to a million dollars in it at the time, that we

3    could use that reserve account to make regular monthly payments

4    in order to avoid a default.  HUD did, in fact, allow that to

5    happen three times in -- I believe it was in 2021.

6            But then for reasons that we still don't know, HUD

7    just stopped it, said, no, you're not allowed to use these

8    reserve payments anymore which then resulted in my client going

9    into default because remember, at this time, my client's not

10   allowed to kick out patients who aren't paying because the

11   state, at that time, had an all-out ban on our ability to evict

12   these types of tenants.

13           And so we believe that there was a manufactured

14   default by HUD.  We worked very hard with HUD over the course

15   of the next two years and M&T Bank to try to work out this

16   situation.  And we were told HUD would not let us touch that

17   reserve account.

18           But guess what HUD did right before it sold the loan.

19   It depleted the reserve account.  And to date, as we sit here

20   right now, Judge, we have not received an accounting that fully

21   accounts for what happened to that money.  It was close to a

22   million dollars.  If that money had been appropriately applied

23   in accordance with government regulations for the prior three

24   years, what would have happened?  I don't know.  I mean, no one

25   in this room knows.  Maybe we would have been fine.  Maybe we

```
 1   could have figured out how to get through this otherwise
 2   financial crisis.
 3              THE COURT:  That was -- there was like a $310,000 tax
 4   payment made.  Was that --
 5              MS. PRICE:  That is what we have been told --
 6              THE COURT:  Okay.
 7              MS. PRICE:  -- since these lawsuits have been filed.
 8              THE COURT:  Um-hum.
 9              MS. PRICE:  But again, when the first set of lawsuits
10   were filed, which were filed in state court back in 2023, we
11   said at that time, show us where -- where's the accounting?
12   Where's the notices of what the actual balance -- we had no
13   idea.
14              And Mr. Berger's clients have bought a loan that they
15   knew was a loan in default at the time that they bought it.
16   They're a group of investors from all over the country, but
17   they bought a $15.7 million loan, but they paid less than $3
18   million for it.  So they knew what they were getting into when
19   they got into it.
20              And all we've done from day one is ask questions
21   which we've not received any answers to.  And I absolutely
22   dispute this idea that this is just a group of guys who are in
23   Florida and all over the country, and they want to come to
24   Northeast Pennsylvania and they want to run a memory care
25   facility.  I mean, we are here on diversity jurisdiction
```

1   because not one person who has any interest in LV1 has any ties

2   to the state of Pennsylvania.  And now they want to come here

3   and run a memory care facility?  That's just not true.

4       This was a loan-to-own situation.  They bought the

5   debt in September of 2023, and by November of 2023, they were

6   making attempts to foreclose on this property to shut us down.

7   And that's exactly what's going to happen here.  They want a

8   receiver to come in under this guise of, we're just going to

9   poke around and see what's happening.  This receiver has no

10  intention of poke -- a receiver, by the way, who's in Florida

11  isn't just going to come in here and poke around.  The receiver

12  is going to find a way to evict the tenant and to shut this

13  down.

14       So I do want to make sure the Court is aware, since

15  these motions were filed, we have filed our answer and our

16  defenses, some of which I've just gone through.  We've also

17  filed a third-party complaint against HUD --

18       THE COURT:  I saw that, yeah.  Um-hum.

19       MS. PRICE:  -- which is still pending.  And we have

20  absolutely disputed from day one that the initial assignment

21  from HUD to a prior entity, Windstream, who is also, I believe,

22  a member of LV1, that that's not enforceable.  It is an invalid

23  assignment.  And there is case law which I have cited to that

24  says that if the assignment is not valid, then the plaintiff

25  does not have the right to enforce the document.

EXHIBIT D, PAGE 012

1           And I don't believe it's valid, but I absolutely

2    think that we at least need discovery on it before some

3    stranger comes in and starts to run a business that matters to

4    my community, that matters to Northeast Pennsylvania, but

5    doesn't mean anything to this group of guys who are all over

6    the country, mostly in Florida.

7           So to say that the appointment of a receiver is not a

8    drastic remedy not only goes against what numerous judges in

9    this court have said, but it just belies reality.  It is the

10   loss of control of a property from the property owner.  And in

11   this case, it's particularly egregious because the property

12   owner has disputed from day one that Windstream and

13   subsequently LV1 has any real right to do what it is that

14   they're asking to do.

15          So what I do believe this is, is -- and don't get me

16   wrong, I represent a lot of banks, so I can understand that

17   Mr. Berger and maybe his clients are starting to feel a little

18   bit frustrated by this process.  But this is the process.  This

19   is our Constitutional due process right.  And you can't end-run

20   due process and say, okay, let's skip over discovery; let's

21   skip over all of these defenses; let's just kind of push it.

22   This is foreclosure; we'll do that later.  But let's get this

23   receiver in, because the reality of a receiver coming in will

24   be that the receiver will find a way to shut it down.

25          If it gets shut down, now we have no way to continue

1  to fight the fact that this was absolutely done improperly from

2  the beginning.

3          And so what I'm asking the Court to do is not permit

4  this usurpation of due process rights and just let us go

5  through the process here, let this play out.  The point of a

6  receiver is when there's real, legitimate concerns about the

7  property -- and there aren't any here, and I'm going to explain

8  to you why -- but the appointment of the receiver is

9  extraordinary, and it's just not necessary here.

10         So let's talk first about the loan documents, because

11 obviously we concede that loan documents say what they say.

12 Right?

13         THE COURT:  Right.

14         MS. PRICE:  But you know and I know and Mr. Berger

15 knows we didn't enter into any loan documents with a group of

16 investors down in Florida.  These are -- it's an investment

17 portfolio.  They're all over the country.  We didn't agree to

18 let these guys come in and take over our business.  That was a

19 bank loan that was backed by the government, and we trusted

20 that the government had our best interests at heart.

21         And again, we've alleged improprieties in the bidding

22 process.  We've alleged that Windstream was not an appropriate

23 qualified bidder.

24         THE COURT:  Let me just stop you for one second.

25         MS. PRICE:  Yeah.

| | |
|---|---|
| 1 | THE COURT:  The original was between M&T Realty -- |
| 2 | that was the first loan before it was assigned. |
| 3 | MS. PRICE:  Yes.  And it was backed by HUD. |
| 4 | THE COURT:  And that was backed by HUD.  Okay. |
| 5 | MS. PRICE:  So it is a HUD-backed -- yeah. |
| 6 | THE COURT:  Okay. |
| 7 | MS. PRICE:  And then it was assigned to HUD later, |
| 8 | and then it sold. |
| 9 | THE COURT:  It came back to HUD.  Right.  Okay, |
| 10 | gotcha. |
| 11 | MS. PRICE:  Yes.  Yes. |
| 12 | THE COURT:  Yup. |
| 13 | MS. PRICE:  So we've also alleged failures to comply |
| 14 | with the bidding requirements.  We've alleged unlawful conduct |
| 15 | as it relates to the alleged default.  We've asserted a third- |
| 16 | party claim against HUD.  All of these raise questions about |
| 17 | the validity of the assignment which would also impact LV1's |
| 18 | right to enforce that. |
| 19 | But beyond that, the fact that the loan documents |
| 20 | provide the right to a receiver is not -- you're not bound by |
| 21 | that, right? |
| 22 | THE COURT:  Right.  It's not dispositive. |
| 23 | MS. PRICE:  It's not dispositive. |
| 24 | THE COURT:  Understood. |
| 25 | MS. PRICE:  It's something that you can consider, and |

**EXHIBIT D, PAGE 015**

1   you should still consider the fact that this is an extreme

2   remedy here.  And by the way, again, my client did not enter

3   into this agreement with Lehigh Valley 1.  It entered into it

4   with M&T Bank.

5           So secondarily, setting aside all of the things that

6   Mr. Berger said, I mean, the main issue here is nonpayment,

7   right?  There hasn't been a payment on this loan.  And that is

8   a factor that the Court should consider, but it's not the only

9   factor.  In fact, all of the other factors, I think, taken

10  together, weigh in favor of not appointing a receiver in this

11  instance.

12          And I want to talk first about just the property

13  itself, because obviously it's in the documents, and Mr. Berger

14  has agreed, it's operating as a memory care facility in

15  Northeast Pennsylvania.  It is --

16          THE COURT:  Is it all memory care?  Or is it assisted

17  living and memory care?

18          MS. PRICE:  It's assisted living with a focus on

19  memory care.

20          THE COURT:  What percentage of the people there are

21  memory care patients?

22          MS. PRICE:  I'm going to give you percentage, but

23  please don't hold me to it.

24          THE COURT:  Okay, that's fine.

25          MS. PRICE:  I want to say it's somewhere around like

```
 1 │ 40 percent.

 2 │         THE COURT:  40 percent, okay.

 3 │         MS. PRICE:  But it is an acute medical facility

 4 │ providing care to, arguably, the most vulnerable people in our

 5 │ community.  But it's operating; it's continuously operating.

 6 │ And I'm sure I don't need to explain to you that this is a

 7 │ heavily regulated industry, that there are obligations that

 8 │ they must fulfill.  They are subject to random spot inspections

 9 │ by the state, that they must obtain and maintain licensure.

10 │         So any argument that, oh, there could be rats in the

11 │ building and maybe the electricity shut off and there's no

12 │ running water, these are not legitimate concerns because if any

13 │ of that was happening at this property, you would know, I would

14 │ know, Mr. Berger would know, because it'd be all over The

15 │ Morning Call that this building was shut down and all of these

16 │ elderly people had been evicted because the property was in

17 │ deplorable condition.

18 │         THE COURT:  What's the occupancy there?  I mean --

19 │         MS. PRICE:  I don't know that.  I do believe that

20 │ there is substantial occupancy.  I'm not sure --

21 │         THE COURT:  If it was fully occupied, how many

22 │ patients would be there?

23 │         MS. PRICE:  That is a question that I should know the

24 │ answer to, but unfortunately I do not.

25 │         THE COURT:  Okay.  That's okay.
```

EXHIBIT D, PAGE 017

1          MS. PRICE:  And I will have that answer for when

2    we're before Judge Costello on Monday.

3          THE COURT:  Okay, great.

4          MS. PRICE:  So I do not know.  I mean, I know it is

5    operational; it's fully staffed.

6          MR. BERGER:  I can help because this is documents

7    that they provided to me yesterday.  And it has the -- it may

8    not exceed 130 people, and it has a dementia care unit which

9    has -- cannot exceed 20.

10         THE COURT:  Okay.

11         MS. PRICE:  Oh.  Well, there you go.  Thank you.  I

12   appreciate that.

13         MR. BERGER:  So --

14         MS. PRICE:  It doesn't have what -- the actual

15   occupancy.  That's maximum.

16         THE COURT:  That's maximum, got it.

17         MS. PRICE:  And that is, by the way, a certificate of

18   occupancy that we maintain that we have, that the township has

19   provided to us without any issue.

20         So the point being the mere fact that the operating

21   entity is continuing to operate at the building is significant

22   evidence that the building is not in waste.  And that is

23   different from the cases that Mr. Berger mentioned to the

24   Court, right?  Because in one of them, the judge said, well,

25   you already have these other three properties that are in

1  receivership.  And that is evidence that maybe there's

2  something going on here financially and gives me cause to put

3  this one in.

4       We don't have other properties in receivership.  I

5  mean, we have another case.  It's the exact same case as this

6  except dealing with another property, although I will say it is

7  a totally different owner and a totally different operating

8  entity.  But there's no receivership in that case either.

9  We're going to make the exact same arguments to Judge Costello

10 on Tuesday.  And so we don't have that here.

11      And in the other cases that were cited, there was

12 actual evidence of actual waste.  So in one case, the property

13 had been deemed abandoned, and in the other one, they had shown

14 that there had been significant declines in vacancy over time.

15 I mean, there was -- it wasn't, like, speculation.  It wasn't,

16 well, these could be happening.  It was:  this is happening.

17      And the important thing to note is in those cases,

18 the receiver motion came after discovery.  We're not there yet.

19 And I'm not saying that maybe in six months, we might not be

20 back here with another motion.  And maybe then Mr. Berger is

21 going to say, okay, this is the discovery.  This is what we

22 found.  Maybe then that really hurts my argument.

23      But as we sit here today, Mr. Berger is asking you to

24 grant extraordinary relief based upon a guess, based upon the

25 fact that, well, they haven't paid, so we think that there's

1  going to be some issues with the property.  But we don't know

2  that there's any issues with the property, because as far as I

3  know, not one of these investors from all over the country has

4  ever made any attempt to set foot onto this property.  I don't

5  even know if Mr. Berger's been to the property.  So nobody --

6            THE COURT:  Would they be permitted to do so?

7            MS. PRICE:  They haven't tried or they haven't asked.

8  So that's a question for another day.  But it hasn't been

9  something that's had to come up yet because no one's even asked

10  to be there.

11            But I mean, if they want to tell the Court that

12  there's actual issues with the property, wouldn't it have made

13  sense to say, well, we went to the property and the lights were

14  off --

15            THE COURT:  Right.

16            MS. PRICE:  -- and there were broken windows, and the

17  floors were cracked.  Right?  But we don't have that because no

18  one's even asked to do that.

19            And I do want to point this out, just because I

20  brought up the cracked floors.  We are here with a property

21  owner.  There's a property owner that's the defendant today.

22  There is a tenant at the building that operates the business

23  that's there, and that tenant doesn't have any contractual or

24  legal obligations with respect to Lehigh Valley 1.  But so

25  there was some concerns about, like, oh, what if there's

EXHIBIT D, PAGE 020

1   medical malpractice and there's no insurance?  That's totally

2   separate legal entities.  So whatever insurance they maintain

3   has nothing to do with the physical property.  And as

4   Mr. Berger said, we did provide evidence of the fact that the

5   property's insured.  But that's just -- it's another

6   disingenuous argument because --

7              THE COURT:  Let me just stop you on the --

8              MS. PRICE:  Yeah.

9              THE COURT:  -- tenant real quick.

10             MS. PRICE:  Um-hum.

11             THE COURT:  So is there a lease that exists for that

12  tenant?  I know there was one until 2023, according to

13  Mr. Berger.  Is there --

14             MS. PRICE:  My understanding is that the lease was

15  renewed when the prior lease terminated.

16             THE COURT:  Do you know the terms of that lease?

17             MS. PRICE:  I do not know the terms of that lease,

18  no.

19             THE COURT:  Okay.

20             MS. PRICE:  But again, tenant is continuing to occupy

21  the property.  But I do believe that there is, in fact, a

22  lease --

23             THE COURT:  Okay.

24             MS. PRICE:  -- which has not been exchanged because

25  there has been no discovery in this case.

```
 1              THE COURT:  Discovery.  Understood.

 2              MS. PRICE:  Yeah.  Let's see.  So again, aside --

 3              THE COURT:  You were going to the insurance.  You

 4   were talking about the insurance.

 5              MS. PRICE:  Yeah, so we did --

 6              THE COURT:  So tell me about the insurance.

 7              MS. PRICE:  We did provide evidence of insurance.  I

 8   understand if it's not necessarily something that Mr. Berger

 9   was satisfied with.  But I do want to go back to this sort of

10   risk of loss idea because Mr. Berger's clients, as a lender,

11   are permitted to and, in fact, I believe have put force-placed

12   insurance on the property.  So they are able to protect

13   themselves.  And again, that just goes down to finances.  It

14   goes down to money.

15              Let's pretend in this sort of imagine --

16              THE COURT:  Tell me what you call that insurance.  I

17   don't -- I didn't --

18              MS. PRICE:  Forced-place.  Forced-place insurance is

19   when a lender can put its own insurance on property because

20   it's not satisfied that the property owner has insurance that

21   meets its needs.

22              THE COURT:  Okay.

23              MS. PRICE:  I'm not going to say definitively that

24   they have done that, but I was under the impression that they

25   had.
```

EXHIBIT D, PAGE 022

1          THE COURT:  Oh, I can ask Mr. Berger about that when

2   he comes back up.

3          MS. PRICE:  Okay.  So but again, this goes down to --

4   this is finances.  So even if, in this sort of imaginary

5   scenario that Mr. Berger has set forth that the property burned

6   down tomorrow and my client receives some type of payout,

7   there's a note, there's a contract, that they could absolutely

8   sue my client on the contract to obtain those insurance

9   proceeds.  I mean, this is not an abnormal way of proceeding,

10  but they can protect themselves while this case is pending.

11  While we're sort of playing out this foreclosure process, they

12  have the ability to protect themselves and to protect the

13  property.

14         THE COURT:  Well, is there insurance?  And for what

15  and for how much?

16         MS. PRICE:  We did provide the policies, and I did

17  look at the policies.

18         THE COURT:  Yeah.  Why were they redacted?

19         MS. PRICE:  My understanding is they were redacted

20  because it was one policy that dealt with not only this

21  particular defendant but also multiple other businesses that

22  were sort of --

23         THE COURT:  Oh, not just this, and --

24         MS. PRICE:  And so that was what was redacted, the

25  information related to nonparties in this and unrelated to this

1  particular property.

2          THE COURT:  And how much was it for?  And what did it

3  cover?

4          MS. PRICE:  I don't remember off the top of --

5          THE COURT:  Okay.

6          MS. PRICE:  I don't recall --

7          THE COURT:  Okay.

8          MS. PRICE:  -- to be honest.  And it wasn't raised to

9  me as a problem or as an issue when I sent it over, or else I

10 could have asked those questions to the insurance broker.

11         THE COURT:  And the loss payee is not listed on that?

12 Like, are they listed as the loss --

13         MS. PRICE:  I don't believe that the loss payee was

14 listed on it.  But again, Your Honor --

15         THE COURT:  You don't think?  I'm sorry; I just

16 didn't hear.

17         MS. PRICE:  I don't believe that it was.

18         THE COURT:  Okay.

19         MS. PRICE:  No, but again, Your Honor, my client

20 disputes the fact that LV1 is the proper holder of the note.

21         THE COURT:  No, I understood.  I understand that.  So

22 what you're saying -- right.

23         MS. PRICE:  Yes.  And so that sort of kind of plays

24 into some of the decisions that were made.

25         THE COURT:  Um-hum.  Okay.

```
 1            MS. PRICE:  So I want to talk to you about the
 2   financial condition because, Mr. Berger, in his papers that he
 3   filed, talks a lot about an audit that was done in 2020-'21 and
 4   the fact that the audit, essentially said that the entity was
 5   in dire financial condition.  I think it even said that it
 6   wasn't going to survive a year.  So let's note on that, because
 7   it was a 2021 audit that said that it wasn't going to survive a
 8   year.  And here we are four years later, and the entity is, in
 9   fact, still operating.  And we can't ignore the fact that the
10   audit happened in 2021.  We all know what was happening, what
11   the market was doing in 2021.  The entire country was in
12   financial straits at that time.  And so there isn't updated
13   financial information.
14            And the requirement to provide this financial
15   information was part of a regulatory agreement between my
16   client and HUD.  The regulatory agreement was not assigned to
17   LV1 and was terminated when HUD sold the note.  So my client
18   owes no obligation to Lehigh Valley 1 with respect to the
19   regulatory agreement.  And again, my client has not provided
20   financial information because my client does not believe that
21   Lehigh Valley 1 is the true and correct rightful holder of the
22   note.  That is something that is in litigation.  That is
23   something that we are currently addressing through the legal
24   process.
25            THE COURT:  May I interrupt you for one second?
```

1          MS. PRICE:  Yes.  And I should note, I mean, I don't

2    have anything with respect to insurance that might have been

3    procured by the tenant.

4          THE COURT:  Okay.

5          MS. PRICE:  And I don't know if they have it because

6    that hasn't been a question that's been asked that I think

7    probably would be a proper discovery question to ask.

8          THE COURT:  Okay.

9          MS. PRICE:  But there is that issue out there, too.

10         THE COURT:  Fair enough.  Okay.

11         MS. PRICE:  Yeah.  So again -- I'm moving on to the

12   diminution in value that --

13         THE COURT:  Um-hum.

14         MS. PRICE:  -- Lehigh Valley 1's arguments, again,

15   they're all speculative.  If this doesn't happen, this could

16   happen.  But there's nothing that is:  this is happening, that

17   there is this issue at the property, this thing is happening

18   that is causing a reduction in value of the property.  There's

19   no actual waste.  There are no actual facts that could cause

20   the reduction.

21         But if a receiver steps in and a receiver shuts us

22   down, now we go from a going-concern and operation which has

23   value to just a piece of real estate.  That's going to cause a

24   reduction in value.

25         And Mr. Berger's already said there is a licensure

1    issue here.  The receiver is not going to come in with

2    licenses.  We don't know what will happen.  But what we do know

3    is that the business is currently operating.  It has been

4    continuously operating.  The operations are required to

5    maintain some level of the building, some level or standard of

6    the building in order to maintain their standard of care.

7    There's no real risk of harm here.  There's no real risk.

8         The only risk here is that maybe Lehigh Valley 1

9    doesn't get paid as fast as it wants to get paid or doesn't get

10   its hands on the property as quickly as it had wanted, but

11   that's due process.  My client's entitled to that.  My client's

12   allowed to see how this plays out.

13        And so when we're talking about the harm to the

14   defendant versus the possible harm to the plaintiff here, to me

15   it's transparent that the plaintiff is -- they're looking to

16   empty out this building so they can get a quick sale.  And

17   they're asking the Court for an extreme remedy in order to do

18   it.  And not doing it and letting this sort of legal process

19   play out will give my client the ability to maintain the

20   property, to continue its operations, to maintain the status

21   quo while it's determining the absolutely seminal issue of

22   whether this assignment was even proper.

23        Just a couple of other additional arguments because

24   this is really important.  We're talking about security here

25   and whether there's proper security.  And there's a lot of talk

1  about this is a $15.7 million loan.  But again, the Court

2  should and can look at the fact that Lehigh Valley 1 did not

3  pay $15.7 million for this loan.  They paid three million, and

4  there's been no argument, no allegation that the property is

5  worth substantially less than what they paid for it.

6        So you can't, as an investor that purchases bad

7  loans, say, well, I'm undersecured.  I'm undersecured, and so

8  let me take this property back.  They were always undersecured.

9  They knew they were undersecured.  But their actual damages

10  here, their actual damages are less than $3 million.  And they

11  are not undersecured as it relates to what their actual

12  investment is.  In fact, they are probably -- there's

13  substantial security because I believe the property is worth

14  more than what they paid for it.

15        THE COURT:  Just the real property?

16        MS. PRICE:  Well, that's all that they have here.

17        THE COURT:  Right.

18        MS. PRICE:  They just have a mortgage on the real

19  property.  Yeah.

20        So it's an extreme remedy.  This is a mortgage

21  foreclosure action.  There are processes that are put in place

22  that are guaranteed to my client.  And this isn't just there's

23  a default on the loan, and now we're going to step in and we're

24  going to take the property.  I mean, that happens every single

25  day.

1          This is not an every single day case.  This is a case

2    that was precipitated by a massive once-in-a-lifetime event

3    that sort of threw everybody off kilter and made worse by

4    subsequent conduct of HUD that we believe violated the

5    documents and violated regulatory schemes that were in place

6    that were intended to protect my client.  And all of that

7    resulted in a manufactured default.  We don't even think that

8    the bidding process was done properly.  We absolutely think

9    that these assignments are invalid.

10          And now just giving LV1 the benefit of the doubt and

11   saying, well, we're just going to let you take over anyway,

12   that will irreparably harm my client.

13          There is no real risk to the property here.  The

14   property is running; it is operational.  And there's no reason,

15   right now, for the Court to award this extreme remedy.  Maybe

16   in the future, maybe give them the ability to file it down the

17   road, but we should at least go through discovery.

18          And by the way, a lot of these cases that were cited,

19   the discovery happened first.  So they came here with this

20   receiver motion with actual proof of the things that LV1 is

21   just sort of speculating about right now.

22          So we would respectfully ask that the Court deny the

23   receiver motion at this time.  Let us go through the process,

24   let us see what HUD has to say.  And yeah, that's what we're

25   asking for.

EXHIBIT D, PAGE 029

1          THE COURT:  Okay.  Thank you.

2          MS. PRICE:  Thank you, Your Honor.  I appreciate it.

3          MR. BERGER:  Your Honor, I'm having a hard time

4    understanding defense counsel's position.  What defense counsel

5    just said to you was we don't need to make mortgage payments;

6    we don't need to pay taxes; we don't need to demonstrate

7    insurance; we don't need to provide our financials, even though

8    the security agreement requires turnover of it because we are

9    operating just fine.  That has been the defendant's position.

10   We don't need to pay anybody; we're just operating.  We're

11   operating until somebody tells us we can't operate anymore.

12         This situation just cannot continue to occur where

13   people aren't paying.

14         I thought it also was very interesting that defense

15   counsel talked about the 2021 financials and that it was in

16   dire straits but yet they're operating four years later.  The

17   reason they're operating four years later is they haven't made

18   $3.4 million of payments on mortgages or taxes.

19         Defense counsel's position that, oh, there's

20   insurance in effect and you can't come here because what

21   happens if an event happens?  Well, first of all, I'm going to

22   turn over the insurance to you which you will see has been

23   redacted.

24         THE COURT:  Um-hum.

25         MR. BERGER:  My concern when I first saw it, which

```
 1               MS. PRICE:  He sounds like someone who lives in
 2    Florida.
 3               THE COURT:  He's from Florida, you said, right?
 4               MS. PRICE:  Yeah.
 5               THE COURT:  Okay.
 6               MS. PRICE:  Yes.
 7               THE COURT:  But you don't know anything about him?
 8               MS. PRICE:  I don't know anything about him, no.
 9               THE COURT:  Okay.  Okay.
10               MS. PRICE:  Thank you, Your Honor.
11               THE COURT:  Great.
12               MR. BERGER:  Your Honor, if I can just submit -- I'm
13    not arguing anymore.
14               THE COURT:  No, you're just going to hand some
15    documents up.  That's fine.
16               MR. BERGER:  I'm just going tell you about what I'm
17    going to be submitting to the Court.
18               THE COURT:  Okay.
19               MR. BERGER:  I'm just going to submit what I received
20    from counsel yesterday, which is the certificate of compliance
21    and the commercial insurance policy.  Your Honor, may I just
22    forward -- I'm going to submit the statement of multifamily
23    mortgage accounts.
24               THE COURT:  Do you want to mark those -- should we
25    mark those as exhibits, Jill?
```

**EXHIBIT E**

```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                                  *
Lehigh Valley 1 LLC               * Docket # 24-cv-2709
                                  *
             Plaintiff,           *
                                  * United States Courthouse
       vs.                        * Courtroom 16A
                                  * Philadelphia, PA
Saucon Trust, U/T/A               * February 18, 2025
Dated October 1, 2007             *
             Defendant.           *
* * * * * * * * * * * * * * * * * * * * * * * * * * *
```

                 TRANSCRIPT OF ORAL ARGUMENTS HEARING
              BEFORE THE HONORABLE MARY KAY COSTELLO
                 UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:        Philip D. Berger, Esquire
                          Berger Law Group PC
                          919 Conestoga Road Building 3
                          Suite #114
                          Rosemont, PA 19010

For The Defendant:        Rebecca Price, Esquire
                          Benjamin P. Sheppard, Esquire
                          Norris McLaughlin, PA
                          515 W. Hamilton St. Suite 502
                          Allentown, PA 18101

                          Raymond G. Lahoud, Esquire
                          Lahoud Law Group, P.A. Tower 6
                          600 Hamilton Street
                          Allentown, PA  18101

Audio Operator:           N. Spicer

Transcribing Firm:        Principle Court Reporting
                          Services, Inc., 544 Grove Ave.,
                          Suite 1, Johnstown, PA  15902
                          Telephone: 814-269-4666

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

EXHIBIT E, PAGE 001

1  issue was raised to the Court which didn't get the substance of

2  it, and I'm happy to address the substance, but I just want to

3  make sure the Court is aware and if it sounds like you are that

4  you're not bound by Judge Schmehl decision. I know that there's

5  this -- this tendency to try to simplify this by saying well

6  they're same the -- the -- the -- the related parties. They are

7  two separately formed LLCs that just happen to have the same

8  manager, but they are separate. There are two sets of loan

9  documents, they might have similar or the same terms, but

10  they're for different amounts of money and they are -- they are

11  absolutely separate, and they're as you pointed out two totally

12  separate properties, interestingly the reason they were filed

13  separately to begin with is because under Pennsylvania law you

14  have to file a foreclosure action in the county in which the

15  property is situated and these are in two totally separate

16  counties as well. There is absolutely no basis for collateral

17  stopple here because as Mr. Berger said one of the problems of

18  that is that the parties have to be identical and they are not

19  identical. There are two totally separate independent

20  defendants that were -- that were listed here, and -- you know

21  as for consolidation these cases were filed in August of 2024.

22  They've been pending for almost seven months so if there was

23  any expectation of consolidation or -- you know a request

24  certainly could have been made and heard up to this point. So I

25  do think that these are totally separate cases. They are

16

1  totally separate issues and you're not bound by what has

2  happened in the other case, and although we did have argument

3  on Thursday before Judge Henry, she has not issued a ruling on

4  that yet as either, and so we're asking to proceed and I do --

5  I do actually do want to raise one housekeeping issue, and I

6  apologize that I did not lead with this. Mr. Berger is also

7  right that we did have argument on a motion to dismiss in the

8  other case that we did take by virtue after that argument. We

9  did take some jurisdictional discovery and we are waiving our

10 argument or objection as it relates to lack of diversity for

11 today's purposes. We do believe -- we would like to proceed

12 with the -- the rest of our motion which relates to standing

13 and the Court's option to abstain from hearing this case, but

14 we are not going to proceed with our diversity argument.

15         THE COURT: Okay, all right. And I'll -- I'll talk

16 about that in a second, but so then as I understand it because

17 we're still supposedly dealing with the motion to strike, there

18 was two issues, one was the letter and the other was the

19 affidavit, right there was an affidavit that was attached?

20         ATTORNEY PRICE: Yes, Your Honor.

21         THE COURT: I don't know if you want to be heard any

22 further on that.

23         ATTORNEY BERGER: The affidavit only went to the

24 diversity issue, and if Rebecca is waiving that I don't think

25 that that's an issue.

EXHIBIT E, PAGE 003

1    that was just one of them. So I guess we can deny that as

2    moving -- having had this discussion on at least that that

3    part. Do you want to let's see the other issues so standing.

4              ATTORNEY PRICE: And abstention, Your Honor.

5              THE COURT: Abstention. Do you want to address the

6    court any further on that or?

7              ATTORNEY PRICE: If I may, Your Honor.

8              THE COURT: Of course.

9              ATTORNEY PRICE: Do you mind if I come to the podium?

10             THE COURT: Not at all.

11             ATTORNEY PRICE: Thank you. And I will be brief

12   because it sounds like you read our pleadings which I

13   appreciate. Your Honor, I -- I just want to remind the Court

14   where this is a motion to dismiss. We've not yet filed a

15   response of pleading to the complaint. As Mr. Berger said there

16   is a sort of kind of companion or a parallel case where similar

17   allegations have been made where we have filed our answer, as

18   well as have asserted counterclaim and has have asserted a

19   third party complaint against Hud. If and when we advance to

20   that stage in this litigation the Court can expect that we will

21   file a very similar answer asserting defenses including --

22   including allegations related to standing, which -- you know

23   regardless of how the Court were to rule on that issue today,

24   would remain an argument of ours because we do believe that

25   there are improprieties with respect to the assignments, not

20

1  only from Hud to Windstream, but also then from Windstream to

2  Lehigh Valley 1 and just for the purpose of today's argument i

3  will call it LV1.

4         THE COURT: Okay.

5         ATTORNEY PRICE: Not intentionally I just kept doing

6  it on Thursday so I am letting you know that's what I mean. I -

7  - I do want to point out that in the response to the motion to

8  dismiss on the argument of standing LV1 has only objected to

9  whether or not my client is permitted to argue standing. They

10 haven't actually responded to the underlying issues that we've

11 raised with respect to the improprieties in the assignments. So

12 i want to talk first about the assignment from Windstream, who

13 it was the original purchaser of the note and mortgage from Hud

14 to LV1 who is the current holder of the note and mortgage and

15 the plaintiff in this proceeding. Now in order for a party to

16 be authorized to purchase a loan from Hud they have to enter

17 into a certain sort of an agreement with Hud that that sets

18 forth the rules and the qualifications, the obligations of any

19 purchaser of the loan. One of the rules in that document

20 provides that in the event that a purchaser of a Hud loan

21 subsequently assigns it to another entity that that assignment

22 has to contain explicitly written language with respect to an

23 assignment of obligations and liabilities over to Hud. The

24 assignment that went from Windstream to LV1 does not contain

25 that language. The Hud rules also provide that if it does not

EXHIBIT E, PAGE 005

21

```
 1   contain that language the assignment is void, and so our
 2   argument to the court is that LV1 does not have the authority
 3   to be before Your Honor or to be in this proceeding to enforce
 4   loan documents because the assignment that granted it the loan
 5   -- the -- the loan documents is not valid. It is void under
 6   Hud's own rules, and the documents were attached to the
 7   pleadings, Your Honor has them. It clearly does not contain
 8   language and I do quote the language in the motion to dismiss
 9   paragraph two, and so absent authority to enforce the documents
10   we can't be here. The case has to be dismissed and the
11   plaintiff will tell you that they're -- you know the only way
12   in which borrower under loan documents has standing to object
13   to standing or to object to an assignment is if there's a risk
14   of double payment, but that's just not true. Courts have held
15   that a borrower has standing when there is a risk of serious
16   injury, double payment certainly is one of those potential
17   injuries, but in this case we're objecting we're -- we're
18   suggesting that there's additional injury. We risk losing our
19   property to an entity that doesn't even have the ability to
20   enforce these documents, and there is at least one case which I
21   have cited that says that a borrower can always object when
22   regarding the validity of an assignment, and if an assignment
23   is avoid, which obviously goes to a party's ability to enforce
24   those documents, that is certainly something that the borrower
25   can raise before the Court, and so we believe and we have
```

EXHIBIT E, PAGE 006

22

1  properly plead, and I don't believe that the plaintiff has even

2  responded to this argument that the that assignment is void,

3  and because that assignment is void they can't be here today as

4  the plaintiff. So then that goes down to the assignment from

5  Hud to Windstream, and again Your Honor, we'll get into this

6  with the motion for the receiver, but there are substantial

7  defenses that my client has raised in the other case, and will

8  raise in this case with respect to the way that Hud treated

9  this -- these loan documents and the way that Hud treated

10 specifically my client. We believe that Hud manufactured a

11 default during the covid pandemic crisis, and unjustifiably

12 denied my client to access to certain government regulations

13 that were intended to protect it from this type of default. We

14 do not believe that this was went properly to the sale. We do

15 not believe that Windstream that Hud properly vetted Windstream

16 as a qualified bidder, for instance Windstream was obligated at

17 the time of bidding to prove that it either was a qualified

18 loan servicer or had retained a loan servicer, neither of which

19 it did, and we -- I'm so sorry I lost my place, but there was

20 there give me one second.

21        THE COURT: Sure take your time.

22        ATTORNEY PRICE: I'm sorry and Windstream also had to

23 provide a plan, a relocation plan because I'm not sure if the

24 Court is aware, but the properties are currently operating as

25 nursing facilities for elderly patients in the Lehigh Valley

 1  including a component for memory care facility, and so because
 2  of the sensitive nature of the business that's operated there,
 3  the qualified bidder was obligated to have a relocation plan in
 4  place in the event of foreclosure. This was, one this isn't a
 5  foreclosure proceeding obviously, but this was always intended
 6  as a sort of loan to own scenario for the -- the plaintiff. The
 7  plaintiff purchases with the intention of moving quickly to
 8  obtain possession of the properties. They could sell it and get
 9  a return on their investment, in fact, they bought this loan in
10  September of '23, and they had filed confessions of judgment
11  within six weeks of receiving them, additionally -- you know we
12  have not received as we sit here today any type of valid
13  documentation from either Hud or the plaintiff that outlines
14  the amounts that are due, that outlines how certain payments
15  were -- I am sorry certain funds that were in Hud's possession
16  were applied to the loan balance. My client has been given
17  absolutely no information regarding this, and so there are
18  valid objections that are pending that that the Court should
19  consider when -- when deciding whether to proceed on this, and
20  then that's -- that's with respect to the standing issue. The
21  secondary issue is under the Colorado River doctrine, which is
22  basically it gives the Court it's not -- it's not an
23  obligation. The Court's not mandated, but it gives the Court
24  the option of pushing this back to the State Court where it
25  rightfully belongs -- you know first there's a strong federal

EXHIBIT E, PAGE 008

24

```
 1  policy that State Court foreclosure matters should be heard in
 2  State Court. This is a -- this is a local matter this is a
 3  local business, and it should be heard and -- and it's in
 4  Northampton County. It should be heard in Northampton County
 5  which the plaintiff knows because that's where the plaintiff
 6  started this action. They filed it in Northampton County and
 7  it's only because they received an adverse decision on their
 8  first go that they decided okay we don't want to be here so
 9  we're going to create this -- this assignment scenario so we
10  can create diversity jurisdiction so that we can move over to
11  Federal Court where hopefully we'll get a friendlier -- a
12  friendlier judiciary, but I mean that that is classic forum
13  shopping that's exactly what this Court should be not allowing
14  a plaintiff to do. This is a local State Court foreclosure
15  action that should be heard in State Court. Now, I know that
16  there's going to be some argument about the fact that
17  confessions of judgment are fundamentally different from
18  mortgage foreclosure because confessions of judgment are -- you
19  know based upon a default on a note, whereas mortgage
20  foreclosure is enforcing rights under a mortgage, but the
21  default is the same; right. It's no matter what the mortgage is
22  tied to the note and you can't file a foreclosure action
23  without alleging that there's been a default under the note,
24  and the default that was alleged in the confession of judgment
25  action is identical to the default that's been alleged in this
```

EXHIBIT E, PAGE 009

1 | proceeding, and that it was already raised in Court. Now the
2 | Court in Northampton County didn't get to the underlying
3 | meritorious defenses just as this Court hasn't gotten to those
4 | because it found that there were irregularities in the loan
5 | documents themselves that that would not allow the -- the
6 | extraordinary remedy of -- you know essentially an immediate
7 | entry of judgment without some consideration of -- you know my
8 | clients due process rights, but that court did exercise
9 | jurisdiction over the loan documents and it exercised
10 | jurisdiction over the default that's been alleged here, and so
11 | again the judgment was stricken, but the plaintiff chose that
12 | jurisdiction first. The plaintiff went there first and the
13 | instruments that were being used in that proceeding are
14 | identical to the instruments -- instruments that are being used
15 | in this proceeding -- you know this one of the other issues to
16 | consider under Colorado River is inconvenient forum, and a
17 | forum selection clause. I should note that the loan documents
18 | do not contain a forum selection clause so it doesn't say that
19 | it has to be in any particular Court, which weighs in favor of
20 | abstention, and in terms of inconvenient forum I mean here we
21 | are I -- I got a lovely drive down the Schuylkill this morning
22 | -- you know to come to Philadelphia to argue this motion when
23 | really -- you know I'm -- I'm a local Lehigh Valley attorney. I
24 | represent local Lehigh Valley businesses and this is a local
25 | Lehigh Valley business. I mean there's no reason why this the

EXHIBIT E, PAGE 010

26

1  State Court can't and shouldn't hear a State Court issue
2  foreclosure matter regarding property in its own county, and so
3  -- you know I do think that it makes sense for this to be in
4  State Court state law controls here. I don't think that that's
5  even in dispute and there's really no concern that the State
6  Court isn't going to protect the plaintiff's interest with
7  respect to a mortgage foreclosure action -- you know I'm sure
8  there was some frustration about the result of the confession
9  of judgment argument, although, I would maintain that there are
10 pretty -- pretty blatant irregularities in the loan documents
11 that caused that decision to be entered, but it wasn't due to
12 any type of favoritism to the defendant. It's just that the --
13 the Court saw that the documents were not proper and struck the
14 judgement, that does not mean that they won't properly hear a
15 mortgage foreclosure going forward, and so -- you know we -- we
16 -- we are asking the Court to abstain from hearing this in
17 Federal Court let's not further clog your docket and let this
18 go to State Court where it belongs where it's intended to be
19 heard for local property based upon state law and that's all I
20 have on the motion to dismiss.
21          THE COURT: Okay thank you.
22          ATTORNEY PRICE: Thank you.
23          ATTORNEY BERGER: There was one other issue raised by
24 Rebecca. I don't know whether you're still raising or not about
25 the -- about this in rem pleading and I'm happy to we recite

35

1    paying the same debt twice. This debtor hasn't even paid the

2    same debt once, and the debtor is not escrowing taxes. The

3    debtor is not escrowing payments for the -- for the mortgage

4    payments, they're just not making payments. Debtor has no

5    standing in -- in the and I cite two cases. The debtor has no

6    standing to challenge a mortgage assignment when the debtor is

7    neither a party or a third party beneficiary of that

8    assignment, and in this case the debtor is not. The mortgagee

9    holds the original note being -- being Lehigh Valley 1. The

10   mortgagee is entitled to enforce it and it's immaterial under

11   the Patosni (phonetic) case that we cite, it states that it's

12   immaterial -- immaterial to any claimed defect by the debtor

13   about an assignment of mortgage or an assignment of loan

14   documents. The Court specifically found that that debtor cannot

15   make any kind of claim of any kind of defect which is what this

16   -- what this debtor is trying to do because it's not because --

17   because it totally lacks standing. For those reasons the

18   defendant's motion to dismiss should be denied.

19             THE COURT: Thank you.

20             ATTORNEY PRICE: May I briefly respond, Your Honor?

21             THE COURT: Yes.

22             ATTORNEY PRICE: Your Honor, first I just want to

23   address the argument that my client doesn't risk injury. My

24   client owns the building there is a business operating from the

25   building, and my client risks losing the building, risks losing

36

 1  the building without having had any of its defenses heard at
 2  this stage of litigation, which -- which as I explained to the
 3  Court will go to the default itself, and whether that default
 4  was a valid default or manufactured by wrongful conduct of a
 5  third party that will be brought into this case if and when we
 6  get to that stage. So to argue that there's no risk of injury
 7  that that's absolutely disingenuous. My client stands to suffer
 8  the most here, whereas, the plaintiff would maybe suffer some
 9  type of monetary damages while the case was pending while my
10  client was provided the due process rights that they're
11  constitutionally protected or -- or given to them, but the risk
12  here is that the property goes away that the building goes away
13  and that people, humans in my community get displaced because
14  the plaintiff doesn't want the Court to hear our defenses. The
15  plaintiff doesn't want the Court to waste its time having to
16  actually prove that there is a legitimate default here, and so
17  there -- there is risk of injury and there is case law, which I
18  have cited to in my pleadings, that says that when there is a
19  legitimate risk of substantial injury that my client has
20  standing to object to the assignment, and I want to talk about
21  that too because again lots of argument on whether my clients
22  allowed to object to an assignment, not one response to my
23  claim that the assignment from Windstream to LV1 violated Hud's
24  loan agreement sale policies, which required that assignment to
25  contain explicit written language that the assignment does not

EXHIBIT E, PAGE 013

1   contain. If LV1 does not have a proper assignment, it does not

2   properly own the loan documents and it has no standing to

3   enforce those loan documents before this Court. I think this is

4   a very serious issue. This issue was not properly raised with

5   Judge Schmehl by myself, which is my fault in the other case,

6   but it's before Your Honor and I think that if you look at the

7   plain language of the -- the rules that had to be followed that

8   specifically say that this language has to be explicitly

9   written in the assignment or the assignment is void, and then

10  you compare it to the assignment that's been attached to the

11  documents the language is not there, the assignment is void,

12  and LV1 does not have sanding to pursue this litigation -- you

13  know, and then finally Your Honor, I just -- I just want to

14  clarify something because -- you know I know there's this issue

15  of I called it a nursing care facility. It's -- it's a 201 bed

16  facility, 50 of which is designated for secure memory care,

17  which is a significant medical provision of medical services to

18  vulnerable members of our community, and then finally -- you

19  know again there's all this talk about we're going to keep --

20  we're going to keep this -- this business going. I mean it's

21  clear that they -- they are looking to completely bypass my

22  clients' due process rights, deny my client the ability to

23  assert is defenses. They've already stepped in and they're

24  taking over this business, but again we're talking about a

25  group of investors from all over the country who bought this

1  loan, and then went to great pains to explain to this Court

2  just how little contact it has with the state of Pennsylvania

3  and with this district, no contacts whatsoever, but they're

4  going to now come in and run a nursing facility in northeast

5  Pennsylvania. I don't buy it. They're looking to get in there

6  right away so that they can take over operations, shut it down

7  and sell it so they can get a return on their investment, and

8  they're looking to do it before my client has any opportunity

9  to assert -- to assert its defenses and to pursue its claims

10 against the third party. So we'll get into that obviously with

11 the receiver motion, but I'm asking this court to dismiss this

12 based upon the lack of standing. Thank you.

13          ATTORNEY BERGER: Your Honor, just really quickly just

14 --.

15          THE COURT: Of course.

16          ATTORNEY BERGER: Real quick review. Defendant's

17 counsel again claims that her risk is the risk of losing the

18 building. There'd be no risk of losing the building if the

19 mortgage was paid and the taxes were paid, that's not a -- that

20 is not under the Patosni issue about standing that's not a risk

21 that would grant them standing to make that argument. The

22 argument -- defense does not have standing to make that

23 standing argument to start with. The again we have this entity

24 this plaintiff was put together in such a way so that they can

25 operate it. We have the ability if we get to that point, and --

EXHIBIT E, PAGE 015

42

1   anybody want to be heard further on any of that? Okay which do

2   you need a break or anything like five minutes before we start

3   talking about the receiver?

4           ATTORNEY BERGER: Yes, please.

5           THE COURT: Okay, all right let's -- let's take well

6   we'll take ten minutes okay everybody?

7           ATTORNEY PRICE: Thank you, Your Honor.

8           THE COURT: Yes.

9           THE CLERK: All rise.

10          THE COURT: You go ahead, Court is adjourned.

11  RECESS

12          THE CLERK: All rise.

13          THE COURT: Hello everyone.

14          ATTORNEY PRICE: Hello.

15          THE COURT: Please be seated welcome back. All right

16  everyone's refreshed. We will move on to the motion for to

17  appoint a receiver. I've looked at the papers, given it some

18  consideration obviously I'm going to hear evidence and

19  argument, but I mean I -- I so just to let you know sort of

20  what I'm thinking about, obviously is I just want to know that

21  the -- you know what factors that the Court has to consider. I

22  think we're in agreement on what the factors are, what's met

23  here and what isn't what -- what's the sort of facts that apply

24  to each of those factors, and I -- I do understand there's a

25  contractual provision that provides for appointment of receiver

EXHIBIT E, PAGE 016

Case: 25-1899    Document: 29-3    Page: 84    Date Filed: 08/11/2025
Case 5:24-cv-02709-CH    Document 47    Filed 02/28/25    Page 43 of 114

43

1 and that's certainly one factor the Court will consider, but

2 it's not the only one, and one thing I want to point out about

3 that is and one the issue that I'm curious about is there the

4 contractual provision talks about the appointment of a receiver

5 for profits right, but the powers of the receiver that you're

6 seeking is much, much broader than that and goes into

7 management as well, which isn't mentioned in the contractual

8 provision, so I want to know -- so I think the facts that that

9 satisfy the factors that go to that I mean what -- what are

10 these -- under what circumstances should the Court allow this

11 receiver to manage the property, and what does that mean by --

12 you know what exactly are we talking about managing the -- the

13 whole entire facility or just managing the finances. So these

14 are the things that I'm curious about just to kind of give you

15 headline that for you so maybe you can sort of focus in so I

16 can help you so we can do this as efficiently as possible, but

17 I'm happy to hear whatever you want me to hear.

18        ATTORNEY BERGER: Thank you, Judge, and thank you for

19 kind of giving the review. I'm going to walk through a bunch of

20 different issues, and I have Mr. Fratangelo was originally

21 brought here to really review the diversity in his affidavit on

22 the diversity of things. If it's -- if the court wants or

23 opposing counsel wants to review some of the defaults I can put

24 him on the stand to review the defaults. Judge Henry just took

25 it by oral arguments. I'm happy to just make oral argument, but

45

1          THE COURT: Okay.

2          ATTORNEY BERGER: Just kind of run through the bottom

3  line issues.

4          THE COURT: Sure I appreciate that.

5          ATTORNEY BERGER: Four years of missed mortgage

6  payments, defendant failed and refused to pay prior taxes when

7  the -- when the loan went from M&T to Hud. Hud had to take and

8  pay two years of past two taxes before the loan sell to my

9  client. So there was another $300,000 300 -- you know $300,000

10 approximately that was paid by Hud to pay prior taxes and now

11 there's $322,294 that is due since the assignment from Hud in

12 past due taxes. We don't want to get into an issue of a tax

13 sale for instance and losing collateral property. The defendant

14 has failed and refused to turn over fire insurance policies

15 after the demand has been made, hazard insurance policies,

16 professional liability insurance policies. Last night the

17 defendant provided to us a blacked out custom insurance policy

18 prepared for White Haul Manner Inc., that's not Saucon and if

19 it is Saucon then the amounts that are in this policy are --

20 are covering the build -- you know various buildings and it's

21 only a $2,000,000 policy and it's covering all the buildings

22 for White Hall, and it's covering all the buildings for this

23 that is certainly not what is acceptable or necessary, and

24 there's a whole bunch of stuff that's blacked out in this. We

25 don't even know whether for instance LV1 is the lost payee,

EXHIBIT E, PAGE 018

 1 which is the issue, and -- and as explained to Judge Henry
 2 because she asked what about lost payee. If they're not listed
 3 as a loss payee and building should burn down and the
 4 defendants get the monies from that policy, they can just leave
 5 and walk and leave the and leave my clients with a burned out
 6 structure, but again the structure if it's $2,000,000 on a
 7 number of different properties that's certainly not even enough
 8 money to cover what -- what is due on this property. So failure
 9 and refuser to turn over the fire insurance policy, the
10 liability insurance policy like I said the other professional
11 liability policy is all a major concern. Failure to turn over
12 financials, one of the big things that the judges reviewed, and
13 we'll go through the case law on that, is what is the health
14 what's the financial health of this defendant. The only
15 financials that we have we've made demand under the security
16 agreement they're supposed to be turning over their financials
17 every year and that's a requirement under the security
18 agreement. We've made demand for those financials. They failed
19 and refused to turn over the financials. The only financials
20 that we have goes back to 2021, which is the date of default on
21 both the mortgage payments and the tax payments shows that this
22 defendant was in such hardship such financial hardship that
23 they couldn't even pay their accountant to do those financials.
24 They still since those 2021 financials, not only have they
25 refused to turn over current financials, they haven't made a

1   the contractual provision. The probability of plaintiff success

2   in mortgage foreclosure, the financial position of the debtor,

3   which we already talked about before, the imminent danger of

4   the property being lost, injured, or diminished in value, and

5   inadequacy of available legal remedies. These are the four

6   things that those judges specifically reviewed. I'll go through

7   it and then I'll quickly just tick off the other ones so make a

8   full record.

9           THE COURT: Okay sounds good.

10          ATTORNEY BERGER: The -- the probability of plaintiff

11  success in the action both Judge -- Judge Savage found that the

12  failure to pay a mortgage shows that a creditor is likely to

13  succeed in a mortgage foreclosure action. Judge Pappert found

14  that a creditor is likely to succeed on the merits in an

15  underlying mortgage foreclosure when there is evidence of

16  payment default, we have that in this case, despite the

17  defendant's silly claim that there actually has to be a

18  mortgage foreclosure judgment entered before you can put a

19  receiver in, that's not one of the requirements and it's not

20  one of the issues. The issue is the probability of success in

21  this matter and the judges found that failure to make mortgage

22  payments was likelihood of success. We meet the first

23  requirement.

24          THE COURT: The -- the idea here is to preserve the

25  collateral to protect your investment; right?

60

1          ATTORNEY BERGER: Well, that's -- that is the bottom

2   line as to what it is yes.

3          THE COURT: Right.

4          ATTORNEY BERGER: That's certainly what we're looking

5   for we want to preserve this. Again we're not asking Your Honor

6   to put to jump ahead and to give us judgment on anything. We're

7   just looking to preserve the collateral and make sure the

8   residents are in a facility which is properly maintained and

9   which has proper insurance, and to know the financial condition

10  of this defendant. The second issue that they look is the

11  financial position of -- of the debtor. We already reviewed --

12  I reviewed that at nauseum. We don't know. The last financial

13  conditions 2021 they haven't made a single payment of mortgage

14  or taxes since then, and we don't even know whether there is

15  insurance. They had an obligation to present their financial

16  conditions they failed and refused to do so. The third thing is

17  the imminent danger of the property being lost, injured, or

18  diminished in value, that gets to the issues of the insurance.

19  The easiest way to looking on that is the insurance, if this

20  property doesn't have proper insurance then the likelihood of

21  it being lost, injured, or diminished in value is pretty high.

22  We need a receiver to go in and to see those policies and not

23  to provide some blacked out policy for a different entity that

24  that may or may not even apply to this case, and we certainly

25  haven't seen a hazard insurance policy at all, liability

 1  insurance policy at all. So those -- that issue is met, and

 2  when they're being lost if they continue to fail to pay taxes

 3  then next year the property will be scheduled for a tax sale.

 4  We meet that requirement. Inadequacy of available legal

 5  remedies, and this is the fourth one that the all three judges

 6  reviewed, Judge Savage found that defendants mismanagement

 7  because by diverting rents and not paying the mortgage, which

 8  is what we believe is happening here, we've asked where the

 9  rents are going and the mortgage is not being paid, but Judge

10  Savage found that they were diverting rents and not paying the

11  mortgage, and decreases the value of the property and a

12  mortgage foreclosure will not prevent the damage being done to

13  the asset. The receiver needs to determine the financial

14  health, make the tax payment, review the insurance, and do all

15  those things while this foreclosure proceeds. So we're not

16  looking to step aside or step in front and say we want judgment

17  and foreclosure. We want the -- we want to be sure we don't

18  lose the collateral, which is underlying this loan of which $18

19  million dollars or whatever that number is -- is due. Those

20  were the four issues that all three Eastern District of

21  Pennsylvania judges reviewed, just to make a clear, quick --.

22          THE COURT: Sure.

23          ATTORNEY BERGER: Full record the other -- the other

24  issues you look at is the possibility of irreparable harm to

25  plaintiff's interest. We talked about that if there's -- if

1   there's a fire, it burns down that's an irreparable harm. If
2   there's somebody that falls and gets hurt and there's not
3   insurance that's harm, failing and refusing to provide
4   insurance just absolutely meets that factor on its own,
5   inadequacy of security to satisfy the debt. We don't know what
6   this property is like. We don't know whether there's busted
7   pipes. We don't know whether it's being maintained. We don't
8   know what the status of the security is to satisfy the debt.
9   The judge -- the other judges didn't review it, but one of the
10  things is what's the status of the security. Probability, next
11  one is probability of fraudulent conduct has occurred, again
12  not really considered, but all I can say is four years of no
13  mortgage payments four years failing refusal to turn over the
14  rent collected, how much rent has been collected, where has
15  that rent gone. It's a potential. I'm not making any claims
16  here, but it's a potential that fraudulent conduct has been
17  occurring by diverting the payments that are due to the
18  plaintiff under the mortgage being all rent payments, and that
19  the funds are being in at least $3.4 million over the last four
20  years has been diverted instead of paying taxes or mortgage.
21  Next one is lack of a less dramatic equitable remedy, again
22  that one we're -- we're not looking to kick out any tenants or
23  at least who are paying, but we want to make sure that it's
24  properly insured, bills, taxes, mortgage. The more dramatic
25  remedy is to continue to allow this defendant to continue to --

EXHIBIT E, PAGE 023

63

1  to mismanage this property, to not pay its bills, to incur

2  liabilities and to have a significant and have a significant

3  liability event without proper insurance that would be a more

4  dramatic remedy than what we are seeking, which is having a

5  receiver come in, and the last one is the likelihood of

6  appointed receiver will do more harm than good. Appointing a

7  receiver to properly manage the facility at least the -- at

8  least the financials of the facility, and then to make a

9  determination as to whether this operating company is doing a

10  fine job or whether this operating company needs to be replaced

11  by somebody that can run the property differently is the best

12  thing that can happen to this -- to this property. It is not a

13  situation that the receiver will be doing more harm, the

14  receiver will be trying to get this property to run properly

15  with insurance, taxes, mortgage payments being paid. All right.

16  I believe that reviews our issues for why -- why a receiver

17  should be a point. I'm certainly happy to ask -- answer any

18  questions, and certainly if Your Honor has any questions about

19  any of my numbers that I put up as how much is due, when the

20  last payment was made all that Mr. Fratangelo can do that, but

21  that's all the -- all the information I've got back up

22  documents for all the numbers.

23          THE COURT: Thank you.

24          ATTORNEY BERGER: Thank you.

25          ATTORNEY PRICE: Your Honor, I want to clear up to

1  start just part of the argument that I think was intentionally

2  confusing because I -- I know -- I know that Mr. Berger and his

3  client are aware of this, but the -- the -- the building is the

4  building right. There's mortgage on the building and the -- the

5  LV1 purports to own the mortgage. The property is operated by a

6  tenant of the building. So it's a totally separate not a party

7  to this proceeding, a party over which LV1 has no control or

8  right of control or interest. It's -- it's a totally separate

9  operating entity that currently occupies the space. So one of

10  the arguments that that was repeatedly made is what if someone

11  slips and falls or what does professional liability issue,

12  that's that would be subject to a lease agreement with that

13  operating entity that has nothing to do with the property

14  itself, that is the -- the operating entity would have its own

15  professional liability insurance because it's the one that's

16  operating the company that provides care to to elderly

17  individuals, and so I just want to make -- make sure that

18  that's clear that when we're here we're talking about the just

19  the property. We're not talking about they can't come in and

20  just run the business. They have -- they only have an interest

21  in the building itself not in the operation that that is

22  currently being run from the building. Now, there's been some

23  argument here that there is an $18,000,000 plus give or takes

24  some monies loan outstanding, and I think it's important for

25  the Court to know that that's not the actual interest that the

65

```
 1  plaintiff has in this loan, right. The -- the loan was bought
 2  as bad debt loan that was bought by a group of investors from
 3  all over the country for somewhere around $3.2 million, so
 4  that's their loss here, that's their actual claim, their actual
 5  interest in this property is what they paid for it, not what
 6  the balance is. I'm not suggesting that that total balance
 7  isn't due, what I'm saying is that when -- when the Court is
 8  looking at actual injury the number you should look at is what
 9  they're actually invested into it not what they could
10  potentially claim is owed under the loan documents, and it
11  matters all of this matters because the plaintiff keeps on
12  saying well it's been covid is over, it's been five years covid
13  was in 2020, and again I don't know what rock Mr. Berger was
14  living under covid didn't end for me in 2021. I felt like
15  people are still dealing with the lasting effects of what
16  happened during that two year period 18 months of which
17  everything was shut down, but what I am saying is that what
18  matters is what Hud did and this is what will come up if we end
19  up filing a third party complaint Hud manufactured this
20  default, at the time and I know I don't need to tell the Court
21  -- you know what an extraordinary series of events was
22  happening during that time period, but everything shut down and
23  my client was subject to various restrictions that prohibited
24  it from taking any type of action against its tenants or
25  residents who were not paying rent. So to the extent that the
```

EXHIBIT E, PAGE 026

1  operating entity wasn't able to pay rent because its residents

2  weren't paying rent, there was nothing that my client could do

3  to the operating entity, there was nothing that the operating

4  entity could do to those tenants because they were strict

5  prohibitions in place for more than 18 months that limited my

6  client's ability to enforce its own agreements, because of that

7  the government stepped in and they passed certain regulations

8  that were intended to benefit borrowers like my client so that

9  they would not be forced into a default of their loan

10 documents. It was this cyclical -- you know governmental sort

11 of mechanism that was in place in order to protect small

12 businesses during this unprecedented time. Now pursuant to

13 those regulations and Hud agreements, Hud was permitted to take

14 close to $1,000,000 of my client's money that my client had

15 deposited into a reserve account, and use those monies to make

16 the monthly mortgage payments to ensure that my client did not

17 default out of loan obligations, and Hud did do that for three

18 months during covid. It took regular monthly payments from the

19 reserve account in order to keep my client out of default, and

20 then it stopped. We don't why it stopped. We asked it to

21 continue to do that. We asked Hud take our own money, and --

22 and help us out here and it refused to do it Hud manufactured

23 this default. We were forced by the government to not take

24 action to protect ourselves against any non-paying tenants or

25 non-paying residence, while also being denied unjustifiably

EXHIBIT E, PAGE 027

67

1   access to benefits and regulations that were intended to
2   protect us, rather Hud allowed the default to continue, refused
3   to allow us to use our reserve account to pay the regular debt
4   service on this mortgage even though we were allowed to do
5   that, and then at the very end right before Hud decided to sell
6   the loan, it took 100 percent of those monies and it applied it
7   somewhere, some way, somehow we don't know because we've never
8   been provided any information with regard to what actually
9   happened to those funds and notably Lehigh Valley 1 knew all of
10  this because they were buying the loan. They knew they were
11  buying that debt. They knew they were buying a loan that was in
12  default so now they're sitting here and saying oh well this
13  loan's in default, they haven't paid in four years well all of
14  this -- all of this is relevant to what happened, who knows
15  what would have happened if Hud had actually done what it was
16  permitted to do with my client's own money, maybe we wouldn't
17  be in the position we're in today. We have been playing catchup
18  for four years and all of this is relevant because these are
19  all of the claims that we will be asserting in the next 14 days
20  against Hud in the form of our answers, our affirmative
21  defenses and our third party complaint. So what plaintiff is
22  doing is saying don't consider any of that Your Honor don't ---
23  don't -- don't look at their defenses, don't look at their
24  potential claim, don't look at what caused this default, right,
25  bypass that, deny my client their constitutionally mandated due

EXHIBIT E, PAGE 028

68

1  process rights and skip to the end, let us step in we want to
2  take over this property, and -- you know there's all this talk
3  about we want to run the property, we want to run it, funny
4  enough we only learned on Thursday that one of these LLCs
5  that's a member of this conglomerate all over the country has
6  some interest in nursing homes. There's nothing on the record
7  of that other than Mr. Berger's argument, but they're not
8  asking for that company to step in. They're asking for someone
9  some guy who I've never heard of, who apparently Mr. Berger's
10 never heard of, who's in Florida to come here to operate an
11 entity in Northampton County, Pennsylvania. It doesn't make
12 sense to me. They're looking -- they're telling you one thing
13 that no, no, no we want to operate, we want to operate it, but
14 then they're also saying oh, but by the way we're going to
15 evict, and -- and then when they evict they're not going to
16 continue to operate. They don't have licenses in place, they
17 don't have the proper ability to operate a nursing care
18 facility in northeast Pennsylvania, none of them have any
19 contacts in northeast Pennsylvania. So what I'm asking the
20 Court is don't take a drastic step right now. It's not
21 necessary and I'm going to get into why it's not necessary, but
22 let this -- let this play out, let my client assert its
23 defenses and pursue its claims to see if maybe this default
24 wasn't my client's fault, maybe this default was manufactured,
25 and if the Court were to grant this this motion today allow a

EXHIBIT E, PAGE 029

69

 1  receiver to step in we all know what's going to happen. The

 2  receiver is going to step in, the receiver is going to take

 3  over and my client is reparably harmed because now we're out,

 4  we've totally lost our property, totally lost the business and

 5  there's no coming back from that. So if two, three, four years

 6  down the line we find out Hud did screw up here, and -- and my

 7  client suffered a loss and my client was harmed then my client

 8  has lost everything in the interim, and the opposite deals with

 9  potential risk to the property, and as I'm going to explain to

10  you we don't have that here. So I do want to start with this

11  idea that the appointment of a receiver is not drastic. I -- I

12  -- I that boggles my mind, but also is completely contrary to

13  all of the law in this circuit, which has said repeatedly that

14  the appointment of a receiver is an extraordinary remedy, and

15  that if a milder measure is available that could protect the

16  planet, the Court should take that milder measure, then also

17  that it is an equitable remedy that is drastic that it should

18  be sparingly exercised with great caution and circumspection,

19  and that it is the moving party's heavy burden to prove that in

20  these circumstances a receiver is warranted, none of which has

21  happened here. So I want to talk quickly about the insurance

22  policy because it was -- it was raised a lot by Mr. Berger, and

23  I believe disingenuously because my client did provide the

24  plaintiff with a copy of a commercial insurance policy. Mr.

25  Berger is correct that there are items that have been blacked

1   out that is because there are multiple properties on this
2   policy. It's not uncommon for somebody with multiple businesses
3   to get a blanket policy. It's a little bit less expensive of a
4   premium to do so, but what Mr. Berger didn't tell you is that
5   what was not blacked out is the two properties that are subject
6   to the two different litigations with LV1, which clearly shows
7   that both of those properties currently have active insurance
8   policies. The property in question has a liability insurance,
9   not liability excuse me, a property insurance policy for $27.8
10  million, there is no claim that the property is worth anywhere
11  near that amount, but that is what is insured to. There's also
12  a 16 page policy that shows all of the coverages that are
13  available. Now the property is in the name of White Hall Manner
14  Inc., but it relates to this property. We have provided proof
15  of that and they have that, but let's pretend we didn't, right,
16  even if we didn't have insurance, which we do, to cover a loss
17  the plaintiff has placed forced place insurance on this
18  property. So to stand here and say oh if the property burns
19  tomorrow we're -- we're done we get nothing, that's not true
20  that that's patently false because the plaintiff has their own
21  insurance policy on this property. So if the property were to
22  burn down tomorrow then the plaintiff would be able to make the
23  claim under their own policy, and again my client has a policy
24  and if there's a concern about well we don't who the loss payee
25  is because obviously the Court is aware we don't believe that

```
 1  Lehigh Valley 1 is a proper signee of this note and mortgage.
 2  We could be in front of Your Honor within a week asking for an
 3  insurance trust to be put into place, put the money the
 4  insurance proceeds into a trust let's wait and see how this
 5  case plays out. So this idea that -- you know somehow my client
 6  is going to abscond with insurance proceeds and leave them
 7  hanging that's totally disingenuous. We have a pending lawsuit.
 8  They have mechanisms before this Court where they could protect
 9  those proceeds, and even if they didn't have that they always
10  have the option to file the lawsuit against my client for those
11  -- for those proceeds. They wouldn't even come to that because
12  again they also have their own insurance policy. So the
13  property from an insurance standpoint is fully protected and
14  again to the extent that they're concerned about professional
15  liability that's on the operating entity the tenant, not on the
16  property owner, and then I do want to just -- just address one
17  more thing only because it's -- he brought it up is this idea
18  of the -- the PPP money that's just not relevant Your Honor. My
19  client took advantage of government funds that were available
20  to many small businesses. It was used to operate the business
21  during the covid-19 pandemic, and it has nothing to do with the
22  mortgage, and in fact I believe that there are severe
23  restrictions there were severe restrictions in place on using
24  PPP money to pay mortgages, and so it's not relevant and I
25  would ask that the Court not consider it. So moving on to the
```

EXHIBIT E, PAGE 032

1  actual appointment of a receiver. The -- the court has pointed

2  out that the loan documents had a very limited reason for

3  appointment of a receiver, but regardless we've alleged

4  improprieties in the bidding process, including the

5  identification of Windstream as a qualified bitter, including

6  Hud's own failure to follow its own policies and procedures,

7  and including what I believe is a facially invalid assignment

8  from Windstream to LV1. So all of these are issues that will --

9  that we will have discovery on, that we will uh ultimately have

10  to reach a final decision on, but if there's even a question

11  that maybe these documents aren't valid then how can we allow

12  them to enforce such a drastic measure when there are lesser

13  measures available that would protect the property, and even if

14  -- even if the Court doesn't want to consider that issue then

15  the -- the Court is not bound by the loan document just -- just

16  because the loan document references the appointment of a

17  receiver for a very limited purpose, not for the purposes that

18  are being sought here today -- you know you can -- it's still

19  an extreme remedy, and the Court is allowed to look at this

20  remedy and think okay what -- what else can be done to protect

21  all of the interests while this case is pending. You are not

22  bound by what those documents say and I -- I understand

23  obviously the legal mechanics of an assignment, but it is

24  important to note that my client entered into a loan agreement

25  with the government with -- with -- you know certain

1  protections in place including a regulatory agreement that's no
2  longer a part of this proceeding because it was terminated, and
3  so it -- it didn't enter into a loan agreement with a random
4  group of people from all over the country to let them come in
5  and just sort of take over operations. I -- I think that's
6  relevant for the Court's consideration you don't have to follow
7  what the documents say, and we did not give LV1 that didn't
8  even exist until February of 2024 the right to step in and take
9  over our business, and so I'm asking the Court to overlook the
10  fact that the lot -- that the documents do provide this because
11  you don't have to consider it you don't and you're not bound by
12  it, and then beyond that -- you know there's a lot of reasons
13  that the plaintiff gave to you today as to -- you know why they
14  need a receiver, but really it boils down to non-payment. Their
15  -- their biggest issue is we haven't paid, we haven't paid the
16  mortgage, and that's something that the Court should consider
17  and can consider, but it's absolutely not the only thing, and
18  in this case it's not the overriding thing. So let's talk about
19  the property itself okay because really what it comes down to
20  is preserving as you said preserving the collateral while the
21  case is pending, and again it is operating as a nursing
22  facility with 50 percent of its occupants needing acute medical
23  care in the form of memory care, dementia, dementia ward. I
24  don't have to tell the Court that that business is subject to
25  severe standards and regulations, that it is subject to random

74

1  inspections by Pennsylvania Department of Health and Human

2  Services that they are required to maintain certain licensor

3  and certain certifications. I can assure the Court that if

4  there were rusty pipes or the electricity have been turned off

5  or if there was a rodent issue, these are issues that will be

6  raised by those random inspections. The mere fact that the

7  building is operating in the manner that it's operating is

8  evidence alone is sufficient for this Court to decide that this

9  property is in good condition. If for some reason it's not in

10 good condition you're going to hear about it, I'll hear about

11 it, the plaintiff is going to hear about it because it's going

12 to be in the morning call newspaper that it was shut down

13 because the water was shut off or -- or whatever, that's not

14 happening that that that's not happening here, but more so

15 there's no evidence from the plaintiff that that is actually

16 happening, and that's where I want to talk about these cases

17 that the plaintiff has cited -- you know yes there are recent

18 cases, yes there the -- the facts were similar in the sense

19 that it was a default of a mortgage foreclosure. I would submit

20 to the Court that it's not similar in that they don't have all

21 of the underlying third party issues where there's an

22 allegation that there actually wasn't a real default. The

23 default was manufactured by a third party, but more so in each

24 of those cases that Mr. Berger cited there was evidence of

25 actual harm to the property, evidence of actual waste in one of

 1  them the -- the Court allowed a receiver because the plaintiff
 2  had three other properties that had already been placed into a
 3  receivership. We don't have that here. We don't have any
 4  receivers for any properties owned by my client in -- in
 5  another one there was evidence that the property had been
 6  abandoned, which there's no allegation of here today, there was
 7  evidence that there had been actual misuse of -- of -- of rents
 8  or of profits that there's nothing here today because we
 9  haven't even gotten out of the pleading stage. We haven't even
10  filed an answer yet, so, in all of those cases the parties went
11  through the normal course of litigation. They filed a
12  complaint, they filed an answer, they did discovery, and it was
13  only the -- the close of discovery that the motion for to
14  appoint a receiver was -- was filed and granted, and what the
15  plaintiff is seeking here is to bypass all of that, once again
16  deny my client due process rights. They want the Court to enter
17  an order providing drastic remedy that will absolutely deny my
18  client access to its property without any actual evidence that
19  anything is amiss here. They haven't, and by the way, this --
20  this -- this motion has been pending for six months. I
21  understand that we're not through the pleading stage yet so it
22  hasn't been appropriate to take discovery, but they could have
23  filed a motion asking for discovery on this particular -- on
24  this particular motion. They could have sought information.
25  I'll also tell you this, not one person from the plaintiff's

 1  massive grouping of LLCs and trust and individuals has ever
 2  been to the property as far as I know. They've never asked to
 3  be to the property. So they can't stand here before you and say
 4  well we know the property is being misused. We know the
 5  property is subject to waste because we've seen it with our own
 6  eyes. They've never been there, but it's not it's currently
 7  operating in a -- in a highly regulated industry so this
 8  argument that well we're really concerned about the property,
 9  again it's -- it's -- it's -- it's disingenuous because the
10  property is just fine, and maybe in six months after we've gone
11  through discovery maybe now we do have a different argument,
12  maybe we're back before the Court on this motion because now
13  there is actual evidence of issues with regard to the property,
14  but we don't have that today, and they don't just get to say
15  well we think there's an issue with the property, we're
16  concerned about it, we're speculating. They have to prove to
17  the Court with facts and evidence that they are entitled to
18  this drastic remedy today, and they haven't done that because
19  all they've brought you is -- is this -- you know speculation
20  that there might be something going on with the property with
21  respect to -- you know likelihood of success again -- you know
22  it -- it is important and relevant, and there is case law that
23  we've cited to that says that it matters that a judgment hasn't
24  been entered, and there has not been a judgment entered, in
25  fact, the only judgment that was entered was stricken by the

 1  Northampton County Court of Common Pleas. Now here we are they
 2  don't have a judgement, they have an allegation of default and
 3  we have defenses to those allegations, and we have every right
 4  to have those defenses heard. We have every right to have our
 5  claims against the third party heard, and -- you know we
 6  believe that at the end of this that that the -- that we will
 7  end up with an award in our favor, and I want to talk about
 8  this and this kind of also goes to the -- the sort of harm
 9  balance that is another prong for the Court to consider -- you
10  know play this out if -- if you were to appoint a receiver
11  today there -- there really is nothing stopping him from coming
12  in and shutting operations down, evicting our tenant, and
13  irreparably harming my client, but if you don't grant it today
14  okay then there's no real risk to the property right because we
15  know that the property is operational. We -- we know that we
16  have to keep the property in a certain condition in order to
17  maintain our licensor from the state, and all that potentially
18  is lost to the plaintiff is it's monetary. It's monetary loss.
19  They're not irreparably harmed by that. They can recoup that in
20  this litigation if necessary, but -- you know if -- if we if
21  you -- if you were to do that if you were to shut this down
22  appoint a receiver we're shut down, two years from now we end
23  up winning it doesn't matter, we are irreparably harmed our --
24  our damage is done we have lost our building. I think that
25  there is much more risk in the possibility of shutting this --

1 | shutting my client out of its property and shutting it down
2 | while these claims are pending before we've had any discovery
3 | on them than in making the plaintiff to just go through the
4 | litigation process that they started -- you know while this
5 | case is pending. Now with respect to the financial condition,
6 | the -- the document that the plaintiff has made a demand for
7 | documents, I'm sorry for financial -- financial information,
8 | was pursuant to the regulatory agreement and it's important for
9 | the Court to know that the regulatory agreement was
10 | specifically not assigned to the plaintiff. So the plaintiff
11 | has no rights under the regulatory agreement and in fact the
12 | regulatory agreement was terminated by Hud when they
13 | transferred the loan in September of 2023. So the motion
14 | references the fact that oh they have no idea about our
15 | financial condition because pursuant to the regulatory
16 | agreement they made a demand and we refused to give them the
17 | documents. We didn't give them the documents because they have
18 | no rights under the regulatory agreement, and so instead the
19 | plaintiff is relying on a 2021 audit that was done, which
20 | notably said that my client's financial position was so bad
21 | that the business was going to shut down within 12 months. So
22 | obviously here we are 2025 it's been four years and the
23 | business is not shut down. It is continuing to operate so it
24 | obviously wasn't as bad as the 2021 audit suggested, but more
25 | so the audit was done in 2021. I mean we are in the midst of

EXHIBIT E, PAGE 039

1  covid. We are still subject to all of the various regulations

2  that were in place and prohibitions that were in place that

3  impacted our finances, and so it's really outdated for the

4  Court to consider something that happened in 2021 as evidence

5  of -- you know what is actually happening there today. The --

6  the -- the next step is let's go through discovery. Let's --

7  let's go through discovery, let's identify these claims against

8  Hud and let's see what's happening here all while we know that

9  the property is protected, right, we know it's -- we know as

10  long as it's operating we know it's in good condition, we have

11  insurance which we've provided to LV1, LV1 has its own

12  insurance so there's no real risk to the property one of the

13  other factors is a risk of diminution value -- you know again

14  they're not arguing that there has been an actual diminution in

15  value. There's no argument or evidence of that. It's just that

16  -- you know maybe there will be if this continues, and I would

17  submit to the Court that if the business is shut down there

18  will be an actual diminution in value because right now the

19  building is a going concern. There's an operational functioning

20  business in there. If a receiver comes in and decides oh we're

21  going to evict this tenant then -- you know that will

22  absolutely impact the value of the property, and then as far as

23  -- you know inadequate legal remedy again the planintiff is

24  seeking to side step the legal process. They want to jump to

25  the end, they try to jump to the end with the confession of

1    judgment, they were rejected. Now before having gone through

2    any discovery or any consideration of my clients defenses and

3    claims against Hud, they want to jump to the end so they can

4    just take over and control the property. The law does not allow

5    that. There is a legal mechanism in place that is the

6    foreclosure process. There is a -- a set of procedures that

7    they are required to follow as part of this litigation, and the

8    Court should not let them -- allow them to just jump to the end

9    to take over the property because what -- what will happen then

10   is -- you know my client's going to be left without any of its

11   property, without a functioning business, and likely without

12   the ability to continue to maintain this claim against Hud. The

13   process is the least drastic remedy. The process is what --

14   what we should follow that's what we should be doing here not

15   just jumping to the end, and -- and allowing somebody to jump

16   in, and then -- you know I -- I have a balance of the interest,

17   we've sort of already talked about that in this case -- you

18   know what the Court needs to consider is okay while this is

19   playing out what's the real concern with the property, and

20   right now there's no evidence before you that there's any

21   actual concern. There's a lot of speculation. There's a lot of

22   well we're concerned that this could be happening, but no

23   actual evidence of anything that actually is happening, which I

24   would submit is a requirement for them to get this drastic

25   remedy of a receiver, but if at some point they do identify

1  something, something that actually is happening nothing would

2  stop them from coming back here and asking for this -- for this

3  remedy. It's just that as we sit here today they have not met

4  the heavy burden of proof that is required for this Court to

5  take the drastic measure of putting a receiver in place. Thank

6  you. Your Honor, I do have I don't know do you -- do you want

7  to hand up I know you handed up to Judge Henry the insurance

8  policy.

9          ATTORNEY BERGER: Yeah, Judge Henry asked for them.

10 I'm happy to hand that up because I think -- I think it's

11 definitely relevant.

12         THE COURT: Sure.

13         ATTORNEY PRICE: Would you -- would you like that?

14         THE COURT: Sure, that's be fine.

15         ATTORNEY PRICE: You know what I think let me just

16 make sure just may I?

17         ATTORNEY BERGER: Just by -- by the way, Your Honor,

18 we received this at 10:00 o'clock last night.

19         THE COURT: Understood.

20         ATTORNEY PRICE: You received it last Tuesday. This --

21 this is the same.

22         ATTORNEY BERGER: Is it the same thing?

23         ATTORNEY PRICE: Identical.

24         ATTORNEY BERGER: Okay then I received it last

25 Tuesday.

1   response? Okay I'm just going -- I'm trying to --.

2           THE COURT: It's all right, take your time.

3           ATTORNEY PRICE: Response here --.

4           ATTORNEY BERGER: Just one second, Your Honor, is it

5   okay if I don't -- I don't want to the men's room.

6           THE COURT: Absolutely. Yeah, okay.

7           ATTORNEY BERGER: Thank you sorry about that.

8           ATTORNEY PRICE: I mean I don't mind waiting.

9           ATTORNEY BERGER: No, no, no.

10          THE COURT: It's okay.

11          ATTORNEY PRICE: Okay.

12          ATTORNEY BERGER: Thank you, Rebecca sorry.

13          ATTORNEY PRICE: No problem. Well, let's start with

14  the insurance policy obviously Your Honor you have it in front

15  of you now. What you have is a blanket insurance policy as I

16  said it references multiple different properties, one of which

17  is this property which is referenced on -- the address is

18  referenced on this document, and if you I -- I -- I apologize

19  these are not numbered, but I can tell you that the seventh

20  page identifies named insured, and -- and does identify Saucon

21  Valley Manner Inc, which is the operating entity at the

22  property. This document also says that this is a blanket policy

23  for the items in here, but that the individual policy limits

24  for the individual properties are referenced on the statement

25  of value which is also been provided to you. So the individual

1  policy limits for this property, which again does not reference

2  the name of the owner, but does reference the address which is

3  1050 Main Street in Hellertown and there is a property policy

4  limit of 27,888,000 which is somewhere around three times the

5  current assessed value of the property. So there is more than

6  enough adequate insurance here to satisfy the Court and to

7  satisfy the plaintiff that if there was a loss that they would

8  be fully covered and that's even before we get to the forced

9  place insurance which the plaintiff has also put on the

10 property to cover any potential -- potential for loss. Now Mr.

11 Berger also said that I have not presented any evidence that

12 the property is in good condition which I don't agree with

13 because again it is currently -- there's no dispute that is

14 currently occupied as a -- as a nursing facility with a memory

15 care component and Your Honor is correct that is subject to

16 government oversight and in fact there is -- it's publicly

17 available information anyone in Pennsylvania can check the

18 current status of facilities like this particular facility. So

19 I do think the mere fact that it's operating is enough

20 evidence, not that I have any burden to provide the Court with

21 any evidence, but it is evidence that the property is in good

22 condition, but beyond that I've also provided Mr. Berger with a

23 current certificate of occupancy for the property as well as a

24 certificate of compliance that is good from September 3rd, 2024

25 until September 3rd, 2025 and that is a certificate of

EXHIBIT E, PAGE 044

93

1   compliance from the Pennsylvania Department of Human Services

2   related specifically to this property. So there is -- there is

3   evidence that the property is functioning and is in good

4   condition. What you don't have is any evidence that it's not,

5   and again the plaintiff has the burden to -- to -- to present

6   that, and now -- now there's this argument that they didn't

7   come to the property because they were worried that what we're

8   going to call the police because they were trespassing. They

9   didn't ask to come to the property either. They could have

10  easily reached out maybe we would have said no I don't know it

11  doesn't matter because they didn't ask. They've never been to

12  the property because they are nowhere near Pennsylvania and

13  they haven't made any attempt in the six months that this

14  motion's been pending to come and see for themselves whether

15  there actually are any concerns with the property, and -- and I

16  apologize if I misspoke regarding the close of discovery on

17  those cases maybe -- maybe discovery hadn't been closed, but my

18  point is the same which is that in all of the cases in which a

19  receiver has been appointed it was appointed only after

20  evidence of waste to the property, evidence of abandonment,

21  evidence of financial condition you don't have any of that

22  before you today, you have speculation, all you have is the

23  fact that there is a loan that has been in default, and what I

24  have explained to the Court and is what will be put in our

25  pleadings in the next two weeks is that that default was caused

Case: 25-1899    Document: 29-3    Page: 113    Date Filed: 08/11/2025
Case 5:24-cv-02709-CH    Document 47    Filed 02/28/25    Page 94 of 114

94

1  by misconduct of Hud and then that default snowballed into

2  where we are today. So just think this through if Hud did what

3  it was permitted to do and applied the -- you know almost

4  $1,000,000 of reserve funds to the loan over the course of

5  those three years my client would not have been in this

6  position now where in 2024 it has to come up with -- you know

7  whatever the balance was at that point whatever the -- the cure

8  default was at that point. They were forced into this position

9  and that has now snowballed into where we are today, and so

10  it's absolutely relevant and it doesn't matter how much time

11  it's been because every single month that Hud is not forced to

12  answer for what it did, it's only going to increase my client's

13  damages, but that matters non-payment matters obviously that's

14  a financial, it's a monetary issue that will have to be

15  addressed by this Court in this legal proceeding, but that's

16  not why you appoint a receiver. You appoint a receiver if

17  there's a legitimate concern for the collateral and there is no

18  legitimate concern here and so -- you know we don't believe

19  that that -- that you should be appointing receiver today. I

20  think that maybe some point down the road there might be

21  evidence in discovery I don't know that might lead the Court to

22  believe that, but you don't have the evidence that you need

23  today to award that drastic measure and so we're asking that

24  this motion be denied.

25          ATTORNEY BERGER: Your Honor, I have just one really,

95

1  really quick thing.

2          THE COURT: I have questions so.

3          ATTORNEY PRICE: Oh should I sit?

4          THE COURT: Yeah, no, yeah, you can go to the table

5  just if you stand when I -- when you're addressing me I'd

6  appreciate that. For Ms. Price so who is the tenant?

7          ATTORNEY PRICE: The tenant is Saucon Manner, hold on

8  I'll give you the exact name.

9          THE COURT: Is it the --.

10          ATTORNEY PRICE: Saucon Valley Manner Inc.

11          THE COURT: Which is the entity that's named in the

12  insurance policy?

13          ATTORNEY PRICE: That is what's named in the insurance

14  policy, yes, and they are the tenant.

15          THE COURT: And what is the relationship between

16  Saucon Valley Manner Inc, and the defendant the trust?

17          ATTORNEY PRICE: Landlord tenant.

18          THE COURT: They have the same name right Saucon

19  Valley? I mean --.

20          ATTORNEY PRICE: Well, it's in the Saucon Valley. I

21  mean that's a -- that's a geographical region in the Lehigh

22  Valley.

23          THE COURT: So is anybody who is a an officer or of

24  Saucon Valley Manner Incorporated also a member of the trust?

25          ATTORNEY PRICE: I do not know that off the top of my

EXHIBIT E, PAGE 047

Case: 25-1899   Document: 29-3   Page: 115   Date Filed: 08/11/2025
Case 5:24-cv-02709-CH   Document 47   Filed 02/28/25   Page 96 of 114

96

1  head. I do know, however, that they are related in the sense I

2  believe that no okay the answer is no.

3       THE COURT: The answer is no, okay. All right. Mr.

4  Berger on this I want to stay on this issue. We haven't talked

5  about it too much, but what about this issue of that the

6  agreement is with the essentially the -- the owner of the

7  property, well the holder of the -- the mortgager, which is not

8  the same entity as the operator of the property. What -- how

9  could I give your client the ability to manage a tenant?

10       ATTORNEY BERGER: So if you look at the -- if you look

11 at the case the Judge Savage case, which was the assistant

12 living facility case. They had same type of thing and the --

13 the operator of the company, they were showing that the owner

14 of the company was diverting funds to pay the operator of the

15 company instead of paying the mortgage that was one of the big

16 issues that the judge found there, and found that that was

17 mismanagement and that the operating company was mismanaging

18 the property. We don't know if that's happening or not, but we

19 know that that operating company has been there for four years

20 and there's not been a mortgage payment for four years. So what

21 we are seeking is that is to have the receiver determine if

22 that's occurring, and if it's not occurring and the receiver

23 finds that there's no mismanagement after reviewing the books

24 the receiver will keep that operating company which is there

25 working there. If the receiver finds that there is

EXHIBIT E, PAGE 048

Case: 25-1899    Document: 29-3    Page: 116    Date Filed: 08/11/2025
Case 5:24-cv-02709-CH    Document 47    Filed 02/28/25    Page 98 of 114

98

```
 1              THE COURT: Collect correct -- collect the rents.
 2              ATTORNEY BERGER: Profits and --.
 3              THE COURT: I agree that that's what it says, but
 4  you're talking about something much broader, you're talking
 5  about bringing somebody in to run the assistant living facility
 6  which is run by a tenant.
 7              ATTOTNEY BERGER: There it's being run by a -- it's
 8  being run by -- it's being -- not the tenant Your Honor so
 9  again we're kind of mixing and matching.
10              THE COURT: Yeah.
11              ATTORNEY BERGER: The tenant are the people that are
12  in the -- that are the patients that are in the facility. They
13  are the tenants. This is an operating company it's not a --
14  it's not -- it's not a -- it's a separate -- it's a separate
15  company which we believe has is part and parcel of the other
16  part, but I'll take defendant's counsel representation, but the
17  tenant is not -- is a separate -- is not a separate -- the
18  tenant is not the -- the operating company. The tenant is the
19  one that's in the facility and the patients that are in the
20  facility and the rent that would be received by the receiver
21  from the tenants that are in that facility.
22              THE COURT: Is this the Sun Valley Manner Incorporated
23  is there a lease between that that entity and the -- the
24  mortgager here?
25              ATTORNEY PRICE: Yes, Your Honor, so what you have
```

EXHIBIT E, PAGE 049

Case: 25-1899    Document: 29-3    Page: 117    Date Filed: 08/11/2025
Case 5:24-cv-02709-CH    Document 47    Filed 02/28/25    Page 99 of 114

99

1  described is exactly the scenario this is a building that is
2  owned by the trust and they have a tenant. It's not an
3  operating company it's not running the business of the real
4  property owner. It is a totally separate entity that is a
5  tenant. It could be a school it could be in this case a nursing
6  facility. I mean it could be any number of businesses. They are
7  independent tenant subject to a lease that that are operating
8  this business.

9          THE COURT: Right so that's I -- so I'm troubled with
10 the idea of you putting somebody in to run the assisted living
11 facility, which is a tenant of the mortgager versus say
12 whatever rents that the mortgager receives -- you know you
13 understand what I'm saying like it's one thing -- I think that
14 are -- are you reaching too far and -- and casting the net a
15 little too wide here because to -- to be able to receive the --
16 the profits and the rents that's from the -- the mortgager;
17 right? Which would be theoretically would be whatever they're
18 getting paid from this Saucon Valley Manner Incorporated?

19         ATTORNEY BERGER: So the way that this typically works
20 and again the way that Judge Savage found that it worked is
21 that the -- all the rents would go to the mortgage company -- I
22 am sorry would go to the owner. The owner would then be paying
23 the -- the operating company. If that's going -- you know and
24 that's why he put the receiver in to handle all that from the -
25 - from there because he found that the owner was improperly

100

1 diverting rents to the operating company instead of paying the

2 mortgage.

3          THE COURT: But we don't have that here. We -- we

4 don't know that that's happening.

5          ATTORNEY BERGER: Well, we know that the -- we know

6 that the monies are -- we know that the -- the owner like these

7 Judge Savage's thing is not paying -- is not paying the

8 mortgage that's exactly the same scenario that was found in

9 that case, and that that -- and that the judge found that by

10 turning over all the rents to this operating company this that

11 it was a -- it was a mismanagement of the entity and that a

12 receiver needed to come in.

13          THE COURT: But we -- I'm saying as a factual matter

14 you haven't established that. You -- I think you've established

15 that there have been no payments up to this point right for --

16 for a period -- a long period of time. So I mean I'm not

17 disputing that at all. I hear what you're saying on that. I

18 don't know -- we don't really know why that is.

19          ATTORNEY BERGER: So Your Honor I can make this easy.

20          THE COURT: Sure, I like that.

21          ATTORNEY BERGER: Okay I -- so -- you know just kind

22 of thinking through where Your Honor is going with this,

23 appoint the receiver to collect the rents from the patients

24 that's what -- you know and that -- and that way the receiver

25 can see what's happening there, and again the receiver can then

EXHIBIT E, PAGE 051

Case: 25-1899  Document: 29-3  Page: 119  Date Filed: 08/11/2025
Case 5:24-cv-02709-CH  Document 47  Filed 02/28/25  Page 101 of 114

101

1  pay if it's -- if it's everything's proper the receiver can

2  then pay the operating.

3        THE COURT: You don't have -- I don't see how you have

4  any interest whatsoever in the business because it could be any

5  business in there, like I say it could be a Five Below in

6  there. So -- so your -- your mortgage agreement doesn't give

7  you the right to take the profits of a tenant. It gives you the

8  right to have the profits that the owner is receiving; right?

9        ATTORNEY BERGER: It's -- it has the right to -- it

10  has the right to receive all funds of the landlord of -- of the

11  owner of the property.

12        THE COURT: Right.

13        ATTORNEY BERGER: So we would have so all funds that

14  would be due would be somebody -- somebody has to pay the owner

15  of the property and whether it's the operating company that is

16  that again all the amounts that are due to the owner of the

17  company you have the right to appoint the receiver to. We would

18  take it to the next part where it's the receiver after

19  receiving all that and would make sure that the owner has

20  proper insurance, that the owner is paying taxes, that the

21  owner is paying -- is paying the mortgage payment, and the

22  owner is not doing that or has an inability to do that the

23  receiver would come back to this Court and say here is a

24  problem and I -- and the problem is because of X, Y, and Z

25  problem is because the operating company is not managing this

EXHIBIT E, PAGE 052

102

1  properly. The problem is because the owner is diverting the

2  rents or -- or taking it and putting and applying to -- to

3  White Hall instead of Saucon. So the receiver would come back

4  and say we are here to collect, I've reviewed the books and

5  records this is a function facility or this is a facility

6  that's being mismanaged.

7           THE COURT: But whose books and records are you

8  looking at just the owners?

9           ATTORNEY BERGER: I guess at this point our rights are

10  against the -- our rights are against the owner. The other

11  issue is I believe that the lease became -- the lease was due

12  and I may be mixing, but I think it's the same thing. I think

13  that the lease with the operating company came due, and that we

14  asked for to turn over as to where what is the lease, what is

15  the amounts that the operating company is being paid, how is

16  the operating being paid, where the rents go. We asked for that

17  and -- and to date we've been just rejected and they've not

18  turned that over that's one of the things that has been asked

19  for so I would have been able to come to Your Honor and say

20  this is what the lease present -- this is what the lease is and

21  I don't even know whether the lease is still in effect or not

22  or whether there's a new lease in effect, but one of the leases

23  was matured two years ago and we never got a notice of a new

24  lease.

25           THE COURT: And it's understandable that you would

103

 1 | want to know so what's the income that the owner is getting

 2 | right from however it's operating the building. So is there a

 3 | current lease?

 4 |         ATTORNEY PRICE: Yes, there is a current lease.

 5 |         THE COURT: Okay.

 6 |         ATTORNEY PRICE: And it's the same entity. It's been

 7 | much more than four years. I think it's been since the

 8 | inception of the loan.

 9 |         THE COURT: So what is -- what's happening with the

10 | money?

11 |         ATTORNEY PRICE: Well, I'll be honest with you I don't

12 | think I've gotten that far with my client as we sit here today.

13 | I think that I mean what I understand is that there were there

14 | were major issues that were caused by covid, and I know that

15 | it's a lot of us want to sort of just push that behind us, I

16 | certainly do especially having three little kids who were home

17 | for a year and a half so, but -- but the fact remains that at

18 | the -- at the time my client is running a business with owning

19 | property right and there's a tenant in place that tenant is now

20 | put in a position due to government regulations where they are

21 | not allowed to enforce their individual agreements with the

22 | individual tenants, right, so those people and I believe in

23 | Pennsylvania the -- the eviction prohibition lasted well into

24 | the end of 2021. It might have even lasted until 2022 and so

25 | you've got now people who are living there and not paying which

Case: 25-1899    Document: 29-3    Page: 122    Date Filed: 08/11/2025
Case 5:24-cv-02709-CH    Document 47    Filed 02/28/25    Page 108 of 114

108

1  and it's not a matter of just if you make us our monthly

2  payment then we're going to be satisfied here. It is we want

3  $3.1 million, and we never should have been in that situation,

4  we were forced into that situation due to the bad conduct of

5  Hud.

6          THE COURT: Why the lack of communication with the

7  plaintiff -- you know that they're asking for information about

8  financial health? Why -- why isn't that being provided?

9          ATTORNEY PRICE: Your Honor, I mean up until -- up

10  until earlier this month, last month I'm sorry, -- you know we

11  were objecting to the venue of this proceeding, but we were

12  also we I -- I strongly I understand the ruling you made today.

13  I believe that the assignment from Windstream to LV1 is

14  facially invalid. It does not contain explicit language that

15  was required by the agreement with Hud, and I think that that

16  makes it void, and so there has been hesitancy to provide

17  information by particularly financial information to an entity

18  that we do not believe has a legal standing to pursue and

19  enforce these loan documents, -- you know obviously when we get

20  into the discovery phase that might change happen how we

21  proceed, but -- but we did provide insurance information at my

22  urging. I -- I -- I -- I maybe I'm not skilled at reading

23  insurance policies, however, I -- I was advised that the

24  coverage limit for this property is $28,000,000 whatever it

25  says 27,000,000, and so that is what my -- my client is paying

109

1  for insurance on the property up to that coverage amount. So if

2  somebody's misreading it I don't know who, but I guess you can

3  make that determination for yourself.

4      THE COURT: And this is -- this is not a nursing

5  facility this -- I think in Pennsylvania is it like personal

6  care?

7      ATTORNEY BERGER: Correct.

8      THE COURT: Is that's what it's referred to?

9      ATTORNEY PRICE: It's assistant living, but my

10  understanding is that the component, the 50 percent component

11  of the secure medical -- I'm sorry the secure memory care does

12  add an extra layer of regulatory oversight because it's

13  providing an extra layer of nursing care to individuals who

14  have specific requirements based upon their diagnosis.

15      THE COURT: And presumably the residents have

16  visitors? You can come into the facility --?

17      ATTORNEY PRICE: I believe that there, yeah --.

18      THE COURT: Regular basis and so is the -- the source

19  of payment from the residents I'm assuming most of that is paid

20  out of pocket. It's not Medicare, Medicaid.

21      ATTORNEY PRICE: Your Honor, I don't know the answer

22  to that question.

23      THE COURT: You don't know.

24      ATTORNEY PRICE: I don't know where, yeah, their funds

25  come from.

EXHIBIT E, PAGE 056

110

1          THE COURT: Okay. So is it -- I don't know if anybody

2    has come out and said it, but sort of been hinted at that maybe

3    the residents aren't paying what they're supposed to be paying,

4    and then there's a snowball effect; is that --?

5          ATTORNEY PRICE: Yeah, and -- and I want to be very

6    clear. I don't know if that's still an issue. I do know that

7    that was an issue throughout 2020 and 2021 where there was

8    substantial nonpayment by residents, but also the inability to

9    do anything about it because there was a restriction on

10   eviction actions which included residents in this facility, and

11   by the way included the operating entity. My client would not

12   have been permitted to receive eviction.

13         THE COURT: Yes, sir.

14         ATTORNEY BERGER: Your Honor, again this defense

15   counsel keeps on talking about 2021. We're at 2025. It's not

16   been -- you know if there hasn't been people, if there hasn't

17   been residents paying they could have -- they could have

18   brought actions to evict. They just haven't made a payment

19   since 2021, and it and again the issue as I mentioned before

20   which is Hud didn't create this default, by the time Hud got

21   the loan even if they applied all of the amounts that were in

22   that reserve account, which was $800,000, to the amounts due

23   just for principal interest they would not have been able to

24   pay the amounts due just in November 2022 because one point

25   almost $1.2 million was due for principal interest, and they

EXHIBIT E, PAGE 057