# United States Court of Appeals
## FOR THE THIRD CIRCUIT

No. 25-1899

**WHITEHALL FIDUCIARY LLC, AS TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007, AND SAUCON VALLEY TRUST U/T/A DATED AUGUST 1, 2007,**
*Appellants,*
v.
**LEHIGH VALLEY 1 LLC, SUCCESSOR BY ASSIGNMENT TO WINDSTREAM CAPITAL LLC, SUCCESSOR BY ASSIGNMENT TO THE UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, SUCCESSOR BY ASSIGNMENT TO M&T REALTY CAPITAL CORPORATION,**

**APPELLEE'S SUPPLEMENTAL APPENDIX – VOLUME I OF I**

On Appeal from the United States District Court for the Eastern District of Pennsylvania Civil Action Nos. 24-2627 & 24-2709 (Consolidated)
The Honorable Catherine Henry

Phillip D. Berger, Esq.
I.D. No. 58942
Matthew R. Kaufmann, Esq.
I.D. No. 206991
Berger Law Group, P.C.
919 Conestoga Avenue
Building 3, Suite 114
Rosemont, PA 19010
Phone: (610) 668-0800
*Attorneys for Plaintiff/Appellee*

# Appellee's Supplemental Appendix

## (Supp. Appx.)

Exh. "1"    Notice of Tax Sale…………………………………………………001

Exh. "2"    Letters Regarding The Payment of Taxes by Tenant…..009

Exh. "3"    Leases and Amendments……………………………………...012

Exh. "4"    Redacted Insurance Coverage……………………………..100

Exh. "5"    2021 Financial Statements………………………………...117

Exh. "6"    Mortgage Assignments to Windstream…………………..184

Exh. "7"    Mortgage Assignments to LV1……………………………208

Exh. "8"    Lessee Security Agreements………………………………221

Exh. "9"    Tax Certifications for Each Property……………………..279

# EXHIBIT 1



**NORTHAMPTON COUNTY
SHERIFF'S DEPARTMENT**
669 WASHINGTON ST
EASTON, PA 18042
PHONE: (610) 829-6699
FAX: (610) 559-3710



CHRISTOPHER ZIEGER
ACTING SHERIFF

Sale #12 for Aug/2025

# S H E R I F F ' S    N O T I C E

### *REAL DEBT OF $129,846.24 PLUS INTEREST AND ALL COSTS*

The real estate situated at 1050 Main Street, Hellertown, Northampton County, Pennsylvania,

has been levied on by me this ___19TH___ day of ____MAY_____, 20_25___, by virtue of a

certain Writ of Execution pursuant to No. CV-2024-06488, at the suit of Saucon Valley School

District vs. Saucon Trust.

ALL LIGHTING, PLUMBING, AND HEATING FIXTURES ARE CONSIDERED PART
OF THE REAL ESTATE AND MAY NOT BE REMOVED FROM THE PREMISES.

Christopher Zieger, Acting Sheriff
Northampton County

Per:___SANMATEO  SIYO_____.
                                        Deputy Sheriff

*Attorney for the plaintiff:*
Portnoff Law Associates, Ltd.
866-720-9748

24-08397-0/WEN/L_P
PORTNOFF LAW ASSOCIATES, LTD.          ATTORNEY FOR PLAINTIFF
BY: ROBERT P. DADAY, ESQUIRE           ATTORNEY ID 43006
BY: DAVID D. DUGAN, ESQUIRE            ATTORNEY ID 312395
POST OFFICE BOX 391
NORRISTOWN, PA 19404
(866) 720-9748

---

Saucon Valley School District          :    IN THE COURT OF COMMON PLEAS
    Plaintiff
              vs.    :    NORTHAMPTON COUNTY, PA
Saucon Trust
    Defendant(s)                :    NO. C-48-CV-2024-06488

                                 :    IN REM  A TRUE COPY
                                        ATTEST:

## WRIT OF EXECUTION
## (TAX CLAIM SALE)

HOLLY RUGGIERO
CLERK OF COURT
CIVIL/PROTHONOTARY
*Holly Ruggiero*

TO THE SHERIFF OF NORTHAMPTON COUNTY, PENNSYLVANIA:

    To satisfy the judgment, interest, costs, and attorney fees against Saucon Trust, Defendant(s), you are directed to levy upon the following real property of the defendant(s) and sell his/her interest therein: (Inquisition and exemption laws waived and condemnation agreed to)
    1050 Main Street, Hellertown, Pennsylvania
    Tax Parcel No. Q7SW2A 1 3 0715

| | | |
|---|---|---|
| Judgment Amount | $ | 129,846.24 |
| Interest from 12/9/24 to 4/22/25, at a rate of $29.95 per diem.* | $ | 4,043.26 |
| Sheriff Deposit | $ | 2,500.00 |
| Portnoff Law Writ of Execution Attorney Fee | $ | 800.00 |
| Title Search Cost | $ | 130.00 |
| Prothonotary Fee | $ | 12.00 |
| TOTAL DUE | $ | 137,331.50 |

    *Plus Interest from 4/22/25, at a rate of $29.95 per diem.

Date: ___4/30/25___          BY: *Holly Ruggiero*
                                  Prothonotary
                                Court of Common Pleas of
                                Northampton County, Pennsylvania

        (SEAL)

                            Per: _____ , Deputy

24-08397-0/WEN/L_P
PORTNOFF LAW ASSOCIATES, LTD.                    ATTORNEY FOR PLAINTIFF
BY: ROBERT P. DADAY, ESQUIRE                     ATTORNEY ID 43006
BY: DAVID D. DUGAN, ESQUIRE                       ATTORNEY ID 312395
POST OFFICE BOX 391
NORRISTOWN, PA 19404
(866) 720-9748

---

Saucon Valley School District          :    IN THE COURT OF COMMON PLEAS
    Plaintiff
           vs.          :    NORTHAMPTON COUNTY, PA

Saucon Trust                            :    NO. C-48-CV-2024-06488
    Defendant(s)
                           :    IN REM

---

### NOTICE OF SHERIFF'S SALE OF REAL PROPERTY

TO:    Saucon Trust
        1177 6th Street
        Whitehall, PA 18052-5212

Your house (real estate) at 1050 Main Street, Hellertown, Pennsylvania is scheduled to be sold at Sheriff's sale on Friday, August 8, 2025, at 10:00 a.m. in County Council Chambers, 3rd Floor of the Northampton County Government Center, 669 Washington Street, Easton, Pennsylvania, to enforce the Court Judgment of $129,846.24 obtained by Saucon Valley School District against you.

### NOTICE OF OWNER'S RIGHTS

<u>YOU MAY BE ABLE TO PREVENT THIS SHERIFF'S SALE</u>

To prevent this Sheriff's sale you must take <u>immediate action:</u>

1. The sale will be canceled if you pay to the Plaintiff the back payments, late charges, costs and reasonable attorney's fees due. To find out how much you must pay, you may call: <u>(866) 211-9466.</u>

2. You may be able to stop the sale by filing a petition asking the Court to strike or open the judgment, if the judgment was improperly entered. You may also ask the Court to postpone the sale for good cause.

3. You may also be able to stop the sale through other legal proceedings.

You may need an attorney to assert your rights. The sooner you contact one, the more chance you will have of stopping the sale. (See notice at bottom on how to obtain an attorney).

### YOU MAY STILL BE ABLE TO SAVE YOUR PROPERTY AND YOU HAVE

## OTHER RIGHTS EVEN IF THE SHERIFF'S SALE DOES TAKE PLACE

1. If the Sheriff's Sale is not stopped, your property will be sold to the highest bidder. You may find out the price bid by calling (866) 211-9466.

2. You may be able to petition the Court to set aside the sale if the bid price was grossly inadequate compared to the value of your property.

3. The sale will go through only if the buyer pays the Sheriff the full amount due in the sale. To find out if this has happened, you may call (610) 559-3781.

4. If the amount due from the Buyer is not paid to the Sheriff, you will remain the owner of the property as if the sale never happened.

5. You have the right to remain in the property until the full amount due is paid to the Sheriff and the Sheriff gives a deed to the buyer. At that time, the buyer may bring legal proceedings to evict you.

6. You may be entitled to a share of the money which was paid for your house. A schedule of distribution of the money bid for your house will be filed by the Sheriff *within 30 days after sale date*. This schedule will state who will be receiving that money. The money will be paid out in accordance with this schedule unless exceptions (reasons why the proposed distribution is wrong) are filed with the Sheriff within ten (10) days after the posting of the schedule of distribution.

7. You may also have other rights and defenses, or ways of getting your home back, if you act immediately after the sale.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE LISTED BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

Northampton County Lawyer Referral Service
P.O. Box 4733
Easton, PA 18042
(610) 258-6333

| | |
|---|---|
| Saucon Valley School District | In the Court of Common Pleas of |
| | Northampton County, Pennsylvania |
| vs. | |
| | |
| Saucon Trust | CV-2024-06488 |

## WRIT OF EXECUTION NOTICE

This paper is a Writ of Execution. It has been issued because there is a judgment against you. It may cause your property to be held or taken to pay the judgment. You may have legal rights to prevent your property from being taken. A lawyer can advise you more specifically of these rights. If you wish to exercise your rights, you must act promptly.

Exempt Property. The law provides that certain property cannot be taken. Such property is said to be exempt. There is a debtor's exemption of $300.00. There are other exemptions which may be applicable to you. Attached is a summary of some of the major exemptions. You may have other exemptions or other rights.

If you have an exemption, you should do the following promptly: (1) fill out the attached claim form and demand for a prompt hearing; (2) deliver the form or mail it to the Sheriff's Department, along with the $12.00 filing fee, at the Northampton County Government Center, 669 Washington Street, Easton, PA 18042.

You should come to Court ready to explain your exemption. If you do not come to Court and prove your exemption, you may lose some of your property.

Property Belonging To Another Person. If there is property included in the levy performed by the Sheriff that belongs to another person or that you own with another person, you should notify that person so that he/she can file a Property Claim or other legal papers with the Sheriff's Office to prevent his/her property from being taken or sold at Sheriff's Sale to satisfy your debt. You can obtain a Property Claim form at the Sheriff's Office.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

<div align="center">

Lawyer Reference Service
155 South Ninth Street
Easton, PA 18042
610-258-6333

</div>

Saucon Valley School District

vs.

Saucon Trust

| In the Court of Common Pleas of
| Northampton County, Pennsylvania
|
| CV-2024-06488

## CLAIM FOR EXEMPTION

To The Sheriff:

I, the above-named defendant, claim exemption of property from levy or attachment:

(1)  From my personal property in my possession which has been levied upon,
    (a) I desire that my $300 statutory exemption be:
        ☐ (i) set aside in kind (specify property to be set aside in kind): _____

_____

_____

        ☐ (ii) paid in cash following the sale of the property levied upon; or

    (b) I claim the following exemption (specify property and basis of exemption): _____

_____

_____

(2) From my property which is in the possession of a third party, I claim the following exemptions:
    (a) my $300 statutory exemption:
        ☐ in cash
        ☐ in kind (specify property): _____

    (b) other (specify amount and basis of exemption): _____

_____

_____

I request a prompt court hearing to determine the exemption. Notice of the hearing should be given to me at _____

_____
                                           (Address and Phone Number)

I verify that the statements made in this Claim for Exemption are true and correct. I understand that false statements herein are made subject to the penalties of 18 PA C.S. § 4904 relating to unsworn falsification to authorities.

Date: _____      _____
                                                            (Defendant)

**Office of the Sheriff of Northampton County**              **Filing Fee: $12.00**
**669 Washington Street, Easton, PA 18042**             **(no personal checks)**

REQUESTED HEARING DATE: _____    (Wednesdays; must be scheduled 7 days prior)

## Property Description

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 2006-5 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1. South 86° 47'33" West 266.09 feet; thence in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2. North 03° 14'23" West 59.03 feet;

3. North 86° 41'33" East 18.00 feet;

4. North 03° 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5. North 86° 48'59" East 247.48 feet to the westerly right of way fine of Main Street; thence along the same

6. South 03° 18'24" East 470.30 feet to the place of beginning.

CONTAINS: 117,610.588 Sq. Ft. 2.7000 Acres

Northampton County Tax Parcel No. Q7SW2A 1 3 0715

BEING the same premises which by Deed dated October 1, 2007 and recorded in the Office of the Recorder of Deeds of Northampton County on October 5, 2007 in Deed Book Volume 2007-1, Page 366369, granted and conveyed unto Saucon Trust.

**EXHIBIT 2**



840 West Hamilton Street, Suite 521
Allentown, PA 18101
(610) 691-7111
www.stevenslee.com

T: (610) 997-5097
F: (610) 988-7214
joel.wiener@stevenslee.com

June 20, 2025

Jeffrey Kelly, Esq.
Portnoff Law Associates
Via Email to JKelly@portnoffonline.com

      RE: 1050 Main Street, Hellertown, PA (Unit 1)
      Your collection for Saucon Valley School District

Dear Jeff:

This letter is to confirm that the payment plan set forth in your email of June 10, 2025 was accepted by Saucon Valley Manor, Inc., the tenant, under which it will make the monthly payments under the plan to allow for it to remain in occupancy by not having the property exposed to Sheriff Sale (C-48-CV-2024-6488). The Receiver for the Property Owner, Saucon Trust, is advised to have been informed of the plan to avoid the Sheriff Sale, by the tenant making the monthly payments directly to your firm of $22,090.40 to be applied to the payment of 2023-24 and 2024-25 Saucon Valley School District taxes due, and the tenant taking a credit for the amounts so paid against rental as may now be due and as comes due under its lease.

The first payment shall be made on July 1, 2025 to your office.

      Very truly yours
      STEVENS & LEE

      *JBWiener*

      Joel B. Wiener

Copy:
Robert Daday, Esq. (rdaday@portnoffonline.com)
Saucon Valley Manor, Inc.
Ray Lahoud, Esq.

Allentown • Bergen County • Bala Cynwyd • Fort Lauderdale • Harrisburg • Lancaster • New York
Philadelphia • Princeton • Providence • Reading • Rochester • Scranton • Valley Forge • Wilkes-Barre • Wilmington
A PROFESSIONAL CORPORATION



## Stevens & Lee

840 West Hamilton Street, Suite 521
Allentown, PA 18101
(610) 691-7111
www.stevenslee.com

T: (610) 997-5097
F: (610) 988-7214
joel.wiener@stevenslee.com

June 20, 2025

Jeffrey Kelly, Esq.
Portnoff Law Associates
Via Email to JKelly@portnoffonline.com

RE: 1177 6th Street, Unit 1, Whitehall Twp, PA
Your collection for Whitehall Coplay School District

Dear Jeff:

This letter is to confirm that the payment plan set forth in your email of June 10, 2025 was accepted by Whitehall Manor, Inc., the tenant, by which it will make the payments under the plan to allow for it to remain in occupancy by not having the property exposed to sale or other collection for the 2023-24 or 2024-25 School taxes due – at least one year of which was liened. The Receiver for the Property Owner, Whitehall Trust, is advised to have been informed of the plan to avoid a Sheriff Sale, by Whitehall Manor, Inc. directly paying to your firm the monthly payments of $22,679.69 to be applied to the payment of above stated school district taxes due by the landlord, and taking a credit for those amounts paid for the taxes against its rental as may now be due and as comes due under its lease.

The first payment shall be made on July 1, 2025 to your office.

Very truly yours
STEVENS & LEE

*Joel*

Joel B. Wiener

Copy:
Robert Daday, Esq. (rdaday@portnoffonline.com)
Whitehall Manor, Inc.
Ray Lahoud, Esq.

Allentown • Bergen County • Bala Cynwyd • Fort Lauderdale • Harrisburg • Lancaster • New York
Philadelphia • Princeton • Providence • Reading • Rochester • Scranton • Valley Forge • Wilkes-Barre • Wilmington
A PROFESSIONAL CORPORATION

**EXHIBIT 3**

AUG-01-2007  11:07       BP  OKSIDE COM. CONST. CO               6104033409    P.18

# LEASE AGREEMENT

THIS LEASE AGREEMENT is made this 1st day of January, 2006 between ABRAHAM R. ATIYEH ("**Landlord**"), and the Tenant named below.

**Tenant:**  SAUCON VALLEY MANOR, INC., a Pennsylvania corporation

**Tenant's Address for Notices:**  1177 N. 6th Street, Whitehall, PA 10852

**Landlord's Address for Notices and Payments:**  1177 N. 6th Street, Whitehall, PA 10852

**Premises:**  Property located at 1050 Main Street, Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, more specifically described on Exhibit A.

**Term:**  The term of the Lease begins on January 1, 2006 and ends on July 31, 2012.

**Base Rent:**  $5,748,000 for the Term, payable in monthly installments of $95,800 each in accordance with Section 4 hereof.

**Additional Rent:**  All other amounts due under this Lease by Tenant to Landlord, which amounts shall be computed as incurred during the Term of the Lease.

**Exhibits:**  A. Description of Premises

1.  **Granting Clause.** In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, ordinances, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Term, subject to the terms, covenants and conditions of this Lease.

2.  **Acceptance of Premises.** Tenant shall accept the Premises in its "As Is" condition as of the first day of the Term, subject to all applicable laws, ordinances, regulations, covenants and restrictions. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. The taking of

- 1 -

DOCS_PH 1867164v.2

possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken.

    3.    **Use; Zoning.**  The Premises shall be used only for the purpose of a residential assisted living facility. Landlord does not warrant or represent that Tenant shall be able to obtain a permit under any zoning or other ordinance or regulation for such use as Tenant intends to make of the Premises, and nothing in this Lease shall obligate Landlord to assist Tenant in obtaining such permit. Landlord and Tenant further agree that in case the Tenant is unsuccessful in obtaining a permit under any zoning ordinance or regulation, that this Lease will not terminate without Landlord's consent and, should such consent be withheld by Landlord, Tenant agrees to use the Premises only in a manner permitted under such zoning ordinance or regulation. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, or subject the Premises to use that would damage the Premises.    Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance. Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, if applicable, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "**Legal Requirements**"). Tenant shall, at its expense, make any alterations or modifications, within or without the Premises, that are required by Legal Requirements related to Tenant's use or occupation of the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, violate its conditions or increase the insurance risk. If any increase in the cost of any insurance on the Premises is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord.

    4.    **Base Rent.** Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent in the amount of $137,500 each, commencing on the date hereof and continuing thereafter on or before the first day of each calendar month of the Term. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder shall be sent to Landlord's address for notices and payments, as set forth above, or at such other place as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or Additional Rent for more than 5 days, Tenant shall pay to Landlord on demand a late charge equal to ten percent (10%) of such delinquent sum, plus interest on any delinquent sum not paid within thirty (30) days after the due date therefor at the rate of 1½% per month (the "**Default Rate**"), which interest shall accrue from the due date to the date of payment. The provision for such late charge and interest shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty. Tenant shall pay to Landlord on demand a charge of $30.00 (or such higher sum as may be charged to Landlord by its bank) for any returned checks.

<div align="center">- 2 -</div>

<div align="center">**Supp. Appx. 014**</div>

AUG-01-2007  11:08        BROOKSIDE COM. CONST. CO              6104033409    P.20

5.    **Net Lease.** This is a net lease, and, except as the contrary is otherwise expressly herein provided, all costs of taxes, insurance, improvements, maintenance, repairs, alterations, additions, and replacements relating to the Premises shall be at the sole cost and expense of Tenant, and Landlord shall not be obligated to make any improvements, maintenance, repairs, alterations, additions, or replacements to the Premises.

6.    **Utilities and Services.** Tenant shall supply and pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Landlord may cause, at Tenant's expense, any utilities to be charged directly to Tenant by the provider; and otherwise Tenant shall pay such charges to Landlord as Additional Rent. No interruption or failure of utilities shall be deemed to be the responsibility of Landlord, or shall result in the termination of this Lease or the abatement of rent.

7.    **Insurance.**

(a)    Tenant, at its expense, shall maintain during the Term: all risk property insurance covering the full replacement cost of all building(s) and other improvements on the Premises (excluding coverage of Tenant's personal property), and such other insurance as Landlord may reasonably deem appropriate or as any mortgagee of Landlord may require, including, without limitation, rent loss coverage and business personal property coverage including, without limitation, any Tenant-Made Alterations; and

(b)    Tenant, at its expense, shall maintain during the Term, commercial general liability insurance, including blanket contractual liability insurance, covering Tenant's use of the Premises, with such coverages and limits of liability as Landlord may reasonably require, but not less than combined single limits of $2,000,000 per occurrence and in the aggregate for bodily injury or property damage (together with such umbrella coverage as Landlord may reasonably require); however, such limits shall not limit Tenant's liability hereunder. Landlord may from time to time require reasonable increases in any such limits. Tenant agrees to name Landlord as the insured party and loss payee in the policy for all risk property insurance. The commercial liability policies shall name Landlord as an additional insured and loss payee, and shall insure on an occurrence or a claims-made basis. The insurance policies shall be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless not less than 30 days' prior written notice shall have been given to Landlord, contain a hostile fire endorsement and a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). Such policies or certificates thereof shall be delivered to Landlord by Tenant upon commencement of the Term and upon each renewal of said insurance.

The all risk property insurance obtained by Tenant shall include a waiver of subrogation by the insurers of all rights based upon an assignment from its insured, against Landlord, its officers, directors, employees, managers, agents, invitees and contractors, in

- 3 -

DOCS_PH 1867164v.2

connection with any loss or damage thereby insured against. Neither Landlord nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to Tenant for loss or damage caused by any risk coverable by all risk property insurance, and Tenant waives any claims against Landlord, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage. The failure of Landlord to insure its property shall not void this waiver. Landlord and its agents, employees and contractors shall not be liable for, and Tenant hereby waives all claims against such parties for, business interruption and losses occasioned thereby sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises from any cause whatsoever, including without limitation, damage caused in whole or in part, directly or indirectly, by the negligence of Landlord or its agents, employees or contractors.

8.     **Landlord's Repairs.**  Except as provided in Section 12 of this Lease, Landlord shall have no obligation to inspect or maintain the Premises, or to make repairs or replacements to the Premises of any kind or nature, including those to the roof, foundation, or exterior walls of any building on the Premises (the **"Building"**).

9.     **Tenant's Maintenance and Repairs.**  Tenant agrees to maintain the Premises, at Tenant's expense, in a good, clean, sanitary and safe condition, including, without limitation, maintenance of the lawn, shrubbery, sidewalks, driveways and other exterior areas of the Premises, snow and ice removal, yearly heater maintenance contract, sewage cost and maintenance, and trash removal. Tenant, at its expense, shall make all necessary repairs and replacements to all portions of the Premises and all areas, improvements and systems exclusively serving the Premises, including, without limitation: the roof, foundation, and exterior walls of the Building; plumbing, water and sewer lines serving the Premises; heating, ventilation and air conditioning systems; fire sprinklers, fire protection systems, security systems and all other systems existing on the Premises for the safety of the Premises and the occupants thereof; and all entries, doors, ceilings, windows, and interior walls. Such repairs and replacements include capital expenditures and repairs whose benefit may extend beyond the Term. Tenant agrees to enter into and maintain, at Tenant's expense, maintenance service contracts for heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises. The scope of services and contractors under such maintenance contracts shall be reasonably approved by Landlord. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may, but shall have no obligation to, perform such work and be reimbursed by Tenant within 10 days after demand therefor.

10.    **Tenant-Made Alterations, Removal of Fixtures and/or Personal Property.**  Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used.    All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval.

-4-

DOCS_PH 1867164v.2

**Supp. Appx. 016**

AUG-01-2007  11:09        [  POKSIDE COM. CONST. CO              [  6104033409    P.22

Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by such removal. Tenant agrees not to remove any fixtures or significant personal property from the Premises during the Term.

11.  **Signs.** Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or for sale.

12.  **Restoration.** If at any time during the Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within 30 days after receipt of at least 75% of the insurance proceeds relating to the casualty as to whether or not Landlord has elected to restore the Premises or to terminate the Lease. If this Lease is terminated under this Section, all rent shall be apportioned as of the date of the casualty. If Landlord elects not to terminate this Lease, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding any improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in

- 5 -

DOCS_PH 1867164v.2

accordance with this Lease. Base Rent shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

13.    **Condemnation.** If any part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises or in Landlord's judgment would materially interfere with or impair its ownership of the Premises, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

14.    **Assignment and Subletting.** Without Landlord's prior written consent, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. For purposes of this Section, a transfer of more than 25% of the ownership interests controlling Tenant or a change in the management of the Premises by Tenant shall be deemed an assignment of this Lease. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any assignment or sublease. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof, Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as Additional Rent hereunder all such excess rental and other excess consideration within 10 days following receipt thereof by Tenant.

- 6 -

AUG-01-2007  11:10        ?  POKSIDE COM. CONST. CO            ¦    6104033409   P.24

If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

15.    **Release and Indemnity.**

(a)    Release. Tenant agrees that Landlord and its agents, employees, officers, directors, shareholders and partners shall not be liable to Tenant and Tenant hereby releases said parties from any liability, for any personal injury, loss of income or damage to or loss of persons or property, or loss of use of any property, in or about the Premises from any cause whatsoever, even if such damage, loss or injury results from the negligence or willful misconduct of Landlord, its officers, employees or agents. The release contained in this Section 15 shall apply, by way of example and not limitation, to damage, loss or injury resulting directly or indirectly from any existing or future condition, matter or thing in the Premises, the Building or any part thereof, or from equipment or appurtenances becoming out of repair, or from accident, or from the flooding of basements or other subsurface areas or from refrigerators, sprinkling devices, air conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors, or noise, or the bursting or leaking of pipes or plumbing fixtures, and shall apply equally whether any such damage, loss or injury results from the act or omission of Tenant or any other persons, and whether such damage be caused by or result from any thing or circumstance, whether of a like or wholly different nature.

(b)    Indemnity. Tenant shall defend, indemnify, save and hold harmless ("Indemnify") Landlord and its agents, employees, officers, directors, shareholders, and partners from and against all liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses, including reasonable attorneys' fees, court costs, administrative costs, and costs of appeals which may be imposed upon or incurred by or asserted against Landlord or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether prior to, during or after the Term. The obligation of Tenant to Indemnify contained in this Section 15 shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Tenant, its agents or contractors under workers' or workman's compensation acts, disability benefit acts or other employee benefits acts, or under any other insurance coverage Tenant may obtain. Tenant's obligations pursuant to this subsection are intended to survive the expiration or termination of this Lease. As used in the Section 12, "Agents" of a party means such party's employees, agents, representatives,

- 7 -

AUG-01-2007  11:11       F  OOKSIDE COM. CONST. CO         6104033409    P.25

contractors, licensees, invitees, and, with regard to Tenant's Agents, shall include all residents and occupants of the Premises.

16.  **Inspection and Access.**  Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make repairs, to the extent Landlord elects to do so, and for any other business purpose.  Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective lenders, tenants or purchasers.  Landlord may grant easements, make public dedications, and create restrictions on or about the Premises, provided that no such easement, dedication, or restriction materially interferes with Tenant's use or occupancy of the Premises.  At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

17.  **Quiet Enjoyment.**  If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

18.  **Surrender.**  Upon termination of the Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Sections 12 and 13 excepted.  Any Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property.  All obligations of Tenant hereunder not fully performed as of the termination of the Term shall survive the termination of the Term, including without limitation, indemnity obligations and obligations concerning the condition and repair of the Premises.

19.  **Holding Over.**  If Tenant retains possession of the Premises after the termination of the Term of this Lease, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to double the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over.  All other payments shall continue under the terms of this Lease.  In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over.  No holding over by Tenant, with or without consent of Landlord, shall operate to extend this Lease, except as otherwise expressly provided, and this Section 19 shall not be construed as consent for Tenant to retain possession of the Premises.  For purposes of this Section 19, "possession of the Premises" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

- 8 -

DOCS_PH 1867164v.2

AUG-01-2007  11:11        F^ OOKSIDE COM. CONST. CO            6104033409    P.26

20.    **Events of Default.**  Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a)    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

(b)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (iii) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (iv) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(c)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(d)    Tenant shall not occupy or shall vacate the Premises or shall remove its personal property and/or fixtures from the Premises, whether or not Tenant is in monetary or other default under this Lease.

(e)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(f)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 30 days after any such lien or encumbrance is filed against the Premises.

(g)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 20.

21.    **Landlord's Remedies.**

(a)    <u>Cumulative Remedies</u>.  In the event Tenant commits an event of default or otherwise breaches the terms of this Lease, Landlord shall have the following rights and remedies which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by law or equity:

(i)    To declare due and payable and sue for recovery, all unpaid Base Rent for the unexpired Term of the Lease (and also all Additional Rent as the amounts of same

- 9 -

DOCS_PH 1867164v.2

**Supp. Appx. 021**

AUG-01-2007  11:11      F  DOKSIDE COM. CONST. CO              I  6104033409    P.27

can be determined or reasonably estimated) as if by the terms of this Lease the same were payable in advance, together with all reasonable legal fees and other expenses incurred by Landlord in connection with the enforcement of any Landlord's rights or remedies hereunder; and/or

       (ii)    To distrain, collect or bring action for such Base Rent and Additional Rent as being rent in arrears, or may enter judgment therefore in an action as herein elsewhere provided for in case of rent in arrears, or may file a Proof of Claim in any bankruptcy or insolvency proceeding for such Base Rent and Additional Rent, or institute any other proceedings, whether similar or dissimilar to the foregoing, to enforce payment thereof; and/or

       (iii)    If Landlord has not elected to accelerate rent under clause (i) above, to terminate this Lease by giving written notice thereof to Tenant and, upon the giving of such notice, this Lease shall expire and terminate with the same force and effect as though the date of such notice was the date hereinabove fixed for the expiration of the Lease, and all rights of Tenant hereunder shall expire and terminate, but Tenant shall remain liable as hereinafter provided; and/or

       (b)    <u>Repossession of Premises</u>. If any event of default shall have occurred and be continuing, Landlord may, whether or not the Lease has been terminated as herein provided, re-enter and repossess the Premises or any part thereof by force, summary proceedings, ejectment or otherwise and Landlord shall have the right to remove all persons and property therefrom. Landlord shall be under no liability for or by reason of any such entry, repossession or removal and no such re-entry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate the Lease unless a written notice of such intention be given to Tenant or unless the termination of this Lease be by a court of competent jurisdiction. At any time or from time to time after the repossession of the Premises or any part thereof whether or not the Lease shall have been terminated, Landlord may (but shall be under no obligation to) relet all or any part of the Premises for the account of Tenant for such term or terms (which may be greater or less in the period which would otherwise have constituted the balance of the term) and on such conditions and for such uses as Landlord, in its absolute discretion, may determine and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be required to exercise any care or diligence with respect to such reletting or to the mitigation of damages. For the purpose of such reletting, Landlord may decorate or make repairs, changes, alterations or additions in or to the Premises or any part thereof to the extent deemed by Landlord desirable or convenient, and the cost of such decoration, repairs, changes, alterations or additions and any reasonable brokerage and legal fees expended by Landlord shall be charged to and payable by Tenant as Additional Rent hereunder. No expiration or termination of this Lease, by operation of law or otherwise, and no repossession of the Premises or any part thereof pursuant to this section, or otherwise, and no reletting of the Premises or any part thereof pursuant to this section shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

       (c)    <u>Payment of Damages</u>.

<div align="center">- 10 -</div>

DOCS_PH 1867164v.2

<div align="center">**Supp. Appx. 022**</div>

(i)      In the event of any expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of Tenant's default, and if Landlord has not elected to accelerate rent, Tenant shall pay to Landlord the Base Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination, repossession and, thereafter, Tenant shall, until the end of what would have been the expiration of the term in the absence of such expiration, termination, repossession and whether or not the Premises or any part thereof shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages, the Base Rent, Additional Rent and other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less the net proceeds, if any, of any reletting effective for the account of Tenant, after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including, without limitation, all related repossession costs, brokerage commissions, attorneys' fees, alterations costs and expenses for preparation of such reletting). Tenant shall pay such current damages on the days on which the rent would have been payable under this Lease in the absence of such expiration, termination, repossession and Landlord shall be entitled to recover the same from Tenant on each such day.

(ii)     At any time after such expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of the occurrence of Tenant's default, whether or not Landlord shall have collected any current damages, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, unless Tenant has paid the whole or accelerated rent, as and for liquidated and agreed final damages for Tenant's default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (A) Base Rent, Additional Rent and other sums which would be payable under this Lease for the remainder of the term from the date of such demand for what would have been the unexpired term of this Lease in the absence of such expiration, termination or repossession, discounted at the rate of six (6%) percent per annum, over (B) the then fair rental value of the Premises for the same period, discounted at a like rate. If any statute or rule of law shall limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

(iii)    Tenant further hereby expressly the authorizes and empowers Landlord, upon the occurrence of Tenant's default and so long as the same is continuing, to enter upon the Premises, distrain upon and remove therefrom all inventory, equipment, machinery, trade fixtures and personal property of whatsoever kind or nature, whether owned by Tenant or others, and to proceed, without judicial decree, writ of execution or assistance of constables, to conduct a private sale, by auction or sale bid, of such personal property, at which sale Landlord may bid without restriction. Tenant hereby waives the benefit of all laws, whether now in force or hereafter enacted, exempting any personal property on the Premises from sale or levy, whether execution thereon is had by order of any Court or through private sales herein authorized. Tenant waives the right to issue a Writ of Replevin under the Pennsylvania Rules of Civil Procedure, under the laws of the Commonwealth of Pennsylvania or under any law previously enacted and now in force or which hereinafter may be enacted for the recovery of any articles of any nature

- 11 -

whatsoever seized under a distress for rent, or levy upon an execution for rent, liquidated damages or otherwise.

(d)    CONFESSION OF JUDGMENT.   TENANT HEREBY EMPOWERS ANY PROTHONOTARY OR ATTORNEY FOR ANY COURT OF RECORD TO APPEAR FOR TENANT IN ANY AND ALL ACTIONS WHICH MAY BE BROUGHT FOR RENT HEREUNDER AND TO SIGN FOR TENANT AN AGREEMENT FOR ENTERING INTO ANY COMPETENT COURT AN ACTION OR ACTIONS FOR THE RECOVERY OF RENT, AND IN SAID SUITS OR IN SAID ACTION OR ACTIONS TO CONFESS JUDGMENT AGAINST TENANT FOR ALL OR ANY PART OF THE RENT INCLUDING, AT LANDLORD'S OPTION, THE RENT FOR THE ENTIRE UNEXPIRED BALANCE OF THE TERM OF THIS LEASE, AND ANY CHARGES, PAYMENTS, COSTS AND EXPENSES RESERVED AS RENT OR AGREED TO BE PAID BY THE TENANT, AND FOR INTEREST AND COSTS TOGETHER WITH AN ATTORNEY'S COMMISSION OF TEN (10%) PERCENT THEREOF.  SAID AUTHORITIES SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, BUT JUDGMENT MAY BE CONFESSED AS AFORESAID FROM TIME TO TIME AND AS OFTEN AS ANY OF THIS SAID RENT OR OTHER CHARGES RESERVED AS RENT OR LIQUIDATED DAMAGES SHALL FALL DUE OR BE IN ARREARS, AND SUCH POWERS MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE ORIGINAL TERM OR DURING ANY EXTENSION OR RENEWAL OF THIS LEASE.

(e)    ACTION FOR EJECTMENT.  UPON TERMINATION OF THIS LEASE OR EXPIRATION OF THE TERM OR ANY EXTENSION THEREOF, IT SHALL BE LAWFUL FOR ANY ATTORNEY AS ATTORNEY FOR TENANT TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION IN EJECTMENT, WITHOUT ANY STAY OF EXECUTION OR APPEAL AGAINST TENANT AND ALL PERSONS CLAIMING UNDER TENANT FOR THE RECOVERY BY LANDLORD OF POSSESSION OF THE HEREIN PREMISES, WITHOUT LIABILITY ON THE PART OF THE SAID ATTORNEY, WHICH THIS LEASE SHALL BE A SUFFICIENT WARRANT, WHEREUPON, IF LANDLORD SO DESIRES A WRIT OF POSSESSION WITH CLAUSES FOR COST MAY ISSUE FORTHWITH WITHOUT ANY PRIOR WRIT OR PROCEEDINGS WHATSOEVER. IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED THE SAME SHALL BE DETERMINED AND THE POSSESSION OF THE PREMISES HEREBY DEMISED REMAIN IN OR BE RESTORED TO TENANT, THE LANDLORD SHALL HAVE THE RIGHT IN ANY SUBSEQUENT DEFAULT OR DEFAULTS TO BRING ONE OR MORE FURTHER ACTIONS IN THE MANNER AND FORM HEREIN BEFORE SET FORTH, TO RECOVER POSSESSION OF SAID PREMISES FOR SUCH SUBSEQUENT DEFAULT. NO SUCH TERMINATION OF THIS LEASE NOR TAKING, NOR RECOVERING POSSESSION OF THE PREMISES SHALL DEPRIVE LANDLORD OF ANY REMEDIES OR ACTION AGAINST TENANT FOR RENT OR DAMAGES DUE OR TO BECOME DUE FOR THE BREACH OF ANY CONDITION OR COVENANT HEREIN CONTAINED, NOR SHALL THE BRINGING OF ANY SUCH ACTION FOR RENT, OR BREACH OF COVENANT OR CONDITION NOR THE RESORT TO ANY OTHER REMEDY HEREIN PROVIDED FOR THE RECOVERY OF RENT OR

- 12 -

DOCS_PH 1867164v.2

AUG-01-2007  11:13      . BOOKSIDE COM. CONST. CO                6104033409    P.30

DAMAGES FOR SUCH BREACH BE CONSTRUED AS A WAIVER OF THE RIGHT TO INSIST UPON THE NATURE AND TO OBTAIN POSSESSION IN THE MANNER HEREIN PROVIDED.

(f)    Landlord's Affidavit.  In any action in ejectment or for rent in arrears, Landlord shall first cause to be filed in such action, an affidavit made by it or someone acting for it setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be conclusive evidence, and if a true copy of this Lease be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of court, custom or practice to the contrary notwithstanding.

(g)    Judgment Final.  Any judgment, order or decree entered against Tenant by or any court or Magistrate by virtue of the powers of attorney contained in this Lease, or otherwise, shall be final, and Tenant will not take an appeal, certiorari, writ of error, exception or objection to same, or file a motion or rule to strike off or open or to stay execution of the same. Tenant releases Landlord and any and all attorneys who may appear for Tenant all errors in the said proceedings. Tenant expressly waives the benefits of law, now or hereafter in force, exempting any goods on the Premises, or elsewhere, from the distraint, levy or sale in any legal proceedings taken by the Landlord to enforce any rights under this Lease.  Tenant further waives the right to any notice to remove as may be specified in the Pennsylvania Landlord and Tenant Act of April 6, 1951, as amended, or any similar or successor provision of law, and agrees that five (5) days notice shall be sufficient in any case where a longer period may be statutorily specified.

(h)    WAIVER.  IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF SAID PREMISES, ANY CLAIM OF INJURY OR DAMAGE, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.  IT IS FURTHER MUTUALLY AGREED THAT IN THE EVENT THAT LANDLORD COMMENCES ANY SUMMARY PROCEEDING FOR NON-PAYMENT OF RENT, TENANT WILL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING.

(i)    Injunction.  In the event of a breach or threatened breach by Tenant of any of the agreements, conditions, covenants or terms hereof, Landlord shall have the right of injunction to restrain the same and the right to invoke any remedy allowed by law or in equity whether or not other remedies, indemnity or reimbursements are herein provided.

(j) ,    Interest and Costs.  All amounts owed by Tenant to Landlord under this Lease, other than the Base Rent, shall be deemed Additional Rent and, unless otherwise provided, shall be paid within ten (10) days from the date Landlord renders a statement of account.  All Base Rent and Additional Rent shall bear interest from the date due until the date

- 13 -

AUG-01-2007  11:14      E.  JOKSIDE COM. CONST. CO            }   6104033409    P.31

paid at the Default Rate.  Tenant shall pay upon demand all of Landlord's costs, charges and expenses, including the reasonable fees of counsel, agents and others retained by Landlord, incurred in enforcing Tenant's obligations hereunder or incurred by Landlord in any litigation, negotiation or transaction which Tenant causes Landlord, without Landlord's fault, to become involved or concerned.

       (k)   <u>Removal of Tenant's Property</u>.  All property removed from the Premises by Landlord pursuant to any provision of this Lease or of law may be handled, removed or stored by Landlord at the cost and expense of the Tenant, and the Landlord shall in no event be responsible for the value, preservation or safekeeping thereof.  Tenant shall pay Landlord for all expenses incurred by Landlord in such removal and storage charges against such property while the same shall be in Landlord's possession or under Landlord's control.  All property not removed from the Premises or not retaken from storage by Tenant within thirty (30) days after the end of the term, however terminated, shall be conclusively deemed to be conveyed by Tenant to Landlord as by bill of sale without further payment or credit by Landlord to Tenant.

       22.   **Bankruptcy.**  If at any time during the term of this Lease there shall be filed by or against Tenant or Guarantor in any court pursuant to any statute either of the United States or of any State (or Canada, as to Guarantor) a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or Guarantor's property, or if a receiver or trustee takes possession of any of the assets of Tenant or Guarantor, or if the leasehold interest herein passes to a receiver, or if Tenant or Guarantor makes an assignment for the benefit of creditors or petitions for or enters into an arrangement (any of which are referred to herein as "a bankruptcy event"), then such bankruptcy event shall be an event of default under this Lease, and the following provisions shall apply:

       Any receiver or trustee in bankruptcy or Tenant as debtor in possession ("debtor") shall either expressly assume or reject this Lease within sixty (60) days following the earlier of the entry of an "Order for Relief", or an order confirming a Plan of Reorganization.

       In the event of an assumption of the Lease by a debtor, receiver, or trustee, such debtor, receiver, or trustee shall immediately after such assumption (1) cure any default or provide adequate assurances that defaults will be promptly cured; and (2) compensate Landlord for actual pecuniary loss or provide adequate assurances that compensation will be made for actual pecuniary loss; and (3) provide adequate assurance of future performance.

       Where a default exists under the Lease, the party assuming the Lease may not require Landlord to provide services or supplies incidental to the Lease before its assumption by such trustee or debtor, unless Landlord is compensated under the terms of the Lease for such services and supplies provided before the assumption of such Lease.

       Landlord specifically reserves any and all remedies available to Landlord in Section 22 hereof or at law or in equity in respect of a bankruptcy event by Tenant to the extent such remedies are permitted by law.

<div align="center">- 14 -</div>

AUG-01-2007  11:14        B. JOKSIDE COM. CONST. CO        |    6104033409    P.32

23.  **Limitation of Liability.**  All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder.  Landlord shall have no liability for consequential damages, nor for punitive or exemplary damages.  All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter.  The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.  Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord; and in any proceeding or in the case of any judgment against Landlord, Tenant shall request that the judgment index be noted to reflect such limitation of liability.

24.  **Subordination.**  This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant.  Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder.  Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder.  Tenant hereby appoints Landlord attorney in fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument and instruments for and in the name of the Tenant and to cause any such instrument to be recorded.  Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder.  The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

25.  **Mechanic's Liens.**  Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs.  Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against

- 15 -

the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 30 days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 30 day period.

26.    **Estoppel Certificates.**    Tenant agrees, from time to time, within three (3) business days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within three (3) business days after Landlord's written request thereof.

27.    **Environmental Requirements.**    Except for Hazardous Material contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall remediate in a manner satisfactory to Landlord any Hazardous Materials released on or from the Premises by Tenant, its agents, employees, contractors, subtenants or invitees. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by

- 16 -

Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises and loss of rental income from the Premises), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Section 27, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section 27 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance.   The obligations of Tenant under this Section 27 shall survive any termination of this Lease.

Landlord shall have access to, and a right (but not an obligation) to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section 27, or the environmental condition of the Premises.  Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests.  Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

28.     **Security Service.**   Tenant acknowledges and agrees that Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

29.     **Force Majeure.**  Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

30.     **Entire Agreement.** This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof.  No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements,

- 17 -

AUG-01-2007  11:16          .OOKSIDE COM. CONST. CO                6104033409    P.35

promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

31. **Severability**. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

32. **Brokers**. Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the broker, if any, set forth on the first page of this Lease, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

33. **Miscellaneous**.        (a)        Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

(b)        If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c)        All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses as set forth at the beginning of this Lease. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery or attempted delivery.

(d)        Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(e)        At Landlord's request from time to time Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants and any other financial information or summaries that Tenant typically provides to its lenders or shareholders.

(f)        Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

- 18 -

DOCS_PH 1867164v.2

**Supp. Appx. 030**

AUG-01-2007 11:16      ᴸ ᴶOOKSIDE COM. CONST. CO                6104033409   P.36

(g)     The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(h)     The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(i)     Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(j)     It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(k)     Construction and interpretation of this Lease shall be governed by the laws of the state in which the Premises is located, excluding any principles of conflicts of laws.

(l)     Time is of the essence as to the performance of Tenant's obligations under this Lease.

(m)     All riders and addenda now or hereafter attached hereto are hereby incorporated into this Lease and made a part hereof.  In the event of any conflict between such riders or addenda and the terms of this Lease, such riders or addenda shall control.

(n)     In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the prevailing party for its reasonable attorney's fees, filing fees, and court costs.

(o)     Each person executing this Lease on behalf of Tenant certifies that he or she has the authority to do so.

(p)     This Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant, and their respective heirs, personal representatives, principals, successors and assigns, except that no rights shall inure to the benefit of any assignee of Tenant unless the

- 19 -

DOCS_PH 1867164v.2

AUG-01-2007  11:16      b. JOKSIDE COM. CONST. CO              6104033409    P.37

assignment of the Lease has previously been approved in writing by Landlord and the assignee or successor to Tenant has executed a consent and authorization for Confession of Judgment and to be otherwise bound hereby.

(q)    Landlord and Tenant both acknowledge that this is a commercial transaction.

(r)    If Landlord accepts the rent at any time after the rent is due, or Landlord fails to enforce any of its rights under this Lease or any of the penalties, forfeitures or conditions contained in this Lease, such forbearance shall not in any way be considered as a waiver of the right to enforce the same; and thereafter Landlord may enforce such rights, penalties or forfeitures against Tenant without any notice whatsoever; and any attempt to collect the rent by one proceeding shall not be considered as a waiver of the right of Landlord to collect the same by any other proceeding.

34.    **Landlord's Lien/Security Interest.**  Tenant hereby grants Landlord a security interest, and this Lease constitutes a security agreement, within the meaning of and pursuant to the Uniform Commercial Code of the state in which the Premises are situated as to all of Tenant's property situated in, or upon, or used in connection with the Premises (except merchandise sold in the ordinary course of business) as security for all of Tenant's obligations hereunder, including, without limitation, the obligation to pay rent.  Such personalty thus encumbered includes specifically all trade and other fixtures for the purpose of this Section and inventory, equipment, contract rights, accounts receivable and the proceeds thereof.  In order to perfect such security interest, Tenant shall execute such financing statements and file the same at Tenant's expense at the state and county Uniform Commercial Code filing offices as often as Landlord in its discretion shall require; and Tenant hereby irrevocably appoints Landlord its agent for the purpose of executing and filing such financing statements on Tenant's behalf as Landlord shall deem necessary.

35.    **Limitation of Liability of Trustees, Shareholders, and Officers of Landlord.**  Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease, or any obligation or liability which may be incurred by Landlord pursuant to any other instrument, transaction, or undertaking contemplated hereby, shall not be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of the trustees, directors, shareholders, officers, employees or agents of Landlord, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise.

**SECTION 21 OF THIS LEASE PROVIDES FOR THE CONFESSION OF JUDGMENT AGAINST TENANT FOR MONEY AND FOR EJECTMENT.  IN CONNECTION THEREWITH, TENANT, KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND UPON ADVICE OF SEPARATE COUNSEL, UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF THE UNITED STATES AND THE COMMONWEALTH OF PENNSYLVANIA. WITHOUT LIMITATION OF THE FOREGOING, TENANT HEREBY SPECIFICALLY WAIVES ALL RIGHTS TENANT HAS OR MAY HAVE TO NOTICE AND OPPORTUNITY FOR**

- 20 -

DOCS_PH 1867164v.2

A HEARING PRIOR TO EXECUTION UPON ANY JUDGMENT CONFESSED AGAINST TENANT BY LANDLORD HEREUNDER.

TENANT FURTHER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS SAID PROVISIONS WITH TENANT'S INDEPENDENT LEGAL COUNSEL AND THAT THE MEANING AND EFFECT OF SUCH PROVISIONS HAVE BEEN FULLY EXPLAINED TO TENANT BY SUCH COUNSEL, AND AS EVIDENCE OF SUCH FACT AN AUTHORIZED OFFICER OF TENANT SIGNS HIS OR HER INITIALS IN THE SPACE PROVIDED BELOW.

(Initials)

IN WITNESS WHEREOF, Landlord and Tenant, intending to be legally bound hereby, have executed this Lease as of the day and year first above written.

ABRAHAM R. ATIYEH

SAUCON VALLEY MANOR, INC.

By:

Name:  RAMES  ANOARO

Title:

(Corporate Seal)

- 21 -

DOCS_PH 1807164v.2

Supp. Appx. 033

## EXHIBIT A

### Description of Premises

**ALL THAT CERTAIN** tract or parcel of land situate in the Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, bounded and described as follows:

**BEGINNING** at a railroad spike (bench mark, elevation 480.00) in Wassergass Road (Legislative Route T-391) and running in an easterly direction M. 82° 43' 30" E. 255.53' to a spike; N 78° 50' 30" E. 354.75' to a spike; N 70° 49' 30" E. 45.54' to a spike; thence in a southerly direction along the property now or late of Jarou Petran, S 9° 58' E. 580.24' to a pin; S. 77° 31' 30" W. 8.25' to a pin; S. 12° 28' 30" E. 533.26' to a point; thence in a westerly direction along property of the School District of the Township of Lower Saucon (now Saucon Valley School District) S. 81° 26' W. 552.23' to a pin; thence continuing S. 81° 28' W. 210.11' along property now or late of Louis Fortley to an iron pin; thence in a northerly direction bordering the property now or later of George Mar N. 5° 45' W. 464.72' to a pin; thence N. 4° 53' W. 631.24' bordering the property now or late of Ronald J. Sweeney to the point of **BEGINNING**. **CONTAINING** 16.25 acres, more or less.

**BEING THE SAME PREMISES** which Saucon Valley School District, successors in interest to Hellertown-Lower Saucon School Authority, by Indenture dated October 1, 1999, did grant and convey unto Abraham R. Atiyeh, said deed being recorded in the Office for the Recording of Deeds in and for Northampton County, at Easton, Pennsylvania, in Deed Book Volume 1999-1, at Page 153214, reference thereunto had, the same will therein more fully and at large appear.

**UNDER AND SUBJECT** to the right-of-way contained in the foregoing deed.

- 22 -

DOCS_PH 1867164v.2

**Supp. Appx. 034**

### Certification

The undersigned, SAUCON VALLEY MANOR, INC., a Pennsylvania corporation (the "**Tenant**") in connection with the Lease Agreement dated January 1, 2006 (the "**Lease**") entered with ABRAHAM R. ATIYEH, an individual (the "**Landlord**") hereby certifies the following:

1.  Tenant has been represented by legal counsel in connection with the Lease.

2.  Tenant has received advice as to the meaning and consequences of the provisions in the Lease authorizing confession of judgment, execution and attachment, confession of judgment in ejectment, waiver of errors, waiver of the right to appeal, all other waivers provided for under the Lease and have executed the Lease following receipt of such advice of counsel.

3.  Tenant, in furtherance of the above, hereby certifies that it has elected to execute the Lease with full understanding of the consequences of such election.

4.  If Tenant is a Corporation, then signatory certifies that he/she has been authorized to execute the Lease.

5.  Tenant acknowledges that the Lease constitutes a commercial transaction.

Tenant has caused this Certification to be executed this _____ day of January, 2006.

SAUCON VALLEY MANOR, INC.

By: _____

Name: _____

Title: _____

(Corporate Seal)

- 23 -

**Supp. Appx. 035**

## Lease Amendment Agreement

MADE as of the 8th day of December, 2006 by and between ABRAHAM R. ATIYEH, an adult individual, herein called Landlord, having an office at 1177 Sixth Street, Whitehall, PA 18052;

A N D

SAUCON VALLEY MANOR, INC., a Pennsylvania corporation, herein called Tenant, having an office at 1050 Main Street, Hellertown, Pennsylvania.

### *Witnesseth:*

WHEREAS, Landlord and Tenant entered into a Lease for the property known as 1050 Main Street, Hellertown, Northampton County, Pennsylvania, (the "Lease"), which lease included the main building and parking lots and open space, consisting of Northampton County tax parcels Q7SW2A-1-3 and Q7SW2A-1-5, (the Property); and

WHEREAS, pursuant to the agreement and understandings between Landlord and Tenant, Landlord was permitted to redevelop the open space and allow use of some of the parking in common with Tenant; and

WHEREAS, Landlord has declared a condominium for the Property; and

WHEREAS, Landlord and Tenant desire to amend the Lease to reflect the revision of the leased area and the reduced obligations of Tenant concerning the Property, as follows.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1.      The Lease is hereby amended to modify the Leased Premises to be Unit 1 of the Condos at Saucon Valley Manor, a Condominium.

2.      The Leased Premises under the Lease shall also include all of the parking rights allowed on Unit 2 for Unit 1 owners, residents, guests, tenants and invitees.

3.      The Leased Premises under the Lease shall also include all easements, encroachment and other rights of Unit 1 as exist or as are allowed

in the future under the Declaration of Condominium for the Condos at Saucon Valley Manor.

4.    Landlord, and not Tenant, shall be responsible for the maintenance and lawn cutting and other actions concerning the area known as Unit 4 of the Condos at Saucon Valley Manor.

5.    Landlord, and not Tenant, shall be responsible for the taxes due upon Unit 4 of the the Condos at Saucon Valley Manor; and the successor(s) to Landlord in ownership of Unit 3 shall be responsible for its taxes and related charges.

6.    In the event of any failure of Landlord to exercise the voting rights of the Unit 1 Owner in a manner consistent with the Lease, the Tenant is authorized and empowered to vote for Landlord as the Unit 1 Owner to fulfill the obligations of Landlord, as amended by this Lease Amendment Agreement. This right is granted with an interest so long as Tenant is not in default under the Lease and no event which would be a default with the passage of time or giving of notice, or both, exists.

7.    Landlord acknowledges that the business of Tenant involves the keeping or dealing with medical records and information, and that any entry by Landlord is made with the understanding that the same will not intentionally expose medical records.

8.    The Lease, except as specifically modified herein, is ratified and affirmed, including the rights of Landlord to confession of judgment and other allowances of summary procedures or waivers of rights by Tenant.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Lease Addendum Agreement intending to be legally bound as of the date and year first above set forth.

SAUCON VALLEY MANOR, INC.

By: _____
    Its (Vice) President

_____
Abraham R. Atiyeh
(Landlord)

ADDENDUM TO LEASE AGREEMENT

MADE October 1, 2007, by and between, Saucon Trust hereinafter, sometimes referred to as Landlord;

AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

WITNESSETH:

WHEREAS Abraham R. Atiyeh as Landlord (the "Assignor") did enter into an Agreement of Lease with Tenant effective January 1, 2006 as more fully described in the above Assignment of Lease (the "Lease") which Lease was assigned to Landlord by the above Assignment of Lease; and

WHEREAS Landlord and Tenant have agreed to amend the description of the Premises and add and delete certain terms and conditions set forth in this Addendum to Lease Agreement with all terms of the Lease not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    The above Recitals do form a part of this Addendum to Lease Agreement.

2.    Section 14 of Lease is deleted in its entirety.

3.    The parties acknowledge that the rent set forth on page 1 of the lease (monthly installments of $95,800.) is correct and do correct and modify the amount set forth in Section 4 to read "monthly installments if Base Rent in the amount of $95,800."

4.    The Premises is amended to read "Unit 1 of the Condos at Saucon Valley Manor, Lower Saucon Township, Northampton County, Pennsylvania" as more fully described on Exhibit A to this Addendum to Lease.

5.    In addition to the Base Rent and other rent or charges set forth in the Lease, Tenant shall pay all common charges for the Premises pursuant the condominium documents of Condos at Saucon Valley ("The Condo Documents") and shall abide by all rules, regulations, terms, covenants and conditions of the Condominium Documents.

6.    All other terms, covenants and conditions of the aforementioned Lease not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as

3

if set forth herein at length.

       IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.

Saucon Trust (Landlord)

_____
Abraham R. Atiyeh, Trustee

Saucon Valley Manor, Inc. (Tenant)

By:_____

Title:_____

4

## SECOND ADDENDUM TO LEASE AGREEMENT

MADE this 29th day of August 2008, by and between, The Saucon Trust,  by and through ABRAHAM R. ATIYEH as  Trustee of the Saucon Trust, hereinafter sometimes referred to as Landlord;

AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

WITNESSETH:

WHEREAS Abraham R. Atiyeh, individually, as Landlord, did enter into an Agreement of Lease with Tenant effective January 1, 2006 (the "Lease"); and the Lease was assigned to Landlord effective October 1, 2007;  and

WHEREAS, Landlord and Tenant entered in the Addendum to Lease Agreement dated October 1, 2007, (the "First Addendum"), which modified the Lease as therein set forth; and

WHEREAS, Landlord and Tenant did agree with National Penn Bank concerning the Assignment of Rents and Leases under date of October 1, 2007 (the "ALR"); and

WHEREAS Landlord and Tenant have agreed to further amend the Lease to change the Base Rental due by Tenant to Landlord effective September 1, 2008, and intend that all terms of the Lease and the First Addendum not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.     The above Recitals do form a part of this Second Addendum to Lease Agreement.

2.     Effective as of September 1, 2008, Base Rent, as defined and/or otherwise stated in Section 4 of the Lease, is amended to be the sum of One Hundred Thirty Two Thousand Five Hundred ($132,500.00) Dollars per month.

3.     The aforesaid increased amount of Base Rent shall be payable monthly starting September 1, 2008 in addition to the continued payment of all amounts due as Additional Rent or otherwise due pursuant to the Lease.

AUG-29-2008  16:46                                      P.02

3.    Tenant certifies to Landlord and National Penn Bank that there is no Default of Landlord existing under the Lease and that it has no knowledge of any event which, with the passage of time or giving of notice would be a default of Landlord under the Lease.

4.    All other terms, covenants and conditions of the aforementioned Lease (as amended by the First Addendum) not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

5.    All terms, covenants and conditions of the aforementioned ALR are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.

**The Saucon Trust** (Landlord)

By: _____
Abraham R. Atiyeh, Trustee of
The Saucon Trust

**Saucon Valley Manor, Inc.** (Tenant)

By: _____
Abraham Atiyeh, President

TOTAL P.02

THIRD AMENDMENT
Dated and Effective As Of January 1, 2010
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

### THIRD AMENDMENT TO LEASE AGREEMENT

This THIRD AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of January 1, 2010, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Abraham R. Atiyeh, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

A N D

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the terms of this Addendum shall be effective as of the date shown above, subject to the obtaining approval as required by the terms of the Mortgage encumbering the Leased Premises.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A.       The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year.  Payments of Rent shall be due in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month. "A.  The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year.  Payments of Rent shall be due (a) in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of $1,200,000.00 to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $2,400,000.00 is paid in full by December 31 of each year.

"A.1       Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth

in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed ten percent (10%) of the Rent so delinquent for each calendar month of delinquency.

2.        The parties acknowledge that the new areas being added to the Building on Unit 1 form a part of the Premises, and that the Lessee shall take possession of the same when occupancy is allowed by applicable ordinance and inspection(s) and certification(s) as may be required. Lessee acknowledges that it is observing the construction and that it shall bear all risk from failure of the premises to comply with requirements for its intended use. Lessee hereby waives all obligations or warranties of Owner with respect to the construction being made for the benefit of Lessee on the Premises.

3.        No other portions of the Lease are amended or modified.

4.        Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5.        Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Third Amendment to Lease Agreement effective as of January 1, 2010.

SAUCON TRUST                    SAUCON VALLEY MANOR, INC.

By: _____       By: _____
    Abraham Atiyeh, Trustee          (Vice) President

FOURTH AMENDMENT
Dated and Effective As Of November 1, 2012
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

## FOURTH AMENDMENT TO LEASE AGREEMENT

This FOURTH AMENDMENT TO LEASE AGREEMENT, (the "First Amendment"), is made and dated as of November 1, 2012, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

A N D

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the Lease has been amended prior to the date hereof; and

WHEREAS, Owner is obtaining a mortgage loan from M&T Realty Capital Corporation, its successors and/or assigns which will be insured or endorsed by the Secretary of Housing and Urban Development ("HUD"), which is herein called the "HUD Mortgage"; and

WHEREAS, the HUD Mortgage requires certain additional lease terms and other amendments, and the parties desire to amend the Lease as herein set forth.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

   "A.      The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the greater of:
      (i)      The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or
      (ii)     During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :
         a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
         b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and

        c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and

        d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and

        e. Annual Property Taxes for the Leased Premises.

(iii)    The obligations of Lessee to pay, as Rent or Additional Rent, any of the items set forth in subsection (ii), above, are satisfied by the payment of rental as set forth in subsection (ii), above.

(iv)    Lessee acknowledges that the foregoing Rent will be variable due to the potential change in payments required for the items comprising rental due by subsection (ii), above.

2.    Owner agrees that it, or the holder of any escrow relating to items within the scope of 1 A (ii), will cause the timely payment of insurance premiums and taxes.

3.    Lessee or Owner may seek reimbursement or funding from the Replacement Reserve to fund costs, provided that any sums disbursed to them or for the use of the Premises are limited by the terms of the Replacement Reserve and the documents by which it was created or otherwise exists

4.    The HUD Rider, attached hereto as Exhibit "A" is incorporated herein by reference and forms a part hereof. Lessee agrees that it shall abide by all terms of the HUD Rider.

5.    Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

6.    Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

7.    Lessee acknowledges and agrees that it shall execute and deliver a Subordination, Nondisturbance and Attornment Agreement in form and content satisfactory to HUD.

8.    Lessee shall cause its subtenants, Lehigh Valley Health Network and Good Shepherd Rehabilitation Hospital to execute Subordination, Nondisturbance and Attornment Agreement in form and content satisfactory to HUD. The said subleases are subordinate to the terms of this Lease, and shall be subordinate to the HUD Mortgage and all subsequent mortgages now or hereafter upon the Premises.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fourth Amendment to Lease Agreement effective as of November 1, 2012.

**SAUCON TRUST**
By: Saucon Management LLC, Trustee

By: _____
    Abraham Atiych,
    Manager of Trustee

**SAUCON VALLEY MANOR, INC.**

By: _____
         (Vice) President

## FIFTH AMENDMENT TO LEASE AGREEMENT

This FIFTH AMENDMENT TO LEASE AGREEMENT, (the "Fifth Amendment") is effective as of July 1, 2018, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

A N D

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

*WHEREAS*, the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

*WHEREAS*, the Lease has been amended four (4) times prior to the effective date hereof; and

*WHEREAS*, Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

*WHEREAS*, Owner and Tenant desire to extend the Term of the Lease.

*NOW, THEREFORE*, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease ratified and Rent shall continue to be calculated as follows:

"A.        The Lessee agrees to pay to the Owner during the Lease Term, starting on January 1, 2013,  as Rent for the Leased Premises, the greater of:
   (i)        The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or
   (ii)       During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :
      a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
      b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and
      c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and

      d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and

      e. Annual Property Taxes for the Leased Premises.

(iii)   The obligations of Lessee to pay, as Rent or Additional Rent, any of the items set forth in subsection (ii), above, are satisfied by the payment of rental as set forth in subsection (ii), above.

(iv)   Lessee acknowledges that the foregoing Rent will be variable due to the potential change in payments required for the items comprising rental due by subsection (ii), above.

(v)   The foregoing does not include those obligations, fees or other expenses and reimbursements as are due by Tenant under the Lease.

2.      Owner agrees that the holder of any escrow relating to items within the scope of 1 A (ii), will cause the timely payment of insurance premiums and taxes.

3.      Lessee or Owner may seek reimbursement or funding from the Replacement Reserve to fund costs, provided that any sums disbursed to them or for the use of the Premises are limited by the terms of the Replacement Reserve and the documents by which it was created or otherwise exists

4.      Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5.      Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

6.      Lessee acknowledges and agrees that this Lease, and all rights of Lessee and anyone claiming by, through or under Lessee, are, and shall be, subordinate to the HUD Mortgage and all subsequent mortgages now or hereafter upon the Premises.

7.      The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the "Termination Date").

8.      The Term shall automatically extend on the Termination Date for three (3) periods of three (3) years, each, (and the Termination Date shall be modified automatically thereby) unless (i) a Default by Lessee occurs, (in which event the rights and remedies of Owner shall be immediately applicable, and no further extension shall automatically occur) or (ii) Owner gives notice of nonrenewal to Lessee at least six (6) months prior to the end of the then-current Term, (in which event no further automatic extensions shall be available), or (iii) Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 9 months prior to the end of the then-current Term.

9.        Lessee certifies that there is no default of Owner under the Lease.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fifth Amendment to Lease Agreement intending to be legally bound effective as of July 1, 2018.

**SAUCON TRUST**
By: Saucon Management LLC, Trustee

By: _____
    Abraham Atiyeh,
    Manager of Trustee

**SAUCON VALLEY MANOR, INC.**

By: _____
    Nandita Kapoor Atiyeh,  President

**Supp. Appx. 051**

## SIXTH AMENDMENT TO LEASE AGREEMENT

This SIXTH AMENDMENT TO LEASE AGREEMENT, (the "Sixth Amendment") is effective as of September 21, 2023, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

A N D

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

*WHEREAS,* the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

*WHEREAS,* the Lease has been amended five (5) times prior to the effective date hereof; and

*WHEREAS,* Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

*WHEREAS,* Owner and Tenant desire to extend the Term of the Lease and to grant extensions to Tenant as hereinafter set forth; and

*NOW, THEREFORE,* in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02 of the Lease (and all other parts of the Lease setting forth Base Rent, Additional Rent or other tenant payment obligations) are as follows:

   a. Base Rental
      i. For the period through December 31, 2024, no Base Rental shall be due.
      ii. For the remainder of the current renewal Term (i.e. calendar years 2025, 2026, 2027 and 2028) Base Rent shall be the greater of (i) One Hundred Twenty Thousand ($120,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment

1

**Supp. Appx. 052**

               for any real property obligation which Tenant may elect to pay, and by uncollected accounts receivable or bad debt] for each calendar year of the Term, limited to the sum of Three Hundred Thousand ($300,000.00) per annum, to be paid on April 30 of the year following the calendar year for which the calculation shall be made; and

      iii.    Base Rental for each calendar year of the Renewal Terms (i.e. Calendar years starting after December 31, 2028 shall be the greater of (i) Two Hundred Forty Thousand ($240,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay and by uncollected accounts receivable or bad debt] during a calendar year, limited to the sum of Five Hundred Thousand ($500,000.00) per annum. Base Rental shall be due on April 30 of the year following the calendar year for which the calculation shall be made; and

   b.  Tenant shall pay all charges for electric, water and sewer services provided to the Premises prior to the same being made a lien upon the Premises; and

   c.  Tenant shall pay the premiums for one or more insurance policies to provide (i) property casualty insurance for the Premises and (ii) general liability insurance for the Premises; and

   d.  Repairs to the Premises as are required to maintain the Premises in the condition required for lawful operation of a personal care home.

2.     The Term is hereby extended to December 31, 2028 (which date shall hereafter be called the Termination Date, unless extended as per subsection (a), below).

   a.  The Term shall automatically extend on the Termination Date for three (3) periods of five (5) years, each, (and the Termination Date shall be modified automatically thereby) unless Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 90 days prior to the end of the then-current Term.

3.     Landlord and Tenant also have agreed to waive all past due rental and any obligations of Tenant or Landlord not performed by one or both through September 21, 2023, and hereby waive and release all unpaid sums and all performance not fully and timely provided.

   a.  Tenant waives any rights to refund or for calculation of overpayment previously made.

2

4.      Landlord acknowledges that Tenant has made repairs and replacements and betterments for the Premises. Tenant hereby waives obligation of Landlord to reimburse or perform such repairs, replacements or betterments, other than such funds are are now or hereafter due from insurers or loss payment sources other than Landlord.

5.      This Sixth Amendment is a full waiver and release of all defaults, deficient performance and any other obligation of Landlord or of Tenant which has arisen or could have been asserted at any time through and including the date hereof.

6.      The obligations of Landlord and/or Tenant under any Regulatory Agreement and all agreements, security interests and other rights, privileges, obligations or performance required under any Regulatory Agreement or other agreement made with the United States Department of Housing and Urban Development ("USHUD") or anyone required by, for or concerning USHUD or arising under any obligation with, concerning or associated with USHUD (collectively "HUD Obligations"), are hereby terminated and void as of September 20, 2023. Any past violations or continuing violation of the terms or conditions of any HUD Obligations are hereby waived and released.

7.      All other terms and conditions of the Lease (as amended through and including the Fifth Amendment and the oral amendment memorialized herein), are ratified and affirmed.

8.      This Agreement is effective as of September 21, 2023 notwithstanding a later date of execution.


        IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Sixth Amendment, intending to be legally bound effective as of September 21, 2023.


SAUCON TRUST ("Landlord")                    SAUCON VALLEY MANOR, INC.
                                             ("Tenant")

By: Saucon Management LLC, its Trustee

By: _____                 By: _____
    Abraham Atiyeh, its Manager                  Nimita Kapoor Atiyeh, President

3

LEASE AGREEMENT
DATED AND EFFECTIVE AS OF August _14_, 2008

By and Between
WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007,
a Pennsylvania Trust, as Owner and Lessor

and

WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

Table of Contents

Page

ARTICLE I      DEFINITIONS ..................................................................... 1
  1.01         Definitions ........................................................................... 1

ARTICLE II     LEASE OF LEASED PREMISES, TERM OF LEASE ................... 5
  2.01         Lease of Leased Premises ........................................................ 5
  2.02         Term of Lease ....................................................................... 5
  2.03         Subordination ........................................................................ 5
  2.04         Quiet Enjoyment .................................................................... 6
  2.05         Ownership of Capital Improvements ........................................... 6
  2.06         No Personal Liability .............................................................. 6

ARTICLE III    HUD REQUIREMENTS ......................................................... 6
  3.01         Precedence of Article III ......................................................... 7
  3.02         Assignment and Subletting ....................................................... 7
  3.03         Compliance With HUD Requirements and Terms of Mortgage
               Loan Documents ................................................................... 7
  3.04         Acknowledgment .................................................................... 7
  3.05         License; Bed Authority ............................................................ 7
  3.06         Financial Statements .............................................................. 7
  3.07         Medicaid and Medicare ........................................................... 8
  3.08         State Licensure Requirements ................................................... 8
  3.09         MAP Guide Requirements ........................................................ 8
  3.10         Execution of Lessee Regulatory Agreement by Lessee .................... 8
  3.11         Management Contract Requirements ........................................... 8
  3.12.        Inspections ........................................................................... 8
  3.13         Insurance ............................................................................. 8
  3.14         Certain Payments ................................................................... 8
  3.15         Eminent Domain .................................................................... 9
  3.16         Ownership of Capital Improvements ........................................... 9

ARTICLE IV     RENTALS; APPLICATION OF GROSS REVENUES ..................... 9
  4.01         General Obligation ................................................................. 9
  4.02         Rental Payments .................................................................... 9
  4.03         Security Interest In Gross Revenues ........................................... 9
  4.04         Obligations Unconditional ........................................................ 10
  4.05         Net Lease ............................................................................. 10

ARTICLE V      COVENANTS AND REPRESENTATIONS OF THE LESSEE ......... 10
  5.01         Maintenance and Operation of Leased Premises ........................... 10

| | | |
|---|---|---|
| 5.02 | Maintenance of Entity Existence | 11 |
| 5.03 | Management | 11 |
| 5.04 | Payment of Lawful Taxes and Charges; Discharge of Liens | 12 |
| 5.05 | Compliance With Law | 12 |
| 5.06 | Additions and Alterations | 12 |
| 5.07 | Financial and Other Restrictions | 13 |
| 5.08 | Inspections | 13 |
| 5.09 | Assignment and Subletting | 14 |
| 5.10 | Indemnification Concerning the Leased Premise | 14 |
| 5.11 | Representations of the Lessee | 14 |
| ARTICLE VI | INSURANCE AND CONDEMNATION | 16 |
| 6.01 | Insurance Coverage and Terms | 16 |
| 6.02 | Insurance Proceeds | 16 |
| 6.03 | Eminent Domain | 16 |
| ARTICLE VII | DEFAULT AND REMEDIES | 16 |
| 7.01 | Events of Default | 16 |
| 7.02 | Remedies | 17 |
| 7.03 | Cumulative Rights; No Implied Waiver | 18 |
| ARTICLE VIII | MISCELLANEOUS | 18 |
| 8.01 | Surrender of Possession | 18 |
| 8.02 | Successors and Assigns | 18 |
| 8.03 | Severability | 18 |
| 8.04 | Counterparts | 18 |
| 8.05 | Notices | 18 |
| 8.06 | Headings | 19 |
| 8.07 | Non-Waiver | 19 |
| 8.08 | Amendments | 19 |
| 8.09 | No Recording | 19 |
| 8.10 | Estoppel Certificates | 19 |
| 8.11 | Governing Law | 19 |
| 8.12 | Entirety of Agreement | 19 |

<u>LEASE AGREEMENT</u>

This LEASE AGREEMENT, (the "Lease Agreement"), is made and dated as of August /4 , 2008, by and between WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007 (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Whitehall Fiduciary LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;
AND

WHITEHALL MANOR, INC., (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner desires to lease to the Lessee the Leased Premises (hereinafter defined) on the terms and conditions set forth herein; and

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

ARTICLE I

<u>DEFINITIONS</u>

The Owner and the Lessee hereby mutually covenant and agree as follows:

1.01    <u>Definitions.</u>

(a)    The following terms shall have the meanings specified below:

"<u>Capital Additions</u>" means property of any kind acquired, constructed or rehabilitated by the Owner or Lessee which is used or useful in connection with the Leased Premises and which is properly chargeable to the plant or property account under generally accepted accounting principles including, without limitation, land, easements, rights-of-way, leaseholds, other interests in real property, personal property, equipment, replacements of property retired or rendered obsolete, and permanent additions and betterments.

"<u>Department of Public Health</u>" means the Pennsylvania Department of Public Welfare.

"<u>Event of Default</u>" means any of the events described in Section 7.01 of this Lease Agreement.

"<u>FHA</u>" means the Federal Housing Administration.

1

"Fiscal Year" means the twelve month period hereby designated by the Owner and the Lessee for financial reporting purposes beginning on the first day of January in any calendar year and ending on the thirty-first day of December of such calendar year.

"Gross Revenues" means all revenues, receipts, income and other moneys at any time received by or on behalf of the Lessee from the operation of the Leased Premises, including, without limitation, revenues derived from the operation of the Leased Premises and all rights to receive the same whether in the form of accounts receivable, contract rights, chattel paper, instruments or other rights, and the proceeds thereof, and any insurance thereon, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Lessee, but excluding the proceeds of any loans to the Lessee and partnership contributions and insurance proceeds and eminent domain awards.

"HUD" means the U.S. Department of Housing and Urban Development.

"HUD Requirements" means Section 232 of the National Housing Act of 1934, as amended; any and all regulations now or hereafter adopted pursuant to such Section 232; and any and all HUD rules, requirements and/or handbooks now or hereafter applicable to the Leased Premises.

"Indemnified Parties" means the Lender, the Owner and any person who "controls" the Owner within the meaning of Section 15 of the Securities Act of 1933, as amended; any member, officer, director, official, employee, agent, general partner, limited partner and attorney of the Owner or the Lender; and their respective executors, administrators, heirs, successors and assigns (excluding the Lessee).

"Leased Premises" means all the land located at, and known and identified as Unit 1 of Whitehall Manor Condominium, as Declared by Declaration of Condominium dated August 13, 2008 and recorded in the Office of the Recorder of Deeds in and for Lehigh County, Pennsylvania, said premises being situate in the Township of Whitehall, Lehigh County, Pennsylvania, and more particularly described in Exhibit A attached to this Lease Agreement, together with any additions thereto and substitutions therefor and any buildings, improvements, betterments, fixtures, equipment, furnishings, and other property, real or personal, now existing or at any time acquired, constructed or located thereon, including any Capital Additions.

"Lease Term" means the duration of the term created in this Lease Agreement as specified in Section 2.02.

"Lender" means M&T Realty Capital Corporation, and any future holder of the Mortgage.

"Lessee Regulatory Agreement" means the Regulatory Agreement-Nursing Homes entered into by and between the Lessee and HUD with respect to the Leased Premises.

2

"Lessee Security Agreement" means that certain Lessee Security Agreement between Lessee and Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments or supplements thereto.

"Mortgage" means that certain Mortgage from the Owner to the Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

"Mortgage Loan" means the FHA-insured mortgage loan in the original maximum principal amount of up to $15,788,700.00 made by Lender to the Owner, secured, in part, by the Leased Premises, as the same may be amended, increased or decreased.

"Mortgage Loan Documents" means the Lessee Regulatory Agreement, the Owner Regulatory Agreement, the Mortgage, the Security Agreement, the Mortgage Note evidencing the Mortgage Loan executed by the Owner in favor of the Lender, the Lessee Security Agreement entered into by and between the Lessee and Lender with respect to the Leased Premises, and any and all other documents required by HUD and/or the Lender in connection with the Mortgage Loan.

"Operating Expenses" means all expenses required in operating and maintaining the Leased Premises, including, in each case, without limitation, (i) expenses of operation of the Leased Premises, including utilities, maintenance, repair, alteration, insurance and inspection expenses, (ii) expenses of professional, managerial, supervisory, administrative, engineering, architectural, legal, auditing and consulting services, (iii) sums payable to any Person, which sums, under generally accepted accounting principles, constitute expenses of operation and maintenance, and (iv) all taxes, assessments and other governmental charges, including, without limitation, property, franchise and excise taxes, but excluding taxes levied on income and/or profits of the Owner and/or Lessee. Operating Expenses shall exclude Rent. Operating Expenses shall also include deductibles relating to casualty losses of a part of the Property and shall also include all regular and special assessments due to the condominium association of which the Leased Premises forms a part.

"Owner Regulatory Agreement" means the Regulatory Agreement entered into by and between the Owner and HUD with respect to the Leased Premises.

"Person" means any natural person, corporation, partnership, limited liability company, trust, agency or other entity.

"Rent" means the payments of rent in respect of the Leased Premises required pursuant to Section 4.02.A of this Lease Agreement.

"Security Agreement" means that certain Security Agreement between Owner and Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

3

(b)    Words importing persons shall include firms, associations and corporations, and words importing the singular number shall include the plural number and vice versa.

4

Supp. Appx. 061

ARTICLE II

## LEASE OF LEASED PREMISES; TERM OF LEASE

2.01    Lease of Leased Premises. The Owner hereby leases to the Lessee, and the Lessee hereby leases from the Owner, the Leased Premises on the terms and conditions set forth in this Lease Agreement.

2.02    Term of Lease. The Lease Term for the Leased Premises shall commence on the date hereof and shall expire on August 31, 2018, or such earlier date as may be hereinafter provided. In addition, the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be.

2.03    Subordination. This Lease Agreement is and shall be subject and subordinate to the Mortgage and other Mortgage Loan Documents; to all renewals, modifications, consolidations, replacements and extensions thereof; to all substitutions therefor; and to all future mortgages upon the Leased Premises and/or other security interests in or to the Leased Premises and any other items which are herein leased to Lessee or which, pursuant to the terms hereof, become a part of the Leased Premises or are otherwise deemed to become the property of Owner or to remain upon the Leased Premises at the end of the Term; and to each advance made or hereafter to be made under any of the foregoing. This Section 2.03 shall be self-operative and no further instrument of subordination shall be required. The Lessee agrees to execute and deliver promptly any and all certificates, agreements and other instruments that the Owner or Lender may reasonably request in order to confirm such subordination. If the Lender shall succeed to the interest of the Owner, then this Lease Agreement shall terminate, or, at the option of the Lender, this Lease Agreement shall nevertheless continue in full force and effect, in which case the Lessee shall and does hereby agree to attorn to the Lender and to recognize the Lender as its landlord under the terms of this Lease Agreement. Any agreements entered into by the Lessee for provision of services to the Leased Premises or the granting of easements, rights of way or other allowances of use or placement of CATV, utilities or other items are, and shall always be, subordinate to (i) the rights of Owner, and (b) the Mortgage and other Mortgage Loan Documents and all other mortgages and security interests now or hereafter encumbering the Leased Premises and/or the property of which it forms a part.

If this Lease Agreement or the Rent due hereunder is assigned to the Lender as collateral security for the Mortgage Loan, the Lender shall not be deemed to have assumed any of the Owner's obligations under this Lease Agreement solely as a result of such assignment. The Lender to whom this Lease Agreement has been so assigned shall be deemed to have assumed such obligations only if (i) by the terms of the instrument of assignment the Lender specifically elects to assume such obligations, or (ii) Lender has (a) foreclosed its mortgage, (b) accepted a deed in lieu thereof, or (c) taken possession of the Leased Premises by entry or otherwise. Even if the Lender so assumes the obligations of the Owner under this Lease Agreement, the Lender will be liable for breaches under this Lease Agreement only to the extent such breaches occur

5

during the period of ownership by the Lender after foreclosure (or after any conveyance by a deed in lieu of foreclosure) and then only to the extent of Lender's interest in the Leased Premises. The Lessee hereby consents to the assignment of this Lease Agreement as provided in the Mortgage.

2.04    Quiet Enjoyment.  The Owner covenants and agrees with the Lessee that so long as the Lessee is in compliance with its obligations under this Lease Agreement, including the payment of the Rent and the other payments required under this Lease Agreement and the observance and performance of all the terms, covenants, and conditions on the Lessee's part to be observed and performed, and subject to the provisions of Section 2.03 of this Lease Agreement, the Lessee may peaceably and quietly have, hold and enjoy the Leased Premises for the Lease Term, subject to easements, agreements, restrictions, and covenants of record. The foregoing is subject to the rights reserved to Owner and/or the Declarant and/or others in the Declaration Condominium for the Property of which the Leased Premises is a part.

2.05    Ownership of Capital Improvements.  Any and all buildings and improvements now existing and/or hereafter erected on the Leased Premises; any betterments made to the Leased Premises; any and all personal property, equipment, furniture, fixtures, computers, accessories and supplies of all kinds now or hereafter located on and/or used in connection with the Leased Premises; and all additions, substitutions, and replacements thereto during the Lease Term (hereinafter collectively called "Personal Property") shall be owned by the Owner, Lessee hereby conveying any and all such Personal Property to Owner.

Lessee agrees not to remove any Personal Property from the Leased Premises except to replace such Personal Property with other similar items of equal or greater quality and value, which items shall immediately become and remain the property of the Owner.

2.06    No Personal Liability.  No recourse under or upon any obligation, covenant or agreement of this Lease Agreement or for any claim based thereon or otherwise in respect thereof, shall be had against any partner (general or limited), member, manager, officer, director, shareholder or employee, trustee, as such, past, present or future, of the Owner or of any successor entity, either directly or through the Owner, at law or in equity, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty, or otherwise; it being expressly understood that no such personal liability whatever shall attach to, or is or shall be incurred by, any such Person, under or by reason of the obligations, covenants or agreements contained in this Lease Agreement or implied herefrom; and that any and all such personal liability, either at common law or in equity or by constitution or statute, of, and any and all such rights and claims against, every such Person under or by reason of the obligations, covenants or agreements contained in this Lease Agreement, or implied herefrom, are hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Lease Agreement.

ARTICLE III

HUD REQUIREMENTS

6

3.01 <u>Precedence of Article III</u>. For so long as, and only for so long as, HUD is the holder or insurer of any indebtedness secured by the Leased Premises, the provisions of this Article III shall apply to this Lease Agreement, notwithstanding anything herein to the contrary. This Article III shall not be amended without the prior written consent of HUD and the Lender.

3.02 <u>Assignment and Subletting</u>. This Lease Agreement shall not be assigned, in whole or in part (including any transfer of title or right to possession and control of the Leased Premises, or of any right to collect fees or rents), without the prior approval of HUD. Owner and Lessee acknowledge that any proposed assignee will be required to execute a Lessee Regulatory Agreement with HUD as a prerequisite to any such approval. Any consent by Owner to any sublease by the Lessee of the Leased Premises or any portion thereof may be given only upon compliance with the Mortgage Loan Documents and applicable HUD Requirements.

3.03 <u>Compliance With HUD Requirements and Terms of Mortgage Loan Documents</u>. The Lessee agrees to comply with all HUD Requirements that are applicable to the Leased Premises. The Lessee agrees that it will not take any action which would violate any applicable provision of any of the Mortgage Loan Documents.

In the event of any conflict between the terms and provisions of this Lease Agreement and any applicable HUD Requirements or the Mortgage Loan Documents, the HUD Requirements and Mortgage Loan Documents shall control in all respects. Owner and Lessee agree that no provision of this Lease Agreement shall modify any obligation of Owner or Lessee under the Mortgage Loan Documents. Owner and Lessee acknowledge that HUD's acceptance of this Lease Agreement in connection with the closing of the Mortgage Loan shall in no way constitute HUD's consent to arrangements which are inconsistent with HUD Requirements. This Lease Agreement is subordinate and subject to the Mortgage Loan Documents and to all HUD Requirements.

3.04 <u>Acknowledgment</u>. Owner and Lessee each acknowledges and agrees that the Rent and other amounts payable by Lessee under this Lease Agreement (including Rent, additional rent and all other sums payable under this Lease Agreement) are sufficient to properly maintain the Leased Premises, and to enable the Owner to meet its debt service obligations and related expenses in connection with the Mortgage Loan and the Leased Premises. Owner and Lessee each acknowledges and agrees that the terms and provisions of this Lease Agreement are comparable to the terms and provisions of leases of comparable facilities in the market.

3.05 <u>License; Bed Authority</u>. Owner and Lessee agree not to undertake or acquiesce to any modification to the assisted living facility license with respect to the Leased Premises or to any "bed authority" related thereto without the prior written approval of HUD.

3.06 <u>Financial Statements</u>. Lessee agrees to furnish HUD and Lender copies of its annual financial statements with respect to the Leased Premises within sixty (60) days after the close of Lessee's fiscal year or such longer period as may be permitted by HUD.

<div align="center">7</div>

3.07    Medicaid and Medicare.    Lessee shall be responsible for obtaining and maintaining all necessary licensure, and provider agreements for Medicaid and Medicare residents in the event the Leased Premises has a dual certification.  Lessee agrees to furnish HUD and Lender with copies of all such provider agreements.

3.08    State Licensure Requirements.    Lessee shall ensure that the Leased Premises meets all state licensure requirements and standards at all times.

3.09    MAP Guide Requirements.    Owner and Lessee acknowledge and agree that this Lease Agreement complies with applicable requirements of Section 3.9.G of the Multifamily Accelerated Processing Guide dated May 17, 2000, as the same may have been amended, promulgated by the Office of the Assistant Secretary for Housing -- FHA Commissioner.

3.10    Execution of Lessee Regulatory Agreement by Lessee.    At the time of the closing of the Mortgage Loan, the Lessee agrees to execute the Lessee Regulatory Agreement.  The Lessee agrees to comply with its obligations under the Lessee Regulatory Agreement, and agrees that a default by the Lessee under the Lessee Regulatory Agreement shall be deemed to be a default under this Lease Agreement.

3.11    Management Contract Requirements.    The Lessee agrees not to enter into any management contract involving the Leased Premises unless such management contract shall contain provisions that, in the event of default under the Owner Regulatory Agreement or the Lessee Regulatory Agreement, the management agreement shall be subject to termination upon not more than thirty (30) days notice without penalty upon written request of HUD.  Upon such HUD termination request, the Lessee shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to HUD for continuing proper management of the Leased Premises.

3.12.    Inspections.    The Lessee agrees that upon reasonable request, the Lender and/or HUD and their designees and representatives may exercise all rights of examination and inspection that are afforded to the Owner under Section 5.08 of this Lease Agreement.

3.13    Insurance.    The Lessee agrees to procure and maintain, or cause to be procured and maintained, the insurance coverages required pursuant to the Mortgage Loan Documents and/or applicable HUD Requirements, including HUD Notices 04-01 and 04-15.  Insurance proceeds shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Requirements.  The decision to repair, reconstruct, restore or replace the Leased Premises shall be made by the Owner, subject to the terms of the Mortgage Loan Documents and applicable HUD Requirements.

3.14    Certain Payments.    The Lessee agrees to pay, as Additional Rent, when due all premiums for (i) FHA mortgage insurance, (ii) liability insurance and full coverage hazard insurance on the Leased Premises, and (iii) all other insurance coverages required under the Mortgage Loan Documents and/or applicable HUD Requirements, and to treat such payments as Operating Expenses.  Unless the Lender and Owner agree otherwise, the Lessee shall be

8

responsible for funding all escrows for taxes, reserves for replacements, mortgage insurance premiums, and/or other insurance premiums as may be required by the Lender and/or FHA.

3.15 <u>Eminent Domain</u>.    The proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Requirements.

3.16 <u>Ownership of Capital Improvements</u>.    Lessee agrees to execute any and all documents as may be required by Lender or HUD to confirm the provisions of Section 2.05 and/or further effect the transfer of title to the Owner as provided in Section 2.05.

## ARTICLE IV

### <u>RENTALS; APPLICATION OF GROSS REVENUES</u>

4.01    <u>General Obligation</u>.    This Lease Agreement is a general obligation of the Lessee.

4.02    <u>Rental Payments</u>.

A.    The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Two Hundred Thousand and No/100 Dollars ($1,200,000.00) per year.   Payments of Rent shall be due in advance in equal monthly installments of One Hundred Thousand and No/100 Dollars ($100,000.00) on the first day of each month.  If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed five percent (5.0%) of the Rent so delinquent.

B.    The Lessee agrees to pay to (or on behalf of) the Owner all payments to the reserve for replacements which are required to be made pursuant to the terms of the Owner Regulatory Agreement.

4.03    <u>Security Interest In Gross Revenues</u>.   As security for the Rent and all other payments due to the Owner under the terms of this Lease Agreement, the Lessee grants to and creates in the Owner a security interest in the Gross Revenues, but the existence of such security interest shall not prevent the expenditure, deposit or commingling of Gross Revenues by the Lessee so long as all payments required under this Lease Agreement are made when due, nor prevent the write-off of any uncollectable accounts or bad debts.  In the event of default by the Lessee under the terms and conditions of this Lease Agreement, beyond any applicable notice and cure periods, the Owner, without limitation of any other rights or remedies available to it and with any required consent of the Department of Public Health, shall have the right to appoint a receiver to collect the Gross Revenues and manage payments from such funds as permitted from time to time by the Department of Public Health, if applicable.

9

4.04    Obligations Unconditional. The obligations of the Lessee to make payments of Rent and all other payments required under this Lease Agreement shall be absolute and unconditional, without defense or set-off by reason of any default or other reason whatsoever, including by the Owner under this Lease Agreement or under any other agreement between the Lessee and the Owner or the Lender, and, except as may be expressly provided herein, such payments shall not be decreased, abated, postponed, or delayed for any reason whatsoever, including, without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Leased Premises, the taking by condemnation of any part of the Leased Premises, commercial frustration of purpose, failure of the Owner to perform and observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Lease Agreement, or failure of any resident or occupant of the Lessee to pay the fees, rentals or other charges owed to the Lessee, and irrespective of whether or not any such resident or occupant of the Lessee receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Lessee under this Lease Agreement will be paid in full when due without any delay or diminution whatsoever.

4.05    Net Lease. This Lease Agreement is intended to be an entirely "net" lease, intending hereby to impose the burden of payment of all costs and expenses related to the use and occupancy of the Leased Premises upon the Lessee. The Lessee agrees to pay when due all real estate and personal property taxes and special assessments assessed or imposed upon the Leased Premises or which may be charged to the Owner in connection with the Leased Premises and treat such payments as Operating Expenses. The Lessee agrees also to pay when due all payments required by Section 3.14 of this Lease Agreement (during periods in which Article III is operative), and premiums for liability insurance and full coverage hazard insurance on the Leased Premises, and to treat such payments as Operating Expenses. The Lessee agrees also to pay when due all other Operating Expenses. Notwithstanding the foregoing, the Lessee shall not be liable for any federal, state or local income taxes which may be assessed against the Owner.

## ARTICLE V

## COVENANTS AND REPRESENTATIONS OF THE LESSEE

5.01    Maintenance and Operation of Leased Premises. The Lessee covenants that during the Lease Term of this Lease Agreement, it shall:

A.    pay or cause to be paid all costs of operating the Leased Premises including, without limitation, all charges for water, electricity, light, heat or power, sewage, telephone and other utility service, rendered or supplied during the Lease Term; all water, water meter, and sewer rents, rates, and charges; and any and all other governmental levies, fees, rents, assessments, or taxes and charges;

B.    at its own cost or expense keep and maintain, or cause to be kept and maintained, in good repair and condition (excepting reasonable wear and tear), the Leased

10

Premises and all additions and improvements thereto, excluding any rebuilding or restoration following damage to or destruction or condemnation of all or part of the Leased Premises;

    C.    make all repairs, renewals, replacements and improvements to the Leased Premises in order to maintain adequate service and quality resident care;

    D.    not commit or suffer any waste of any of the Leased Premises;

    E.    maintain in good standing its license to operate the Leased Premises as an assisted living facility and any other licenses or permits required to operate the Leased Premises as a licensed facility; and promptly comply, unless contested in good faith, with any and all requests and recommendations of the Department of Public Health and its representatives with respect to the operation of the Leased Premises, in providing care to residents;

    F.    comply with all applicable requirements of Titles XVIII and XIX of the Social Security Act, and the rules and regulations thereunder, as the same may now or hereafter be in effect, in order to maintain its status in good standing as a provider of health care services under such Titles;

    G.    upon receipt, promptly furnish the Owner with copies of any inspection reports made by the Department of Public Health or the United States Department of Health and Human Services, and promptly undertake to correct any deficiencies noted in such inspection reports regarding its operation of the Leased Premises as an assisted living facility; and

    H.    promptly inform the Owner of any decisions on behalf of the Department of Public Health as to a change in status of any certificate or license affecting the Lessee's operation of the Leased Premises as an assisted living facility.

    5.02    <u>Maintenance of Entity Existence.</u>  The Lessee agrees that during the Lease Term (unless this Lease Agreement is assigned in accordance with its terms, in which event this Section shall apply to such assignee), it will maintain its entity existence, will continue to be a corporation organized under the laws of the Commonwealth of Pennsylvania, will promptly pay all taxes assessed against it or any of its assets by any federal, state or local governmental authority, will not dissolve or otherwise dispose of all or substantially all of its assets, and will not consolidate with or merge into another entity or permit one or more other entities to consolidate with or merge into it.

    5.03    <u>Management.</u>  The Lessee agrees at all times during the Lease Term of this Lease Agreement to employ or cause to be employed a qualified management firm and/or qualified administrator to supervise the operation of the Leased Premises, who shall be experienced in the management and operation of facilities of the nature and size of the Leased Premises, and who shall be subject to the approval of the Owner (and HUD, in accordance with Section 3.11, during periods in which Article III is operative).

11

5.04    Payment of Lawful Taxes and Charges; Discharge of Liens.

A.    The Lessee agrees to pay all taxes and assessments or other municipal or governmental charges of any kind whatsoever that may at any time be lawfully imposed, levied or assessed upon or in respect of the Lessee's income, operations, assets or property, including the Leased Premises, or any part thereof, when the same shall become due, including any machinery, equipment or related property installed or brought by the Lessee therein or thereon, and all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of the Leased Premises; provided, that with respect to special assessments or other governmental charges that lawfully may be paid in installments over a period of years, the Lessee shall be obligated to pay only such installments as are required to be paid during the term of this Lease Agreement. Notwithstanding the foregoing, the Lessee shall not be liable for any federal, state or local income taxes which may be assessed against the Owner.

B.    The Lessee may, at its own expense and in good faith, contest any such taxes, assessments, charges, claims or demands and, in the event of any such contest, may, with the approval of the Owner (and HUD, in accordance with Section 3.12.A, during periods in which Article III is operative), permit the taxes, assessments, charges, claims and demands so contested to remain unpaid during the period of such contest and may appeal therefrom.

5.05    Compliance With Law.

A.    The Lessee covenants, represents and warrants that at all times during the term of this Lease Agreement:

(1)    all actions heretofore and hereafter taken by the Lessee with respect to the Leased Premises, including all repairs, additions, alterations or improvements thereto, have been and will at all times be in compliance in all material respects with all applicable requirements of federal, state and local laws, ordinances, rules, regulations and orders, and with all applicable requirements of any agency, board, or commission created under the laws of the state where the Leased Premises are located, or any other duly constituted public authority, and any requirement of an insurance company so long as such company is providing insurance in respect to the Lessee or the Leased Premises; and

(2)    it shall not take any action which would cause the Leased Premises to be in violation of such laws, ordinances, rules, regulations or orders.

B.    Notwithstanding any provision of this Lease Agreement, the Lessee shall have the right to contest in good faith any law, ordinance, rule, regulation or order, provided that such action is promptly and diligently pursued, and the Lessee agrees to keep the Owner informed as to the status of such contest and provided further that such action does not, in the Owner's judgment materially adversely affect the Lessee's ability to operate the Leased Premises and pay the Rent.

5.06    Additions and Alterations. Except where an emergency situation exists:

12

A.    The Lessee shall not, without the prior written approval of the Owner, which will not be unreasonably withheld or delayed, make any alterations, changes, replacements, improvements and additions of a structural nature to the Leased Premises;

B.    The Lessee agrees not to permit any alienation, removal, demolition, substitution, improvement, alteration or deterioration of the Leased Premises or any other act which might impair or reduce the usefulness or value thereof or the Owner's interest therein; and

C.    The Lessee agrees to comply with all applicable requirements of law with respect to such alterations, changes, replacements, improvements and additions.

(And Lessee shall also comply with Section 3.12.B during periods in which Article III is operative.)

5.07    Financial and Other Restrictions. So long as this Lease Agreement remains in effect, (and, as to the records required hereunder, for a period of one year thereafter), the Lessee agrees to:

A.    Keep proper books of record and account in which full, true and correct entries will be made of all its business transactions in accordance with generally accepted accounting principles;

B.    Make payment of all indebtedness incurred in the ordinary course of the Lessee's business within the times provided under the terms of such indebtedness and make payments of all taxes, governmental charges and/or payments in lieu of taxes promptly (unless the Lessee is contesting the validity thereof in good faith);

C.    Provide to the Owner annual financial statements with respect to the Leased Premises, prepared by a certified public accountant or firm of certified public accountants acceptable to the Owner (and which meet the requirements of Section 3.06 during periods in which Article III is operative); and

D.    With reasonable promptness provide to the Owner any other data and information which may be reasonably requested from time to time.

5.08    Inspections. The Lessee agrees that upon reasonable request, the Owner and its designees and representatives may at all reasonable times, upon reasonable notice, subject to the rights of patients, residents and tenants, if any, examine and inspect the Leased Premises. The Lessee will, on the request of the Owner, promptly make available for inspection by the Owner and its designees and representatives copies of all of the Lessee's correspondence, books, records and other documentation relating to the Leased Premises, but excepting communications between the Lessee and its attorneys. The Lessee agrees to maintain accounting records for the Leased Premises in accordance with its customary practice, separate from any general accounting records which the Lessee may maintain in connection with the Lessee's general business activities. The

13

Lessee agrees that the Owner and its designees and representatives shall, at any reasonable time, have access to and the right to examine all accounting records of the Lessee which relate directly or indirectly to the Leased Premises. (See also Section 3.13 during periods in which Article III is operative.)

5.09    Assignment and Subletting. Except as set forth in this Section 5.09, the Lessee may not assign this Lease Agreement or sublease the Leased Premises or any portion thereof without the prior written consent of the Owner (and HUD, in accordance with Section 3.02, during periods in which Article III is operative). The Lessee shall be permitted to enter into leases and other possession and use agreements in the nature of assisted living rental, lease and/or services agreements with individual persons in the ordinary course of its operations.

5.10    Indemnification Concerning the Leased Premises.

A.    The Lessee covenants and agrees, at its expense, to pay and to indemnify and save the Indemnified Parties harmless of, from and against, any and all claims, damages, demands, expenses, liabilities, and losses of every kind, character, and nature asserted by or on behalf of any person arising out of, resulting from, or in any way connected with, the condition, use, possession, conduct, management, operation, or leasing of the Leased Premises or any part thereof, except for any claim, damage, demand, expense, liability or loss arising out of the negligence or willful misconduct of the party seeking indemnity.

B.    If any action is brought against any Indemnified Party based upon any of the above and in respect to which indemnity may be sought against the Lessee, the Indemnified Party involved may request in writing that the Lessee assume the defense thereof, including the employment of counsel selected by the Lessee satisfactory to such Indemnified Party (as reasonably determined), the payment of all costs and expenses and the right to negotiate and consent to settlement. Any one or more of the Indemnified Parties shall have the right to employ separate counsel at the sole cost and expense of such Indemnified Party in any such action, to participate in the defense thereof. The Lessee shall not be liable for any settlement of any such action effected without its consent, which consent shall not be unreasonably withheld nor delayed, but if settled with the consent of the Lessee or if there be a final judgment for the plaintiff in any such action, the Lessee agrees to indemnify and hold harmless the Indemnified Parties from and against any loss or liability by reason of such settlement or judgment.

C.    The Lessee shall have the right to obtain insurance, if available, against the risks which it has undertaken in paragraph A of this Section, and to treat the cost of such insurance as a part of Operating Expenses.

5.11    Representations of the Lessee. The Lessee represents and warrants as follows:

A.    Due Organization. The Lessee is a corporation, duly organized, validly existing and in good standing under the laws of Pennsylvania, and is duly authorized and qualified to operate this type of facility in the Commonwealth of Pennsylvania. The Lessee has powers adequate for the execution, delivery and performance of its obligations under this Lease

14

Agreement and for carrying on the business now conducted by it and contemplated in connection with the Leased Premises. The execution and delivery of, and the performance by the Lessee of its obligations under this Lease Agreement have been duly authorized by all appropriate action by the Lessee, and this Lease Agreement constitutes the valid and binding obligations of the Lessee, enforceable in accordance with its terms, except as enforceability may be subject to the exercise of judicial discretion in accordance with general equitable principles and to applicable bankruptcy, insolvency, reorganization, moratorium and other laws for the relief of debtors heretofore or hereafter enacted to the extent that the same may be constitutionally applied.

B.    Legal Proceedings.    There is no action, suit, proceeding (including, without limitation, any condemnation proceeding or proceeding in the nature of bankruptcy or for reorganization or arrangement), or investigation at law or in equity before or by any court or public board or body, pending or, to the knowledge of the Lessee after due investigation, threatened, against the Lessee or the Leased Premises, nor, to the best knowledge of the Lessee, any basis therefor, wherein an unfavorable decision, ruling or finding would, in any material respect, adversely affect the business, assets or condition (financial or otherwise) of the Lessee or the Leased Premises or the transactions contemplated by this Lease Agreement, or which in any way would adversely affect the validity of this Lease Agreement.

C.    Compliance With Law; Consents.    The Lessee is not in violation of any term or provision of its organizational documents or in violation of any term or provision of any mortgage, lease, agreement or other instrument which is material to its business or assets, or of any judgment, decree, governmental order, statute, rule or regulation by which it is bound or to which it or any of its assets is subject.    The execution, delivery and performance of and compliance with this Lease Agreement will not violate or constitute a default under the organizational documents of the Lessee or of any term or provision of any mortgage, lease, agreement or other instrument, or of any judgment, decree, governmental order, statute, rule or regulation by which the Lessee is bound or to which any of its assets is subject.  No approval by, authorization of, or filing with any federal, state, or local or other governmental commission, board, or agency or other governmental authority is necessary in connection with the execution and delivery of this Lease Agreement by the Lessee.

D.    The Facility.

(1)    The Lessee agrees to operate the Leased Premises as an assisted living facility.

(2)    In the occupancy, maintenance, improvement and operation of the Leased Premises, the Lessee shall at all times comply in all respects with all applicable building, zoning and land use, environmental protection, sanitary, safety and other laws, rules and regulations, and shall not permit a nuisance thereon.

E.    The foregoing representations and assurances are made for the benefit of the Owner, the Lender and HUD and not for the benefit of any other third party.

15

**Supp. Appx. 072**

## ARTICLE VI

### INSURANCE AND CONDEMNATION

6.01    Insurance Coverage and Terms.

A.    The Lessee agrees to procure and maintain, or cause to be procured and maintained, commercial general liability insurance and property insurance coverages with respect to the Leased Premises (and, during such periods as applicable, the insurance required under Section 3.14 of this Lease Agreement), naming the Owner and the Lender as additional insureds.

B.    In the event that the Lessee fails to maintain any insurance as provided in this Section 6.01, the Owner may, at its option and upon such notice to the Lessee as is reasonable under the circumstances, procure and maintain such insurance. The Lessee agrees and covenants to pay any amounts so advanced therefor by the Owner, together with interest thereon at the prime rate of interest published in the Wall Street Journal plus five percent (5.0%), from the date thereof.

6.02    Insurance Proceeds. In the event of damage or destruction to the Leased Premises, the decision to repair, reconstruct, restore or replace the Leased Premises shall be made by the Owner (and in accordance with Section 3.14, during periods in which Article III is operative).

6.03    Eminent Domain. Subject to Section 3.16 (during periods in which Article III is operative), the proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be the property of Owner. The Lessee shall, however, be entitled to recover any amounts payable to it for moving expenses, loss of personal property, and the like so long as they do not affect Owner's award.

## ARTICLE VII

### DEFAULT AND REMEDIES

7.01    Events of Default. Each of the following shall be an "Event of Default" under this Lease Agreement:

A.    If payment of any amount due under Section 4.02 of this Lease Agreement is not made when it becomes due and payable and if such payment remains unpaid for a period of fifteen (15) days; or

B.    If the Lessee shall:

16

1.      admit in writing its inability to pay its debts as they become due, or

2.      file a petition to be adjudicated a voluntary bankrupt in bankruptcy or a petition to otherwise take advantage of any federal or state bankruptcy or insolvency law, or

3.      make an assignment for the benefit of its creditors or seek a composition with its creditors, or

4.      consent to the appointment of a receiver of itself or of the whole or any substantial part of the Leased Premises, or

C.      If (i) the Lessee shall, upon an involuntary petition under any section or chapter of the federal bankruptcy laws filed against it, be adjudicated a bankrupt; or (ii) a court of competent jurisdiction shall enter an order or decree appointing a trustee or receiver (interim or permanent) or appointing the Lessee a debtor-in-possession, with or without the consent of the Lessee, of the whole or any substantial part of the Leased Premises, or of the Gross Revenues, or approving a petition filed against the Lessee seeking reorganization or an arrangement under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any legal subdivision thereof; and such adjudication, order or decree is not dismissed or vacated within a period of sixty (60) days from the date thereof; or

D.      If the Lessee defaults in the due and punctual performance or observance of any other representation, agreement or covenant in this Lease Agreement and such default continues for thirty (30) days after written notice requiring the same to be remedied has been given by the Owner.

7.02    Remedies. Upon or after the occurrence of any Event of Default, the Lessee, upon demand of the Owner, shall forthwith surrender to the Owner the actual possession of the Leased Premises and the Owner may enter and take possession of the Leased Premises and may exclude the Lessee, its agent and employees wholly therefrom. Upon or after the occurrence of any Event of Default the Owner may, upon notice, do any or all of the following at the Lessee's risk:

A.      Re-enter and take possession of the Leased Premises or any portion thereof without terminating this Lease Agreement, and lease the Owner's interest in such Leased Premises for the account of the Lessee to any other party, holding the Lessee liable for the difference between (i) the net proceeds to Owner from such re-leasing and (ii) the rent and other amounts payable by the Lessee and due under this Lease Agreement, including the expenses of Owner and Lender, including reasonable attorneys' fees, incurred in connection with such default.

B.      Terminate the Lease Term, exclude the Lessee from possession of the Leased Premises and lease the Owner's interest in the Leased Premises for the account of the

17

Lessee, to any other party, holding the Lessee liable for all rents and other amounts due under this Lease Agreement and not paid by such other party.

        C.     Take whatever action at law or in equity may appear necessary or desirable to collect the payment then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Lessee under this Lease Agreement.

     7.03    <u>Cumulative Rights; No Implied Waiver</u>.  No remedy conferred upon or reserved to the Owner by this Lease Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Lease Agreement or now or hereafter existing at law or in equity or by statute. No waiver by the Owner of any obligations, agreements or covenants under this Lease Agreement shall be deemed a waiver of any subsequent breach, and no delay or omission to exercise any right or power shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.

<div align="center">ARTICLE VIII</div>

<div align="center"><u>MISCELLANEOUS</u></div>

     8.01    <u>Surrender of Possession</u>.  Except as otherwise expressly provided in this Lease Agreement, at the expiration or earlier termination of the Lease Term, the Lessee agrees to surrender possession of the Leased Premises peacefully and promptly to the Owner in as good a condition as at the commencement of the Lease Term, loss by fire or other casualty covered by insurance, condemnation, or ordinary wear, tear, and obsolescence excepted.

     8.02    <u>Successors and Assigns</u>.  This Lease Agreement shall inure to the benefit of and shall be binding upon the Owner, the Lessee and their respective successors and assigns.

     8.03    <u>Severability</u>. In the event any provision of this Lease Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision of this Lease Agreement.

     8.04    <u>Counterparts</u>.  This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

     8.05    <u>Notices</u>.  All notices or other communications provided for in this Lease Agreement shall be in writing and shall be delivered personally to, or sent by certified or registered mail or recognized overnight delivery service to the respective offices of the Owner and the Lessee as set forth on the first page of this Lease Agreement, or such other address as may have been previously specified in a notice given in accordance with this Section 8.05.

<div align="center">18</div>

The Owner or Lessee may from time to time designate other representatives or addresses with respect to receipt of notices or other communications.

8.06    Headings. The Article and Section headings in this Lease Agreement are inserted for convenience of reference only and are not intended to define or limit the scope of any provision of this Lease Agreement.

8.07    Non-Waiver. It is understood and agreed that nothing contained in this Lease Agreement shall be construed as a waiver on the part of the parties, or any of them, of any right not explicitly waived in this Lease Agreement.

8.08    Amendments. This Lease Agreement shall not be amended without the prior written consent of the Owner and Lessee and no such amendment shall be effective unless the same shall be in writing and executed by both parties hereto.

8.09    No Recording. Neither party shall record this Lease Agreement. At the request of Lessee or Owner, the parties shall execute and record a memorandum of lease.

8.10    Estoppel Certificates. The Lessee agrees that upon request by Owner, it will execute and deliver to the Owner, and/or to such third party as is designated by the Owner, a statement in writing certifying (a) that (except as may be otherwise specified by the Lessee) (i) this Lease Agreement is in full force and effect and unmodified and has not been assigned by Lessee, (ii) the Lessee is not in default under this Lease Agreement, and (iii) to the best of Lessee's knowledge, the Owner is not in default under this Lease Agreement, and (b) as to such other factual matters as the Owner may reasonably request about this Lease Agreement.

8.11    Governing Law. The internal laws of the State of Pennsylvania shall govern as to the interpretation, validity and effect of this Lease Agreement, without regard to such state's choice of law principles.

8.12    Entirety of Agreement. This Lease Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior leases, agreements, correspondence, arrangements and understandings relating to the subject matter hereof.

IN WITNESS WHEREOF, the Owner and the Lessee have signed this Lease Agreement as of the date first above written.

19

OWNER:

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a/ dated August 1, 2007

By: _____
        Abraham R. Atiyeh, Manager


LESSEE:

WHITEHALL MANOR, INC.

By: _____
        Abraham R. Atiyeh, President

20

08/04/2008 - Cincinnati 730125.v3

EXHIBIT A

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of
Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office
of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO.  5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said
WHITEHALL MANOR CONDOMINIUM.

FIRST AMENDMENT
Dated and Effective As Of January 1, 2010
To The
LEASE AGREEMENT
Dated and Effective As Of August ____, 2008
By and Between
WHITEHALL TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

## FIRST AMENDMENT TO LEASE AGREEMENT

This FIRST AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of January 1, 2010, by and between **WHITEHALL TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Whitehall Fiduciary LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**WHITEHALL MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated August ___, 2008 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Whitehall Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the terms of this Addendum shall be effective as of the date shown above, subject to the obtaining approval as required by the terms of the Mortgage encumbering the Leased Premises.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A. The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Nine Hundred Fifty Thousand ($1,950,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of $750,000.00 to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $1,950,000.00 is paid in full by December 31 of each year.

"A.1 Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed

ten percent (10%) of the Rent so delinquent for each calendar month of delinquency.

2.          No other portions of the Lease are amended or modified.

3.          Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

4.          Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

5.          The amendment set forth herein is subject to approval by the Secretary of Housing and Urban Development pursuant to the terms of the Mortgage encumbering the Leased Premises, and this amendment shall be void and of no force or effect if the said approval is not granted, and in such event, the Lease shall remain in full force and effect as if this First Amendment to Lease Agreement was never executed.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this First Amendment to Lease Agreement effective as of January 1, 2010.

WHITEHALL TRUST                              WHITEHALL MANOR, INC.
By: Whitehall Fiduciary LLC

By: _____               By: _____
    Abraham Atiyeh, Manager                     (Vice) President

SECOND AMENDMENT
Dated and Effective As Of January 1, 2012,
To The
LEASE AGREEMENT
Dated on or about August, 2008
By and Between
WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007, as Owner and Lessor

and

WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

## SECOND AMENDMENT TO LEASE AGREEMENT

This SECOND AMENDMENT TO LEASE AGREEMENT, (the "Second Amendment"), is made and dated as of January 1, 2012 by and between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007**, a trust organized and existing under the laws of the Commonwealth of Pennsylvania (the "Owner") having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

A N D

**WHITEHALL MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated on or about August, 2008 between Owner and Lessee (the "Original Lease") and the First Amendment to Lease Agreement dated as of January 1, 2010, together with this Second Amendment to Lease Agreement being herein called the "Lease", for those certain premises known as Unit 1 of Whitehall Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, Owner is refinancing the Mortgage Loan relating to the Premises, and the conditions for such loan require amendment of the Original Lease as amended by the First Amendment and Lessee is agreeable to such modifications; and

WHEREAS, Owner and Lessee agree that the terms of this Addendum shall be effective as of the date shown above.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 2.02 of the Lease is amended and restated as follows:

    2.02    Term of Lease. The Lease Term for the Leased Premises commenced on August 19, 2008 and shall expire on August 31, 2018, or such earlier date as may be hereinafter provided. In addition, the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be.

2. Section 4.02(A) of the Lease is amended and restated as follows:

"A.        The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Six Hundred Sixty Eight Thousand ($1,668,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of Eighty Thousand Dollars ($80,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of Seven Hundred Eight Thousand ($708,000.00) Dollars to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $1,668,000.00 is paid in full by December 31 of each year.

"A.1        Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed ten percent (10%) of the Rent so delinquent for each calendar month of delinquency."

3.        Owner and Lessee agree that the terms of the HUD Addendum to Operating Lease, which is attached hereto as Exhibit "A" and incorporated herein by reference, are a part of this Lease and that Owner and Lessee shall be bound thereby.

4.        Other than as set forth in Sections 1 and 2 of this Second Amendment to Lease Agreement, there are no other changes to the Original Lease or the First Amendment to Lease.

5.        Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

6.        Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Original Lease as if fully set forth herein at length and ratified and affirmed herein at length.

[Signature page follows]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Second Amendment to Lease Agreement effective as of January 1, 2012.

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
Abraham Atiyeh, Manager

WHITEHALL MANOR, INC., a
Pennsylvania corporation

By: _____
Nimita Kapoor Atiyeh, President

## EXHIBIT A

### HUD ADDENDUM TO OPERATING LEASE

This Addendum is attached to and made a part of that certain Operating Lease Agreement dated on or about August, 2008, as amended by the First Amendment to Lease dated as of January 1, 2010, and the Second Amendment to Lease dated as of January 1, 2012, all entered into by Owner/Lessor and Lessee (the " Operating Lease"), and amends and/or supplements the Operating Lease. In the event of a conflict between the terms of this Addendum and the Operating Lease, the terms of this Addendum shall govern and control. Capitalized terms used herein but not defined shall have the meanings set forth in the Operating Lease.

### DEFINITIONS

The following terms shall have the meanings specified below:

"FF&E" means furnishings, fixtures and equipment of all kinds used in connection with the Leased Premises, including additions, substitutions and replacements thereto.

"FHA" means the Federal Housing Administration.

"Health Care Requirements" shall mean, relating to the Leased Premises, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions or agreements, in each case, pertaining to or concerned with the establishment, construction, ownership, operation, use or occupancy of the Leased Premises or any part thereof as a health care facility, and all material permits, licenses and authorizations and regulations relating thereto, including all material rules, orders, regulations and decrees of and agreements with health care authorities pertaining to the Leased Premises.

"HUD" means the U.S. Department of Housing and Urban Development.

"HUD Program Requirements" means all applicable statutes and regulations, including all amendments to such statutes and regulations, as they become effective, and all applicable requirements in HUD handbooks, notices and mortgagee letters that apply to the Leased Premises, including all updates and changes to such handbooks, notices and mortgagee letters that apply to the Leased Premise, except that changes subject to notice and comment rulemaking shall become effective upon completion of the rulemaking process.

"Leased Premises" means all the land located at, and known and identified as Unit 1 of Whitehall Manor Condominium, said premises being situated in the Township of Whitehall, Lehigh County, Pennsylvania, and more particularly described in Exhibit "B"  attached to this Second Amendment to Lease Agreement dated as of January 1, 2012, together with any additions thereto and substitutions therefore, and any buildings, improvements, betterments, all FF&E and other property, real or personal, now existing or at any time acquired, constructed or located thereon, and all easements and other rights appurtenant thereto.

"Lender" means M&T Realty Capital Corporation, and any future holder of the Mortgage.

"Lessee" means Whitehall Manor, Inc.

"Lessee Regulatory Agreement" means the Regulatory Agreement-Nursing Homes entered into by and between the Lessee and FHA with respect to the Leased Premises and any riders, amendments and supplements thereto.

"Lessee Security Agreement" means that certain Lessee Security Agreement between Lessee and Lender with respect to the Leased Premises and any amendments or supplements thereto.

"Material Term" is a term in a loan or security agreement that:

1) extends the maturity date of the loan;
2) adds guarantors to the loan;
3) releases guarantors from the loan;
4) adds borrowers to the loan;
5) adds an interest reserve to the loan;
6) amends the interest rate payable on the outstanding principal balance of the loan;
7) increases or decreases the principal amount of the loan;
8) adds collateral as additional security for the loan; and/or
9) amends or expands the type of obligations secured by the loan.

"Mortgage" means that certain mortgage or deed of trust from the Owner/Lessor in favor of the Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

"Mortgage Loan" means the FHA-insured mortgage loan in the original maximum principal amount of up to $15,788,700.00 made by Lender to the Owner/Lessor, secured, in whole or in part, by the Leased Premises, as the same may be amended, increased or decreased.

"Mortgage Loan Documents" means the Owner/Lessor Regulatory Agreement, the Mortgage, the Promissory Note evidencing the Mortgage Loan executed by the Owner/Lessor in favor of the Lender, the Security Agreement, the Lessee Regulatory Agreement, the Lessee Security Agreement, and any and all other documents required by HUD and/or the Lender in connection with the Mortgage Loan.

"Owner/Lessor" means Whitehall Fiduciary LLC, Trustee of the Whitehall Trust.

"Owner/Lessor Regulatory Agreement" means the Regulatory Agreement entered into by and between the Owner/Lessor and HUD with respect to the Leased Premises and any riders, amendments and supplements thereto.

"Security Agreement" means that certain Security Agreement between Owner/Lessor and Lender with respect to the Leased Premises and any amendments and supplements thereto.


## HUD REQUIREMENTS

1. Precedence of Addendum. For so long as HUD is the holder or insurer of any indebtedness secured by the Leased Premises, the provisions of this Addendum shall apply to this Lease. In the event of any conflict between any provision of this Addendum and any other provision of this Lease, the provision of this Addendum shall be controlling. This Addendum shall not be amended without the prior written consent of HUD and the Lender.

2. Compliance With HUD Program Requirements and Terms of Mortgage Loan Documents.

(a)    The Lessee agrees to comply with all applicable HUD Program Requirements and the Mortgage Loan Documents. The Lessee further agrees that this lease will be part of the collateral pledged by Owner/Lessor to Lender & HUD. The Lessee agrees that it will not take

any action which would violate any applicable HUD Program Requirements or any of the Mortgage Loan Documents.

    (b)    In the event of any conflict between the terms and provisions of this Lease Agreement and any applicable HUD Program Requirements or the Mortgage Loan Documents, the HUD Program Requirements and Mortgage Loan Documents shall control in all respects. Owner/Lessor and Lessee agree that no provision of this Lease shall modify any obligation of Owner/Lessor or Lessee under the Mortgage Loan Documents. Owner/Lessor and Lessee acknowledge that HUD's acceptance of this Lease in connection with the closing of the Mortgage Loan shall in no way constitute HUD's consent to arrangements which are inconsistent with HUD Program Requirements. This Lease is subject to all HUD Program Requirements.

    3. Subordination.
    (a)    This Lease is and shall be subject and subordinate to the Mortgage and other Mortgage Loan Documents; to all renewals, modifications, consolidations, replacements and extensions thereof; to all substitutions thereof; and to all future mortgages upon the Leased Premises and/or other security interests in or to the Leased Premises and any other items which are herein leased to Lessee or which, pursuant to the terms hereof, become a part of the Leased Premises or are otherwise deemed to become the property of Owner/Lessor or to remain upon the Leased Premises at the end of the term; and to each advance made or hereafter to be made under any of the foregoing. This Section shall be self-operative and no further instrument of subordination shall be required. Without limiting the foregoing, the Lessee agrees to execute and deliver promptly any and all certificates, agreements and other instruments that the Owner/Lessor, Lender or HUD may reasonably request in order to confirm such subordination. Unless the Lender shall have agreed otherwise, if the Lender or another person or entity shall succeed to the interest of the Owner/Lessor by reason of foreclosure or other proceedings brought by Lender in lieu of or pursuant to a foreclosure, or by any other manner (Lender or such other person or entity being called a "Successor"), then this Lease shall terminate, or, at the option of the Successor, this Lease shall nevertheless continue in full force and effect, in which case the Lessee shall and does hereby agree to attorn to the Successor and to recognize the Successor as its landlord under the terms of this Lease.

    (b)    Agreements for provision of services to the Leased Premises or the granting of easements, rights of way or other allowances of use or placement of CATV, utilities or other items are, and shall always be, subordinate to (i) the right of Owner/Lessor, and (ii) the Mortgage and other Mortgage Loan Documents and all other mortgages and security interests now or hereafter encumbering the Leased Premises and/or the property of which it forms a part. Lessee must obtain HUD written approval prior to entering into any telecommunications services agreement and/or granting of any easements.

    4. FF&E. Lessee agrees that (a) except leases of FF&E entered into in the ordinary course of business with third-party lessees and property of tenants and residents of the Leased Premises, all FF&E located on the Leased Premises at the date of the Lease is and shall be the property of the Owner/Lessor , and (b) any FF&E acquired by Owner/Lessor or Lessee during the term of this Lease remaining on the Leased Premises at the termination of the Lease shall be and/or become the property of the Owner/Lessor. Lessee agrees, during the term of the Lease,

not to remove any FF&E from the Leased Premises, except to replace such FF&E with other similar items of equal or greater quality and value.

5. <u>Payments</u>. Owner/Lessor and Lessee each acknowledges and agrees that the rent and other amounts payable by Lessee under this Lease (including rent, additional rent and all other sums payable under this Lease) are sufficient to properly maintain the Leased Premises, and to enable the Owner/Lessor to meet its debt service obligations and related expenses in connection with the Mortgage Loan and the Leased Premises.

(a)     Without limiting the generality of the foregoing, the Lessee agrees to pay, as additional rent, when due all premiums for (i) FHA mortgage insurance, (ii) liability insurance and full coverage property insurance on the Leased Premises, and (iii) all other insurance coverage required under the Mortgage Loan Documents and/or applicable HUD Program Requirements.

(b)     Unless the Lender and Owner/Lessor agree otherwise, the Lessee shall be responsible for funding all escrows for taxes, reserves for replacements, mortgage insurance premiums and/or other insurance premiums as may be required by the Lender and/or HUD.

6. <u>Lessee Regulatory Agreement and Lessee Security Agreement</u>. At the time of the closing of the Mortgage Loan, the Lessee agrees to execute the Lessee Regulatory Agreement and the Lessee Security Agreement, and other applicable documents evidencing the Lender's security interest in the collateral of the Lessee. The Lessee agrees to comply with its obligations under the Lessee Regulatory Agreement and the Lessee Security Agreement, and agrees that a default by the Lessee under the Lessee Regulatory Agreement or Lessee Security Agreement shall be deemed to be a default under this Lease.

7. <u>Management Contract Requirements</u>. The Lessee agrees not to enter into any management contract involving the Leased Premises unless such management contract complies with applicable HUD Program Requirements and contains provisions that, in the event of default under the Owner/Lessor Regulatory Agreement or the Lessee Regulatory Agreement, the management agreement shall be subject to termination upon not more than thirty (30) days notice without penalty upon written request of HUD. Upon such HUD termination request, the Lessee shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to HUD for continuing proper management of the Leased Premises.

8. <u>Licenses; Bed Authority</u>. Lessee shall ensure that the Leased Premises meets all state licensure requirements and standards at all times. Owner/Lessor and Lessee agree not to undertake or acquiesce to any modification to any license with respect to the Leased Premises or to any "bed authority" related thereto without the prior written approval of HUD.

9. <u>Governmental Receivables</u>. Lessee shall be responsible for obtaining and maintaining all necessary provider agreements with Medicaid, Medicare and other governmental third party payors. Lessee agrees to furnish HUD and Lender with copies of all such provider agreements and any and all amendments thereto promptly after execution thereof.

10.  Financial Statements and Reporting Requirements.  Lessee agrees to furnish HUD and Lender copies of its annual financial statements with respect to the Leased Premises, prepared in compliance with the requirements of the Lessee Regulatory Agreement, within ninety (90) days after the close of Lessee's fiscal year or such longer period as may be permitted by HUD.  Lessee agrees to submit to HUD and Lender copies of all other financial reports as specified in the Lessee Regulatory Agreement.

11.  Inspections.  The Lessee agrees that upon reasonable request, the Lender, HUD and their respective designees and representatives may at all reasonable times, upon reasonable notice, subject to the rights of patients, residents and tenants, examine and inspect the Leased Premises. The Lessee will, on the request of the Lender and/or HUD, promptly make available for inspection by the Lender and/or HUD, and their designees and representatives, copies of all of the Lessee's correspondence, books, records and other documentation relating to the Leased Premises, excepting communications between the Lessee and its attorneys. The Lessee agrees to maintain accounting records for the Leased Premises in accordance with its customary practice and the Lessee Regulatory Agreement, separate from any general accounting records which the Lessee may maintain in connection with the Lessee's other activities. The Lessee agrees that the Lender and/or HUD, and their designees and representatives, shall at any reasonable time, have access to and the right to examine all accounting records of the Lessee which relate directly or indirectly to the Leased Premises.  The obligations of Lessee under this Section shall be limited to the extent necessary in order for Lessee to comply with applicable laws regarding the confidentiality of resident/patient medical records and information.

12.  Insurance; Casualty; Condemnation.  The Lessee agrees to procure and maintain, or cause to be procured and maintained, the insurance coverage required pursuant to the Mortgage Loan Documents and/or applicable HUD Requirements, including HUD Notices H 04-01 and H 04-15.  Insurance proceeds and the proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Program Requirements.  The decision to repair, reconstruct, restore or replace the Leased Premises following a casualty or condemnation shall be subject to the terms of the Mortgage Loan Documents and applicable HUD Requirements.

13.  Assignment of Operating Lease and Subletting of the Leased Premises.  This Lease shall not be assigned or subleased by Lessee, in whole or in part (including any transfer of title or right to possession and control of the Leased Premises, or of any right to collect fees or rents), without the prior written approval of HUD.  The prior written approval of HUD shall be required for (a) any change in or transfer of the management, operation, or control of the project or (b) any change in the ownership of the lessee that requires HUD approval under the Department's previous participation approval requirements.  Owner/Lessor and Lessee acknowledge that any proposed assignee will be required to execute a Lessee Regulatory Agreement and a Lessee Security Agreement, each in form and substance satisfactory to HUD, as a prerequisite to any such approval.  Any assignment or subletting of the Leased Premises made without such prior approval shall be null and void.  This restriction on subletting does not apply to Lessee's leasing of individual units or beds to patient / residents.

14. Accounts Receivable (AR) Financing. The Lessee shall not pledge its accounts receivable or receipts to an accounts receivable lender for any loan without the prior written approval of the Lender and HUD. In the event that the Lender and HUD grant such approval; (i) the holder(s) of such lien shall enter into an Intercreditor and a Rider to Intercreditor Agreement with the AR Lender and Lender on such terms and conditions as may be required by HUD; and (ii) Lessee shall agree to comply with the requirements imposed by the Lender and HUD in connection therewith. Until such approved loan is paid in full, the written approval of HUD is required for any proposed modifications, extensions, renewals or amendments to a Material Term of the AR loan or the security agreement, prior to the effective date of such amendments.

15. Termination of Lease. The Lease shall not be terminated prior to its expiration date without the prior written approval of HUD. If HUD becomes Mortgagee, Mortgagee in Possession, or Successor, HUD can terminate the Lease (A) for any violation of the Lease that is not cured within any applicable notice and cure period given in the Lease, (B) for any violation of the Lessee Regulatory Agreement or other HUD Program Requirements or Health Care Requirements that is not cured within thirty (30) days after receipt by Lessee of written notice of such violation or (C) if HUD, as a result of the occurrence of either of the events described in the foregoing items (A) or (B), is required to advance funds for the operation of the facility located on the Leased Premises.

16. Master Lease. Projects proposed for FHA financing under the Section 232 program that are affiliated by common ownership among Mortgagors and/or Lessee/Operator entities must receive written approval from HUD, and may be required to use a Master Lease between the Mortgagor/Landlord and the Master Tenant/Subtenant/Operator. The Master Lease and the HUD Master Lease Subordination Agreement or Master Lease Subordination Non Disturbance Agreement shall be approved by HUD and the Mortgagee. The Master Lease shall only contain Mortgagors and Operators of FHA-insured projects.

17. Notwithstanding any other terms contained in the Lease, in the event of an assignment of the Lease to HUD or FHA, neither HUD nor FHA shall have any indemnification obligations under the Lease. In addition, any payment obligations of HUD or FHA pursuant to the Lease shall be limited to actual amounts received by HUD or FHA, and otherwise not prohibited by applicable law or regulation, including without limitation, the Anti Deficiency Act, 31 U.S.C. § 1341 et seq.

[signature page follows…]

SIGNATURE PAGE
FOR
HUD ADDENDUM TO OPERATING LEASE

In witness whereof, the undersigned has executed and delivered this Addendum as of the date first above set forth.

OWNER/LESSOR:

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
Name: Abraham Atiyeh
Title: Manager

LESSEE:

WHITEHALL MANOR, INC.,
a Pennsylvania corporation

By _____
Name: Nimita Kapoor Atiyeh
Title: President

**EXHIBIT B**

**LEGAL DESCRIPTION**

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO.  5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

1/17/2012 12724384 V.2

## THIRD AMENDMENT TO LEASE AND
## MEMORANDUM OF LEASE EXTENSION

This Third Amendment to Lease and Memorandum of Lease Extension is effective as of August 31, 2018 by and between **WHITEHALL TRUST**, herein called Landlord;

A N D

**WHITEHALL MANOR, INC.**, herein called Tenant.

*Witnesseth:*

*Whereas*, Landlord and Tenant are parties to the Lease dated August, 2008, which was amended by First Amendment to Lease, made and dated as of January 1, 2012, and Second Amendment to Lease, made and dated as of January 1, 2012, (collectively and as amended herein called the "Lease"), by which Landlord has leased to Tenant the real property and improvements thereon situate on Unit 1 of Whitehall Manor Condominium; and

*Whereas,* Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease; and

*Whereas,* the parties desire that this Third Amendment to Lease and Memorandum of Lease Extension be executed to memorialize the election by Tenant of its exercise of the first of the three (3) extension options granted to Tenant under the Lease.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1.     The above recitals are incorporated herein, and form a part hereof.

2.     Tenant has exercised the privilege to extend the Term for 5 years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023.

3.     All other terms and conditions of the Lease (as amended through and including the Second Amendment), are ratified and affirmed.

4.     Tenant expressly ratifies and affirms the rights granted to Landlord to confess judgment against Tenant as if the same were fully set forth herein at length. Tenant has knowingly and voluntarily granted the warrants of attorney and waivers of rights and authorization for confession of judgment.

5.     Tenant certifies that it has no claims against Landlord, and that Tenant has no knowledge of any default by Landlord under the Lease or other claim which it does, or could, have against Landlord.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Third Amendment to Lease and Memorandum of Lease Extension, intending to be legally bound effective as of August 31, 2018.

WHITEHALL TRUST ("Landlord")          WHITEHALL MANOR, INC.  ("Tenant")
By: Whitehall Fiduciary LLC,
       Its Trustee

By: _____          By: _____
       Abraham Atiyeh,                       Nimita Kapoof Atiyeh,  President
       Manager of Trustee

## FOURTH AMENDMENT TO LEASE AND
## MEMORANDUM OF LEASE EXTENSION

This Fourth Amendment to Lease and Memorandum of Lease Extension is effective as of September 21, 2023 by and between **WHITEHALL TRUST,** herein called Landlord;

AND

**WHITEHALL MANOR, INC.,** herein called Tenant.

*Witnesseth:*

*Whereas,* Landlord and Tenant are parties to the Lease dated August, 2008, which was amended by First Amendment to Lease, made and dated as of January 1, 2012, and Second Amendment to Lease, made and dated as of January 1, 2012, and a Third Amendment made August 31, 2018, (collectively and as amended herein called the "Lease"), by which Landlord has leased to Tenant the real property and improvements thereon situate on Unit 1 of Whitehall Manor Condominium; and

*Whereas,* Tenant has made improvements to the Premises; and

*Whereas,* Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease, and that the terms of such lease extension were orally modified as of September 21, 2023 as more fully set forth herein; and

*Whereas,* the parties desire that this Fourth Amendment to Lease and Memorandum of Lease Extension be executed to memorialize the election by Tenant of its exercise of the second of the three (3) extension options granted to Tenant under the Lease, and to memorialize the modification of terms of the Lease as set forth herein.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1. The above recitals are incorporated herein, and form a part hereof.

2. Tenant has exercised the privilege to extend the Term for 5 years, such that the modified termination date of August 31, 2023, and to allow for the calculation on a calendar year basis, is now agreed to be December 31, 2028.

3. Tenant has made repairs and also arranged for other work to be performed to maintain the condition of the Premises.

1

**Supp. Appx. 096**

4.      Landlord and Tenant also have agreed to waive all past due rental and any obligations of Tenant or Landlord not performed by one or both through September 21, 2023, and hereby waive and release all unpaid sums and all performance not fully and timely provided.

    a.  Tenant waives any rights to refund or for calculation of overpayment previously made.

    b.  Tenant waives any right to payment for improvements made and any repairs or remodeling performed, other than any insurance coverage payments or proceeds as may be available.

    c.  This Fourth Amendment is a full waiver and release of all defaults, deficient performance and any other obligation of Landlord or of Tenant which has arisen or could have been asserted at any time through and including the date hereof.

5.      Landlord and Tenant also have agreed that Tenant shall have two (2) additional extension periods of five (5) years, each, and that any renewal may be exercised by notice from Tenant to Landlord given not less than 90 days prior to the end of the then current termination date of the then current lease extension.

6.      Landlord and Tenant have agreed to the following modifications of the Lease:

    a.  Base Rental

       i.   For the period through December 31, 2024, no Base Rental shall be due.

       ii.  For the remainder of the current renewal Term (i.e. calendar years 2025, 2026, 2027 and 2028) Base Rent shall be the greater of (i) One Hundred Twenty Thousand ($120,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay, and by uncollected accounts receivable or bad debt] for each calendar year of the Term, limited to the sum of Three Hundred Thousand ($300,000.00) per annum, to be paid on April 30 of the year following the calendar year for which the calculation shall be made; and

       iii. Base Rental for each calendar year of the Renewal Terms (i.e. Calendar years starting after December 31, 2028 shall be the greater of (i) Two Hundred Forty Thousand ($240,000.00)

2

Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay and by uncollected accounts receivable or bad debt] during a calendar year, limited to the sum of Five Hundred Thousand ($500,000.00) per annum. Base Rental shall be due on April 30 of the year following the calendar year for which the calculation shall be made; and

b. Tenant shall pay all charges for electric, water and sewer services provided to the Premises prior to the same being made a lien upon the Premises; and

c. Tenant shall pay the premiums for one or more insurance policies to provide (i) property casualty insurance for the Premises and (ii) general liability insurance for the Premises; and

d. Repairs to the Premises as are required to maintain the Premises in the condition required for lawful operation of a personal care home.

7.     The obligations of Landlord and/or Tenant under any Regulatory Agreement and all agreements, security interests and other rights, privileges, obligations or performance required under any Regulatory Agreement or other agreement made with the United States Department of Housing and Urban Development ("USHUD") or anyone required by, for or concerning USHUD or arising under any obligation with, concerning or associated with USHUD (collectively "HUD Obligations"), are hereby terminated and void as of September 20, 2023. Any past violations or continuing violation of the terms or conditions of any HUD Obligations are hereby waived and released.

8.     All other terms and conditions of the Lease (as amended through and including the Third Amendment and the oral amendment memorialized herein), are ratified and affirmed.

9.     This Agreement is effective as of September 21, 2023 notwithstanding a later date of execution.

3

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fourth Amendment to Lease and Memorandum of Lease Extension, intending to be legally bound effective as of September 21, 2023.

**WHITEHALL TRUST ("Landlord")**

By: Whitehall Fiduciary LLC, its Trustee

By: _____

Abraham Atiyeh, its Manager

**WHITEHALL MANOR, INC. ("Tenant")**

By: _____

Nimita Kapoor Atiyeh, President

4

# EXHIBIT 4



**TRAVELERS**

**Report Claims Immediately by Calling***
**1-800-238-6225**
*Speak directly with a claim professional*
*24 hours a day, 365 days a year*

*Unless Your Policy Requires **Written** Notice or Reporting

## COMMERCIAL INSURANCE

**A Custom Insurance Policy Prepared for:**

WHITEHALL MANOR, INC.
1177 SIXTH ST
WHITEHALL PA 18052

**Presented by: THE YURCONIC AGENCY**



TRAVELERS

One Tower Square, Hartford, Connecticut 06183

TRAVELERS CORP. TEL: 1-800-328-2189
INSTITUTIONAL - B
COMMON POLICY DECLARATIONS
ISSUE DATE: 10/04/24
POLICY NUMBER:

INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

1. NAMED INSURED AND MAILING ADDRESS:
WHITEHALL MANOR, INC. (AS PER IL T8 00)
1177 SIXTH ST
WHITEHALL, PA 18052

2. POLICY PERIOD: From 10/01/24 to 10/01/25 12:01 A.M. Standard Time at your mailing address.

3. LOCATIONS

| Premises Loc. No. | Bldg. No. | Occupancy | Address |
|---|---|---|---|

SEE IL T0 03

4. COVERAGE PARTS FORMING PART OF THIS POLICY AND INSURING COMPANIES:
DELUXE PROPERTY COVERAGE PART DECLARATIONS DX T0 00 11 12 TIL

5. NUMBERS OF FORMS AND ENDORSEMENTS
FORMING A PART OF THIS POLICY: SEE IL T8 01 10 93

6. SUPPLEMENTAL POLICIES: Each of the following is a separate policy containing its complete provisions:

| Policy | Policy No. | Insuring Company |
|---|---|---|

DIRECT BILL
7. PREMIUM SUMMARY:
Provisional Premium
Due at Inception
Due at Each
[redacted]

NAME AND ADDRESS OF AGENT OR BROKER:
THE YURCONIC AGENCY (K1116)
5910 HAMILTON BLVD
ALLENTOWN, PA 18106

COUNTERSIGNED BY:

Authorized Representative

DATE:

IL T0 02 11 89(REV. 09-07) PAGE 1 OF 1
OFFICE: READING

**POLICY NUMBER:**

**EFFECTIVE DATE:** 10-01-24

**ISSUE DATE:** 10-04-24

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL T0 02 11 89    COMMON POLICY DECLARATIONS
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL T3 18 05 11    COMMON POLICY CONDITIONS-DELUXE
IL T0 03 04 96    LOCATION SCHEDULE
IL T8 00          GENERAL PURPOSE ENDORSEMENT
```

DELUXE PROPERTY

```
DX T0 00 11 12    DELUXE PROP COV PART DECLARATIONS
DX 00 01 07 94    MORTGAGEE HOLDER SCHEDULE
DX 00 04 11 12    TABLE OF CONTENTS - DELUXE PROP COV PART
DX T1 00 11 12    DELUXE PROPERTY COVERAGE FORM
DX T1 01 11 12    DELUXE BI (AND EE) COVERAGE FORM
DX T4 61 11 12    BUSINESS INCOME-COINSURANCE
DX T4 64 11 12    ADDITIONAL INSURED-BUILDING OWNER
DX T4 75 11 12    PUBLIC RELATIONS CRISIS MANAGEMENT
DX T3 01 11 12    CAUSES OF LOSS-EARTHQUAKE
DX T3 02 11 12    CAUSES OF LOSS - BROAD FORM FLOOD
DX T3 15 11 12    SPOILAGE COVERAGE EXTENSION
DX T3 19 11 12    CAUSES OF LOSS - EQUIPMENT BREAKDOWN
DX T3 41 11 12    PROTECTIVE SAFEGUARDS
DX T3 79 11 12    LOSS PAYABLE PROVISIONS
DX T4 02 01 21    FEDERAL TERRORISM RISK INSURANCE ACT DIS
DX T4 49 11 12    EMERGENCY EVACUATION EXPENSE
DX T4 50 11 12    PERS PROP OF PATIENTS AND RESIDENTS
DX T5 21 01 23    DIGITAL ASSETS EXCLUSIONS
DX T3 98 01 23    ELECTRONIC VANDALISM LIMIT & OTHER CHANG
```

INTERLINE ENDORSEMENTS

```
IL T0 63 07 22    ACTUAL CASH VALUE
IL T4 12 03 15    AMNDT COMMON POLICY COND-PROHIBITED COVG
IL T4 14 01 21    CAP ON LOSSES FROM CERT ACTS OF TERRORIS
IL T4 40 10 20    PROTECTION OF PROPERTY
IL T9 15 09 07    PA CHANGES-CANCELLATION AND NONRENEWAL
IL T9 76 09 07    PENNSYLVANIA CHANGES
IL T9 77 07 94    PENNSYLVANIA NOTICE
```

POLICYHOLDER NOTICES

```
PN T1 89 02 23    JURISDICTIONAL INSP & CONTACT INFO REQ
```

# COMMON POLICY CONDITIONS – DELUXE

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 60 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the policy period. If a Coverage Part is cancelled, that date will become the end of the policy period as respects that Coverage Part only.

   Cancellation will not affect coverage on any shipment in transit on the date of the cancellation. Coverage will continue in full force until such property is delivered and accepted.

5. If this policy or any Coverage Part is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

1. We have the right but not obligated to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake related only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. PREMIUMS

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. We compute all premiums for this policy in accordance with our rules, rates, rating plans,

premiums and minimum premiums. The premium shown in the Declarations was computed based on rates and rules in effect at the time the policy was issued. On each renewal continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

## G. WHEN WE DO NOT RENEW

If we decide not to renew this policy we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date.

## H. DELUXE PROPERTY COVERAGE PART-REFERENCE TO FORMS AND ENDORSEMENTS

In some instances, the Deluxe Property Declarations may list endorsements included in the Deluxe Property Coverage Part that reference:

1. The Commercial Property Coverage Part;

2. The Commercial Inland Marine Coverage Part;

3. Commercial Property forms including, but not limited to, the following:

    a. Building and Personal Property Coverage Form;

    b. Business Income Coverage Form;

    c. Commercial Property Conditions;

    d. Causes of Loss – Special Form;

    e. Causes of Loss – Earthquake Form.

4. Commercial Inland Marine Forms including but not limited to the Transportation Coverage – Special Form

    Endorsements referencing the Commercial Property Coverage Part, Commercial Inland Marine Coverage Part, Commercial Property Forms, or Commercial Inland Marine Forms apply to the Deluxe Property Coverage Forms in the same manner as they apply to the Forms they reference.

## I. INSURANCE UNDER TWO OR MORE COVERAGE PARTS

If two or more of this policy's Coverage Parts apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

This policy consists of the Common Policy Declarations and the Coverage Parts and endorsements listed in that declarations form.

In return for payment of the premium, we agree with the Named Insured to provide the insurance afforded by a Coverage Part forming part of this policy. That insurance will be provided by the company indicated as insuring company in the Common Policy Declarations by the abbreviation of its name opposite that Coverage Part.

One of the companies listed below (each a stock company) has executed this policy, and this policy is counter-signed by the officers listed below:

The Travelers Indemnity Company (IND)

The Phoenix Insurance Company (PHX)

The Charter Oak Fire Insurance Company (COF)

Travelers Property Casualty Company of America (TIL)

The Travelers Indemnity Company of Connecticut (TCT)

The Travelers Indemnity Company of America (TIA)

Travelers Casualty Insurance Company of America (ACJ)

Wendy C. Sky

Secretary

President

Includes copyrighted material of Insurance Services Office, Inc. with its permission.    **IL T3 18 05 11** (Rev. 09-1

**LOCATION SCHEDULE**          **POLICY NUMBER:**

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period
10-01-24 to 10-01-25 .

| Loc. No. | Bldg. No. | Address | Occupancy |
|----------|-----------|---------|-----------|
| 1 | 1 | 1177 6TH STREET<br>WHITEHALL, PA 18052 | ELDERLY RESIDENTIAL NON- MEDICAL |
| 2 | 2 | ███████████████ | ███████████████ |
| 3 | 3 | 1050 MAIN STREET<br>HELLERTOWN, PA 18055 | ELDERLY RESIDENTIAL NON- MEDICAL |
| 4 | 4 | ███████████████ | |
| 5 | 5 | | |
| 6 | 6 | | |
| 7 | 7 | | |
| 7 | 8 | | |
| 7 | 9 | | |
| 8 | 10 | | |
| 9 | 11 | | |
| 10 | 12 | | |

POLICY NUMBER:                                    GENERAL PURPOSE ENDORSEMENT

ITEM 1 NAMED INSURED TO READ:

WHITEHALL MANOR, INC.



SAUCON VALLEY MANOR INC.

DELUXE PROPERTY

# DELUXE PROPERTY

 **TRAVELERS** J

One Tower Square, Hartford, Connecticut 06183

**DELUXE PROPERTY COVERAGE**
**PART DECLARATIONS**

**POLICY NUMBER:**
**ISSUE DATE:** 10-04-24

INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

EFFECTIVE DATE:  Same as policy unless otherwise specified:

DELUXE PROPERTY COVERAGE FORM


COVERAGES AND LIMITS OF INSURANCE - DESCRIBED PREMISES

Insurance applies on a BLANKET basis only to a coverage or type of property for
which a Limit of Insurance is shown below, and then only at the premises
locations for which a value for such coverage or property is shown on the
Statement of Values dated 08/25/23, or subsequently reported to and insured by
us. For Insurance that applies to a specific premises location see Deluxe
Property Coverage Part Schedule - Specific Limits.


Blanket Description of Coverage or Property                      Limits of
                                                                Insurance

Building(s) and Your Business Personal Property

        COINSURANCE PROVISION:

        Coinsurance does not apply to the Blanket coverages
        as shown above.

        VALUATION PROVISION:

        Replacement cost (subject to limitations) applies to most
        types of covered property (See Valuation Loss Condition in DX T1 00).

ADDITIONAL COVERED PROPERTY                                      Limits of
                                                                Insurance
Personal Property at Undescribed Premises:

        At any "exhibition" premises                            Not Covered
        At any installation premises or temporary storage premises    Not Covered
        At any other not owned, leased or regularly operated
          premises                                        $        25,000

Personal Property in Transit:                              $        25,000



**DX T0 00 11 12**

PRODUCER: **THE YURCONIC AGENCY**          K1116    OFFICE: **READING**          177



**TRAVELERS**                          One Tower Square, Hartford, Connecticut 06183

---

**DELUXE PROPERTY COVERAGE**            **POLICY NUMBER:**
**PART DECLARATIONS**                   **ISSUE DATE:** 10-04-24

DELUXE PROPERTY COVERAGE FORM - ADDITIONAL COVERAGES & COVERAGE EXTENSIONS

The Limits of Insurance shown in the left column are included in the coverage
form and apply unless a Revised Limit of Insurance or Not Covered is shown in
the Revised Limits of Insurance column on the right. The Limits of Insurance
apply in any one occurrence unless otherwise stated.

|  | Limits of Insurance | Revised Limits of Insurance |
|---|---|---|
| Accounts Receivable | | |
|     At all described premises | $    50,000 | |
|     In transit or at all undescribed premises | $    25,000 | |
| Appurtenant Buildings and Structures | $   100,000 | |
| Claim Data Expense | $    25,000 | |
| Covered Leasehold Interest - Undamaged | | |
|   Improvements & Betterments | | |
|     Lesser of Your Business Personal Property | | |
|     limit or: | $   100,000 | |
| Debris Removal (additional amount) | $   250,000 | |
| Deferred Payments | $    25,000 | |
| Duplicate Electronic Data Processing Data and | | |
|   Media | $    50,000 | |
| Electronic Data Processing Data and Media | | |
|     At all described premises | Included | |
| Employee Tools | | |
|     In any one occurrence | $    25,000 | |
|     Any one item | $     2,500 | |
| Expediting Expenses | $    25,000 | |
| Extra Expense | $    25,000 | |
| Fine Arts | | |
|     At all described premises | $    50,000 | |
|     In transit | $    25,000 | |
| Fire Department Service Charge | Included* | |
| Fire Protective Equipment Discharge | Included* | |
| Green Building Alternatives - Increased Cost | | |
|     Percentage    1 % | | |
|     Maximum amount - each building | $   100,000 | |
| Green Building Reengineering and | | |
|   Recertification Expense | $    25,000 | |
| Limited Coverage for Fungus, Wet Rot or | | |
|   Dry Rot - Annual Aggregate | $    25,000 | |
| Loss of Master Key | $    25,000 | |
| Newly Constructed or Acquired Property: | | |
|     Building - each | $ 2,000,000 | |
|     Personal Property at each premises | $ 1,000,000 | |
| Non-Owned Detached Trailers | $    25,000 | |
| Ordinance or Law Coverage | $   250,000 | $   5,000,000 |

DX T0 00 11 12

PRODUCER: **THE YURCONIC AGENCY**          K1116   OFFICE: **READING**        177

 **TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**DELUXE PROPERTY COVERAGE**
**PART DECLARATIONS**

**POLICY NUMBER:**
**ISSUE DATE:** 10-04-24

DELUXE PROPERTY COVERAGE FORM - ADDITIONAL COVERAGES & COVERAGE EXTENSIONS
(continued)

|  | | Limits of Insurance | Revised Limits of Insurance |
|---|---|---|---|
| Outdoor Property | $ | 25,000 | |
|     Any one tree, shrub or plant | $ | 2,500 | |
| Outside Signs | | | |
|     At all described premises | $ | 100,000 | |
|     At all undescribed premises | $ | 5,000 | |
| Personal Effects | $ | 25,000 | |
| Personal Property At Premises Outside of the Coverage Territory | $ | 50,000 | |
| Personal Property In Transit Outside of the Coverage Territory | $ | 25,000 | |
| Pollutant Cleanup and Removal - Annual Aggregate | $ | 100,000 | |
| Preservation of Property | | | |
|     Expenses to move and temporarily store property | $ | 250,000 | |
|     Direct loss or damage to moved property | Included* | | |
| Reward Coverage | | | |
|     25% of covered loss up to maximum of: | $ | 25,000 | |
| Stored Water | $ | 25,000 | |
| Theft Damage to Rented Property | Included* | | |
| Undamaged Parts of Stock In Process | $ | 50,000 | |
| Valuable Papers and Records - Cost of Research | | | |
|     At all described premises | $ | 50,000 | |
|     In transit or at all undescribed premises | $ | 25,000 | |
| Water or Other Substance Loss - Tear Out and Replacement Expense | Included* | | |

*Included means included in applicable Covered Property Limit of Insurance

DELUXE BUSINESS INCOME(AND EXTRA EXPENSE) COVERAGE FORM - DESCRIBED PREMISES

| Premises Location No. | Building No. | | Limits of Insurance |
|---|---|---|---|
| 1-10 | 1-12 | $ | �In |

70 % Coinsurance Applies. See Business Income - Coinsurance DX T4 61.

Rental Value:  Included

**DX T0 00 11 12**

PRODUCER: **THE YURCONIC AGENCY**          K1116    OFFICE: **READING**          177



One Tower Square, Hartford, Connecticut 06183

**DELUXE PROPERTY COVERAGE**          **POLICY NUMBER:**
**PART DECLARATIONS**                 **ISSUE DATE:** 10-04-24

DELUXE BUSINESS INCOME(AND EXTRA EXPENSE) COVERAGE FORM - DESCRIBED PREMISES
(continued)

     Ordinary Payroll:  Included


DELUXE BUSINESS INCOME - ADDITIONAL COVERAGES AND COVERAGE EXTENSIONS

The Limits of Insurance, Coverage Period and Coverage Radius shown in the left
column are included in the coverage form and apply unless a revised Limit of
Insurance, Coverage Period, Coverage Radius or Not Covered is shown under the
column on the right. The Limits of Insurance apply in any one occurrence unless
otherwise stated.

| | Limits of Insurance, Coverage Period or Coverage Radius | Revised Limits of Insurance, Coverage Period or Coverage Radius |
|---|---|---|
| Business Income From Dependent Property | | |
|    At Premises Within the Coverage | | |
|       Territory | $ 100,000 | |
|    At Premises Outside of the Coverage | | |
|       Territory | $ 100,000 | |
| Civil Authority | | |
|    Coverage Period | 30 days | |
|    Coverage Radius | 100 miles | |
| Claim Data Expense | $ 25,000 | |
| Contract Penalties | $ 25,000 | |
| Extended Business Income | | |
|    Coverage Period | 180 days | |
| Fungus, Wet Rot or Dry Rot - Amended | | |
|  Period of Restoration | | |
|    Coverage Period | 30 days | |
| Green Building Alternatives - Increased | | |
|  Period of Restoration | | |
|    Coverage Period | 30 days | |
| Ingress or Egress | $ 25,000 | |
|    Coverage Radius | 1 mile | |
| Newly Acquired Locations | $ 500,000 | |
| Ordinance or Law - Increased | | |
|  Period of Restoration | $ 250,000 | |
| Pollutant Cleanup and Removal - Annual | | |
|  Aggregate | $ 25,000 | |
| Transit Business Income | $ 25,000 | |
| Undescribed Premises | $ 25,000 | |

**DX T0 00 11 12**

PRODUCER: **THE YURCONIC AGENCY**          K1116    OFFICE: **READING**          177


**TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**DELUXE PROPERTY COVERAGE**
**PART DECLARATIONS**

**POLICY NUMBER:**
**ISSUE DATE:** 10-04-24

CAUSES OF LOSS - EARTHQUAKE - aggregate in any one policy year, for all losses covered under the Causes of Loss - Earthquake endorsement, commencing with the inception date of this policy:

Annual
Aggregate Limit

1. Applies at the following Building(s) numbered:

001-012                                                         $    3,000,000

If more than one Annual Aggregate Limit applies in any one occurrence, the most we will pay is the highest involved Annual Aggregate Limit. The most we will pay during each annual period is the highest of the Annual Aggregate Limits shown.

CAUSES OF LOSS - BROAD FORM FLOOD - aggregate in any one policy year, for all losses covered under the Causes of Loss - Broad Form Flood endorsement, commencing with the inception date of this policy:

Annual
Aggregate Limit

1. Applies at the following Building(s) numbered:

001-012                                                         $    3,000,000

If more than one Annual Aggregate Limit applies in any one occurrence, the most we will pay is the highest involved Annual Aggregate Limit. The most we will pay during each annual period is the highest of the Annual Aggregate Limits shown.

  EXCESS OF LOSS LIMITATION APPLIES - See Causes of Loss - Broad Form Flood endorsement.

DEDUCTIBLES:

BY EARTHQUAKE:

  1. In any one occurrence, at the following Building(s) numbered:

001-012                                                         $      50,000

**DX T0 00 11 12**


**TRAVELERS**                          One Tower Square, Hartford, Connecticut 06183

---

**DELUXE PROPERTY COVERAGE**          **POLICY NUMBER:**
**PART DECLARATIONS**                 **ISSUE DATE:** 10-04-24

DEDUCTIBLES: (continued)

BY EARTHQUAKE: (continued)

    As respects Business Income Coverage a   72 hour deductible applies
    at all premises locations.


BY "FLOOD":


    1. At the premises location(s) of the following Building(s) numbered:

    001-006,009-012
    in any one occurrence                                    $       50,000


    As respects Business Income Coverage a   72 hour deductible applies
    at all premises locations.

    2. At the premises location(s) of the following Building(s) numbered:

    007,008
    in any one occurrence                                    $      100,000


    As respects Business Income Coverage a   72 hour deductible applies
    at all premises locations.


BUSINESS INCOME:

    As respects Business Income Coverage, for which no other deductible is
    stated above or in the coverage description, a  24 hour deductible applies.


ANY OTHER COVERED LOSS in any one occurrence:                  $       25,000


**DX T0 00 11 12**

PRODUCER: **THE YURCONIC AGENCY**             K1116   OFFICE: **READING**          177

POLICY NUMBER:                                    ISSUE DATE: **10-04-24**

# MORTGAGE HOLDER SCHEDULE

| Premises<br>Loc. No. | Bldg.<br>No. | Mortgage Holder<br>Name and Mailing Address |
|---|---|---|



| 1 | 1 | WINDSTREAM CAPITAL LLC<br>C/O PLANET LOAN SERVICING, LLC<br>PO BOX 7005<br>TROY                    MI 48007-7005 |
| 3 | 3 | WINDSTREAM CAPITAL LLC<br>C/O PLANET LOAN SERVICING, LLC<br>PO BOX 7005<br>TROY                    MI 48007-7005 |

**DX 00 01 07 94**

# EXHIBIT 5



**Annual Financial Statement**
# Electronic Submission
**U.S. Department of Housing and Urban Development**
**Public Indian Housing - Real Estate Assessment Center (PIH-REAC)**

Owner: Whitehall Trust                          TIN: 207502201
Reporting From: 01/01/2021                      Reporting To: 12/31/2021
FHA/Contract Number(s):  03422084               Submission Type: AUD-2000.04

### Assets

| Account | Description | Value | |
|---|---|---|---|
| 1120 | Cash - Operations | | $ 82,076 |
| 1145 | Accounts and Notes Receivable - Entity | | $ 1,390,000 |

**Detail - Accounts and Notes Receivable - Entity**

1145-005 - Type of Receivable — Lessee receivable

| Account | Description | Value | |
|---|---|---|---|
| | 1145-010 - Description - Miscellaneous Detail for 1145 | Whitehall Manor | |
| | 1145-020 - Amount - Miscellaneous Detail for 1145 | $ 1,390,000 | |

### Assets

| Account | Description | Value |
|---|---|---|
| 1200 | Prepaid Expenses | $ 199,637 |
| 1100T | Total Current Assets | $ 1,671,713 |
| 1310 | Escrow Deposits | $ 29,598 |
| 1320 | Replacement Reserve | $ 801,553 |
| 1300T | Total Deposits | $ 831,151 |
| 1410 | Land | $ 60,028 |
| 1420 | Buildings | $ 6,718,774 |
| 1400T | Total Fixed Assets | $ 6,778,802 |
| 1495 | Accumulated Depreciation | $ 4,375,751 |
| 1400N | Net Fixed Assets | $ 2,403,051 |
| 1000T | Total Assets | $ 4,905,915 |

### Liabilities

| Account | Description | Value | |
|---|---|---|---|
| 2110 | Accounts Payable - Operations | | $ 133,440 |
| 2130 | Accrued Interest Payable - Section 236 | | $ 281,389 |
| 2170 | Mortgage (or Bonds) Payable - First Mortgage (Bonds) (Short Term) | | $ 12,487,669 |
| 2190 | Miscellaneous Current Liabilities | | $ 315,688 |

**Detail - Miscellaneous Current Liabilities**

2190-010 - Description -

**Supp. Appx. 118**

|       | Miscellaneous Detail for 2190  Accrued Insurance |       |
|-------|--------------------------------------------------|-------|
|       | 2190-020 - Amount - Miscellaneous Detail for 2190  $ 315,688 |  |
| 2122T | Total Current Liabilities                        | $ 13,218,186 |
| 2390  | Miscellaneous Long Term Liabilities              | $ 564,778 |

**Detail - Miscellaneous Long-term Liabilities**

|       | 2390-010 - Description - Miscellaneous Detail for 2390  Due to Beneficiary Miscellaneous |       |
|-------|--------------------------------------------------|-------|
|       | 2390-020 - Amount - Miscellaneous Detail for 2390  $ 564,778 |  |
| 2300T | Total Long Term Liabilities                      | $ 564,778 |
| 2000T | Total Liabilities                                | $ 13,782,964 |

**Equity Data - Entities other than Corporations**

| Account | Description | Value |
|---------|-------------|-------|
| 3130  | Total Equity | $- 8,877,049 |
| 2033T | Total Liabilities and Equity | $ 4,905,915 |

**Rent Revenue**

| Account | Description | Value |
|---------|-------------|-------|
| 5195  | Lease Revenue (Nursing Home or Section 232 - B&C or AL) | $ 1,668,000 |
| 5100T | Total Rent Revenue | $ 1,668,000 |

**Vacancies**

| Account | Description | Value |
|---------|-------------|-------|
| 5152N | Net Rental Revenue (Rent Revenue Less Vacancies) | $ 1,668,000 |

**Other Revenue**

| Account | Description | Value |
|---------|-------------|-------|
| 5990  | Miscellaneous Revenue | $ 468 |

**Details - Miscellaneous Revenue**

|       | 5990-010 - Description  Interest Income |       |
|-------|-----------------------------------------|-------|
|       | 5990-020 - Amount  $ 468 |  |
| 5900T | Total Other Revenue | $ 468 |
| 5000T | Total Revenue | $ 1,668,468 |

**Administrative Expenses**

| Account | Description | Value |
|---------|-------------|-------|
| 6320  | Management Fee | $ 133,440 |
| 6390  | Miscellaneous Administrative Expenses | $ 48 |

**Details - Miscellaneous Administrative Expenses**

|       | 6390-010 - Description  Bank Service Charges |       |
|-------|----------------------------------------------|-------|
|       | 6390-020 - Amount  $ 48 |  |
| 6263T | Total Administrative Expenses | $ 133,488 |

**Taxes & Insurance**

| Account | Description | Value |
|---------|-------------|-------|
| 6710  | Real Estate Taxes | $ 325,857 |
| 6720  | Property & Liability Insurance (Hazard) | $ 267,218 |
| 6700T | Total Taxes and Insurance | $ 593,075 |

**Financial Expenses**

**Supp. Appx. 119**

| Account | Description | Value |
|---------|-------------|-------|
| 6820 | Interest on First Mortgage (or Bonds) Payable | $ 423,055 |
| 6850 | Mortgage Insurance Premium/ Service Charge | $ 61,827 |
| 6800T | Total Financial Expenses | $ 484,882 |

### Operating Results

| Account | Description | Value |
|---------|-------------|-------|
| 6000T | Total Cost of Operations before Depreciation | $ 1,211,445 |
| 5060T | Profit (Loss) before Depreciation | $ 457,023 |
| 6600 | Depreciation Expenses | $ 326,308 |
| 6610 | Amortization Expense | $ 394,339 |
| 5060N | Operating Profit or (Loss) | $- 263,624 |

### Profit or Loss

| Account | Description | Value |
|---------|-------------|-------|
| 3250 | Profit or Loss (Net Income or Loss) | $- 263,624 |

### Part II

| Account | Description | Value |
|---------|-------------|-------|
| S1000-010 | Total first mortgage (or bond) principal payments required during the audit period (usually 12 months). This applies to all direct loans, HUD-held and HUD-insured first mortgages. | $ 416,661 |
| S1000-020 | The total of all monthly reserve for replacement deposits (usually 12 months) required during the audit period even if deposits have been temporarily waived or suspended. | $ 96,900 |

### Equity Data - Entities other than Corporations

| Account | Description | Value |
|---------|-------------|-------|
| S1100-010 | Beginning of Year Balance | $- 8,279,160 |
| 3250 | Net Income or Loss | $- 263,624 |
| S1200-420 | Distributions | $- 334,265 |
| 3130 | End of Year - 3130 | $- 8,877,049 |

### Cash Flow from Operating Activities

| Account | Description | Value |
|---------|-------------|-------|
| S1200-010 | Rental Receipts | $ 278,000 |
| S1200-020 | Interest Receipts | $ 468 |
| S1200-040 | Total Receipts | $ 278,468 |
| S1200-070 | Management Fee | $- 133,440 |
| S1200-120 | Real Estate Taxes | $- 226,654 |
| S1200-140 | Property Insurance | $- 285,712 |
| S1200-170 | Other Operating Expenses | $- 48 |
| S1200-180 | Interest on First Mortgage | $ 138,364 |

**Supp. Appx. 120**

| Account | Description | Value |
|---|---|---|
| S1200-210 | Mortgage Insurance Premium (MIP) | $- 26,621 |
| S1200-230 | Total Disbursements | $- 534,111 |
| S1200-240 | Net Cash provided by (used in) Operating Activities | $- 255,643 |

**Cash Flow from Investing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-250 | Net Deposits to the Reserve for Replacement account | $ 473,962 |
| S1200-350 | Net Cash used in Investing Activities | $ 473,962 |

**Cash Flow from Financing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-360 | Principal Payments - First Mortgage (or Bonds) | $- 171,901 |
| S1200-420 | Distributions | $- 334,265 |
| S1200-460 | Net Cash used in Financing Activities | $- 506,166 |
| S1200-470 | Net increase (decrease) in Cash and Cash Equivalents | $- 287,847 |

**Cash and Cash Equivalents**

| Account | Description | Value |
|---|---|---|
| S1200-480 | Beginning of Period Cash | $ 369,923 |
| S1200T | End of Period Cash | $ 82,076 |

**Reconciliation of Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities**

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $- 263,624 |

**Adjustments to Reconcile Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities**

| Account | Description | Value |
|---|---|---|
| 6600 | Depreciation Expenses | $ 326,308 |
| 6610 | Amortization Expense | $ 394,339 |
| S1200-500 | Decrease (increase) in Accounts Receivable - Other | $- 1,390,000 |
| S1200-520 | Decrease (increase) in Prepaid Expenses | $ 3,500 |
| S1200-540 | Increase (decrease) in Accounts Payable | $- 147,560 |
| S1200-570 | Increase (decrease) in Accrued Interest Payable | $ 561,419 |
| S1200-600 | Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $ 259,975 |

**Details – Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities**

S1200-601 - Description - Other adjustments to reconcile net profit (loss) to        Escrow Deposits

|  | Net Cash provided by (used in) Operating Activities S1200-602 - Amount - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $ 259,975 |
|---|---|---|

| Account | Description | Value |
|---|---|---|
| S1200-610 | Net Cash provided by (used in) Operating Activities | $- 255,643 |

| Account | Description | Value |
|---|---|---|

Notes

| Account | Description | Value |
|---|---|---|
| S3100-010 | Organization and Presentation Note | Whitehall Trust owns a condominium interest in the facility and land from which operations are conducted. Whitehall Manor, Inc. is the entity that operates a 215 bed assisted living facility. |
| S3100-040 | Summary of Significant Accounting Policies Note | Cash: For the purposes of the statement of cash flows, the Trust considers all cash on hand, deposits in banks, and certificates-of- deposits with an initial maturity of three months or less to be a cash equivalent. Prepaid Expenses: Prepaid expenses consist of real estate taxes and insurance paid in advance of the period covered. Amounts are reclassified to expense on a straight-line basis over the term of the policy or tax year. Mortgage Escrow: Under provisions of their loan agreement, the Trust is required to escrow property taxes and insurance on a monthly basis. Restricted Deposits and Funded Reserves: Under provisions of a regulatory agreement with HUD, the Trust is required to make monthly deposits of $8,075 to a replacement reserve maintained by the bank. The Trust's replacement reserve represents amounts set aside for future project replacements in accordance with HUD regulations. The replacement reserve is comprised of cash, certificates-of-deposit, other short-term investments and government securities which are stated at market value. Any disbursements from this account other than for repairs authorized during loan origination must be approved by HUD. Property and Equipment: Property and equipment is carried at cost. Donated property is recorded at its estimated fair-value at the date of receipt. Depreciation is computed on the straight- line method over the following estimated useful lives: Building: 39 Years, Land Improvements: 20 Years, Leasehold Improvements: 5 to 40 Years, Furniture and Fixtures: 5 to 10 Years, Machinery and |

Equipment: 3 to 10 Years, and Vehicles and Trailers: 5 to 10 Years. Repair and maintenance costs are charged to expense as incurred and significant replacements and betterments in excess of $7,500 are capitalized. Repair and maintenance costs include all costs that do not extend the useful life of the real estate asset. Upon sale or other disposition, the asset account and related accumulated depreciation account are relieved, and any gain or loss is included in operations. Estimates: The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates. Income Taxes: Under the provisions of the Internal Revenue Code, management has elected for the Trust to be treated as a grantor trust for income tax purposes. Under those provisions, the Trust does not pay Federal or state income taxes on its taxable income as they are the responsibility of the beneficiary. Accordingly, no provision has been made for Federal or state income tax in the financial statements. The Trust's tax returns are subject to examination by the appropriate tax jurisdictions. As of December 31, 2021, the Trust's Federal and state tax returns generally remain open for the last three years.

| | | |
|---|---|---|
| S3100-050 | Mortgages (or Bond) Payable Note | The Trust has a mortgage note payable that requires monthly installments of $69,845, including interest at 3.38%, maturing February 2042. Pledged as collateral is unit one of the Condos at Whitehall Manor including all buildings, improvements, fixtures, and appliances located on the property with a net book value of $2,275,921. In addition, the Organization provides unlimited corporate sureties to unconditionally guarantee the mortgage and covenants along with a personal guarantee of the grantor and is insured by HUD. |

**Details – Mortgages Payable**

| | |
|---|---|
| S3100-060 - Principal Payments in the next 12 months - Year 1 | $ 12,487,669 |
| S3100-070 - Principal Payments in the next 12 months - Year 2 | $ 0 |
| S3100-080 - Principal Payments in the next 12 | $ 0 |

| | | |
|---|---|---|
| | months - Year 3 | |
| | S3100-090 - Principal Payments in the next 12 months - Year 4 | $ 0 |
| | S3100-100 - Principal Payments in the next 12 months - Year 5 | $ 0 |
| | S3100-110 - Principal Payments remaining after Year 5 | $ 0 |
| S3100-200 | Related Party Transactions Note | Whitehall Manor, Inc. leases unit one of Whitehall Manor Condominium from the Whitehall Trust, whose trustee and beneficiary are affiliates of the ownership and management of Whitehall Manor, Inc. As of January 1, 2012, the Manor is committed under a lease with the Trust in the amount of $80,000 per month with an additional payment of $708,000 due prior to December 31 of 105% of the annual principal and interest payments, mortgage insurance premiums, deposit for reserve for replacement, property insurance premiums, and property taxes. The Manor is also responsible for all maintenance and repairs associated with the property. The contract is set to expire August 2023. Rent expense under the lease was $1,668,000 for the year ended December 31, 2021. In addition, the beneficiary of the Trust has advanced funds to the Trust to cover costs associated with the maintenance of the building. These advances are non-interest bearing and do not have specific repayment terms. The total amount due to the beneficiary was $564,778 at December 31, 2021. |

**Details - Related Party Transactions**

| | | |
|---|---|---|
| | S3100-210 - Company Name | Whitehall Manor |
| | S3100-220 - Amount Received | $ 1,668,000 |
| S3100-230 | Management Fee Note | The Trust has entered into a management agreement with a company which is owned by the beneficiary. The Trust has agreed to pay 8% of the rental income in return for accounting and business advisory support. Total management fee paid by the Trust under this agreement was $133,440 for the year ended December 31, 2021. |
| S3100-240 | Additional Note | Under U.S. Department of Housing and Urban Development guidelines for the Section 232 HUD Insured Loan Program, the outstanding loan balance is considered a major Federal program for the Trust. Specific program requirements for HUD Section 232 Nursing Homes and Similar Facilities include: Federal financial reports, |

**Supp. Appx. 124**

|  |  | mortgage status, replacement reserves, residual receipts, security deposits, cash receipts and disbursements, distributions to owners, tenant application, eligibility, recertification, and management functions. |
| S3100-240 | Additional Note | At December 31, 2021, the Trust was in default with its mortgage note. In addition, Whitehall Manor (the operating entity) continues to report operating losses. These conditions raise substantial doubt about the Trust's ability to continue as a going concern within one year after issuance date of the financial statements. The Trust is working with its lender to restructure the terms of the note. However, there can be no assurance that the Trust will be successful in achieving its objectives. The accompanying financial statements have been prepared assuming that the Trust will continue as a going concern; however, the above condition raises substantial doubt about the Trust's ability to do so. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classifications of liabilities that may result should the Trust be unable to continue as a going concern. |

## Report on the Financial Statement

| Account | Description | Value |
| --- | --- | --- |
| S2100-020 | Opinion | Unmodified |
| S2100-050 | Going Concern Issue | Yes |
| S2100-030 | Opinion Explanation | In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Whitehall Trust as of December 31, 2021, and the results of operations and cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America. |

## Report on Supplemental Data

| Account | Description | Value |
| --- | --- | --- |
| S2100-100 | Opinion | Unmodified |
| S2100-110 | Opinion Explanation | Our audit was conducted for the purpose of forming an opinion on the financial statement as a whole. The supplementary information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the |

underlying accounting and other records used to prepare the financial statements or to the combined financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

### Report on Internal Controls

| Account | Description | Value |
| --- | --- | --- |
| S2200-020 | Instances of Fraud, Non-compliance, or Abuse of Laws, Regulations, Contracts or Grants That Have a Material Effect on the Audit | Yes |

| Account | Description | Value |
| --- | --- | --- |
| S2200-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Financial Reporting Indicator | No |

### Report on Compliance Major Programs

| Account | Description | Value |
| --- | --- | --- |
| S2300-020 | Opinion on Compliance with Laws, Regulations, and Contracts Applicable to Each Major Program | Qualified |

| Account | Description | Value |
| --- | --- | --- |
| S2300-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Compliance Indicator | Yes |

### Report on Compliance - Major Programs

| Account | Description | Value |
| --- | --- | --- |
| S2300-040 | Comments on Non-compliance | None. |

**Detail - Schedule of Findings & Questioned Costs**

| | | |
| --- | --- | --- |
| | S2700-005 - Finding Reference Number | 2021-001 |
| | S2700-006 - Finding Resolution Status | In Progress |
| S2700-007 | Information on Universe Population Size | N/A |
| S2700-008 | Sample Size Information | N/A |
| S2700-009 | Noncompliance Information | Annual reporting requirement. |
| S2700-010 | Statement of Condition | The Trust did not have the audited financial statements submitted into REAC within the ninety days or the year end. |
| S2700-020 | Criteria | Whitehall Trust (the Trust) entered into a Regulatory Agreement with the U.S. Department of Housing and Urban Development (HUD) on |

| | | |
|---|---|---|
| | | January 26, 2012. The Trust is required to provide audited financial statements, submitted into HUD's Real Estate Assessment Center (REAC), within ninety days of year end. |
| S2700-030 | Effect or Potential Effect | The Trust is not in compliance with the Regulatory Agreement entered into with HUD. |
| S2700-040 | Cause | As a result of declining cash flows, the Trust was unable to pay for a financial statement audit earlier in the year. |
| S2700-050 | Recommendation | The Trust should arrange for audits to be completed within the 90-day deadline. |
| | S2700-055 - Auditor Non-Compliance Code | Z - Other |
| | S2700-065 - Amount of Questioned Costs | $ 0 |
| | **Detail - Questioned Costs by Property** | |
| | S2700-057 - FHA/Contract Number | 03422084 |
| | S2700-058 - Questioned Costs | $ 0 |
| S2700-100 | Reporting Views of Responsible Officials | We agree with the finding and are working on a plan to restructure the business to improve cash flow. Future audits will be submitted within the ninety-day deadline. |
| | S2700-070 - Concur or Do Not Concur with this Finding | CONCUR |
| | S2700-075 - Agree or Disagree with auditor recommendations | AGREE |
| S2700-080 | Completion Date or Proposed Completion Date | 03/30/2023 |
| S2700-090 | Actions Taken or Planned on the Finding | Audits will be completed timely in subsequent years. |
| | **Detail - Schedule of Findings & Questioned Costs** | |
| | S2700-005 - Finding Reference Number | 2021-002 |
| | S2700-006 - Finding Resolution Status | In Progress |
| S2700-007 | Information on Universe Population Size | N/A |
| S2700-008 | Sample Size Information | N/A |
| S2700-009 | Noncompliance Information | Failure to make mortgage payments. |
| S2700-010 | Statement of Condition | The Trust stopped making required monthly mortgage payments in March of 2021. |
| S2700-020 | Criteria | Whitehall Trust entered into a mortgage note with M&T Realty Capital Corporation (M&T) on January 26, 2012. The Trust is required to make monthly principal and interest payments of $69,845 on the 1st of each month until maturity in September 2043. |
| S2700-030 | Effect or Potential Effect | The Trust is in default of their mortgage with |

| | | M&T. |
|---|---|---|
| S2700-040 | Cause | As a result of declining cash flows, the Trust was unable to make the required monthly mortgage payments. |
| S2700-050 | Recommendation | None |
| | S2700-055 - Auditor Non-Compliance Code | Q - Failure to Make Mortgage Payments |
| | S2700-065 - Amount of Questioned Costs | $ 526,149 |
| | **Detail - Questioned Costs by Property** | |
| | S2700-057 - FHA/Contract Number | 03422084 |
| | S2700-058 - Questioned Costs | $ 0 |
| S2700-100 | Reporting Views of Responsible Officials | We agree with the fining and are working on a plan to restructure the business to improve cash flow which will enable us to make all required debt service obligations. |
| | S2700-070 - Concur or Do Not Concur with this Finding | CONCUR |
| | S2700-075 - Agree or Disagree with auditor recommendations | AGREE |
| S2700-080 | Completion Date or Proposed Completion Date | 06/30/2023 |
| S2700-090 | Actions Taken or Planned on the Finding | We are working on a plan to improve cash flow. |

**Schedule of Findings and Questioned Costs**

| Account | Description | Value |
|---|---|---|
| S2700-110 | Contact Person First Name | Abraham |
| S2700-130 | Contact Person Last Name | Atiyeh |

**Schedule of Reserve for Replacement**

| Account | Description | Value |
|---|---|---|
| 1320P | Balance at Beginning of Year | $ 1,275,515 |
| 1320INT | Interest on Replacement Reserve Accounts | $ 468 |
| 1320WT | Approved Withdrawals | $ 474,430 |
| 1320 | Balance at End of Year, Confirmed by Mortgagee | $ 801,553 |
| 1320R | Deposits Suspended or Waived Indicator | Yes |

**Computation of Surplus Cash, Distributions, and Residual Receipts (Annual)**

| Account | Description | Value |
|---|---|---|
| S1300-010 | Cash and Other Specified Assets | $ 82,076 |
| S1300-040 | Total Cash | $ 82,076 |
| S1300-050 | Accrued Mortgage (or Bond) Interest Payable | $ 281,389 |
| S1300-060 | Delinquent Mortgage (or Bond) Principal Payments | $ 244,760 |
| S1300-140 | Total Current Obligations | $ 526,149 |

**Supp. Appx. 128**

| Account | Description | Value |
|---|---|---|
| S1300-150 | Surplus Cash (Deficiency) | $- 444,073 |
| S1300-200 | Amount Available for distribution during next fiscal period | $ 0 |

### Schedule of Changes in Fixed Asset Accounts

| Account | Description | Value |
|---|---|---|
| 1410P | Beginning Balance for 1410 | $ 60,028 |
| 1410 | Land | $ 60,028 |
| 1420P | Beginning Balance for 1420 | $ 6,718,774 |
| 1420 | Buildings | $ 6,718,774 |
| 1400PT | Total Beginning Balance for Fixed Assets | $ 6,778,802 |
| 1400T | Total Fixed Assets | $ 6,778,802 |
| 1495P | Beginning Balance for 1495 | $ 4,049,443 |
| 6600 | Total Provisions | $ 326,308 |
| 1495 | Ending Balance for Accumulated Depreciation | $ 4,375,751 |
| 1400N | Total Net Book Value | $ 2,403,051 |

### Mortgagor's Certification

| Account | Description | Value |
|---|---|---|
| S2900-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S2900-020 | Name of Signatory #1 | Wendy Macarro |
| S2900-025 | Title of Certifying Official #1 | Accountant |
| S2900-030 | Name of Signatory #2 | Nimita A. Atiyek |

### Mortgagors Certification

| Account | Description | Value |
|---|---|---|
| S2900-035 | Title of Certifying Official #2 | President |

### Mortgagor's Certification

| Account | Description | Value |
|---|---|---|
| S2900-040 | Auditee Telephone Number | 6104033400 |
| S2900-050 | Date of Certification | 02/08/2023 |

### Managing Agent's Certification

| Account | Description | Value |
|---|---|---|
| S3000-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S3000-020 | Name of Managing Agent | N/A |
| S3000-030 | Name of Signatory | N/A |
| S3000-040 | Managing Agent TIN | N/A |
| S3000-050 | Name of Property Manager | N/A |

### Auditor's Transmittal Letter

| Account | Description | Value |
|---|---|---|
| S3200-005 | Audit Firm ID (UII) | 01107 |
| S3200-010 | Audit Firm | Kohanksi & Company, PC |
| S3200-020 | Lead Auditor First Name | Kelley |

**Supp. Appx. 129**

| | | |
|---|---|---|
| S3200-030 | Lead Auditor Middle Name | Ann |
| S3200-040 | Lead Auditor Last Name | Lindsay |
| S3200-050 | Auditor Street Address Line 1 | 3939 Birney Ave |
| S3200-070 | Auditor City | Moosic |
| S3200-080 | Auditor State | PA |
| S3200-090 | Auditor Zip Code | 18507 |
| S3200-110 | Telephone Number | 5709412248 |
| S3200-120 | Audit Firm TIN | 832620517 |
| S3200-130 | Date of Independent Auditor's Report | 02/07/2023 |

- end of statement -

**Supp. Appx. 130**



**Annual Financial Statement**
**Electronic Submission**
U.S. Department of Housing and Urban Development
Public Indian Housing - Real Estate Assessment Center (PIH-REAC)

| | |
|---|---|
| Owner: Whitehall Trust | TIN: 207502201 |
| Reporting From: 01/01/2020 | Reporting To: 12/31/2020 |
| FHA/Contract Number(s): 03422084 | Submission Type: AUD-2000.04 |

### Assets

| Account | Description | Value |
|---|---|---|
| 1120 | Cash - Operations | $ 369,923 |
| 1200 | Prepaid Expenses | $ 203,137 |
| 1100T | Total Current Assets | $ 573,060 |
| 1310 | Escrow Deposits | $ 289,573 |
| 1320 | Replacement Reserve | $ 1,275,515 |
| 1300T | Total Deposits | $ 1,565,088 |
| 1410 | Land | $ 60,028 |
| 1420 | Buildings | $ 6,718,774 |
| 1400T | Total Fixed Assets | $ 6,778,802 |
| 1495 | Accumulated Depreciation | $ 4,049,443 |
| 1400N | Net Fixed Assets | $ 2,729,359 |
| 1000T | Total Assets | $ 4,867,507 |

### Liabilities

| Account | Description | Value |
|---|---|---|
| 2110 | Accounts Payable - Operations | $ 281,000 |
| 2131 | Accrued Interest Payable - First Mortgage (or Bonds) | $ 35,658 |
| 2170 | Mortgage (or Bonds) Payable - First Mortgage (Bonds) (Short Term) | $ 416,661 |
| 2122T | Total Current Liabilities | $ 733,319 |
| 2320 | Mortgage (or Bonds) Payable - First Mortgage (or Bonds) | $ 11,848,570 |
| 2390 | Miscellaneous Long Term Liabilities | $ 564,778 |

**Detail - Miscellaneous Long-term Liabilities**

| | | |
|---|---|---|
| 2390-010 - Description - Miscellaneous Detail for 2390 | Due to Beneficiary | |
| 2390-020 - Amount - Miscellaneous Detail for 2390 | $ 564,778 | |

| Account | Description | Value |
|---|---|---|
| 2300T | Total Long Term Liabilities | $ 12,413,348 |
| 2000T | Total Liabilities | $ 13,146,667 |

### Equity Data - Entities other than Corporations

| Account | Description | Value |
|---|---|---|
| 3130 | Total Equity | $- 8,279,160 |
| 2033T | Total Liabilities and Equity | $ 4,867,507 |

**Supp. Appx. 131**

### Rent Revenue

| Account | Description | Value |
|---|---|---|
| 5195 | Lease Revenue (Nursing Home or Section 232 - B&C or AL) | $ 1,668,000 |
| 5100T | Total Rent Revenue | $ 1,668,000 |

### Vacancies

| Account | Description | Value |
|---|---|---|
| 5152N | Net Rental Revenue (Rent Revenue Less Vacancies) | $ 1,668,000 |

### Other Revenue

| Account | Description | Value |
|---|---|---|
| 5990 | Miscellaneous Revenue | $ 631 |

**Details - Miscellaneous Revenue**
5990-010 - Description       Interest Income
5990-020 - Amount             $ 631

| Account | Description | Value |
|---|---|---|
| 5900T | Total Other Revenue | $ 631 |
| 5000T | Total Revenue | $ 1,668,631 |

### Administrative Expenses

| Account | Description | Value |
|---|---|---|
| 6320 | Management Fee | $ 133,440 |
| 6390 | Miscellaneous Administrative Expenses | $ 48 |

**Details - Miscellaneous Administrative Expenses**
6390-010 - Description       Bank Service Charges
6390-020 - Amount             $ 48

| Account | Description | Value |
|---|---|---|
| 6263T | Total Administrative Expenses | $ 133,488 |

### Taxes & Insurance

| Account | Description | Value |
|---|---|---|
| 6710 | Real Estate Taxes | $ 316,965 |
| 6720 | Property & Liability Insurance (Hazard) | $ 221,379 |
| 6700T | Total Taxes and Insurance | $ 538,344 |

### Financial Expenses

| Account | Description | Value |
|---|---|---|
| 6820 | Interest on First Mortgage (or Bonds) Payable | $ 434,172 |
| 6850 | Mortgage Insurance Premium/ Service Charge | $ 63,890 |
| 6890 | Miscellaneous Financial Expenses | $ 8,000 |

**Details - Miscellaneous Financial Expenses**
6890-010 - Description       Loan Fees
6890-020 - Amount             $ 8,000

| Account | Description | Value |
|---|---|---|
| 6800T | Total Financial Expenses | $ 506,062 |

### Operating Results

| Account | Description | Value |
|---|---|---|
| 6000T | Total Cost of Operations before Depreciation | $ 1,177,894 |
| 5060T | Profit (Loss) before Depreciation | $ 490,737 |

**Supp. Appx. 132**

| Account | Description | Value |
|---|---|---|
| 6600 | Depreciation Expenses | $ 317,833 |
| 6610 | Amortization Expense | $ 18,704 |
| 5060N | Operating Profit or (Loss) | $ 154,200 |

**Profit or Loss**

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $ 154,200 |

**Part II**

| Account | Description | Value |
|---|---|---|
| S1000-010 | Total first mortgage (or bond) principal payments required during the audit period (usually 12 months). This applies to all direct loans, HUD-held and HUD-insured first mortgages. | $ 402,833 |
| S1000-020 | The total of all monthly reserve for replacement deposits (usually 12 months) required during the audit period even if deposits have been temporarily waived or suspended. | $ 65,228 |

**Equity Data - Entities other than Corporations**

| Account | Description | Value |
|---|---|---|
| S1100-010 | Beginning of Year Balance | $- 8,433,360 |
| 3250 | Net Income or Loss | $ 154,200 |
| 3130 | End of Year - 3130 | $- 8,279,160 |

**Cash Flow from Operating Activities**

| Account | Description | Value |
|---|---|---|
| S1200-010 | Rental Receipts | $ 1,668,000 |
| S1200-020 | Interest Receipts | $ 631 |
| S1200-040 | Total Receipts | $ 1,668,631 |
| S1200-070 | Management Fee | $- 133,440 |
| S1200-120 | Real Estate Taxes | $- 315,420 |
| S1200-140 | Property Insurance | $- 47,849 |
| S1200-170 | Other Operating Expenses | $- 8,048 |
| S1200-180 | Interest on First Mortgage | $- 435,307 |
| S1200-210 | Mortgage Insurance Premium (MIP) | $- 64,888 |
| S1200-230 | Total Disbursements | $- 1,004,952 |
| S1200-240 | Net Cash provided by (used in) Operating Activities | $ 663,679 |

**Cash Flow from Investing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-250 | Net Deposits to the Reserve for Replacement account | $- 65,228 |
| S1200-330 | Net Purchase of Fixed Assets | $- 127,130 |
| S1200-350 | Net Cash used in Investing Activities | $- 192,358 |

**Cash Flow from Financing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-360 | Principal Payments - First Mortgage (or Bonds) | $- 402,833 |
| S1200-460 | Net Cash used in Financing Activities | $- 402,833 |
| S1200-470 | Net increase (decrease) in Cash and Cash Equivalents | $ 68,488 |

**Cash and Cash Equivalents**

| Account | Description | Value |
|---|---|---|
| S1200-480 | Beginning of Period Cash | $ 301,435 |
| S1200T | End of Period Cash | $ 369,923 |

**Reconciliation of Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities**

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $ 154,200 |

**Adjustments to Reconcile Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities**

| Account | Description | Value |
|---|---|---|
| 6600 | Depreciation Expenses | $ 317,833 |
| 6610 | Amortization Expense | $ 18,704 |
| S1200-520 | Decrease (increase) in Prepaid Expenses | $- 22,744 |
| S1200-540 | Increase (decrease) in Accounts Payable | $ 159,086 |
| S1200-570 | Increase (decrease) in Accrued Interest Payable | $- 1,135 |
| S1200-600 | Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $ 37,735 |

**Details - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities**

| | | |
|---|---|---|
| | S1200-601 - Description - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | Escrow Deposits |
| | S1200-602 - Amount - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $ 37,735 |

| Account | Description | Value |
|---|---|---|
| S1200-610 | Net Cash provided by (used in) Operating Activities | $ 663,679 |

**Notes**

| Account | Description | Value |
|---|---|---|
| S3100-010 | Organization and Presentation Note | Whitehall Trust owns a condominium interest in the facility and land from which operations are |

| | | |
|---|---|---|
| S3100-040 | Summary of Significant Accounting Policies Note | conducted. Whitehall Manor, Inc. is the entity that operates a 215 bed assisted living facility. Cash: For the purposes of the statement of cash flows, the Trust considers all cash on hand, deposits in banks, and certificates-of- deposits with an initial maturity of three months or less to be a cash equivalent. Prepaid Expenses: Prepaid expenses consist of real estate taxes and insurance paid in advance of the period covered. Amounts are reclassified to expense on a straight-line basis over the term of the policy or tax year. Mortgage Escrow: Under provisions of their loan agreement, the Trust is required to escrow property taxes and insurance on a monthly basis. Replacement Reserve: Under provisions of a regulatory agreement with HUD, the Trust is required to make monthly deposits of $8,075 to a reserve for replacements maintained by the bank. The Trust's reserve for replacements represents amounts set aside for future project replacements in accordance with HUD regulations. The reserve for replacements is comprised of cash, certificates of deposit, other short-term cash investments and government securities which are stated at market value. Any disbursements from this account other than for repairs authorized during loan origination must be approved by HUD. Property and Equipment: Property and equipment is carried at cost. Donated property is recorded at its estimated fair-value at the date of receipt. Depreciation is computed on the straight-line method over the following estimated useful lives: Building: 39 Years Land Improvements: 20 Years Leasehold Improvements: 5 to 40 Years Furniture and fixtures: 5 to 10 Years Machinery and equipment: 3 to 10 Years Vehicles and trailers: 5 to 10 Years. Repair and maintenance costs are charged to expense as incurred and significant replacements and betterments in excess of $7,500 are capitalized. Repair and maintenance costs include all costs that do not extend the useful life of the real estate asset. Upon sale or other disposition, the asset account and related accumulated depreciation account are relieved, and any gain or loss is included in operations. Loan Origination Fees: Loan origination fees are amortized on the straight-line basis over the life of the loan. Estimates: The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make |

|  |  | estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates. Income Taxes: Under the provisions of the Internal Revenue Code, management has elected for the Trust to be treated as a grantor trust for income tax purposes. Under those provisions, the Trust does not pay Federal or state income taxes on its taxable income as they are the responsibility of the and beneficiary. Accordingly, no provision has been made for Federal or state income tax in the financial statements. The Trust's tax returns are subject to examination by the appropriate tax jurisdictions. As of December 31, 2020, the Trust's Federal and state tax returns generally remain open for the last three years. |
|---|---|---|
| S3100-050 | Mortgages (or Bond) Payable Note | The Trust has a mortgage note payable that requires monthly installments of $69,845, including interest at 3.38%, maturing February 2042. Pledged as collateral is unit one of the Condos at Whitehall Manor including all buildings, improvements, fixtures, and appliances located on the property with a net book value of $2,602,229. In addition, the Organization provides unlimited corporate sureties to unconditionally guarantee the mortgage and covenants along with a personal guarantee of the grantor and is insured by HUD. |
|  | **Details - Mortgages Payable** |  |
|  | S3100-060 - Principal Payments in the next 12 months - Year 1 | $ 416,661 |
|  | S3100-070 - Principal Payments in the next 12 months - Year 2 | $ 430,965 |
|  | S3100-080 - Principal Payments in the next 12 months - Year 3 | $ 445,759 |
|  | S3100-090 - Principal Payments in the next 12 months - Year 4 | $ 461,061 |
|  | S3100-100 - Principal Payments in the next 12 months - Year 5 | $ 476,889 |
|  | S3100-110 - Principal Payments remaining after Year 5 | $ 10,428,235 |
| S3100-200 | Related Party Transactions Note | Whitehall Manor, Inc. leases unit one of Whitehall Manor Condominium from the Whitehall Trust, whose trustee and beneficiary are affiliates of the ownership and management of Whitehall Manor, |

Inc. As of January 1, 2012, the Manor is committed under a lease with the Trust in the amount of $80,000 per month with an additional payment of $708,000 due prior to December 31 of 105% of the annual principal and interest payments, mortgage insurance premiums, deposit for reserve for replacement, property insurance premiums, and property taxes. The Manor is also responsible for all maintenance and repairs associated with the property. The contract is set to expire August 2023. Rent expense under the lease was $1,668,000 for the year ended December 31, 2020. In addition, the beneficiary of the Trust to cover costs associated with the maintenance of the building. These advances are non-interest bearing and do not have specific repayments terms. The total amount due to the beneficiary was $564,778 at December 31, 2020.

**Details - Related Party Transactions**

| Account | Description | Value |
|---|---|---|
| | S3100-210 - Company Name | Whitehall Manor |
| | S3100-220 - Amount Received | $ 1,668,000 |
| S3100-230 | Management Fee Note | The Trust has entered into a management agreement with a company which is owned by the beneficiary. The Trust has agreed to pay 8% of the rental income in return for accounting and business advisory support. Total management fees paid by the Trust under this agreement were $133,440 for the year ended December 31, 2020. |
| S3100-240 | Additional Note | Under U.S. Department of Housing and Urban Development guidelines for the Section 232 HUD Insured Loan Program, the outstanding loan balance is considered a major Federal program for the Trust. Specific program requirements for HUD Section 232 Nursing Homes and Similar Facilities include: Federal financial reports, mortgage status, replacement reserves, residual receipts, security deposits, cash receipts and disbursements, distributions to owners, tenant application, eligibility, recertification, and management functions. |

**Report on the Financial Statement**

| Account | Description | Value |
|---|---|---|
| S2100-020 | Opinion | Unmodified |
| S2100-050 | Going Concern Issue | No |
| S2100-030 | Opinion Explanation | In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Whitehall Trust as of December 31, 2020, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles |

generally accepted in the United States of America.

### Report on Supplemental Data

| Account | Description | Value |
|---|---|---|
| S2100-100 | Opinion | Unmodified |
| S2100-110 | Opinion Explanation | Our audit was made for the purpose of forming an opinion on the financial statement as a whole. The supplementary information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the supplementary information is fairly stated, in all material respects, in relation to the financial statements as a whole. |

### Report on Internal Controls

| Account | Description | Value |
|---|---|---|
| S2200-020 | Instances of Fraud, Non-compliance, or Abuse of Laws, Regulations, Contracts or Grants That Have a Material Effect on the Audit | No |

| Account | Description | Value |
|---|---|---|
| S2200-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Financial Reporting Indicator | No |

### Report on Internal Controls

| Account | Description | Value |
|---|---|---|
| S2200-040 | Comments on Internal Controls | None |

### Report on Compliance Major Programs

| Account | Description | Value |
|---|---|---|
| S2300-020 | Opinion on Compliance with Laws, Regulations, and Contracts Applicable to Each Major Program | Unmodified |

| Account | Description | Value |
|---|---|---|
| S2300-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over | No |

**Supp. Appx. 138**

Compliance Indicator

**Report on Compliance - Major Programs**

| Account | Description | Value |
|---|---|---|
| S2300-040 | Comments on Non-compliance | none |

**Schedule of Findings and Questioned Costs**

| Account | Description | Value |
|---|---|---|
| S2700-110 | Contact Person First Name | Stephen |
| S2700-130 | Contact Person Last Name | Chiyka |

**Schedule of Reserve for Replacement**

| Account | Description | Value |
|---|---|---|
| 1320P | Balance at Beginning of Year | $ 1,210,287 |
| 1320DT | Total Monthly Deposits | $ 64,600 |
| 1320INT | Interest on Replacement Reserve Accounts | $ 628 |
| 1320 | Balance at End of Year, Confirmed by Mortgagee | $ 1,275,515 |
| 1320R | Deposits Suspended or Waived Indicator | Yes |

**Computation of Surplus Cash, Distributions, and Residual Receipts (Annual)**

| Account | Description | Value |
|---|---|---|
| S1300-010 | Cash | $ 369,923 |
| S1300-040 | Total Cash | $ 369,923 |
| S1300-050 | Accrued Mortgage (or Bond) Interest Payable | $ 35,658 |
| S1300-140 | Total Current Obligations | $ 35,658 |
| S1300-150 | Surplus Cash (Deficiency) | $ 334,265 |
| S1300-200 | Amount Available for distribution during next fiscal period | $ 334,265 |

**Schedule of Changes in Fixed Asset Accounts**

| Account | Description | Value |
|---|---|---|
| 1410P | Beginning Balance for 1410 | $ 60,028 |
| 1410 | Land | $ 60,028 |
| 1420P | Beginning Balance for 1420 | $ 6,591,644 |
| 1420AT | Additions for 1420 | $ 127,130 |
| | **Details - Additions for 1420** | |
| | 1420A-010 - Item Purchased    Remodel | |
| | 1420A-030 - Total Amount    $ 127,130 | |
| 1420 | Buildings | $ 6,718,774 |
| 1400PT | Total Beginning Balance for Fixed Assets | $ 6,651,672 |
| 1400AT | Total Asset Additions | $ 127,130 |
| 1400T | Total Fixed Assets | $ 6,778,802 |
| 1495P | Beginning Balance for 1495 | $ 3,731,610 |
| 6600 | Total Provisions | $ 317,833 |
| 1495 | Ending Balance for Accumulated Depreciation | $ 4,049,443 |
| 1400N | Total Net Book Value | $ 2,729,359 |

**Mortgagor's Certification**

| Account | Description | Value |
|---|---|---|

| Account | Description | Value |
|---|---|---|
| S2900-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S2900-020 | Name of Signatory #1 | Stephen Chiyka |
| S2900-025 | Title of Certifying Official #1 | Accountant |
| S2900-030 | Name of Signatory #2 | Nimita A. Atiyek |

**Mortgagors Certification**

| Account | Description | Value |
|---|---|---|
| S2900-035 | Title of Certifying Official #2 | President |

**Mortgagor's Certification**

| Account | Description | Value |
|---|---|---|
| S2900-040 | Auditee Telephone Number | 6104033400 |
| S2900-050 | Date of Certification | 03/31/2021 |

**Managing Agent's Certification**

| Account | Description | Value |
|---|---|---|
| S3000-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S3000-020 | Name of Managing Agent | N/A |
| S3000-030 | Name of Signatory | N/A |
| S3000-040 | Managing Agent TIN | N/A |
| S3000-050 | Name of Property Manager | Michael Kohanski |

**Auditor's Transmittal Letter**

| Account | Description | Value |
|---|---|---|
| S3200-005 | Audit Firm ID (UII) | 01107 |
| S3200-010 | Audit Firm | Kohanksi & Company, PC |
| S3200-020 | Lead Auditor First Name | Michael |
| S3200-040 | Lead Auditor Last Name | Kohanski |
| S3200-050 | Auditor Street Address Line 1 | 3939 Birney Ave |
| S3200-070 | Auditor City | Moosic |
| S3200-080 | Auditor State | PA |
| S3200-090 | Auditor Zip Code | 18507 |
| S3200-110 | Telephone Number | 5709412248 |
| S3200-120 | Audit Firm TIN | 832620517 |
| S3200-130 | Date of Independent Auditor's Report | 03/31/2021 |

- end of statement -

**Supp. Appx. 140**



**Annual Financial Statement**
# Electronic Submission
**U.S. Department of Housing and Urban Development**
**Public Indian Housing - Real Estate Assessment Center (PIH-REAC)**

Owner: Whitehall Trust
Reporting From: 01/01/2019
FHA/Contract Number(s):   03422084

TIN: 207502201
Reporting To: 12/31/2019
Submission Type: AUD-2000.04

### Assets

| Account | Description | Value |
|---|---|---|
| 1120 | Cash - Operations | $ 301,435 |
| 1200 | Prepaid Expenses | $ 180,393 |
| 1100T | Total Current Assets | $ 481,828 |
| 1310 | Escrow Deposits | $ 327,308 |
| 1320 | Replacement Reserve | $ 1,210,287 |
| 1300T | Total Deposits | $ 1,537,595 |
| 1410 | Land | $ 60,028 |
| 1420 | Buildings | $ 6,591,644 |
| 1400T | Total Fixed Assets | $ 6,651,672 |
| 1495 | Accumulated Depreciation | $ 3,731,610 |
| 1400N | Net Fixed Assets | $ 2,920,062 |
| 1000T | Total Assets | $ 4,939,485 |

### Liabilities

| Account | Description | Value |
|---|---|---|
| 2110 | Accounts Payable - Operations | $ 121,914 |
| 2131 | Accrued Interest Payable - First Mortgage (or Bonds) | $ 36,793 |
| 2170 | Mortgage (or Bonds) Payable - First Mortgage (Bonds) (Short Term) | $ 402,883 |
| 2122T | Total Current Liabilities | $ 561,590 |
| 2320 | Mortgage (or Bonds) Payable - First Mortgage (or Bonds) | $ 12,246,477 |
| 2390 | Miscellaneous Long Term Liabilities | $ 564,778 |

**Detail - Miscellaneous Long-term Liabilities**

| | | |
|---|---|---|
| 2390-010 - Description - Miscellaneous Detail for 2390 | Due to Beneficiary | |
| 2390-020 - Amount - Miscellaneous Detail for 2390 | $ 564,778 | |

| Account | Description | Value |
|---|---|---|
| 2300T | Total Long Term Liabilities | $ 12,811,255 |
| 2000T | Total Liabilities | $ 13,372,845 |

### Equity Data - Entities other than Corporations

| Account | Description | Value |
|---|---|---|
| 3130 | Total Equity | $- 8,433,360 |
| 2033T | Total Liabilities and Equity | $ 4,939,485 |

**Supp. Appx. 141**

### Rent Revenue

| Account | Description | Value |
|---|---|---|
| 5195 | Lease Revenue (Nursing Home or Section 232 - B&C or AL) | $ 1,668,000 |
| 5100T | Total Rent Revenue | $ 1,668,000 |

### Vacancies

| Account | Description | Value |
|---|---|---|
| 5152N | Net Rental Revenue (Rent Revenue Less Vacancies) | $ 1,668,000 |

### Other Revenue

| Account | Description | Value |
|---|---|---|
| 5990 | Miscellaneous Revenue | $ 581 |

**Details - Miscellaneous Revenue**

| | | |
|---|---|---|
| 5990-010 - Description | Interest Income | |
| 5990-020 - Amount | $ 581 | |

| Account | Description | Value |
|---|---|---|
| 5900T | Total Other Revenue | $ 581 |
| 5000T | Total Revenue | $ 1,668,581 |

### Administrative Expenses

| Account | Description | Value |
|---|---|---|
| 6320 | Management Fee | $ 133,440 |
| 6390 | Miscellaneous Administrative Expenses | $ 52 |

**Details - Miscellaneous Administrative Expenses**

| | | |
|---|---|---|
| 6390-010 - Description | Bank Service Charges | |
| 6390-020 - Amount | $ 52 | |

| Account | Description | Value |
|---|---|---|
| 6263T | Total Administrative Expenses | $ 133,492 |

### Taxes & Insurance

| Account | Description | Value |
|---|---|---|
| 6710 | Real Estate Taxes | $ 293,130 |
| 6720 | Property & Liability Insurance (Hazard) | $ 146,630 |
| 6700T | Total Taxes and Insurance | $ 439,760 |

### Financial Expenses

| Account | Description | Value |
|---|---|---|
| 6820 | Interest on First Mortgage (or Bonds) Payable | $ 447,579 |
| 6850 | Mortgage Insurance Premium/ Service Charge | $ 65,884 |
| 6800T | Total Financial Expenses | $ 513,463 |

### Operating Results

| Account | Description | Value |
|---|---|---|
| 6000T | Total Cost of Operations before Depreciation | $ 1,086,715 |
| 5060T | Profit (Loss) before Depreciation | $ 581,866 |
| 6600 | Depreciation Expenses | $ 317,833 |
| 6610 | Amortization Expense | $ 18,704 |
| 5060N | Operating Profit or (Loss) | $ 245,329 |

### Profit or Loss

| Account | Description | Value |
|---|---|---|

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $ 245,329 |

**Part II**

| Account | Description | Value |
|---|---|---|
| S1000-010 | Total first mortgage (or bond) principal payments required during the audit period (usually 12 months). This applies to all direct loans, HUD-held and HUD-insured first mortgages. | $ 389,463 |
| S1000-020 | The total of all monthly reserve for replacement deposits (usually 12 months) required during the audit period even if deposits have been temporarily waived or suspended. | $ 97,433 |

**Equity Data - Entities other than Corporations**

| Account | Description | Value |
|---|---|---|
| S1100-010 | Beginning of Year Balance | $- 8,398,689 |
| 3250 | Net Income or Loss | $ 245,329 |
| S1200-420 | Distributions | $- 280,000 |
| 3130 | End of Year - 3130 | $- 8,433,360 |

**Cash Flow from Operating Activities**

| Account | Description | Value |
|---|---|---|
| S1200-010 | Rental Receipts | $ 1,668,000 |
| S1200-020 | Interest Receipts | $ 581 |
| S1200-040 | Total Receipts | $ 1,668,581 |
| S1200-070 | Management Fee | $- 133,440 |
| S1200-120 | Real Estate Taxes | $- 286,586 |
| S1200-140 | Property Insurance | $- 149,730 |
| S1200-170 | Other Operating Expenses | $- 52 |
| S1200-180 | Interest on First Mortgage | $- 448,676 |
| S1200-210 | Mortgage Insurance Premium (MIP) | $- 64,277 |
| S1200-230 | Total Disbursements | $- 1,082,761 |
| S1200-240 | Net Cash provided by (used in) Operating Activities | $ 585,820 |

**Cash Flow from Investing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-250 | Net Deposits to the Reserve for Replacement account | $- 97,482 |
| S1200-350 | Net Cash used in Investing Activities | $- 97,482 |

**Cash Flow from Financing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-360 | Principal Payments - First Mortgage (or Bonds) | $- 389,463 |
| S1200-420 | Distributions | $- 280,000 |
| S1200-460 | Net Cash used in Financing | |

|  | Activities | $- 669,463 |
| S1200-470 | Net increase (decrease) in Cash and Cash Equivalents | $- 181,125 |

### Cash and Cash Equivalents

| Account | Description | Value |
|---|---|---|
| S1200-480 | Beginning of Period Cash | $ 482,560 |
| S1200T | End of Period Cash | $ 301,435 |

### Reconciliation of Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $ 245,329 |

### Adjustments to Reconcile Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities

| Account | Description | Value |
|---|---|---|
| 6600 | Depreciation Expenses | $ 317,833 |
| 6610 | Amortization Expense | $ 18,704 |
| S1200-520 | Decrease (increase) in Prepaid Expenses | $ 19,544 |
| S1200-540 | Increase (decrease) in Accounts Payable | $ 121,914 |
| S1200-570 | Increase (decrease) in Accrued Interest Payable | $- 1,097 |
| S1200-600 | Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $- 136,407 |

**Details - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities**

S1200-601 - Description - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities — Escrow Deposits

S1200-602 - Amount - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities — $- 136,407

| Account | Description | Value |
|---|---|---|
| S1200-610 | Net Cash provided by (used in) Operating Activities | $ 585,820 |

### Notes

| Account | Description | Value |
|---|---|---|
| S3100-010 | Organization and Presentation Note | Whitehall Trust owns a condominium interest in the facility and land from which operations of an assisted living facility are conducted. Whitehall Manor, Inc. is the entity that operates a 215 bed assisted living facility. |
| S3100-040 | Summary of Significant | Cash: For the purposes of the statement of cash |

Accounting Policies Note        flows, the Trust considers all cash on hand, deposits in banks, and certificates of deposits with an initial maturity of three months or less to be a cash equivalent. Prepaid Expenses: Prepaid expenses consist of real estate taxes and insurance paid in advance of the period covered. Amounts are reclassified to expense on a straight-line basis over the term of the policy or tax year. Mortgage Escrow: Under provisions of their loan agreement, the Trust is required to escrow property taxes and insurance on a monthly basis. Replacement Reserve: Under provisions of a regulatory agreement with HUD, the Trust is required to make monthly deposits of $8,075 to a reserve for replacements maintained by the bank. The Trust's reserve for replacements represents amounts set aside for future project replacements in accordance with HUD regulations. The reserve for replacements is comprised of cash, certificates of deposit, other short-term cash investments and government securities which are stated at market value. Any disbursements from this account other than for repairs authorized during loan origination must be approved by HUD. Property and Equipment: Property and equipment is carried at cost. Donated property is recorded at its estimated fair-value at the date of receipt. Depreciation is computed on the straight-line method over the following estimated useful lives: Building: 39 Years Land Improvements: 20 Years Leasehold Improvements: 5 to 40 Years Furniture and fixtures: 5 to 10 Years Machinery and Equipment: 3 to 10 Years Vehicles and Trailers: 5 to 10 Years Repair and maintenance costs are charged to expense as incurred and significant replacements and betterments in excess of $5,000 are capitalized. Repair and maintenance costs include all costs that do not extend the useful life of the real estate asset. Upon sale or other disposition, the asset account and related accumulated depreciation account are relieved, and any gain or loss is included in operations. Loan Origination Fees: Loan origination fees are amortized on the straight-line basis over the life of the loan. Estimates: The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Supp. Appx. 145**

|  |  | Income Taxes: Under the provisions of the Internal Revenue Code, management has elected for the Trust to be treated as a grantor trust for income tax purposes. Under those provisions, the Trust does not pay Federal or state income taxes on its taxable income as they are the responsibility of the beneficiary. Accordingly, no provision has been made for Federal or state income tax in the financial statement. The Trust's tax returns are subject to examination by the appropriate tax jurisdictions. As of December 31, 2019, the Trust's Federal and state tax returns generally remain open for the last three years. |
| S3100-050 | Mortgages (or Bond) Payable Note | The Trust has a mortgage note payable that requires monthly installments of $69,845, including interest at 3.38%, maturing February 2042. Pledged as collateral is unit one of the Condos at Whitehall Manor including all buildings, improvements, fixtures, and appliances located on the property with a net book value of $2,920,062. In addition, the Organization provides unlimited corporate sureties to unconditionally guarantee the mortgage and covenants along with a personal guarantee of the grantor and is insured by HUD. |
|  | **Details - Mortgages Payable** |  |
|  | S3100-060 - Principal Payments in the next 12 months - Year 1 | $ 402,833 |
|  | S3100-070 - Principal Payments in the next 12 months - Year 2 | $ 416,661 |
|  | S3100-080 - Principal Payments in the next 12 months - Year 3 | $ 430,965 |
|  | S3100-090 - Principal Payments in the next 12 months - Year 4 | $ 445,759 |
|  | S3100-100 - Principal Payments in the next 12 months - Year 5 | $ 461,061 |
|  | S3100-110 - Principal Payments remaining after Year 5 | $ 10,905,124 |
| S3100-200 | Related Party Transactions Note | Whitehall Manor, Inc. leases unit one of Whitehall Manor Condominium from The Whitehall Trust, whose trustee and beneficiary are affiliates of the ownership and management of Whitehall Manor, Inc. As of January 1, 2012, the Manor is committed under a lease with the Trust in the amount of $80,000 per month with an additional |

payment of $708,000 due prior to December 31 or 105% of the annual principal and interest payments, mortgage insurance premiums, deposit for reserve for replacement, property insurance premiums, and property taxes. The Manor is also responsible for all maintenance and repairs associated with the property. The contract is set to expire August 2023. Rent expense under the lease was $1,668,000 for the year ended December 31, 2019. In addition, the beneficiary of the Trust has advanced funds to the Trust to cover costs associated with the maintenance of the building. These advances are non-interest bearing and do not have specific repayment terms. The total amount due to the beneficiary was $564,778 at December 31, 2019.

**Details – Related Party Transactions**

|  |  |  |
|---|---|---|
| | S3100-210 - Company Name | Whitehall Manor |
| | S3100-220 - Amount Received | $ 1,668,000 |
| S3100-230 | Management Fee Note | The Trust has entered into a management agreement with a company which is owned by the beneficiary. The Trust has agreed to pay 8% of the rental income in return for accounting and business advisory support. Total management fees paid by the Trust under this agreement were $133,440 for the year ended December 31, 2019. |
| S3100-240 | Additional Note | Under U.S. Department of Housing and Urban Development guidelines for the Section 232 HUD Insured Loan Program, the outstanding loan balance is considered a major program for the Trust. Specific program requirements for HUD Section 232 Nursing Homes and Similar Facilities include: Federal financial reports, mortgage status, replacement reserves, residual receipts, security deposits, cash receipts and disbursements, distributions to owners, tenant application, eligibility, recertification, and management functions. |

**Report on the Financial Statement**

| Account | Description | Value |
|---|---|---|
| S2100-020 | Opinion | Unmodified |
| S2100-050 | Going Concern Issue | No |
| S2100-030 | Opinion Explanation | In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Whitehall Trust as of December 31, 2019, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. |

### Report on Supplemental Data

| Account | Description | Value |
|---|---|---|
| S2100-100 | Opinion | Unmodified |
| S2100-110 | Opinion Explanation | Our audits were made for the purpose of forming an opinion on the combined financial statements as a whole. The supplementary information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the supplementary information is fairly stated, in all material respects, in relation to the financial statements as a whole. |

### Report on Internal Controls

| Account | Description | Value |
|---|---|---|
| S2200-020 | Instances of Fraud, Non-compliance, or Abuse of Laws, Regulations, Contracts or Grants That Have a Material Effect on the Audit | No |

| Account | Description | Value |
|---|---|---|
| S2200-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Financial Reporting Indicator | No |

### Report on Internal Controls

| Account | Description | Value |
|---|---|---|
| S2200-040 | Comments on Internal Controls | None |

### Report on Compliance Major Programs

| Account | Description | Value |
|---|---|---|
| S2300-020 | Opinion on Compliance with Laws, Regulations, and Contracts Applicable to Each Major Program | Unmodified |

| Account | Description | Value |
|---|---|---|
| S2300-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Compliance Indicator | No |

### Report on Compliance - Major Programs

| Account | Description | Value |
|---|---|---|
| S2300-040 | Comments on Non-compliance | None |

### Schedule of Findings and Questioned Costs

| Account | Description | Value |
|---|---|---|
| S2700-110 | Contact Person First Name | Stephen |
| S2700-130 | Contact Person Last Name | Chiyka |

### Schedule of Reserve for Replacement

| Account | Description | Value |
|---|---|---|
| 1320P | Balance at Beginning of Year | $ 1,112,805 |
| 1320DT | Total Monthly Deposits | $ 96,900 |
| 1320INT | Interest on Replacement Reserve Accounts | $ 582 |
| 1320 | Balance at End of Year, Confirmed by Mortgagee | $ 1,210,287 |
| 1320R | Deposits Suspended or Waived Indicator | No |

### Computation of Surplus Cash, Distributions, and Residual Receipts (Annual)

| Account | Description | Value |
|---|---|---|
| S1300-010 | Cash | $ 301,435 |
| S1300-040 | Total Cash | $ 301,435 |
| S1300-050 | Accrued Mortgage (or Bond) Interest Payable | $ 36,793 |
| S1300-075 | Accounts Payable - 30 days | $ 121,914 |
| S1300-140 | Total Current Obligations | $ 158,707 |
| S1300-150 | Surplus Cash (Deficiency) | $ 142,728 |
| S1300-200 | Amount Available for distribution during next fiscal period | $ 142,728 |

### Schedule of Changes in Fixed Asset Accounts

| Account | Description | Value |
|---|---|---|
| 1410P | Beginning Balance for 1410 | $ 60,028 |
| 1410 | Land | $ 60,028 |
| 1420P | Beginning Balance for 1420 | $ 6,591,644 |
| 1420 | Buildings | $ 6,591,644 |
| 1400PT | Total Beginning Balance for Fixed Assets | $ 6,651,672 |
| 1400T | Total Fixed Assets | $ 6,651,672 |
| 1495P | Beginning Balance for 1495 | $ 3,413,777 |
| 6600 | Total Provisions | $ 317,833 |
| 1495 | Ending Balance for Accumulated Depreciation | $ 3,731,610 |
| 1400N | Total Net Book Value | $ 2,920,062 |

### Mortgagor's Certification

| Account | Description | Value |
|---|---|---|
| S2900-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S2900-020 | Name of Signatory #1 | Stephen Chiyka |

**Supp. Appx. 149**

| Account | Description | Value |
|---------|-------------|-------|
| S2900-025 | Title of Certifying Official #1 | Accountant |
| S2900-030 | Name of Signatory #2 | Nimita A. Atiyek |

**Mortgagors Certification**

| Account | Description | Value |
|---------|-------------|-------|
| S2900-035 | Title of Certifying Official #2 | President |

**Mortgagor's Certification**

| Account | Description | Value |
|---------|-------------|-------|
| S2900-040 | Auditee Telephone Number | 6104033400 |
| S2900-050 | Date of Certification | 03/30/2020 |

**Managing Agent's Certification**

| Account | Description | Value |
|---------|-------------|-------|
| S3000-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S3000-020 | Name of Managing Agent | N/A |
| S3000-030 | Name of Signatory | N/A |
| S3000-040 | Managing Agent TIN | N/A |
| S3000-050 | Name of Property Manager | N/A |

**Auditor's Transmittal Letter**

| Account | Description | Value |
|---------|-------------|-------|
| S3200-005 | Audit Firm ID (UII) | 01107 |
| S3200-010 | Audit Firm | Kohanksi & Company, PC |
| S3200-020 | Lead Auditor First Name | Michael |
| S3200-040 | Lead Auditor Last Name | Kohanski |
| S3200-050 | Auditor Street Address Line 1 | 3939 Birney Ave |
| S3200-070 | Auditor City | Moosic |
| S3200-080 | Auditor State | PA |
| S3200-090 | Auditor Zip Code | 18507 |
| S3200-110 | Telephone Number | 5709412248 |
| S3200-120 | Audit Firm TIN | 832620517 |
| S3200-130 | Date of Independent Auditor's Report | 03/30/2020 |

- end of statement -

**Supp. Appx. 150**



**Annual Financial Statement**
## Electronic Submission
**U.S. Department of Housing and Urban Development**
**Public Indian Housing - Real Estate Assessment Center (PIH-REAC)**

Owner: Saucon Trust        TIN: 306161712
Reporting From: 01/01/2021        Reporting To: 12/31/2021
FHA/Contract Number(s): 03422096        Submission Type: AUD-2000.04

### Assets

| Account | Description | Value |
|---|---|---|
| 1120 | Cash - Operations | $ 32,505 |
| 1145 | Accounts and Notes Receivable - Entity | $ 1,421,184 |

**Detail - Accounts and Notes Receivable - Entity**

| | 1145-005 - Type of Receivable | Related party receivable |
|---|---|---|

| Account | Description | Value |
|---|---|---|
| | 1145-010 - Description - Miscellaneous Detail for 1145 | Accounts Receivable |
| | 1145-020 - Amount - Miscellaneous Detail for 1145 | $ 1,421,184 |

### Assets

| Account | Description | Value |
|---|---|---|
| 1200 | Prepaid Expenses | $ 222,821 |
| 1100T | Total Current Assets | $ 1,676,510 |
| 1310 | Escrow Deposits | $ 28,946 |
| 1320 | Replacement Reserve | $ 432,529 |
| 1300T | Total Deposits | $ 461,475 |
| 1410 | Land | $ 45,638 |
| 1420 | Buildings | $ 15,185,883 |
| 1400T | Total Fixed Assets | $ 15,231,521 |
| 1495 | Accumulated Depreciation | $ 9,951,655 |
| 1400N | Net Fixed Assets | $ 5,279,866 |
| 1590 | Miscellaneous Other Assets | $ 3,579,739 |

**Detail - Miscellaneous Other Assets**

| | 1590-005 - Type of Asset | Notes receivable related parties |
|---|---|---|
| | 1590-005 - Type of Asset | Notes receivable related parties |

| Account | Description | Value |
|---|---|---|
| | 1590-010 - Description - Miscellaneous Detail for 1590 | Due from Beneficiary |
| | 1590-020 - Amount - Miscellaneous Detail for 1590 | $ 2,173,904 |
| | 1590-010 - Description - Miscellaneous Detail for 1590 | Due from Saucon Valley Manor |
| | 1590-020 - Amount - Miscellaneous Detail for 1590 | $ 1,405,835 |

### Assets

**Supp. Appx. 151**

| Account | Description | Value | |
|---------|-------------|-------|---|
| 1500T | Total Other Assets | | $ 3,579,739 |
| 1000T | Total Assets | | $ 10,997,590 |

## Liabilities

| Account | Description | Value | |
|---------|-------------|-------|---|
| 2110 | Accounts Payable - Operations | | $ 102,325 |
| 2131 | Accrued Interest Payable - First Mortgage (or Bonds) | | $ 271,389 |
| 2170 | Mortgage (or Bonds) Payable - First Mortgage (Bonds) (Short Term) | | $ 16,238,862 |
| 2190 | Miscellaneous Current Liabilities | | $ 343,008 |

**Detail - Miscellaneous Current Liabilities**

| | | |
|---|---|---|
| 2190-010 - Description - Miscellaneous Detail for 2190 | Accrued Insurance | |
| 2190-020 - Amount - Miscellaneous Detail for 2190 | $ 343,008 | |

| Account | Description | Value | |
|---------|-------------|-------|---|
| 2122T | Total Current Liabilities | | $ 16,955,584 |
| 2320 | Mortgage (or Bonds) Payable - First Mortgage (or Bonds) | | $ 0 |
| 2300T | Total Long Term Liabilities | | $ 0 |
| 2000T | Total Liabilities | | $ 16,955,584 |

## Equity Data - Entities other than Corporations

| Account | Description | Value | |
|---------|-------------|-------|---|
| 3130 | Total Equity | | $- 5,957,994 |
| 2033T | Total Liabilities and Equity | | $ 10,997,590 |

## Rent Revenue

| Account | Description | Value | |
|---------|-------------|-------|---|
| 5195 | Lease Revenue (Nursing Home or Section 232 - B&C or AL) | | $ 1,705,421 |
| 5100T | Total Rent Revenue | | $ 1,705,421 |

## Vacancies

| Account | Description | Value | |
|---------|-------------|-------|---|
| 5152N | Net Rental Revenue (Rent Revenue Less Vacancies) | | $ 1,705,421 |

## Other Revenue

| Account | Description | Value | |
|---------|-------------|-------|---|
| 5990 | Miscellaneous Revenue | | $ 290 |

**Details - Miscellaneous Revenue**

| | | |
|---|---|---|
| 5990-010 - Description | Interest Income | |
| 5990-020 - Amount | $ 290 | |

| Account | Description | Value | |
|---------|-------------|-------|---|
| 5900T | Total Other Revenue | | $ 290 |
| 5000T | Total Revenue | | $ 1,705,711 |

## Administrative Expenses

| Account | Description | Value | |
|---------|-------------|-------|---|
| 6320 | Management Fee | | $ 136,434 |
| 6390 | Miscellaneous Administrative Expenses | | $ 62 |

**Details - Miscellaneous Administrative Expenses**

| | | |
|---|---|---|
| | 6390-010 - Description | Bank Service Charges |
| | 6390-020 - Amount | $ 62 |
| 6263T | Total Administrative Expenses | $ 136,496 |

### Taxes & Insurance

| Account | Description | Value |
|---|---|---|
| 6710 | Real Estate Taxes | $ 362,690 |
| 6720 | Property & Liability Insurance (Hazard) | $ 260,763 |
| 6700T | Total Taxes and Insurance | $ 623,453 |

### Financial Expenses

| Account | Description | Value |
|---|---|---|
| 6820 | Interest on First Mortgage (or Bonds) Payable | $ 407,455 |
| 6850 | Mortgage Insurance Premium/ Service Charge | $ 80,745 |
| 6800T | Total Financial Expenses | $ 488,200 |

### Operating Results

| Account | Description | Value |
|---|---|---|
| 6000T | Total Cost of Operations before Depreciation | $ 1,248,149 |
| 5060T | Profit (Loss) before Depreciation | $ 457,562 |
| 6600 | Depreciation Expenses | $ 438,849 |
| 6610 | Amortization Expense | $ 223,294 |
| 5060N | Operating Profit or (Loss) | $- 204,581 |

### Profit or Loss

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $- 204,581 |

### Part II

| Account | Description | Value |
|---|---|---|
| S1000-010 | Total first mortgage (or bond) principal payments required during the audit period (usually 12 months). This applies to all direct loans, HUD-held and HUD-insured first mortgages. | $ 429,429 |
| S1000-020 | The total of all monthly reserve for replacement deposits (usually 12 months) required during the audit period even if deposits have been temporarily waived or suspended. | $ 123,168 |

### Equity Data - Entities other than Corporations

| Account | Description | Value |
|---|---|---|
| S1100-010 | Beginning of Year Balance | $- 5,569,900 |
| 3250 | Net Income or Loss | $- 204,581 |
| S1200-420 | Distributions | $- 183,513 |

| Account | Description | Value |
|---|---|---|
| 3130 | End of Year - 3130 | $- 5,957,994 |

### Cash Flow from Operating Activities

| Account | Description | Value |
|---|---|---|
| S1200-010 | Rental Receipts | $ 284,236 |
| S1200-020 | Interest Receipts | $ 290 |
| S1200-040 | Total Receipts | $ 284,526 |
| S1200-050 | Administrative | $- 62 |
| S1200-070 | Management Fee | $- 136,434 |
| S1200-120 | Real Estate Taxes | $- 244,588 |
| S1200-140 | Property Insurance | $- 235,327 |
| S1200-180 | Interest on First Mortgage | $ 152,739 |
| S1200-210 | Mortgage Insurance Premium (MIP) | $- 33,644 |
| S1200-230 | Total Disbursements | $- 497,316 |
| S1200-240 | Net Cash provided by (used in) Operating Activities | $- 212,790 |

### Cash Flow from Investing Activities

| Account | Description | Value |
|---|---|---|
| S1200-250 | Net Deposits to the Reserve for Replacement account | $ 368,721 |
| S1200-350 | Net Cash used in Investing Activities | $ 368,721 |

### Cash Flow from Financing Activities

| Account | Description | Value |
|---|---|---|
| S1200-360 | Principal Payments - First Mortgage (or Bonds) | $- 177,629 |
| S1200-420 | Distributions | $- 183,513 |
| S1200-460 | Net Cash used in Financing Activities | $- 361,142 |
| S1200-470 | Net increase (decrease) in Cash and Cash Equivalents | $- 205,211 |

### Cash and Cash Equivalents

| Account | Description | Value |
|---|---|---|
| S1200-480 | Beginning of Period Cash | $ 237,716 |
| S1200T | End of Period Cash | $ 32,505 |

### Reconciliation of Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $- 204,581 |

### Adjustments to Reconcile Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities

| Account | Description | Value |
|---|---|---|
| 6600 | Depreciation Expenses | $ 438,849 |
| 6610 | Amortization Expense | $ 223,294 |
| S1200-500 | Decrease (increase) in Accounts Receivable - Other | $- 1,421,184 |
| S1200-520 | Decrease (increase) in Prepaid Expenses | $- 29,060 |
| S1200-540 | Increase (decrease) in Accounts Payable | $- 88,527 |

| | | |
|---|---|---|
| S1200-560 | Increase (decrease) in Accrued Liabilities | $ 560,194 |
| S1200-600 | Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $ 308,225 |

**Details - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities**

S1200-601 - Description - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities

Mortgage Escrow

S1200-602 - Amount - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities

$ 308,225

| Account | Description | Value |
|---|---|---|
| S1200-610 | Net Cash provided by (used in) Operating Activities | $- 212,790 |

| Account | Description | Notes Value |
|---|---|---|
| S3100-010 | Organization and Presentation Note | Saucon Trust owns a condominium, interest in the facility and land from which operations of an assisted living facility are constructed. Saucon Valley Manor is the entity that operates a 290 bed assisted living facility. |
| S3100-040 | Summary of Significant Accounting Policies Note | Cash: For the purpose of the statement of cash flows, the Organization considers all cash on hand, deposits in banks, and certificates-of-deposits with initial maturity of three months or less to be a cash equivalent. Prepaid Expenses: Prepaid expenses consist of real estate taxes and insurance paid in advance of the period covered. Amounts are reclassified to expense on a straight-line basis over the term of the policy or tax year. Mortgage Escrow: Under provisions of their loan agreement, the Trust is required to escrow property taxes and insurance on a monthly basis. Replacement Reserve: Under provisions of the regulatory agreement with the U.S. Department of Housing and Urban Development (HUD), the Organization is required to make monthly deposits of $10,264 to a replacement reserve maintained by the bank. The Organization's replacement reserve represents amounts set aside for future project replacement s in accordance with HUD regulations. The replacement reserve is comprised of cash, certificates-of- deposits, other |

short- term investments and government securities which are stated at market value. Any disbursements from this account other than for repairs authorized during loan origination must be approved by HUD. Property and Equipment: Property and equipment is carried at cost. Donated property is recorded at its estimated fair-value at the date of receipt. Depreciation is computed on the straight-line method over the following estimated useful lives: Building: 39 Years, Land Improvements: 20 Years, Leasehold Improvements: 5 to 40 Years, Furniture and fixtures: 5 to 10 Years, Vehicles: 5 to 10 Years, Repair and maintenance costs are charged to expense as incurrent and significant replacements and betterments in excess of $7,500 are capitalized. Repair and maintenance costs include all costs that do not extend the useful life of the real estate asset. Upon sale or other disposition, the asset account and related accumulated depreciation account are relieved, and any gain or loss is included in operations. Loan Origination Fees: Loan origination fees are amortized on the straight-line basis over the life of the loan. Estimates: The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates. Income Taxes: Under the provisions of the Internal Revenue Code, the Trust is treated as a grantor trust for income tax purposes. Under those provisions, the Trust does not pay Federal or state income taxes on its taxable income as it is the responsibility of the beneficiary. Accordingly, no provision has been made for Federal or state income tax in the accompanying financial statements. The Trust's tax returns are subject to examination by the appropriate tax jurisdictions. As of December 31, 2021, the Trust's Federal and state tax returns generally remain open for the last three years.

| | | |
|---|---|---|
| S3100-050 | Mortgages (or Bond) Payable Note | The Trust has a mortgage note payable that requires monthly installments of $69,578, including interest at 2.5%, maturing January 2048. Pledged as collateral is unit one of the Condos at Saucon Valley Manor including all buildings, improvements, fixtures and appliances located on the property with a net book value of $5,279,866 at December 31, 2021. In addition, prepayments |

of principal on the note are subject to a prepayment premium equal to a percentage of the principal prepayment. The premium percentage ranges from 10% at January 31, 2013, to 1% at January 31, 2022. Principal prepayments made after January 31, 2023, will not be subject to the prepayment premium.

| | Details - Mortgages Payable | |
|---|---|---|
| | S3100-060 - Principal Payments in the next 12 months - Year 1 | $ 16,416,489 |
| | S3100-070 - Principal Payments in the next 12 months - Year 2 | $ 0 |
| | S3100-080 - Principal Payments in the next 12 months - Year 3 | $ 0 |
| | S3100-090 - Principal Payments in the next 12 months - Year 4 | $ 0 |
| | S3100-100 - Principal Payments in the next 12 months - Year 5 | $ 0 |
| | S3100-110 - Principal Payments remaining after Year 5 | $ 0 |
| S3100-200 | Related Party Transactions Note | Saucon Valley Manor, Inc leases unit one of Saucon Valley Condominium from Saucon Trust, whose trustee and beneficiary are affiliates of the ownership and management of Saucon Valley Manor, Inc. As of November 1, 2012, the Manor is committed under a lease with the Trust in the amount of $1,705,421 per year or 105% of the annual principal and interest payments, mortgage insurance premiums, deposit for reserve for replacement, property insurance premiums, and property taxes. The Manor is responsible for all maintenance and repairs associated with the property. The contract is set to expire August 2023. Rent expense under the lease was $1,705,421 for the year ended December 31, 2021. In addition, the Manor owes the Trust for operating transfers and costs occurring prior to December 11, 2012. The balance due to the Trust from Saucon Valley Manor was $1,405,835 at December 31, 2021. In addition, the Trust has advanced funds to the beneficiary. These advances are non-interest bearing and do not have specific repayment terms. Net advances due to the Trust from the beneficiary was $2,173,904 at December 31, 2021. |

**Details - Related Party Transactions**

| | | |
|---|---|---|
| | S3100-210 - Company Name | Saucon Valley Manor |
| | S3100-220 - Amount Received | $ 1,405,835 |
| | S3100-210 - Company Name | Due from Beneficiary |
| | S3100-220 - Amount Received | $ 2,173,904 |
| S3100-230 | Management Fee Note | The Trust has entered into a management agreement with a Company which is owned by the beneficiary. The Trust has agreed to pay 8% of the rental income in return for accounting and business advisory support. Total management fees paid by the Trust under this agreement was $136,434 for the year ended December 31, 2021. |
| S3100-240 | Additional Note | Going Concern - At December 31, 2021, the Trust was in default with its mortgage note. In addition, Saucon Valley Manor (the Operating Entity) continues to report operating losses. These conditions raise substantial doubt about the Trust's ability to continue as a going concern within one year after the issuance date of the financial statements. The trust is working with its lender to restructure the term s of the note. However, there can be no assurance that the Trust will be successful in achieving its objectives. The accompanying financial statements have been prepared assuming that the Trust will continue as a going concern; however, the above condition raises substantial doubt about the Trust's ability to do so. The financial statements do not include any adjustment to reflect the possible future effects on the recoverability and classification of assets or the amounts and classifications of liabilities that may result should the Trust be unable to continue as a going concern. |

### Report on the Financial Statement

| Account | Description | Value |
|---|---|---|
| S2100-020 | Opinion | Unmodified |
| S2100-050 | Going Concern Issue | Yes |
| S2100-030 | Opinion Explanation | In our opinion, the accompanying combined financial statements present fairly, in all material respects, the financial position of the Trust as of December 31, 2021, and the results of operations and cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America. |

### Report on Supplemental Data

| Account | Description | Value |
|---|---|---|
| S2100-100 | Opinion | Unmodified |
| S2100-110 | Opinion Explanation | Our audit was conducted for the purpose of |

**Supp. Appx. 158**

forming an opinion on the combined financial statements as a whole. The supplementary information is presented for purposes of additional analysis and is not a required part of the financial statements. The supplementary information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

### Report on Internal Controls

| Account | Description | Value |
|---|---|---|
| S2200-020 | Instances of Fraud, Non-compliance, or Abuse of Laws, Regulations, Contracts or Grants That Have a Material Effect on the Audit | Yes |

| Account | Description | Value |
|---|---|---|
| S2200-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Financial Reporting Indicator | No |

### Report on Compliance Major Programs

| Account | Description | Value |
|---|---|---|
| S2300-020 | Opinion on Compliance with Laws, Regulations, and Contracts Applicable to Each Major Program | Qualified |

| Account | Description | Value |
|---|---|---|
| S2300-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Compliance Indicator | Yes |

### Detail - Schedule of Findings & Questioned Costs

| | | |
|---|---|---|
| | S2700-005 - Finding Reference Number | 2021-001 |
| | S2700-006 - Finding Resolution Status | In Progress |
| S2700-007 | Information on Universe | N/A |

|  | Population Size |  |
|---|---|---|
| S2700-008 | Sample Size Information | N/A |
| S2700-009 | Noncompliance Information | Annual Reporting Requirements |
| S2700-010 | Statement of Condition | The Trust did not have the audited financial statements submitted into REAC within ninety days of the year end. |
| S2700-020 | Criteria | Saucon Trust (the Trust) entered into a Regulatory Agreement with the U.S. Department of Housing and Urban Development (HUD) on December 13, 2012. The Trust is required to provide audited financial statements, submitted into HUD's Real Estate Assessment Center (REAC), within ninety days of year end. |
| S2700-030 | Effect or Potential Effect | The Trust is not in compliance with the Regulatory Agreement entered into with HUD. |
| S2700-040 | Cause | As a result of declining cash flows, the Trust was unable to pay for a financial statement audit earlier in the year. |
| S2700-050 | Recommendation | The Trust should arrange for audits to be completed within the 90-day deadline. |
|  | S2700-055 - Auditor Non-Compliance Code | Z - Other |
|  | S2700-065 - Amount of Questioned Costs | $ 0 |
|  | **Detail - Questioned Costs by Property** |  |
|  | S2700-057 - FHA/Contract Number | 03422096 |
|  | S2700-058 - Questioned Costs | $ 0 |
| S2700-100 | Reporting Views of Responsible Officials | We agree with the funding and are working on a plan to restructure the business to improve cash flow. Future audits will be submitted within the ninety-day deadline. |
|  | S2700-070 - Concur or Do Not Concur with this Finding | CONCUR |
|  | S2700-075 - Agree or Disagree with auditor recommendations | AGREE |
| S2700-080 | Completion Date or Proposed Completion Date | 03/30/2023 |
| S2700-090 | Actions Taken or Planned on the Finding | Audits will be completed timely in subsequent years. |
|  | **Detail - Schedule of Findings & Questioned Costs** |  |
|  | S2700-005 - Finding Reference Number | 2021-002 |
|  | S2700-006 - Finding Resolution Status | In Progress |
| S2700-007 | Information on Universe Population Size | N/A |
| S2700-008 | Sample Size Information | N/A |
| S2700-009 | Noncompliance Information | Failure to make mortgage payments. |

**Supp. Appx. 160**

| | | |
|---|---|---|
| S2700-010 | Statement of Condition | The Trust stopped making required monthly mortgage payments in June of 2021. |
| S2700-020 | Criteria | Saucon Trust entered into a mortgage note with M&T Realty Capital Corporation (M&T) on December 13, 2012. The Trust is required to make monthly principal and interest payments of $69,579 on the 1st of each month until maturity in January 2048. |
| S2700-030 | Effect or Potential Effect | The Trust is in default of their mortgage with M&T. |
| S2700-040 | Cause | As a result of declining cash flows, the Trust was unable to make the required monthly mortgage payments. |
| S2700-050 | Recommendation | Add |
| | S2700-055 - Auditor Non-Compliance Code | Q - Failure to Make Mortgage Payments |
| | S2700-065 - Amount of Questioned Costs | $ 487,050 |
| | **Detail - Questioned Costs by Property** | |
| | S2700-057 - FHA/Contract Number | 03422096 |
| | S2700-058 - Questioned Costs | $ 487,050 |
| S2700-100 | Reporting Views of Responsible Officials | We agree with the finding and are working on a plan for the business to improve cash flow which will enable us to make all required debt service obligations. |
| | S2700-070 - Concur or Do Not Concur with this Finding | CONCUR |
| | S2700-075 - Agree or Disagree with auditor recommendations | AGREE |
| S2700-080 | Completion Date or Proposed Completion Date | 03/30/2023 |
| S2700-090 | Actions Taken or Planned on the Finding | We are working on a plan to restructure the business to improve cash flows. |

### Schedule of Findings and Questioned Costs

| Account | Description | Value |
|---|---|---|
| S2700-110 | Contact Person First Name | Abraham |
| S2700-130 | Contact Person Last Name | Atiyeh |

### Schedule of Reserve for Replacement

| Account | Description | Value |
|---|---|---|
| 1320P | Balance at Beginning of Year | $ 801,250 |
| 1320INT | Interest on Replacement Reserve Accounts | $ 290 |
| 1320WT | Approved Withdrawals | $ 369,011 |
| 1320 | Balance at End of Year, Confirmed by Mortgagee | $ 432,529 |
| 1320R | Deposits Suspended or Waived Indicator | Yes |

### Computation of Surplus Cash, Distributions, and Residual Receipts (Annual)

| Account | Description | Value |
|---------|-------------|-------|
| S1300-010 | Cash and Other Specified Assets | $ 32,505 |
| S1300-040 | Total Cash | $ 32,505 |
| S1300-050 | Accrued Mortgage (or Bond) Interest Payable | $ 271,389 |
| S1300-060 | Delinquent Mortgage (or Bond) Principal Payments | $ 251,800 |
| S1300-140 | Total Current Obligations | $ 523,189 |
| S1300-150 | Surplus Cash (Deficiency) | $- 490,684 |
| S1300-200 | Amount Available for distribution during next fiscal period | $ 0 |

**Schedule of Changes in Fixed Asset Accounts**

| Account | Description | Value |
|---------|-------------|-------|
| 1410P | Beginning Balance for 1410 | $ 45,638 |
| 1410 | Land | $ 45,638 |
| 1420P | Beginning Balance for 1420 | $ 15,185,883 |
| 1420 | Buildings | $ 15,185,883 |
| 1400PT | Total Beginning Balance for Fixed Assets | $ 15,231,521 |
| 1400T | Total Fixed Assets | $ 15,231,521 |
| 1495P | Beginning Balance for 1495 | $ 9,512,806 |
| 6600 | Total Provisions | $ 438,849 |
| 1495 | Ending Balance for Accumulated Depreciation | $ 9,951,655 |
| 1400N | Total Net Book Value | $ 5,279,866 |

**Mortgagor's Certification**

| Account | Description | Value |
|---------|-------------|-------|
| S2900-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S2900-020 | Name of Signatory #1 | Wendy Macarro |
| S2900-025 | Title of Certifying Official #1 | Accountant |
| S2900-030 | Name of Signatory #2 | Nimita A. Atiyek |

**Mortgagors Certification**

| Account | Description | Value |
|---------|-------------|-------|
| S2900-035 | Title of Certifying Official #2 | President |

**Mortgagor's Certification**

| Account | Description | Value |
|---------|-------------|-------|
| S2900-040 | Auditee Telephone Number | 6104033400 |
| S2900-050 | Date of Certification | 02/07/2023 |

**Managing Agent's Certification**

| Account | Description | Value |
|---------|-------------|-------|
| S3000-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |

**Supp. Appx. 162**

| S3000-020 | Name of Managing Agent | N/A |
| S3000-030 | Name of Signatory | N/A |
| S3000-040 | Managing Agent TIN | N/A |
| S3000-050 | Name of Property Manager | N/A |

**Auditor's Transmittal Letter**

| Account | Description | Value |
|---|---|---|
| S3200-005 | Audit Firm ID (UII) | 01107 |
| S3200-010 | Audit Firm | Kohanksi & Company, PC |
| S3200-020 | Lead Auditor First Name | Kelley |
| S3200-030 | Lead Auditor Middle Name | Ann |
| S3200-040 | Lead Auditor Last Name | Lindsay |
| S3200-050 | Auditor Street Address Line 1 | 3939 Birney Ave |
| S3200-070 | Auditor City | Moosic |
| S3200-080 | Auditor State | PA |
| S3200-090 | Auditor Zip Code | 18507 |
| S3200-110 | Telephone Number | 5709412248 |
| S3200-120 | Audit Firm TIN | 832620517 |
| S3200-130 | Date of Independent Auditor's Report | 02/07/2023 |

- end of statement -

**Supp. Appx. 163**



**Annual Financial Statement**
# Electronic Submission
**U.S. Department of Housing and Urban Development**
**Public Indian Housing - Real Estate Assessment Center (PIH-REAC)**

Owner: Saucon Trust                    TIN: 306161712
Reporting From: 01/01/2020             Reporting To: 12/31/2020
FHA/Contract Number(s):  03422096      Submission Type: AUD-2000.04

## Assets

| Account | Description | Value |
|---|---|---|
| 1120 | Cash - Operations | $ 237,716 |
| 1200 | Prepaid Expenses | $ 193,760 |
| 1100T | Total Current Assets | $ 431,476 |
| 1310 | Escrow Deposits | $ 337,171 |
| 1320 | Replacement Reserve | $ 801,250 |
| 1300T | Total Deposits | $ 1,138,421 |
| 1410 | Land | $ 45,638 |
| 1420 | Buildings | $ 15,185,883 |
| 1400T | Total Fixed Assets | $ 15,231,521 |
| 1495 | Accumulated Depreciation | $ 9,512,807 |
| 1400N | Net Fixed Assets | $ 5,718,714 |
| 1590 | Miscellaneous Other Assets | $ 3,579,739 |

**Detail - Miscellaneous Other Assets**

| | | |
|---|---|---|
| | 1590-005 - Type of Asset | Notes receivable related parties |
| | 1590-005 - Type of Asset | Notes receivable related parties |

| Account | Description | Value |
|---|---|---|
| | 1590-010 - Description - Miscellaneous Detail for 1590 | Due from Beneficiary |
| | 1590-020 - Amount - Miscellaneous Detail for 1590 | $ 2,173,904 |
| | 1590-010 - Description - Miscellaneous Detail for 1590 | Due from Saucon Valley Manor |
| | 1590-020 - Amount - Miscellaneous Detail for 1590 | $ 1,405,835 |

## Assets

| Account | Description | Value |
|---|---|---|
| 1500T | Total Other Assets | $ 3,579,739 |
| 1000T | Total Assets | $ 10,868,350 |

## Liabilities

| Account | Description | Value |
|---|---|---|
| 2110 | Accounts Payable - Operations | $ 190,852 |
| 2131 | Accrued Interest Payable - First Mortgage (or Bonds) | $ 54,203 |
| 2170 | Mortgage (or Bonds) Payable - First Mortgage (Bonds) (Short Term) | $ 429,429 |

**Supp. Appx. 164**

| Account | Description | Value |
|---|---|---|
| 2122T | Total Current Liabilities | $ 674,484 |
| 2320 | Mortgage (or Bonds) Payable - First Mortgage (or Bonds) | $ 15,763,766 |
| 2300T | Total Long Term Liabilities | $ 15,763,766 |
| 2000T | Total Liabilities | $ 16,438,250 |

### Equity Data - Entities other than Corporations

| Account | Description | Value |
|---|---|---|
| 3130 | Total Equity | $- 5,569,900 |
| 2033T | Total Liabilities and Equity | $ 10,868,350 |

### Rent Revenue

| Account | Description | Value |
|---|---|---|
| 5195 | Lease Revenue (Nursing Home or Section 232 - B&C or AL) | $ 1,705,421 |
| 5100T | Total Rent Revenue | $ 1,705,421 |

### Vacancies

| Account | Description | Value |
|---|---|---|
| 5152N | Net Rental Revenue (Rent Revenue Less Vacancies) | $ 1,705,421 |

### Other Revenue

| Account | Description | Value |
|---|---|---|
| 5990 | Miscellaneous Revenue | $ 387 |

**Details - Miscellaneous Revenue**

| | | |
|---|---|---|
| 5990-010 - Description | Interest Income | |
| 5990-020 - Amount | $ 387 | |

| Account | Description | Value |
|---|---|---|
| 5900T | Total Other Revenue | $ 387 |
| 5000T | Total Revenue | $ 1,705,808 |

### Administrative Expenses

| Account | Description | Value |
|---|---|---|
| 6320 | Management Fee | $ 136,434 |
| 6390 | Miscellaneous Administrative Expenses | $ 48 |

**Details - Miscellaneous Administrative Expenses**

| | | |
|---|---|---|
| 6390-010 - Description | Bank Service Charges | |
| 6390-020 - Amount | $ 48 | |

| Account | Description | Value |
|---|---|---|
| 6263T | Total Administrative Expenses | $ 136,482 |

### Taxes & Insurance

| Account | Description | Value |
|---|---|---|
| 6710 | Real Estate Taxes | $ 357,839 |
| 6720 | Property & Liability Insurance (Hazard) | $ 241,643 |
| 6700T | Total Taxes and Insurance | $ 599,482 |

### Financial Expenses

| Account | Description | Value |
|---|---|---|
| 6820 | Interest on First Mortgage (or Bonds) Payable | $ 415,233 |
| 6850 | Mortgage Insurance Premium/ Service Charge | $ 82,872 |
| 6800T | Total Financial Expenses | $ 498,105 |

### Operating Results

| Account | Description | Value |
|---|---|---|

| Account | Description | Value |
|---|---|---|
| 6000T | Total Cost of Operations before Depreciation | $ 1,234,069 |
| 5060T | Profit (Loss) before Depreciation | $ 471,739 |
| 6600 | Depreciation Expenses | $ 438,849 |
| 6610 | Amortization Expense | $ 7,464 |
| 5060N | Operating Profit or (Loss) | $ 25,426 |

**Profit or Loss**

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $ 25,426 |

**Part II**

| Account | Description | Value |
|---|---|---|
| S1000-010 | Total first mortgage (or bond) principal payments required during the audit period (usually 12 months). This applies to all direct loans, HUD-held and HUD-insured first mortgages. | $ 418,836 |
| S1000-020 | The total of all monthly reserve for replacement deposits (usually 12 months) required during the audit period even if deposits have been temporarily waived or suspended. | $ 123,168 |

**Equity Data - Entities other than Corporations**

| Account | Description | Value |
|---|---|---|
| S1100-010 | Beginning of Year Balance | $- 5,595,326 |
| 3250 | Net Income or Loss | $ 25,426 |
| 3130 | End of Year - 3130 | $- 5,569,900 |

**Cash Flow from Operating Activities**

| Account | Description | Value |
|---|---|---|
| S1200-010 | Rental Receipts | $ 1,705,421 |
| S1200-020 | Interest Receipts | $ 387 |
| S1200-040 | Total Receipts | $ 1,705,808 |
| S1200-050 | Administrative | $- 51 |
| S1200-070 | Management Fee | $- 136,434 |
| S1200-120 | Real Estate Taxes | $- 394,203 |
| S1200-140 | Property Insurance | $- 132,412 |
| S1200-180 | Interest on First Mortgage | $- 416,104 |
| S1200-210 | Mortgage Insurance Premium (MIP) | $- 81,808 |
| S1200-230 | Total Disbursements | $- 1,161,012 |
| S1200-240 | Net Cash provided by (used in) Operating Activities | $ 544,796 |

**Cash Flow from Investing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-250 | Net Deposits to the Reserve for Replacement account | $- 82,500 |

**Supp. Appx. 166**

| Account | Description | Value |
|---|---|---|
| S1200-350 | Net Cash used in Investing Activities | $- 82,500 |

### Cash Flow from Financing Activities

| Account | Description | Value |
|---|---|---|
| S1200-360 | Principal Payments - First Mortgage (or Bonds) | $- 418,836 |
| S1200-460 | Net Cash used in Financing Activities | $- 418,836 |
| S1200-470 | Net increase (decrease) in Cash and Cash Equivalents | $ 43,460 |

### Cash and Cash Equivalents

| Account | Description | Value |
|---|---|---|
| S1200-480 | Beginning of Period Cash | $ 194,256 |
| S1200T | End of Period Cash | $ 237,716 |

### Reconciliation of Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $ 25,426 |

### Adjustments to Reconcile Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities

| Account | Description | Value |
|---|---|---|
| 6600 | Depreciation Expenses | $ 438,849 |
| 6610 | Amortization Expense | $ 7,464 |
| S1200-520 | Decrease (increase) in Prepaid Expenses | $- 10,154 |
| S1200-540 | Increase (decrease) in Accounts Payable | $ 57,437 |
| S1200-560 | Increase (decrease) in Accrued Liabilities | $- 872 |
| S1200-600 | Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $ 26,646 |

**Details - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities**

| | |
|---|---|
| S1200-601 - Description - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | Mortgage Escrow |
| S1200-602 - Amount - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $ 26,646 |

| Account | Description | Value |
|---|---|---|
| S1200-610 | Net Cash provided by (used in) Operating Activities | $ 544,796 |

### Notes

**Supp. Appx. 167**

| Account | Description | Value |
|---|---|---|
| S3100-010 | Organization and Presentation Note | Saucon Trust owns a condominium, interest in the facility and land from which operations of an assisted living facility are constructed. Saucon Valley Manor is the entity that operates a 290 bed assisted living facility. |
| S3100-040 | Summary of Significant Accounting Policies Note | Cash: For the purpose of the statement of cash flows, the Organization considers all cash on hand, deposits in banks, and certificates-of-deposits with initial maturity of three months or less to be cash equivalents. Prepaid Expenses: Prepaid expenses consist of real estate taxes and insurance paid in advance of the period covered. Amounts are reclassified to expense on a straight-line basis over the term of the policy or tax year. Mortgage Escrow: Under provisions of their loan agreement, the Organization is required to escrow property taxes and insurance on a monthly basis. Replacement Reserve: Under provisions of the regulatory agreement with the U.S. Department of Housing and Urban Development (HUD), the Organization is required to make monthly deposits of $10,264 to a replacement reserve maintained by the bank. The Organization's replacement reserve represents amounts set aside for future project replacements in accordance with HUD regulations. The replacement reserve is comprised of cash, certificates-of- deposits, other short- term investments and government securities which are stated at market value. Any disbursements from this account other than for repairs authorized during loan origination must be approved by HUD. Property and Equipment: Property and equipment is carried at cost. Donated property is recorded at its estimated fair-value at the date of receipt. Depreciation is computed on the straight-line method over the following estimated useful lives: Building: 39 Years Land Improvements: 20 Years Leasehold Improvements: 5 to 40 Years Furniture and fixtures: 5 to 10 Years Vehicles: 5 to 10 Years Repair and maintenance costs are charged to expense as incurred and significant replacements and betterments in excess of $7,500 are capitalized. Repair and maintenance costs include all costs that do not extend the useful life of the real estate asset. Upon sale or other disposition, the asset account and related accumulated depreciation account are relieved, and any gain or loss is included in operations. Loan Origination Fees: Loan origination fees are amortized on a |

straight-line basis over the life of the loan. Estimates: The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates. Income Taxes: Under the provisions of the Internal Revenue Code, the Trust has elected to be treated as a grantor trust for income tax purposes. Under those provisions, the Trust does not pay Federal or state income taxes on their taxable income as they are the responsibility of the beneficiary of the Trust. Accordingly, no provision has been made for Federal or state income tax in the financial statements. The Manor's and Saucon Trust's tax returns are subject to examination by the appropriate tax jurisdictions. As of December 31, 2020, the Trust's Federal and state tax returns generally remain open for the last three years.

| S3100-050 | Mortgages (or Bond) Payable Note | The Trust has a mortgage note payable that requires monthly installments of $69,578, including interest at 2.5%, maturing January 2048. Pledged as collateral is unit one of the Condos at Saucon Valley Manor including all buildings, improvements, fixtures and appliances located on the property with a net book value of $5,718,714 at December 31, 2020. In addition, prepayments of principal on the note are subject to a prepayment premium equal to a percentage of the principal prepayment. The premium percentage ranges from 10% at January 31, 2013 to 1% at January 31, 2022. Principal prepayments made after January 31, 2023 will not be subject to the prepayment premium. Mortgage payable are shown net of loan origination fees of $223,294. |
|---|---|---|

**Details - Mortgages Payable**

| | |
|---|---|
| S3100-060 - Principal Payments in the next 12 months - Year 1 | $ 429,429 |
| S3100-070 - Principal Payments in the next 12 months - Year 2 | $ 440,289 |
| S3100-080 - Principal Payments in the next 12 months - Year 3 | $ 451,423 |
| S3100-090 - Principal Payments in the next 12 months - Year 4 | $ 462,839 |
| S3100-100 - Principal | |

|  |  |  |
|---|---|---|
|  | Payments in the next 12 months - Year 5 | $ 474,543 |
|  | S3100-110 - Principal Payments remaining after Year 5 | $ 14,157,966 |
| S3100-200 | Related Party Transactions Note | Saucon Valley Manor, Inc leases unit one of Saucon Valley Condominium from Saucon Trust, whose trustee and beneficiary are affiliates of the ownership and management of Saucon Valley Manor, Inc. As of November 1, 2012 the Manor is committed under a lease with the Trust in the amount of $1,705,421 per year or 105% of the annual principal and interest payments, mortgage insurance premiums, deposit for reserve for replacement, property insurance premiums, and property taxes. The Manor is responsible for all maintenance and repairs associated with the property. The contract is set to expire August 2023. Rent expense under the lease was $1,705,421 for the year ended December 31, 2020. In addition, the Manor owes the Trust for operating transfers and costs occurring prior to December 11, 2012. The balance due to the Trust from Saucon Valley Manor was $1,405,835 at December 31, 2020. In addition, the Trust has advanced funds to the beneficiary. These advances are non- interest bearing and do not have specific repayment terms. Net advances due to the Trust from the beneficiary was $2,173,904 at December 31, 2020. |

**Details - Related Party Transactions**

|  |  |  |
|---|---|---|
|  | S3100-210 - Company Name | Saucon Valley Manor |
|  | S3100-220 - Amount Received | $ 1,405,835 |
|  | S3100-210 - Company Name | Due from Beneficiary |
|  | S3100-220 - Amount Received | $ 2,173,904 |
| S3100-230 | Management Fee Note | The Trust has entered into a management agreement with a Company which is owned by the beneficiary. The Trust has agreed to pay 8% of the rental income in return for accounting and business advisory support. Total management fees paid by Saucon Trust under this agreement was $136,434 for each of the year ended December 31, 2020. |

**Report on the Financial Statement**

| Account | Description | Value |
|---|---|---|
| S2100-020 | Opinion | Unmodified |
| S2100-050 | Going Concern Issue | No |
| S2100-030 | Opinion Explanation | In our opinion, the financial statements referred to above present fairly, in all material respects, the |

financial position of and Saucon Trust, as of December 31, 2020, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

## Report on Supplemental Data

| Account | Description | Value |
|---|---|---|
| S2100-100 | Opinion | Unmodified |
| S2100-110 | Opinion Explanation | Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplementary information is presented for purposes of additional analysis and is not a required part of the financial statements. The supplementary information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. Such information has been subject to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the accompanying supplementary information is fairly stated, in all material respects, in relation to the financial statements as a whole. |

## Report on Internal Controls

| Account | Description | Value |
|---|---|---|
| S2200-020 | Instances of Fraud, Non-compliance, or Abuse of Laws, Regulations, Contracts or Grants That Have a Material Effect on the Audit | No |

| Account | Description | Value |
|---|---|---|
| S2200-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Financial Reporting Indicator | No |

## Report on Compliance Major Programs

| Account | Description | Value |
|---|---|---|
| S2300-020 | Opinion on Compliance with Laws, Regulations, and Contracts Applicable to Each Major Program | Unmodified |

**Supp. Appx. 171**

| Account | Description | Value |
|---------|-------------|-------|
| S2300-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Compliance Indicator | No |

### Schedule of Reserve for Replacement

| Account | Description | Value |
|---------|-------------|-------|
| 1320P | Balance at Beginning of Year | $ 718,750 |
| 1320DT | Total Monthly Deposits | $ 82,112 |
| 1320INT | Interest on Replacement Reserve Accounts | $ 388 |
| 1320 | Balance at End of Year, Confirmed by Mortgagee | $ 801,250 |
| 1320R | Deposits Suspended or Waived Indicator | Yes |

### Computation of Surplus Cash, Distributions, and Residual Receipts (Annual)

| Account | Description | Value |
|---------|-------------|-------|
| S1300-010 | Cash | $ 237,716 |
| S1300-040 | Total Cash | $ 237,716 |
| S1300-050 | Accrued Mortgage (or Bond) Interest Payable | $ 54,203 |
| S1300-140 | Total Current Obligations | $ 54,203 |
| S1300-150 | Surplus Cash (Deficiency) | $ 183,513 |
| S1300-200 | Amount Available for distribution during next fiscal period | $ 183,513 |

### Schedule of Changes in Fixed Asset Accounts

| Account | Description | Value |
|---------|-------------|-------|
| 1410P | Beginning Balance for 1410 | $ 45,638 |
| 1410 | Land | $ 45,638 |
| 1420P | Beginning Balance for 1420 | $ 15,185,883 |
| 1420 | Buildings | $ 15,185,883 |
| 1400PT | Total Beginning Balance for Fixed Assets | $ 15,231,521 |
| 1400T | Total Fixed Assets | $ 15,231,521 |
| 1495P | Beginning Balance for 1495 | $ 9,073,958 |
| 6600 | Total Provisions | $ 438,849 |
| 1495 | Ending Balance for Accumulated Depreciation | $ 9,512,807 |
| 1400N | Total Net Book Value | $ 5,718,714 |

### Mortgagor's Certification

| Account | Description | Value |
|---------|-------------|-------|
| S2900-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S2900-020 | Name of Signatory #1 | Stephen Chiyka |
| S2900-025 | Title of Certifying Official #1 | Accountant |
| S2900-030 | Name of Signatory #2 | Nimita A. Atiyek |

### Mortgagors Certification

**Supp. Appx. 172**

| Account | Description | Value |
|---|---|---|
| S2900-035 | Title of Certifying Official #2 | President |

**Mortgagor's Certification**

| Account | Description | Value |
|---|---|---|
| S2900-040 | Auditee Telephone Number | 6104033400 |
| S2900-050 | Date of Certification | 05/26/2021 |

**Managing Agent's Certification**

| Account | Description | Value |
|---|---|---|
| S3000-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S3000-020 | Name of Managing Agent | N/A |
| S3000-030 | Name of Signatory | N/A |
| S3000-040 | Managing Agent TIN | N/A |
| S3000-050 | Name of Property Manager | N/A |

**Auditor's Transmittal Letter**

| Account | Description | Value |
|---|---|---|
| S3200-005 | Audit Firm ID (UII) | 01107 |
| S3200-010 | Audit Firm | Kohanksi & Company, PC |
| S3200-020 | Lead Auditor First Name | Michael |
| S3200-040 | Lead Auditor Last Name | Kohanski |
| S3200-050 | Auditor Street Address Line 1 | 3939 Birney Ave |
| S3200-070 | Auditor City | Moosic |
| S3200-080 | Auditor State | PA |
| S3200-090 | Auditor Zip Code | 18507 |
| S3200-110 | Telephone Number | 5709412248 |
| S3200-120 | Audit Firm TIN | 832620517 |
| S3200-130 | Date of Independent Auditor's Report | 05/26/2021 |

- end of statement -

**Supp. Appx. 173**



**Annual Financial Statement**
# Electronic Submission
**U.S. Department of Housing and Urban Development**
**Public Indian Housing - Real Estate Assessment Center (PIH-REAC)**

Owner: Saucon Trust                          TIN: 306161712
Reporting From: 01/01/2019                   Reporting To: 12/31/2019
FHA/Contract Number(s):   03422096           Submission Type: AUD-2000.04

### Assets

| Account | Description | Value |
|---|---|---|
| 1120 | Cash - Operations | $ 194,256 |
| 1200 | Prepaid Expenses | $ 183,606 |
| 1100T | Total Current Assets | $ 377,862 |
| 1310 | Escrow Deposits | $ 363,817 |
| 1320 | Replacement Reserve | $ 718,750 |
| 1300T | Total Deposits | $ 1,082,567 |
| 1410 | Land | $ 45,638 |
| 1420 | Buildings | $ 15,185,883 |
| 1400T | Total Fixed Assets | $ 15,231,521 |
| 1495 | Accumulated Depreciation | $ 9,073,958 |
| 1400N | Net Fixed Assets | $ 6,157,563 |
| 1590 | Miscellaneous Other Assets | $ 3,579,739 |

**Detail - Miscellaneous Other Assets**

| | | |
|---|---|---|
| | 1590-005 - Type of Asset | Notes receivable related parties |
| | 1590-005 - Type of Asset | Notes receivable related parties |

| Account | Description | Value |
|---|---|---|
| | 1590-010 - Description - Miscellaneous Detail for 1590 | Due from Beneficiary |
| | 1590-020 - Amount - Miscellaneous Detail for 1590 | $ 2,173,904 |
| | 1590-010 - Description - Miscellaneous Detail for 1590 | Dur from Saucon Valley Manor |
| | 1590-020 - Amount - Miscellaneous Detail for 1590 | $ 1,405,835 |

### Assets

| Account | Description | Value |
|---|---|---|
| 1500T | Total Other Assets | $ 3,579,739 |
| 1000T | Total Assets | $ 11,197,731 |

### Liabilities

| Account | Description | Value |
|---|---|---|
| 2110 | Accounts Payable - Operations | $ 133,415 |
| 2131 | Accrued Interest Payable - First Mortgage (or Bonds) | $ 55,075 |
| 2170 | Mortgage (or Bonds) Payable - First Mortgage (Bonds) (Short Term) | $ 418,837 |

| Account | Description | Value |
|---|---|---|
| 2122T | Total Current Liabilities | $ 607,327 |
| 2320 | Mortgage (or Bonds) Payable - First Mortgage (or Bonds) | $ 16,185,730 |
| 2300T | Total Long Term Liabilities | $ 16,185,730 |
| 2000T | Total Liabilities | $ 16,793,057 |

**Equity Data - Entities other than Corporations**

| Account | Description | Value |
|---|---|---|
| 3130 | Total Equity | $- 5,595,326 |
| 2033T | Total Liabilities and Equity | $ 11,197,731 |

**Rent Revenue**

| Account | Description | Value |
|---|---|---|
| 5195 | Lease Revenue (Nursing Home or Section 232 - B&C or AL) | $ 1,705,421 |
| 5100T | Total Rent Revenue | $ 1,705,421 |

**Vacancies**

| Account | Description | Value |
|---|---|---|
| 5152N | Net Rental Revenue (Rent Revenue Less Vacancies) | $ 1,705,421 |

**Other Revenue**

| Account | Description | Value |
|---|---|---|
| 5990 | Miscellaneous Revenue | $ 330 |
| | **Details - Miscellaneous Revenue** | |
| | 5990-010 - Description Interest Income | |
| | 5990-020 - Amount $ 330 | |
| 5900T | Total Other Revenue | $ 330 |
| 5000T | Total Revenue | $ 1,705,751 |

**Administrative Expenses**

| Account | Description | Value |
|---|---|---|
| 6320 | Management Fee | $ 136,434 |
| 6390 | Miscellaneous Administrative Expenses | $ 54 |
| | **Details - Miscellaneous Administrative Expenses** | |
| | 6390-010 - Description Bank Service Charges | |
| | 6390-020 - Amount $ 54 | |
| 6263T | Total Administrative Expenses | $ 136,488 |

**Taxes & Insurance**

| Account | Description | Value |
|---|---|---|
| 6710 | Real Estate Taxes | $ 357,839 |
| 6720 | Property & Liability Insurance (Hazard) | $ 160,630 |
| 6700T | Total Taxes and Insurance | $ 518,469 |

**Financial Expenses**

| Account | Description | Value |
|---|---|---|
| 6820 | Interest on First Mortgage (or Bonds) Payable | $ 425,585 |
| 6850 | Mortgage Insurance Premium/ Service Charge | $ 84,946 |
| 6800T | Total Financial Expenses | $ 510,531 |

**Operating Results**

| Account | Description | Value |
|---|---|---|

| | | |
|---|---|---:|
| 6000T | Total Cost of Operations before Depreciation | $ 1,165,488 |
| 5060T | Profit (Loss) before Depreciation | $ 540,263 |
| 6600 | Depreciation Expenses | $ 438,848 |
| 6610 | Amortization Expense | $ 7,464 |
| 5060N | Operating Profit or (Loss) | $ 93,951 |

### Profit or Loss

| Account | Description | Value |
|---|---|---:|
| 3250 | Profit or Loss (Net Income or Loss) | $ 93,951 |

### Part II

| Account | Description | Value |
|---|---|---:|
| S1000-010 | Total first mortgage (or bond) principal payments required during the audit period (usually 12 months). This applies to all direct loans, HUD-held and HUD-insured first mortgages. | $ 408,507 |
| S1000-020 | The total of all monthly reserve for replacement deposits (usually 12 months) required during the audit period even if deposits have been temporarily waived or suspended. | $ 123,168 |

### Equity Data - Entities other than Corporations

| Account | Description | Value |
|---|---|---:|
| S1100-010 | Beginning of Year Balance | $- 5,589,277 |
| 3250 | Net Income or Loss | $ 93,951 |
| S1200-420 | Distributions | $- 100,000 |
| 3130 | End of Year - 3130 | $- 5,595,326 |

### Cash Flow from Operating Activities

| Account | Description | Value |
|---|---|---:|
| S1200-010 | Rental Receipts | $ 1,705,421 |
| S1200-020 | Interest Receipts | $ 330 |
| S1200-040 | Total Receipts | $ 1,705,751 |
| S1200-050 | Administrative | $- 55 |
| S1200-070 | Management Fee | $- 136,434 |
| S1200-120 | Real Estate Taxes | $- 364,682 |
| S1200-140 | Property Insurance | $- 152,375 |
| S1200-180 | Interest on First Mortgage | $- 426,435 |
| S1200-210 | Mortgage Insurance Premium (MIP) | $- 78,558 |
| S1200-230 | Total Disbursements | $- 1,158,539 |
| S1200-240 | Net Cash provided by (used in) Operating Activities | $ 547,212 |

### Cash Flow from Investing Activities

| Account | Description | Value |
|---|---|---:|
| S1200-250 | Net Deposits to the Reserve | |

| | | |
|---|---|---|
| | for Replacement account | $- 123,498 |
| S1200-350 | Net Cash used in Investing Activities | $- 123,498 |

**Cash Flow from Financing Activities**

| Account | Description | Value |
|---|---|---|
| S1200-360 | Principal Payments - First Mortgage (or Bonds) | $- 408,507 |
| S1200-420 | Distributions | $- 100,000 |
| S1200-460 | Net Cash used in Financing Activities | $- 508,507 |
| S1200-470 | Net increase (decrease) in Cash and Cash Equivalents | $- 84,793 |

**Cash and Cash Equivalents**

| Account | Description | Value |
|---|---|---|
| S1200-480 | Beginning of Period Cash | $ 279,049 |
| S1200T | End of Period Cash | $ 194,256 |

**Reconciliation of Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities**

| Account | Description | Value |
|---|---|---|
| 3250 | Profit or Loss (Net Income or Loss) | $ 93,951 |

**Adjustments to Reconcile Net Profit (Loss) to Net Cash Provided by (Used in) Operating Activities**

| Account | Description | Value |
|---|---|---|
| 6600 | Depreciation Expenses | $ 438,848 |
| 6610 | Amortization Expense | $ 7,464 |
| S1200-520 | Decrease (increase) in Prepaid Expenses | $ 27,217 |
| S1200-540 | Increase (decrease) in Accounts Payable | $ 133,415 |
| S1200-560 | Increase (decrease) in Accrued Liabilities | $- 850 |
| S1200-600 | Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $- 152,833 |

**Details - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities**

| | | |
|---|---|---|
| | S1200-601 - Description - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | Mortgage Escrow |
| | S1200-602 - Amount - Other adjustments to reconcile net profit (loss) to Net Cash provided by (used in) Operating Activities | $- 152,833 |

| Account | Description | Value |
|---|---|---|
| S1200-610 | Net Cash provided by (used | $ 547,212 |

**Supp. Appx. 177**

in) Operating Activities

**Notes**

| Account | Description | Value |
|---------|-------------|-------|
| S3100-010 | Organization and Presentation Note | Saucon Trust owns a condominium, interest in the facility and land from which operations of an assisted living facility are conducted. Saucon Valley Manor is the entity that operates a 290 bed assisted living facility. |
| S3100-040 | Summary of Significant Accounting Policies Note | Cash: For the purpose of the combined statement of cash flows, the Organization considers all cash on hand, deposits in banks, and certificates of deposits with initial maturity of three months or less to be cash equivalents. Prepaid Expenses: Prepaid expenses consist of real estate taxes and insurance paid in advance of the period covered. Amounts are reclassified to expense on a straight-line basis over the term of the policy or tax year. Mortgage Escrow: Under provisions of their loan agreement, the Organization is required to escrow property taxes and insurance on a monthly basis. Replacement Reserve: Under provisions of the regulatory agreement with the U.S. Department of Housing and Urban Development ('HUD'), the Organization is required to make monthly deposits of $10,264 for replacements to a reserve maintained by the bank. The Organization's replacement reserve represents amounts set aside for future project replacements in accordance with HUD regulations. The replacement reserve is comprised of cash, certificates of deposits, other short-term cash investments and government securities which are stated at market value. Any disbursements from this account other than for repairs authorized during loan origination must be approved by HUD. Property and Equipment: Property and equipment is carried at cost. Donated property is recorded at its estimated fair-value at the date of receipt. Depreciation is computed on the straight-line method over the following estimated useful lives: Building: 39 Years Land Improvements: 20 Years Leasehold Improvements: 5 to 40 Years Furniture and Fixtures: 5 to 10 Years Vehicles: 5 to 10 Years Repair and maintenance costs are charged to expense as incurred and significant replacements and betterments in excess of $5,000 are capitalized. Repair and maintenance costs include all costs that do not extend the useful life of the real estate asset. Upon sale or other disposition, the asset account and related accumulated depreciation account are relieved, |

and any gain or loss is included in operations. Loan Origination Fees: Loan Origination fees are amortized on a straight-line basis over the life of the loan. Estimates: The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates. Income Taxes: Under the provisions of the Internal Revenue Code, the Trust has elected to be treated as a grantor trust for income tax purposes. Under those provisions, the Trust does not pay Federal or state income taxes on their taxable income as they are the responsibility of the beneficiary of the Trust. Accordingly, no provision has been made for Federal or state income tax in the financial statements. The Trust's tax returns are subject to examination by the appropriate tax jurisdictions. As of December 31, 2019, the Trust's Federal and state tax returns generally remain open for the last three years.

| | | |
|---|---|---|
| S3100-050 | Mortgages (or Bond) Payable Note | The Trust has a mortgage note payable that requires monthly installments of $69,578, including interest at 2.5%, maturing January 2048. Pledged as collateral is unit one of the Condos at Saucon Valley Manor including all buildings, improvements, fixtures and appliances located on the property with a net book value of $6,157,563 at December 31, 2019. In addition, prepayments of principal on the note are subject to a prepayment premium equal to a percentage of the principal prepayment. The premium percentage ranges from 10% at January 31, 2013 to 1% at January 31, 2022. Principal prepayments made after January 31, 2023 will not be subject to the prepayment premium. Mortgage payable are shown net of loan origination fees of $230,759. |

**Details - Mortgages Payable**

| | |
|---|---|
| S3100-060 - Principal Payments in the next 12 months - Year 1 | $ 418,837 |
| S3100-070 - Principal Payments in the next 12 months - Year 2 | $ 429,429 |
| S3100-080 - Principal Payments in the next 12 months - Year 3 | $ 440,289 |
| S3100-090 - Principal Payments in the next 12 | $ 451,423 |

|  |  |  |
|---|---|---|
|  | months - Year 4 | |
|  | S3100-100 - Principal Payments in the next 12 months - Year 5 | $ 462,839 |
|  | S3100-110 - Principal Payments remaining after Year 5 | $ 14,632,509 |
| S3100-200 | Related Party Transactions Note | Saucon Valley Manor, Inc. leases unit one of Saucon Valley Condominium from Saucon Trust, whose trustee and beneficiary are affiliates of the ownership and management of Saucon Valley Manor, Inc. As of November 1, 2012, the Manor is committed under a lease with the Trust in the amount of $1,705,421 per year or 105% of the annual principal and interest payments, mortgage insurance premiums, deposit for reserve for replacement, property insurance premiums, and property taxes. The Manor is responsible for all maintenance and repairs associated with the property. The contract is set to expire August 2023. Rent expense under the lease was $1,705,421 for the year ended December 31, 2019. In addition, the Manor owes the Trust for operating transfers and costs occurring prior to December 11, 2012. The balance due to the Trust from Saucon Valley Manor was $1,405,835 at December 31, 2019. In addition, the Trust has advanced funds to the beneficiary. These advances are non-interest bearing and do not have specific repayment terms. Net advances due to the Trust from the beneficiary was $2,173,904 at December 31, 2019. |

**Details - Related Party Transactions**

|  |  |  |
|---|---|---|
|  | S3100-210 - Company Name | Saucon Valley Manor |
|  | S3100-220 - Amount Received | $ 1,405,835 |
|  | S3100-210 - Company Name | Due from Beneficiary |
|  | S3100-220 - Amount Received | $ 2,173,904 |
| S3100-230 | Management Fee Note | The Trust has entered into a management agreement with a company which is owned by the beneficiary. The Trust has agreed to pay 8% of the rental income in return for accounting and business advisory support. Total management fees paid by the Trust under this agreement were $136,434 for the year ended December 31, 2019. |

**Report on the Financial Statement**

| Account | Description | Value |
|---|---|---|
| S2100-020 | Opinion | Unmodified |
| S2100-050 | Going Concern Issue | No |
| S2100-030 | Opinion Explanation | In our opinion, the financial statements referred to |

**Supp. Appx. 180**

above present fairly, in all material respects, the financial position of Saucon Trust, as of December 31, 2019, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

### Report on Supplemental Data

| Account | Description | Value |
| --- | --- | --- |
| S2100-100 | Opinion | Unmodified |
| S2100-110 | Opinion Explanation | Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplementary information is presented presented for purposes of additional analysis and is not a required part of the financial statements. The supplementary information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. Such information has been subject to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the accompanying supplementary information is fairly stated, in all material respects, in relation to the financial statements as a whole. |
| S2400-010 | Management Letter | N/A |

### Report on Internal Controls

| Account | Description | Value |
| --- | --- | --- |
| S2200-020 | Instances of Fraud, Non-compliance, or Abuse of Laws, Regulations, Contracts or Grants That Have a Material Effect on the Audit | No |

| Account | Description | Value |
| --- | --- | --- |
| S2200-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Financial Reporting Indicator | No |

### Report on Internal Controls

| Account | Description | Value |
| --- | --- | --- |
| S2200-040 | Comments on Internal Controls | N/A |

### Report on Compliance Major Programs

| Account | Description | Value |
|---|---|---|
| S2300-020 | Opinion on Compliance with Laws, Regulations, and Contracts Applicable to Each Major Program | Unmodified |

| Account | Description | Value |
|---|---|---|
| S2300-030 | Significant Deficiencies or Material Weaknesses in Internal Controls Over Compliance Indicator | No |

### Report on Compliance - Major Programs

| Account | Description | Value |
|---|---|---|
| S2300-040 | Comments on Non-compliance | N/A |

### Schedule of Reserve for Replacement

| Account | Description | Value |
|---|---|---|
| 1320P | Balance at Beginning of Year | $ 595,252 |
| 1320DT | Total Monthly Deposits | $ 123,168 |
| 1320INT | Interest on Replacement Reserve Accounts | $ 330 |
| 1320 | Balance at End of Year, Confirmed by Mortgagee | $ 718,750 |
| 1320R | Deposits Suspended or Waived Indicator | No |

### Computation of Surplus Cash, Distributions, and Residual Receipts (Annual)

| Account | Description | Value |
|---|---|---|
| S1300-010 | Cash | $ 194,256 |
| S1300-040 | Total Cash | $ 194,256 |
| S1300-050 | Accrued Mortgage (or Bond) Interest Payable | $ 55,075 |
| S1300-075 | Accounts Payable - 30 days | $ 133,415 |
| S1300-140 | Total Current Obligations | $ 188,490 |
| S1300-150 | Surplus Cash (Deficiency) | $ 5,766 |
| S1300-200 | Amount Available for distribution during next fiscal period | $ 5,766 |

### Schedule of Changes in Fixed Asset Accounts

| Account | Description | Value |
|---|---|---|
| 1410P | Beginning Balance for 1410 | $ 45,638 |
| 1410 | Land | $ 45,638 |
| 1420P | Beginning Balance for 1420 | $ 15,185,883 |
| 1420 | Buildings | $ 15,185,883 |
| 1400PT | Total Beginning Balance for Fixed Assets | $ 15,231,521 |
| 1400T | Total Fixed Assets | $ 15,231,521 |
| 1495P | Beginning Balance for 1495 | $ 8,635,110 |
| 6600 | Total Provisions | $ 438,848 |
| 1495 | Ending Balance for Accumulated Depreciation | $ 9,073,958 |

**Supp. Appx. 182**

| 1400N | Total Net Book Value | $ 6,157,563 |
|---|---|---|

**Mortgagor's Certification**

| Account | Description | Value |
|---|---|---|
| S2900-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S2900-020 | Name of Signatory #1 | Stephen Chiyka |
| S2900-025 | Title of Certifying Official #1 | Accountant |
| S2900-030 | Name of Signatory #2 | Nimita A. Atiyek |

**Mortgagors Certification**

| Account | Description | Value |
|---|---|---|
| S2900-035 | Title of Certifying Official #2 | President |

**Mortgagor's Certification**

| Account | Description | Value |
|---|---|---|
| S2900-040 | Auditee Telephone Number | 6104033400 |
| S2900-050 | Date of Certification | 03/30/2020 |

**Managing Agent's Certification**

| Account | Description | Value |
|---|---|---|
| S3000-010 | Narrative | I/we hereby certify that I/we have examined the accompanying financial statements AND supplemental data and, to the best of my/our knowledge and belief, the same is complete AND accurate. |
| S3000-020 | Name of Managing Agent | N/A |
| S3000-030 | Name of Signatory | N/A |
| S3000-040 | Managing Agent TIN | N/A |
| S3000-050 | Name of Property Manager | N/A |

**Auditor's Transmittal Letter**

| Account | Description | Value |
|---|---|---|
| S3200-005 | Audit Firm ID (UII) | 01107 |
| S3200-010 | Audit Firm | Kohanksi & Company, PC |
| S3200-020 | Lead Auditor First Name | Michael |
| S3200-040 | Lead Auditor Last Name | Kohanski |
| S3200-050 | Auditor Street Address Line 1 | 3939 Birney Ave |
| S3200-070 | Auditor City | Moosic |
| S3200-080 | Auditor State | PA |
| S3200-090 | Auditor Zip Code | 18507 |
| S3200-110 | Telephone Number | 5709412248 |
| S3200-120 | Audit Firm TIN | 832620517 |
| S3200-130 | Date of Independent Auditor's Report | 03/30/2020 |

- end of statement -

**Supp. Appx. 183**

**EXHIBIT 6**

# COUNTY OF NORTHAMPTON



### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy

**Book - 2023-1   Starting Page - 207700**
**\*Total Pages - 6**

Instrument Number - 2023023619
Recorded On 10/30/2023 At 11:20:02 AM

| NCGIS Registry UPI Certification |
| On October 30, 2023 By RMH |

\* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - 1070579
\* Grantor - SECRETARY OF HOUSING AND URBAN DEVELOPMENT
\* Grantee - WINDSTREAM CAPITAL LLC
User - KABE
\* Customer - PUBLIC RECORD EXPERTS

| \* FEES | | \*RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | PUBLIC RECORD EXPERTS |
| JCS/ACCESS TO JUSTICE | $19.00 | 869 QUAINT ST |
| RECORDING FEES | $17.00 | CLIFTON HEIGHTS, PA 19018-3316 |
| COUNTY RECORDS | $2.00 | |
| IMPROVEMENT FEE | | |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | I hereby CERTIFY that this document is recorded in the |
| UPI CERTIFICATION FEE | $10.00 | Recorder's Office Of Northampton County, Pennsylvania |
| TOTAL PAID | $51.50 | |



Andrea F. Suter
Recorder of Deeds

## THIS IS A CERTIFICATION PAGE
# Do Not Detach
THIS PAGE IS NOW THE FIRST
OF THIS LEGAL DOCUMENT

**Book: 2023-1        Page: 207700**

00JAAQ

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

After recording, please
return to:

**Public Record Experts, LLC**

**Premises: 1050 Main Street**

**Borough of Hellertown**

**Parcel: Q7SW2A-1-3 0715**

This instrument
prepared by:

David Loesberg, Esq.
U.S. Department of Housing
and Urban Development
Office of General Counsel
451 7th Street SW, Room 10172
Washington, DC 20410

### ASSIGNMENT OF MORTGAGE

FHA Project No.: 034-22096
Project Name: Saucon Valley Manor
City, State: Hellertown, Pennsylvania

Borrower:  **Saucon Trust**

**Original Amount: $19,462,800.00**

THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT ("HUD"), in
consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns,
transfers, sets over and conveys to Windstream Capital LLC ("Assignee"), without recourse, the
following:

> that certain Mortgage dated December 1, 2012, and recorded on December 13, 2012
> in Book 2012-1, at Page 300709, in the Office of the Recorder of Deeds of
> Northampton County, Pennsylvania, as assigned, amended or modified from time to
> time (the "Mortgage"), which Mortgage secures that certain Mortgage Note dated
> December 1, 2012 (the "Note");

**Last Assigned to United States Secretary of Housing and Urban Development, recorded
11/21/2022 in book 2022-1 page 306345.**

> such other documents, agreements, instruments, and other collateral (excluding the
> Regulatory Agreement referenced in the Mortgage) which evidence, secure or
> otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the
> Note, including without limitation all security agreements, intercreditor agreements,

deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard insurance policies that may presently be in effect.

**[INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**. HUD has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the 20th day of September. 2023.

WITNESS:

Marlene L. Robinson

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

By:

Authorized Agent

Print Name:    John W. Lucey

## ACKNOWLEDGEMENT

DISTRICT OF COLUMBIA. ss: DC

The foregoing instrument was acknowledged before me on September 20 . 2023. by John W. Lucey , as Authorized Agent of the Secretary of Housing and Urban Development.

Notary Public

[SEAL]                                My commission expires

STACEY B. RHINEHART
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires March 14, 2027

## CERTIFICATE OF RESIDENCE

The address of the within-named Assignee is:

Windstream Capital LLC
2100 Ponce De Leon Blvd. Suite 720
Coral Gables, FL 33134

By: _____

On behalf of Assignee

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

# COUNTY OF NORTHAMPTON



### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy

**Book - 2023-1   Starting Page - 207706**
**\*Total Pages - 6**

| | |
|---|---|
| Instrument Number - 2023023620 | NCGIS Registry UPI Certification |
| Recorded On 10/30/2023 At 11:20:03 AM | On October 30, 2023 By RMH |

\* Instrument Type - ASSIGNMENT
Invoice Number - 1070579
\* Grantor - SECRETARY OF HOUSING AND URBAN DEVELOPMENT
\* Grantee - WINDSTREAM CAPITAL LLC
User - KABE
\* Customer - PUBLIC RECORD EXPERTS

| \*FEES | | \*RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | PUBLIC RECORD EXPERTS |
| RECORDING FEES | $15.00 | 869 QUAINT ST |
| COUNTY RECORDS | $2.00 | CLIFTON HEIGHTS, PA 19018-3316 |
| IMPROVEMENT FEE | | |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | |
| UPI CERTIFICATION FEE | $10.00 | I hereby CERTIFY that this document is recorded in the |
| TOTAL PAID | $30.50 | Recorder's Office Of Northampton County, Pennsylvania |



Andrea F. Suter
Recorder of Deeds

## THIS IS A CERTIFICATION PAGE
# Do Not Detach
THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

**Book: 2023-1        Page: 207706**


00JAAR

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Inst. # 2023023620 - Page 2 of 6

After recording, please
return to:

Public Record Experts, LLC

Premises: 1050 Main Street

Borough of Hellertown

Parcel: Q7SW2A-1-3 0715

This instrument
prepared by:

David Loesberg, Esq.
U.S. Department of Housing
and Urban Development
Office of General Counsel
451 7th Street SW, Room 10172
Washington, DC 20410

### ASSIGNMENT OF AGREEMEENT

FHA Project No.: 034-22096
Project Name: Saucon Valley Manor
City, State: Hellertown, Pennsylvania

Borrower: Saucon Trust

Original Amount: $19,462,800.00

    THE SECRETARY OF HOUSING ·AND URBAN DEVELOPMENT ("HUD"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns, transfers, sets over and conveys to Windstream Capital LLC ("Assignee"), without recourse, the following:

**Last Assigned to United States Secretary of Housing and Urban Development,**

**recorded 11/21/2022 in book 2022-1 page 306362.**

that certain Subordination, Non-Disturbance and Attornment Agreement dated December 10, 2012 and recorded on December 14, 2012 in Book 2012-1, Page 302837, in the Office of the Recorder of Deeds of Northampton County, Pennsylvania, as assigned, amended or modified from time to time; and

such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation all security agreements, intercreditor agreements,

Inst. # 2023023620 - Page 3 of 6

deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard insurance policies that may presently be in effect.

**[INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** HUD has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the 20th day of September, 2023.

WITNESS:

SECRETARY OF HOUSING AND
URBAN DEVELOPMENT

Marlene L. Robinson

By: _____
Authorized Agent
Print Name:   **John W. Lucey**

## ACKNOWLEDGEMENT

DISTRICT OF COLUMBIA, ss: **DC**

The foregoing instrument was acknowledged before me on _September 20_, 20_23_, by _John W. Lucey_____, as Authorized Agent of the Secretary of Housing and Urban Development.

_____
Notary Public

[SEAL]

My commission expires _____

STACEY B. RHINEHART
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires March 14, 2027

## CERTIFICATE OF RESIDENCE

The address of the within-named Assignee is:

Windstream Capital LLC
2100 Ponce De Leon Blvd, Suite 720
Coral Gables, FL 33134

By: _____
           On behalf of Assignee

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

# COUNTY OF NORTHAMPTON

**RECORDER OF DEEDS**
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy



**Book - 2023-1   Starting Page - 207712**
**\*Total Pages -   6**

Instrument Number - 2023023621
Recorded On 10/30/2023 At 11:20:04 AM

| NCGIS Registry UPI Certification |
| On October 30, 2023 By RMH |

\* Instrument Type - ASSIGNMENT
Invoice Number - 1070579
\* Grantor - SECRETARY OF HOUSING AND URBAN DEVELOPMENT
\* Grantee - WINDSTREAM CAPITAL LLC
User -  KABE
\* Customer - PUBLIC RECORD EXPERTS

| \*FEES | | \*RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | PUBLIC RECORD EXPERTS |
| RECORDING FEES | $15.00 | 869 QUAINT ST |
| COUNTY RECORDS | $2.00 | CLIFTON HEIGHTS, PA 19018-3316 |
| IMPROVEMENT FEE | | |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | |
| UPI CERTIFICATION FEE | $10.00 | I hereby CERTIFY that this document is recorded in the |
| TOTAL PAID | $30.50 | Recorder's Office Of Northampton County, Pennsylvania |



Andrea F. Suter
Recorder of Deeds

THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

**Book: 2023-1        Page: 207712**

00JAAS

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Inst. # 2023023621 - Page 2 of 6

After recording, please
return to:

**Public Record Experts, LLC**

**Premises: 1050 Main Street**

**Borough of Hellertown**

**Parcel: Q7SW2A-1-3 0715**

This instrument
prepared by:

David Loesberg, Esq.
U.S. Department of Housing
and Urban Development
Office of General Counsel
451 7th Street SW, Room 10172
Washington, DC 20410

## ASSIGNMENT OF AGREEMENT

FHA Project No.: 034-22096
Project Name: Saucon Valley Manor
City, State: Hellertown, Pennsylvania

**Borrower: Saucon Trust**

**Original Amount: $19,462,800.00**

THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT ("HUD"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns, transfers, sets over and conveys to Windstream Capital LLC ("Assignee"), without recourse, the following:

that certain Subordination, Non-Disturbance and Attornment Agreement dated December 10, 2012 and recorded on December 14, 2012 in Book 2012-1, Page 302853, in the Office of the Recorder of Deeds of Northampton County, Pennsylvania, as assigned, amended or modified from time to time;

**Last Assigned to United States Secretary of Housing and Urban Development,**

**recorded 11/21/2022 in book 2022-1 page 306367.**

such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation all security agreements, intercreditor agreements,

deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard insurance policies that may presently be in effect.

[INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, HUD has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the 20th day of September, 2023.

WITNESS:

_____

Marlene L. Robinson

_____

SECRETARY OF HOUSING AND
URBAN DEVELOPMENT

By: _____
Authorized Agent

Print Name:    **John W. Lucey**

## ACKNOWLEDGEMENT

DISTRICT OF COLUMBIA, ss: DC

The foregoing instrument was acknowledged before me on September 20 , 2023, by John W. Lucey , as Authorized Agent of the Secretary of Housing and Urban Development.

_____
Notary Public

[SEAL]

My commission expires

STACEY B. RHINEHART
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires March 14, 2027

## CERTIFICATE OF RESIDENCE

The address of the within-named Assignee is:

Windstream Capital LLC
2100 Ponce De Leon Blvd. Suite 720
Coral Gables, FL 33134

By: _____
                 On behalf of Assignee

Inst. # 2012042243T -- Page 10 of 61

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

| After recording, please return to: | This instrument prepared by: |
|---|---|
| **Public Record Experts, LLC** | David Loesberg, Esq. U.S. Department of Housing and Urban Development |
| **Premises: 1177 6th Street** | Office of General Counsel |
| **Township of Whitehall** | 451 7th Street SW, Room 10172 Washington, DC 20410 |
| **Parcel: 549893788632 2** | |

### ASSIGNMENT OF MORTGAGE

FHA Project No.: 034-22084
Project Name:  Whitehall Manor Senior Living
City, State:  Whitehall, Pennsylvania

**Borrower: Whitehall Fiduciary, LLC**

**Orig Amount: $15,788,700.00**

THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT ("HUD"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns, transfers, sets over and conveys to Windstream Capital LLC ("Assignee"), without recourse, the following:

1.  that certain Open-End Mortgage dated January 19, 2012, to be effective January 26, 2012 and recorded on January 26, 2012 as Instrument No. 2012002759, in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania, as assigned, amended or modified from time to time (the "Mortgage"), which Mortgage secures that certain Mortgage Note dated January 26, 2012 (the "Note"); and

2.  such other documents, agreements, instruments, and other collateral (excluding the Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including without limitation all security agreements, intercreditor agreements, deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard insurance policies that may presently be in effect.

**IN WITNESS WHEREOF.** HUD has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the 20th day of September. 2023.

WITNESS:

_Marlene L. Robinson_

Marlene L. Robinson

SECRETARY OF HOUSING AND
URBAN DEVELOPMENT

By: _____
Authorized Agent
Print Name:
John W. Lucey

## ACKNOWLEDGEMENT

DISTRICT OF COLUMBIA, ss: DC.

The foregoing instrument was acknowledged before me on _September 20_, 20_23_, by _John W. Lucey_, as Authorized Agent of the Secretary of Housing and Urban Development.

_Stacey B. Rhinehart_
Notary Public

[SEAL]

My commission expires _____
STACEY B. RHINEHART
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires March 14, 2027

Inst. # 2023025934 - Page 3 of 5

## CERTIFICATE OF RESIDENCE

The address of the within-named Assignee is:

Windstream Capital LLC
2100 Ponce De Leon Blvd. Suite 720
Coral Gables, FL 33134

By: _____
              On behalf of Assignee

## Exhibit A

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM,** according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

**PARCEL ID NO. 5498 9378 8632-** 2

Together with an undivided interest of 50% of, in and to the Common Elements of the said **WHITEHALL MANOR CONDOMINIUM.**

12/28/20 1 12696553

9

*ANDREA E. NAUGLE*
*LEHIGH COUNTY CLERK OF JUDICIAL RECORDS*



**Recorder of Deeds Division**
**Lisa Stella-Ali, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA 18101-1614**
**(610) 782-3162**

\*RETURN DOCUMENT TO:
PUBLIC RECORD EXPERTS
869 QUAINT ST
CLIFTON HEIGHTS, PA 19018-3316

**Instrument Number - 2023025934**
Recorded On 10/30/2023 At 9:42:18 AM
\* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - 531910      User ID: JV      **\*Total Pages - 5**
\* Grantor -  WHITEHALL FIDUCIARY LLC  SECRETARY OF HOUSING & URBAN DEVELOPMENT
\* Grantee - WINDSTREAM CAPITAL LLC
\* Customer - PUBLIC RECORD EXPERTS

\* FEES
| | |
|---|---|
| STATE WRIT TAX | $0.50 |
| STATE JCS | $40.25 |
| RECORDING FEES | $15.00 |
| COUNTY ARCHIVES FEE | $2.00 |
| ROD ARCHIVES FEE | $3.00 |
| UPI CERTIFICATION FEES | $10.00 |
| TOTAL PAID | $70.75 |

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



*andrea E Naugle*
Andrea E. Naugle
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On October 27, 2023 By CJ**

## THIS IS A CERTIFICATION PAGE

# Do Not Detach

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

**INSTRUMENT NUMBER - 2023025934**

00DU4Y

# EXHIBIT 7

Inst. # 2024011568 - Page 1 of 6

# COUNTY OF NORTHAMPTON

### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy



**Book - 2024-1   Starting Page - 99908**
**\*Total Pages - 6**

Instrument Number - 2024011568
Recorded On 6/11/2024 At 9:04:41 AM

| NCGIS Registry UPI Certification |
| On June 10, 2024 By KW |

* Instrument Type - ASSIGNMENT OF MORTGAGE
  Invoice Number - 1084517
* Grantor - WINDSTREAM CAPITAL LLC
* Grantee - LEHIGH VALLEY 1 LLC
  User - MKTE
* Customer - CAPITOL LIEN RECORDS & RESEARCH

| * FEES | | *RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | CAPITOL LIEN RECORDS & RESEARCH |
| JCS/ACCESS TO JUSTICE | $40.25 | 1010 N DALE ST |
| RECORDING FEES | $17.00 | ST. PAUL, MN 55117 |
| COUNTY RECORDS | $2.00 | |
| IMPROVEMENT FEE | | |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | I hereby CERTIFY that this document is recorded in the |
| UPI CERTIFICATION FEE | $10.00 | Recorder's Office Of Northampton County, Pennsylvania |
| TOTAL PAID | $72.75 | |



Andrea P. Suter

Andrea F. Suter
Recorder of Deeds

THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

**Book: 2024-1        Page: 99908**

00JNGI

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Inst. # 2024011568 - Page 2 of 6

This instrument
prepared by:
Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

After recording, please return to:
Lehigh Valley 1, LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

Premises: 1050 Main Street
Borough of Hellertown
Parcel: Q7SW2A-1-3 0715

## ASSIGNMENT OF MORTGAGE

Project Name: Saucon Valley Manor City, State: Hellertown, Pennsylvania

Borrower: Saucon Trust          Original Amount: $19,462,800.00

WINDSTREAM CAPITAL LLC ("Assignor"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns, transfers, sets over and conveys to Lehigh Valley 1 LLC ("Assignee"), without recourse, the following:

1.      that certain Open-End Mortgage dated December 1, 2012, and recorded on December 13, 2012 in Book 2012-1, at Page 300709, in the Office of the Recorder of Deeds of Northampton County, Pennsylvania, as assigned, amended or modified from time to time (the "Mortgage", as further described on Exhibit B), which Mortgage secures that certain Mortgage Note dated December 1, 2012 (the "Note") and encumbers the property described herein and on Exhibit A attached hereto; and

2.      such other documents, agreements, installments, and other collateral (excluding the Regulatory Agreement reference in the Mortgage) which evidence, secure or otherwise relate to Windstream Capital LLC's right, title or interest in and to the Mortgage and/or the Note, including without limitation all security agreements, intercreditor agreements, deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard policies that may presently be in effect.

**IN WITNESS WHEREOF,** Windstream Capital LLC has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the 15 day of ‾‾May‾‾ 2024.

WITNESS:

Name: Antoinette Hernandez

Name: KEVIN BANDEL

WINDSTREAM CAPITAL LLC

By: James Fratangelo

Its: Manager

# ACKNOWLEDGEMENT

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this 15 day of May , 2024

by, James Fratangelo , who is personally known to me or who has

produced_____ as identification and who did take an oath, as manager of Windstream Capital LLC.

NOTARY PUBLIC, STATE OF FLORIDA

SHANNA ALVAREZ
MY COMMISSION # HH 332785
EXPIRES: November 16, 2026

**CERTIFICATE OF RESIDENCE**

The address of the within-named Assignee is:

Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

On behalf of Assignee:

By: _____

Name: _James Freatangelo_

Title: _Manager_

Inst. # 2024011568 - Page 5 of 6

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

### DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 2006-5 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1. South 86°47'33" West 266.09 feet; thence in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;
2. North 03° 14'23" West 59.03 feet;
3. North 86° 41'33" East 18.00 feet;
4. North 03° 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same
5. North 86° 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same
6. South 03° 18'24" East 470.30 feet to the place of beginning,

CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

## EXHIBIT B

### Mortgage Description – Assignments of Mortgage

1. Mortgage executed by Saucon Trust, U/T/A dated December 1, 2012, in favor of M&T Realty Capital Corporation and recorded on December 13, 2012, in Book 2012-1, at Page 300709, Instrument No. 2012040239 in the Office of the Recorder of Deeds of Northampton County, Pennsylvania ("Recorder");

   a. Assignment of Mortgage executed by M&T Realty Capital Corporation to the United States Secretary of Housing and Urban Development dated November 8, 2022, effective as of November 16, 2022, and recorded on November 21, 2022, in Book 2022-1, at Page 306345, Instrument No. 2022036070, with the Recorder;

   b. Assignment of Mortgage executed by the Secretary of Housing and Urban Development to Windstream Capital LLC dated September 20, 2023, and recorded on October 30, 2023, in Book 2023-1, at Page 207700, Instrument No. 2023023619, with the Recorder.

159432397.1

This instrument
prepared by:
Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

After recording, please return to:
Lehigh Valley 1, LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

Premises: 1177 6th Street
Township of Whitehall
Parcel: 549893788632-2

## ASSIGNMENT OF MORTGAGE

Project Name: Whitehall Manor Senior Living City, State:  Whitehall, Pennsylvania

**Borrower: Whitehall Fiduciary, LLC Original Amount: $15,788,700.00**

WINDSTREAM CAPITAL LLC  ("Assignor"),  in consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns, transfers, sets over and conveys to Lehigh Valley 1 LLC ("Assignee"), without recourse, the following:

1.      that certain Open-End Mortgage dated January 19, 2012, to be effective January 26, 2012 and recorded on January 26 , 2012 as Instrument No. 2012002759, in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania, as assigned, amended or modified from time to time (the "Mortgage", as further described on Exhibit B), which Mortgage secures that certain Mortgage Note dated January 26, 2012 (the "Note") and encumbers the property described herein and on Exhibit A attached hereto; and

2.      such other documents, agreements, installments, and other collateral (excluding the Regulatory Agreement reference in the Mortgage) which evidence, secure or otherwise relate to Windstream Capital LLC's right, title or interest in and to the Mortgage  and/or the Note, including without limitation all security agreements, intercreditor agreements, deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard policies that may presently be in effect.

**IN WITNESS WHEREOF,** Windstream Capital LLC has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the ⎯15⎯ day of ⎯May⎯ 2024.

WITNESS:

Name: Antoinette Hernandez

Name: KEVIN BANDEL

WINDSTREAM CAPITAL LLC

By: James Fratangelo

Its: Manager

## ACKNOWLEDGEMENT

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this ⎯15⎯ day of ⎯May⎯ , 2024

by, ⎯James Fratangelo⎯ , who is personally known to me or who has

produced⎯⎯⎯⎯⎯⎯⎯ as identification and who did take an oath.

NOTARY PUBLIC, STATE OF FLORIDA

SHANNA ALVAREZ
MY COMMISSION # HH 332785
EXPIRES: November 16, 2026

**CERTIFICATE OF RESIDENCE**

The address of the within-named Assignee is:

Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

On behalf of Assignee:

By:

Name: James Pratangelo
Title: Manager

**Exhibit A**

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according** to the **Declaration** of Condominium of **Whitehall Manor** Condominium dated **August 13, 2008 recorded in** the **Office** of the **Recorder** of **Deeds of Lehigh County,** Pennsylvania as its Document ID# 7494518.

**PARCEL ID NO. 5498 9378 8632-2**

Together with an undivided interest of 50% of, in and to the Common Elements of the said **WHITEHALL MANOR CONDOMINIUM.**

**EXHIBIT B**

**Mortgage Description – Assignments of Mortgage**

1.  Open-End Mortgage executed by Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust U/T/A dated August 1, 2007, in favor of M&T Realty Capital Corporation, dated January 19, 2012, to be effective January 26, 2012, and recorded on January 26, 2012, as Instrument No. 2012002759, in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania ("Recorder");

    a.  Assignment of Mortgage executed by M&T Realty Capital Corporation to the United States Secretary of Housing and Urban Development dated November 8, 2022, effective as of November 16, 2022, and recorded on November 16, 2022, as Instrument No. 2022038363, with the Recorder;

    b.  Assignment of Mortgage executed by the Secretary of Housing and Urban Development to Windstream Capital LLC dated September 20, 2023, and recorded on October 30, 2023, as Instrument No. 2023025934.

159430045.1

*MICHELLE GRAUPNER*
*LEHIGH COUNTY CLERK OF JUDICIAL RECORDS*



**Recorder of Deeds Division**
**Lisa Stella-Ali, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA 18101-1614**
**(610) 782-3162**

*RETURN DOCUMENT TO:
CAPITOL LIEN RECORDS & RESEARCH
1010 N DALE ST
ST. PAUL, MN 55117

**Instrument Number - 2024012857**
Recorded On 6/10/2024 At 3:00:10 PM
* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - 546999     User ID: KW          **Total Pages - 6**
* Grantor - WINDSTREAM CAPITAIL LLC WHITEHALL FIDUCIARY LLC
* Grantee - LEHIGH VALLEY 1 LLC
* Customer - CAPITOL LIEN RECORDS & RESEARCH

* FEES
STATE WRIT TAX          $0.50
STATE JCS              $40.25
RECORDING FEES         $18.00
COUNTY ARCHIVES FEE     $2.00
ROD ARCHIVES FEE        $3.00
UPI CERTIFICATION FEES $10.00
TOTAL PAID             $73.75

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



Michelle Graupner
Michelle Graupner
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On June 10, 2024 By TLL**

THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

INSTRUMENT NUMBER - **2024012857**

00E8SA

# EXHIBIT 8

SAUCON VALLEY MANOR
FHA Project No. 034-22096

## LESSEE SECURITY AGREEMENT

      **THIS LESSEE SECURITY AGREEMENT** (the "Agreement") is made, entered into and dated as of the 1st day of December, 2012, by and between SAUCON VALLEY MANOR, INC., a corporation organized and existing under the laws of the state of Pennsylvania, whose principal place of business is located at 1050 Main Street, Hellertown, Pennsylvania 18055 (the "Lessee" or "Debtor"); and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

      **A.**    Contemporaneously with this Agreement, the Secured Party has made a loan to SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007 (the "Borrower") in the maximum principal amount of $19,462,800.00 (the "Loan").  The Loan is (i) evidenced by the Mortgage Note made by the Borrower in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Saucon Valley Manor, FHA Project No. 034-22096 (the "Project") located at 1050 Main Street, Hellertown, Pennsylvania 18055, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises").  The Premises are leased to the Lessee by the Borrower pursuant to a Lease dated January 1, 2006, as amended (the "Lease"), and are the subject of the Regulatory Agreement Nursing Homes between the Lessee and the Federal Housing Commissioner, dated as of even date herewith (the "Regulatory Agreement Nursing Homes").

      **B.**    As security, in part, for the Obligations (as defined below), the Borrower (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage"), (ii) entered into a Security Agreement, dated as of even date herewith, with the Secured Party (the "Borrower Security Agreement") and (iii) entered into a Regulatory Agreement with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Borrower Regulatory Agreement").  As additional security, the Lessee has entered into this Agreement with the Secured Party.  The Note, the Mortgage, the Borrower Security Agreement, the Borrower Regulatory Agreement, this Agreement, the Regulatory Agreement Nursing Homes and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Borrower to the Secured Party and/or HUD, or by or on behalf of the Lessee to the Secured Party and/or HUD, in connection with, or related to, the Lease, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

      **C.**    The Lessee is affiliated with and/or shares common ownership with the Borrower, and shall benefit directly from the making of the Loan.

**D.**     As used herein, "Healthcare Assets" means (i) any and all licenses, permits and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement Nursing Homes), (ii) any and all Medicare and Medicaid provider agreements, and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

### Statement of Agreement

**1.     SECURITY INTEREST; SETOFF.**

(a)     To secure the full, prompt and complete payment and performance of all Obligations, the Lessee hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Lessee's right, title and interest in and to the property described on Exhibit B attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Borrower and/or the Lessee to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

(b)     In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Borrower and/or Lessee of, any and all funds, monies, securities and other property held in escrow or for the account of the Borrower and/or the Lessee pursuant to the Loan Documents, against any amount payable by the Borrower and/or the Lessee under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Lessee).

(c)     Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

**2.     REPRESENTATIONS; GENERAL COVENANTS.**

(a)     To induce the Secured Party to make the Loan, the Lessee promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Lessee has good title to, and is the sole and lawful owner of, the Collateral; (iii) the Lessee has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19

-2-

hereof, rights granted to the Borrower under the Lease, if any, which are subordinate to the liens in favor of the Secured Party ("Subordinate Lease Rights") and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Lessee keeps all tangible Collateral at the Premises; (vi) all trade names, assumed names, fictitious names and other names used by the Lessee during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Lessee has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Lessee's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Lessee's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Lessee's exact legal name is as set forth in the first paragraph of this Agreement; (x) Lessee's organizational number (if any) as assigned by the State in which Lessee is organized is the number identified as Lessee's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Lessee has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

(b)     The Lessee will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any), and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Lessee will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party, Permitted Liens, and Subordinate Lease Rights, and except to the extent expressly permitted pursuant to Section 19 hereof. The Lessee, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

(c)     The Collateral will only be used by the Lessee in the operation of the Project. Until an Event of Default (as defined below) occurs, the Lessee may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Lessee will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Lessee will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Lessee, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in favor of the Secured Party and Subordinate Lease Rights and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will

-3-

automatically become a part of the Collateral under this Agreement). The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)     All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below. Immediately on demand therefor by the Secured Party, the Lessee will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Lessee will give the Secured Party not less than 30 days prior written notice of any change of (A) Lessee's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)     The Lessee will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Lessee may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Lessee's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)     The Lessee will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Lessee is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)     The Lessee will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of the Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)     The Lessee will not merge or consolidate with or into any other Person without the prior written consent of the Secured Party.

(i)     As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Lessee with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below). The Lessee will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on **Exhibit C**) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party consistent with the Lessee's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Lessee, the Secured Party

-4-

and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Lessee will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Lessee. The Lessee authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Lessee receives no Government Payments, the Lessee will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Lessee will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Lessee shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Lessee shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Lessee in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Lessee that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Lessee will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Lessee shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Lessee to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

       3.    **COMPLIANCE WITH LAWS.** The Lessee will comply with the requirements of all valid and applicable federal, state and local laws.

       4.    **TAXES; EXPENSES.** Lessee will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Lessee will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and

-5-

expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Lessee to Secured Party under this Section 4 will be paid by the Lessee upon the Secured Party's demand therefor.

**5.    INSPECTION; NOTICES.** Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Lessee's records pertaining to the Collateral. The Lessee will keep accurate and complete records of the Collateral. The Lessee will give the Secured Party prompt notice of any Event of Default.

**6.    INSURANCE.** The Lessee will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. The Lessee will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Lessee will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

**7.    DISCHARGE OF LIENS.** At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Lessee will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

**8.    EVENTS OF DEFAULT.** Each of the following events or circumstances, whether or not caused by or within the control of the Lessee, will be an "Event of Default" under this Agreement:

(a)    Any of the Obligations are not paid on or before the date when due, subject to any grace period provided under the Note;

-6-

(b)     The Lessee does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)     A default or breach under the Lease or under any of the Loan Documents (exclusive of this Agreement which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)     Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Lessee proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)     The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)     There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Lessee or the Borrower, which may materially impair the value of the Collateral or the Project;

(g)     Filing by or against the Lessee of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Lessee's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Lessee without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Lessee for the benefit of creditors, or the Lessee dissolves or is the subject of any dissolution, winding up or liquidation;

(h)     The Lessee is dissolved and liquidation of the Lessee is commenced in accordance with the Lessee's organizational documents and/or the law of the jurisdiction of organization; or

(i)     The Lessee changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

9.     **REMEDIES ON DEFAULT.**

(a)     If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Lessee expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in **Exhibit B**), the rights of Lessee thereto and shares of

-7-

Lessee therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Lessee to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)       Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Lessee, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Lessee hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)       If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Lessee agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)       The Lessee further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or any other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or any other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Lessee hereby waiving the application of any doctrine of marshaling.

(e)       The Lessee shall cooperate in any legal and lawful manner necessary or required, to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Lessee's name, place and stead. For this purpose, and to the extent not prohibited by applicable law with respect to Healthcare Assets, Lessee irrevocably appoints the Secured Party, its successors and assigns, as Lessee's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Lessee. This power is coupled with an interest.

**10.     NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.**

(a)       No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan

-8-

Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

      (b)    Neither the Lessee nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or any other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

      **11.    BINDING EFFECT.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Lessee will bind its heirs, personal representatives and permitted successors and assigns; however, the Lessee may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party.

      **12.    GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

      (a)    This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements, amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural

-9-

and conversely.  The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO BORROWER, SECURED PARTY AND LESSEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS.  LESSEE FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

13.    **TERM OF AGREEMENT.**  The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Lessee until the date that all of the Obligations are fully and finally paid and satisfied.

14.    **PERFECTION; FURTHER ASSURANCES.**  The Lessee agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof.  At any time and from time to time, the Lessee, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement.  Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Lessee and to name therein the Lessee as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Lessee as debtor and the Secured Party and/or HUD as secured parties.  The Lessee hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Lessee, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Lessee and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Lessee under this Agreement.  The power of attorney granted hereby is coupled with an interest and is irrevocable.  The Secured Party is also authorized by the Lessee to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and or HUD's interests in the Collateral.  Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Lessee's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Lessee will, on Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

-10-

**15.    INTEREST.** Any amounts payable by the Lessee under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Lessee to the Secured Party; however, nothing in this Agreement will be deemed to give to the Lessee the right to withhold payment in consideration of the payment of such interest.

**16.    DELIVERY OF NOTICES.** All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

**17.    REVIVAL OF SECURITY INTEREST.** If the Lessee makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

**18.    CLAIMS AGAINST SECURED PARTY.**

(a)    <u>Notification</u>. The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Lessee shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Lessee alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    <u>Remedies</u>. If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Lessee as a result thereof.

(c)    <u>Limitations</u>. In no event, however, shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, for any other damages, including, without limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents. In no event shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, unless a written

-11-

notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

**19.    PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.** Written approval from HUD and Secured Party must be obtained prior to the Lessee's obtaining any accounts receivable financing, as set forth in paragraph (b) of this Section.

(a)    _Definitions_. The following words and terms shall have the meanings hereinafter set forth:

"<u>Accounts</u>" shall mean all right, title and interest of the Lessee in and to the following, in each case arising from the Lessee's operation of the Project in the ordinary course of the Lessee's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c). Notwithstanding the foregoing, "<u>Accounts</u>" do not include accounts rising from the sale of the Lessee's equipment, inventory or other goods, other than accounts arising from the sale of Lessee's inventory in the ordinary course of the Lessee's business.

"<u>Eligible AR Lender</u>" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Lessee.

"<u>Eligible AR Loan</u>" means a loan or line of credit obtained by the Lessee from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"<u>Required Intercreditor Agreement</u>" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender, the Lessee and the Borrower, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    _Eligible AR Loan_. Provided that prior written approval of HUD and Secured Party is obtained, the Lessee may obtain and maintain an Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral" (composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

(i)    no more than one Eligible AR Loan shall be maintained at any time;

(ii)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

-12-

(iii)     without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

(iv)     with respect to any existing Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

(v)     with respect to any other Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

(vi)     the Eligible AR Loan, the collateral therefor, and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

(vii)     until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s). As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c)     **Required Intercreditor Agreement**.     Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect. The Lessee shall comply at all times with the Required Intercreditor Agreement then in effect.

(d)     **Information**.     Lessee shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Lessee regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

20.     **WAIVERS**.

(a)     No act or thing need occur to establish the liability of the Lessee hereunder, and no act or thing, except full payment and discharge of all of the Obligations, shall

-13-

in any way exonerate the Lessee or modify, reduce, limit or release the liability of the Lessee hereunder.

(b)    The Lessee will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the Lessee against any Person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

(c)    Whether or not any existing relationship between the Lessee and the Borrower has been changed or ended and whether or not this Agreement has been terminated, the Secured Party may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Obligations without any consent or approval by the Lessee and without any notice to the Lessee. The liability of the Lessee shall not be affected or impaired by any of the following acts or things (which the Secured Party is expressly authorized to do, omit or suffer from time to time, both before and after termination of this Agreement, without notice to or consent or approval by the Lessee): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue Borrower or any other Person liable in respect of any Obligations; (v) any discharge of any evidence of Obligations or the acceptance of any instrument in renewal thereof or of substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or any evidence thereof; (ix) any order of application of any payments of credits upon Obligations; (x) any election by Secured Party under §1111(b)(2) of the United States Bankruptcy Code.

(d)    The Lessee waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Obligations, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Lessee will not assert, plead or enforce against Secured Party any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other Person liable in respect of any indebtedness, or any setoff available against Secured Party to Borrower or any such other Person, whether or not on account of a related transaction. The Lessee expressly agrees that the Lessee shall be and remain liable, to the extent of the Collateral, for any deficiency remaining after foreclosure of any security interest securing the Obligations, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

-14-

(e)    The Lessee waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing the Obligations. To the extent of the Collateral, this Agreement constitutes an absolute, unlimited, unconditional and continuing guaranty of payment, not collection. The Secured Party shall not be required first to resort for payment of the Obligations to Borrower, or any other Persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Agreement.

(f)    The liability of the Lessee under this Agreement is in addition to and shall be cumulative with all other liabilities of the Lessee to Secured Party as obligor or otherwise, without any limitation as to amount, and all other liabilities of any other Person who guarantees all or any portion of the Obligations, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(g)    This Agreement shall be effective upon delivery to Secured Party, without further act, condition or acceptance by Secured Party. Any invalidity or unenforceability of any provision of application of this Agreement shall not affect other lawful provisions and application hereof, and to this end the provisions of this Agreement are declared to be severable.

(h)    Lessee hereby covenants that this Agreement will not be discharged except by complete performance of the obligations contained in this Agreement. Lessee waives all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of, and reliance on, this Agreement. Lessee further waives all (i) notices of the existence, creation or incurring of new or additional indebtedness, arising either from additional loans extended to Lessee or Borrower, or otherwise, (ii) notices that the principal amount, or any portion thereof (and any interest thereon), of the Loan or any of the other Obligations is due, (iii) notices of any and all proceedings to collect from Lessee and/or Borrower of all or any part of the Obligations, or from anyone else, (iv), to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to Secured Party to secure payment of all or any part of the Obligations, and (v) defenses based on suretyship or impairment of collateral.

## 21.    MISCELLANEOUS.

(a)    This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)    In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)    It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

Supp. Appx. 236

(d)    This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Lessee with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents to which Lessee is a party may be amended, altered or changed other than in a writing signed by the Secured Party and the Lessee. The Lessee's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Lessee with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)    This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

## 22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.

(a)    Lessee and Secured Party hereby agree that HUD shall be an additional secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)    To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF,** the Lessee and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

-16-

COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

**THE LESSEE:**

**SAUCON VALLEY MANOR, INC.,**
a Pennsylvania corporation

By: _____

Name: Nimita Kapoor Atiyeh
Title: President

**COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT**

**THE SECURED PARTY:**

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _Christine R. Chandler_

Name: Christine R. Chandler

Title: Vice President

## EXHIBIT A TO LESSEE SECURITY AGREEMENT

### LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

A-1

### DESCRIPTION OF 1050 MAIN STREET

      ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

      BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

    1.    South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

    2.    North 03' 14'23" West 59.03 feet;

    3.    North 86' 41'33" East 18.00 feet;

    4.    North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

    5.    North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

    6.    South 03' 18'24" East 470.30 feet to the place of beginning.

      CONTAINS:   117,610.588 Sq. Ft.    2.7000 Acres

Exhibit A

A-2

### EXHIBIT B TO LESSEE SECURITY AGREEMENT

All of the following described property and interests in property, whether now in existence or hereafter arising, and relating to, situated or located on or used or usable in connection with the maintenance and/or operation of the property described in Exhibit A (hereafter referred to as the "Premises").

(a) All fixtures, furniture, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the Premises, including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, radiators, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment, and fixtures, fans and switchboards; all telephone equipment; all piping, tubing and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not all of the above are now or hereafter acquired or attached to the Premises in any manner;

(b) All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

(c) All rents, leases, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments or money;

(d) All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts, or money;

B-1

(e) All land surveys, plans and specifications, drawings, briefs and other work product and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

(f) All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, any nursing home license, assisted living facility license, any and all Medicaid/Medicare Provider Agreements, and any other license necessary for the provision of services at the Premises; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder.

(g) All funds, monies, securities and other property held in escrow, lock boxes, depository or blocked accounts or as reserves and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities or property held in escrow, lock boxes, depository or blocked accounts or as reserves, including, but not limited to, all of Debtor's rights (if any) to any funds or amounts in that certain reserve funds and/or residual receipts accounts created under the Regulatory Agreement required by the Secretary of Housing and Urban Development or the Federal Housing Administration Commissioner;

(h) All accounts, accounts receivable, general intangibles, chattel paper, instruments, documents, inventory, goods, cash, bank accounts, certificates of deposits, securities, insurance policies, letters of credit, deposits, judgments, liens, causes of action, warranties, guaranties and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h). As used herein, the term "accounts receivable" shall include (i) all healthcare insurance receivables, including, but not limited to Medicaid and Medicare receivables, Veterans Administration or other governmental receivables, private patient receivables, and HMO 10 receivables; (ii) any payments due or to be made to the Debtor relating to the Premises or (iii) all other rights of the Debtor to receive payment of any kind with respect to the Premises;

(i) All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles.

(j) Any and all security or other deposits which have not been forfeited by any tenant under any lease; and

(k) All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, securities, leases, instruments, inventory, documents, deposit accounts or cash.

B-2

## EXHIBIT C TO LESSEE SECURITY AGREEMENT

**Other Names Used by Lessee in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Lessee's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*: None

*Letters of Credit*: None

*Electronic Chattel Paper*: None

*Commercial Tort Claims*: None

*Instruments (including promissory notes)*: None

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g.: operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| | | | |

Note: Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits. See Section 2(i) of the Agreement for the Lessee's obligations in this regard.

C-1

**Supp. Appx. 244**

Project No.:    **034-22096**
Project Name: **Saucon Valley Manor**
Location:        **Northampton County, Pennsylvania**

## ASSIGNMENT OF LESSEE SECURITY AGREEMENT

**November 21, 2022**

FOR VALUE RECEIVED, M&T REALTY CAPITAL CORPORATION, a Maryland corporation, called Assignor, does hereby grant, bargain, sell, convey and assign to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, his/her successors and assigns, called Assignee, all Assignor's right, title and interest in and to the Lessee Security Agreement dated December 1, 2012, between Saucon Valley Manor, Inc., as Debtor, and M&T REALTY CAPITAL CORPORATION, as Secured Party.   The Assignor hereby warrants that no act or omission of the Assignor has impaired the validity or priority of the lien created by said Lessee Security Agreement and that Assignor has a good right to assign said Lessee Security Agreement.   Attached hereto as Exhibit A is a description of the real property to which the Lessee Security Agreement relates.

[THIS SPACE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this instrument has been duly executed to be effective as of the date first above written.

**M&T REALTY CAPITAL CORPORATION**, a
Maryland corporation

By:_____
Michael Angles, Senior Vice President

## EXHIBIT A

### Legal Description

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467.

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration).

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.    South 86°47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.    North 03' 14'23" West 59.03 feet;

3.    North 86' 41'33" East 18.00 feet;

4.    North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.    North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.    South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

WHITEHALL MANOR SENIOR LIVING
FHA Project No. 034-22084

### LESSEE SECURITY AGREEMENT

THIS LESSEE SECURITY AGREEMENT (the "Agreement") is made, entered into and dated as of the $\underline{26th}$ day of January, 2012, by and between WHITEHALL MANOR, INC., a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, whose principal place of business is located at 1177 Sixth Street, Whitehall, Pennsylvania 18052 (the "Lessee" or "Debtor"); and M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

**A.**     Contemporaneously with this Agreement, the Secured Party has made a loan to Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust u/t/a dated August 1, 2007 (the "Borrower") in the maximum principal amount of $15,788,700.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Borrower in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Whitehall Manor Senior Living, FHA Project No. 034-22084 (the "Project") located at 1177 Sixth Street, Whitehall, Pennsylvania 18052, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Premises are leased to the Lessee by the Borrower pursuant to a Lease Agreement dated on or about August, 2008, as amended by a First Amendment to Lease Agreement dated as of January 1, 2010 and a Second Amendment to Lease Agreement dated as of January 1, 2012 (collectively, the "Lease"), and are the subject of the Regulatory Agreement Nursing Homes between the Lessee and the Federal Housing Commissioner, dated as of even date herewith (the "Regulatory Agreement Nursing Homes").

**B.**     As security, in part, for the Obligations (as defined below), the Borrower (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage"), (ii) entered into a Security Agreement, dated as of even date herewith, with the Secured Party (the "Borrower Security Agreement") and (iii) entered into a Regulatory Agreement with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Borrower Regulatory Agreement"). As additional security, the Lessee has entered into this Agreement with the Secured Party. The Note, the Mortgage, the Borrower Security Agreement, the Borrower Regulatory Agreement, this Agreement, the Regulatory Agreement Nursing Homes and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Borrower to the Secured Party and/or HUD, or by or on behalf of the Lessee to the Secured Party and/or HUD, in connection with, or related to, the Lease, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

   **C.** The Lessee is affiliated with and/or shares common ownership with the Borrower, and shall benefit directly from the making of the Loan.

   **D.** As used herein, "Healthcare Assets" means (i) any and all licenses, permits and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement Nursing Homes), (ii) any and all Medicare and Medicaid provider agreements, and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

<u>**Statement of Agreement**</u>

 **1.** **SECURITY INTEREST; SETOFF.**

   (a) To secure the full, prompt and complete payment and performance of all Obligations, the Lessee hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Lessee's right, title and interest in and to the property described on <u>**Exhibit B**</u> attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Borrower and/or the Lessee to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

   (b) In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Borrower and/or Lessee of, any and all funds, monies, securities and other property held in escrow or for the account of the Borrower and/or the Lessee pursuant to the Loan Documents, against any amount payable by the Borrower and/or the Lessee under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Lessee).

   (c) Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

 **2.** **REPRESENTATIONS; GENERAL COVENANTS.**

   (a) To induce the Secured Party to make the Loan, the Lessee promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Lessee has good title to, and is the sole and lawful owner of, the

-2-

Collateral; (iii) the Lessee has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19 hereof, rights granted to the Borrower under the Lease, if any, which are subordinate to the liens in favor of the Secured Party ("Subordinate Lease Rights") and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Lessee keeps all tangible Collateral at the Premises; (vi) all trade names, assumed names, fictitious names and other names used by the Lessee during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Lessee has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Lessee's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Lessee's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Lessee's exact legal name is as set forth in the first paragraph of this Agreement; (x) Lessee's organizational number (if any) as assigned by the State in which Lessee is organized is the number identified as Lessee's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Lessee has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

      (b)     The Lessee will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any), and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Lessee will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party, Permitted Liens, and Subordinate Lease Rights, and except to the extent expressly permitted pursuant to Section 19 hereof. The Lessee, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

      (c)     The Collateral will only be used by the Lessee in the operation of the Project. Until an Event of Default (as defined below) occurs, the Lessee may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Lessee will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Lessee will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Lessee, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in

-3-

favor of the Secured Party and Subordinate Lease Rights and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will automatically become a part of the Collateral under this Agreement). The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below. Immediately on demand therefor by the Secured Party, the Lessee will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Lessee will give the Secured Party not less than 30 days prior written notice of any change of (A) Lessee's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Lessee will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Lessee may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Lessee's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Lessee will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Lessee is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Lessee will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of the Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Lessee will not merge or consolidate with or into any other Person without the prior written consent of the Secured Party.

(i)    As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Lessee with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below). The Lessee will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on Exhibit C) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party

-4-

consistent with the Lessee's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Lessee, the Secured Party and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Lessee will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Lessee. The Lessee authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Lessee receives no Government Payments, the Lessee will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Lessee will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Lessee shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Lessee shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Lessee in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Lessee that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Lessee will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Lessee shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Lessee to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

      **3.    COMPLIANCE WITH LAWS.** The Lessee will comply with the requirements of all valid and applicable federal, state and local laws.

**Supp. Appx. 253**

**4.    TAXES; EXPENSES.** Lessee will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Lessee will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Lessee to Secured Party under this Section 4 will be paid by the Lessee upon the Secured Party's demand therefor.

**5.    INSPECTION; NOTICES.** Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Lessee's records pertaining to the Collateral. The Lessee will keep accurate and complete records of the Collateral. The Lessee will give the Secured Party prompt notice of any Event of Default.

**6.    INSURANCE.** The Lessee will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. The Lessee will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Lessee will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

**7.    DISCHARGE OF LIENS.** At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Lessee will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

**8.    EVENTS OF DEFAULT.** Each of the following events or circumstances, whether or not caused by or within the control of the Lessee, will be an "Event of Default" under this Agreement:

-6-

(a)    The Lessee does not pay when due any of the Obligations, subject to any grace period provided under the Note;

(b)    The Lessee does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)    A default or breach under the Lease or under any of the Loan Documents (exclusive of this Agreement which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)    Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Lessee proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)    The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)    There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Lessee or the Borrower, which may materially impair the value of the Collateral or the Project;

(g)    Filing by or against the Lessee of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Lessee's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Lessee without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Lessee for the benefit of creditors, or the Lessee dissolves or is the subject of any dissolution, winding up or liquidation;

(h)    The Lessee is dissolved and liquidation of the Lessee is commenced in accordance with the Lessee's organizational documents and/or the law of the jurisdiction of organization; or

(i)    The Lessee changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

9.    **REMEDIES ON DEFAULT.**

(a)    If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Lessee expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as

-7-

defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in Exhibit B), the rights of Lessee thereto and shares of Lessee therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Lessee to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)     Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Lessee, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Lessee hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)     If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Lessee agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)     The Lessee further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or any other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or any other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Lessee hereby waiving the application of any doctrine of marshaling.

(e)     The Lessee shall cooperate in any legal and lawful manner necessary or required, to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Lessee's name, place and stead. For this purpose, and to the extent not prohibited by applicable law with respect to Healthcare Assets, Lessee irrevocably appoints the Secured Party, its successors and assigns, as Lessee's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Lessee. This power is coupled with an interest.

**10.     NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.**

-8-

(a)     No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)     Neither the Lessee nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or any other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

**11.     BINDING EFFECT.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Lessee will bind its heirs, personal representatives and permitted successors and assigns; however, the Lessee may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party.

**12.     GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)     This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements,

-9-

amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural and conversely. The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO BORROWER, SECURED PARTY AND LESSEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. LESSEE FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

**13.    TERM OF AGREEMENT.** The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Lessee until the date that all of the Obligations are fully and finally paid and satisfied.

**14.    PERFECTION; FURTHER ASSURANCES.** The Lessee agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof. At any time and from time to time, the Lessee, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Lessee and to name therein the Lessee as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Lessee as debtor and the Secured Party and/or HUD as secured parties. The Lessee hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Lessee, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Lessee and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Lessee under this Agreement. The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Lessee to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and or HUD's interests in the Collateral. Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Lessee's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Lessee will, on

-10-

Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

**15.    INTEREST.** Any amounts payable by the Lessee under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Lessee to the Secured Party; however, nothing in this Agreement will be deemed to give to the Lessee the right to withhold payment in consideration of the payment of such interest.

**16.    DELIVERY OF NOTICES.** All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

**17.    REVIVAL OF SECURITY INTEREST.** If the Lessee makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

**18.    CLAIMS AGAINST SECURED PARTY.**

(a)    <u>Notification</u>. The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Lessee shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Lessee alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    <u>Remedies</u>. If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Lessee as a result thereof.

(c)    <u>Limitations</u>. In no event, however, shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, for any other damages, including, without

-11-

limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents. In no event shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, unless a written notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

### 19. PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.

(a)    _Definitions_. The following words and terms shall have the meanings hereinafter set forth:

"Accounts" shall mean all right, title and interest of the Lessee in and to the following, in each case arising from the Lessee's operation of the Project in the ordinary course of the Lessee's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c). Notwithstanding the foregoing, "Accounts" do not include accounts rising from the sale of the Lessee's equipment, inventory or other goods, other than accounts arising from the sale of Lessee's inventory in the ordinary course of the Lessee's business.

"Eligible AR Lender" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Lessee.

"Eligible AR Loan" means a loan or line of credit obtained by the Lessee from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"Required Intercreditor Agreement" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender, the Lessee and the Borrower, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    _Eligible AR Loan_. Subject to the written approval of Secured Party and HUD, the Lessee may obtain and maintain at any time one, and only one, Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral" (composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

(i)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

-12-

(ii)     without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

(iii)    with respect to any existing Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

(iv)     with respect to any other Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

(v)      the Eligible AR Loan, the collateral therefor and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

(vi)     until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s).  As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c)      **Required Intercreditor Agreement.**      Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect.  The Lessee shall comply at all times with the Required Intercreditor Agreement then in effect.

(d)      **Information.**  Lessee shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Lessee regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

20.    **WAIVERS.**

(a)      No act or thing need occur to establish the liability of the Lessee hereunder, and no act or thing, except full payment and discharge of all of the Obligations, shall

-13-

in any way exonerate the Lessee or modify, reduce, limit or release the liability of the Lessee hereunder.

(b)     The Lessee will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the Lessee against any Person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

(c)     Whether or not any existing relationship between the Lessee and the Borrower has been changed or ended and whether or not this Agreement has been terminated, the Secured Party may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Obligations without any consent or approval by the Lessee and without any notice to the Lessee.  The liability of the Lessee shall not be affected or impaired by any of the following acts or things (which the Secured Party is expressly authorized to do, omit or suffer from time to time, both before and after termination of this Agreement, without notice to or consent or approval by the Lessee): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue Borrower or any other Person liable in respect of any Obligations; (v) any discharge of any evidence of Obligations or the acceptance of any instrument in renewal thereof or of substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or any evidence thereof; (ix) any order of application of any payments of credits upon Obligations; (x) any election by Secured Party under §1111(b)(2) of the United States Bankruptcy Code.

(d)     The Lessee waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Obligations, except the defense of discharge by payment in full.  Without limiting the generality of the foregoing, the Lessee will not assert, plead or enforce against Secured Party any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other Person liable in respect of any indebtedness, or any setoff available against Secured Party to Borrower or any such other Person, whether or not on account of a related transaction.  The Lessee expressly agrees that the Lessee shall be and remain liable, to the extent of the Collateral, for any deficiency remaining after foreclosure of any security interest securing the Obligations, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

-14-

(e)     The Lessee waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing the Obligations. To the extent of the Collateral, this Agreement constitutes an absolute, unlimited, unconditional and continuing guaranty of payment, not collection. The Secured Party shall not be required first to resort for payment of the Obligations to Borrower, or any other Persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Agreement.

(f)     The liability of the Lessee under this Agreement is in addition to and shall be cumulative with all other liabilities of the Lessee to Secured Party as obligor or otherwise, without any limitation as to amount, and all other liabilities of any other Person who guarantees all or any portion of the Obligations, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(g)     This Agreement shall be effective upon delivery to Secured Party, without further act, condition or acceptance by Secured Party. Any invalidity or unenforceability of any provision of application of this Agreement shall not affect other lawful provisions and application hereof, and to this end the provisions of this Agreement are declared to be severable.

(h)     Lessee hereby covenants that this Agreement will not be discharged except by complete performance of the obligations contained in this Agreement. Lessee waives all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of, and reliance on, this Agreement. Lessee further waives all (i) notices of the existence, creation or incurring of new or additional indebtedness, arising either from additional loans extended to Lessee or Borrower, or otherwise, (ii) notices that the principal amount, or any portion thereof (and any interest thereon), of the Loan or any of the other Obligations is due, (iii) notices of any and all proceedings to collect from Lessee and/or Borrower of all or any part of the Obligations, or from anyone else, (iv), to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to Secured Party to secure payment of all or any part of the Obligations, and (v) defenses based on suretyship or impairment of collateral.

21.     **MISCELLANEOUS.**

(a)     This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)     In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)     It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

-15-

(d)      This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Lessee with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents to which Lessee is a party may be amended, altered or changed other than in a writing signed by the Secured Party and the Lessee. The Lessee's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Lessee with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)      This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

## 22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.

(a)      Lessee and Secured Party hereby agree that HUD shall be an additional secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)      To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF**, the Lessee and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

-16-

**COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT**

<u>**THE LESSEE**</u>:

**WHITEHALL MANOR, INC.,**
a Pennsylvania corporation

By: _____
Nimita Kapoor-Atiyeh, President

-17-

## COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

### THE SECURED PARTY:

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: *Christine R. Chandler*

Christine R. Chandler, Vice President

-18-

## EXHIBIT A TO LESSEE SECURITY AGREEMENT

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.**

**PARCEL ID NO.  5498 9378 8632-1**

**Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.**

-19-

## EXHIBIT B TO LESSEE SECURITY AGREEMENT

All of the following described property and interests in property, whether now in existence or hereafter arising, and relating to, situated or located on or used or usable in connection with the maintenance and/or operation of the property described in Exhibit A (hereafter referred to as the "Premises").

(a) All fixtures, furniture, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the Premises, including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, radiators, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment, and fixtures, fans and switchboards; all telephone equipment; all piping, tubing and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not all of the above are now or hereafter acquired or attached to the Premises in any manner;

(b) All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

(c) All rents, leases, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments or money;

(d) All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts, or money;

-20-

(e) All land surveys, plans and specifications, drawings, briefs and other work product and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

(f) All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, any nursing home license, assisted living facility license, any and all Medicaid/Medicare Provider Agreements, and any other license necessary for the provision of services at the Premises; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder.

(g) All funds, monies, securities and other property held in escrow, lock boxes, depository or blocked accounts or as reserves and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities or property held in escrow, lock boxes, depository or blocked accounts or as reserves, including, but not limited to, all of Debtor's rights (if any) to any funds or amounts in that certain reserve funds and/or residual receipts accounts created under the Regulatory Agreement required by the Secretary of Housing and Urban Development or the Federal Housing Administration Commissioner;

(h) All accounts, accounts receivable, general intangibles, chattel paper, instruments, documents, inventory, goods, cash, bank accounts, certificates of deposits, securities, insurance policies, letters of credit, deposits, judgments, liens, causes of action, warranties, guaranties and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h). As used herein, the term "accounts receivable" shall include (i) all healthcare insurance receivables, including, but not limited to Medicaid and Medicare receivables, Veterans Administration or other governmental receivables, private patient receivables, and HMO 10 receivables; (ii) any payments due or to be made to the Debtor relating to the Premises or (iii) all other rights of the Debtor to receive payment of any kind with respect to the Premises;

(i) All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles.

(j) Any and all security or other deposits which have not been forfeited by any tenant under any lease; and

(k) All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, securities, leases, instruments, inventory, documents, deposit accounts or cash.

Supp. Appx. 269

## EXHIBIT C TO LESSEE SECURITY AGREEMENT

**Other Names Used by Lessee in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Lessee's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*:  None

*Letters of Credit*: None

*Electronic Chattel Paper*: None

*Commercial Tort Claims*: None

*Instruments (including promissory notes)*: None

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g., operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| ▉ | National Penn Bank | Operating | None |

Note:  Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits.  See Section 2(i) of the Agreement for the Lessee's obligations in this regard.

1/18/2012 12698621

**Supp. Appx. 270**

Project No.:   **034-22084**
Project Name: **Whitehall Manor Senior Living**
Location:        **Lehigh County, Pennsylvania**

## ASSIGNMENT OF LESSEE SECURITY AGREEMENT

**November 16, 2022**

FOR VALUE RECEIVED, M&T REALTY CAPITAL CORPORATION, a Maryland corporation, called Assignor, does hereby grant, bargain, sell, convey and assign to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, his/her successors and assigns, called Assignee, all Assignor's right, title and interest in and to the Lessee Security Agreement dated January 26, 2012, between Whitehall Manor, Inc., as Debtor, and M&T REALTY CAPITAL CORPORATION, as Secured Party. The Assignor hereby warrants that no act or omission of the Assignor has impaired the validity or priority of the first lien created by said Lessee Security Agreement and that Assignor has a good right to assign said Lessee Security Agreement. Attached hereto as Exhibit A is a description of the real property to which the Lessee Security Agreement relates.

[THIS SPACE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this instrument has been duly executed to be effective as of the date first above written.

**M&T REALTY CAPITAL CORPORATION**, a
Maryland corporation

By: _____
Michael Angles, Senior Vice President

## EXHIBIT A

### Legal Description

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

ESTOPPEL CERTIFICATE

To:   **M&T Realty Capital Corporation**
      25 South Charles Street, 17th Floor
      Baltimore, Maryland 21201

      **Secretary of Housing and Urban Development**
      c/o Office of Healthcare Programs
      451 7th Street S.W.
      Washington, DC 20410

      Re:   Lease Agreement dated on or about August, 2008 by and between Whitehall Fiduciary
            LLC, as Trustee of Whitehall Trust under Agreement Dated August 1, 2007
            ("Owner/Landlord"), and Whitehall Manor, Inc. ("Tenant"), with respect to Whitehall
            Manor Senior Living, 1177 Sixth Street, Whitehall, Pennsylvania 18052, FHA Project
            No. 034-22084 (the "Project"), as amended by a First Amendment to Lease Agreement
            dated effective as of January 1, 2010 by and between Owner/Landlord and Tenant and
            Second Amendment to Lease Agreement dated effective as of January 1, 2012 by and
            between Owner/Landlord and Tenant.

Gentlemen:

        This Estoppel Certificate is furnished by Owner/Landlord and Tenant to M&T Realty Capital
Corporation (the "Lender") and the Secretary of Housing and Urban Development ("HUD") in
connection with a mortgage loan (the "Mortgage Loan") that Lender is making to the Owner/Landlord
with respect to the Project, which Mortgage Loan is being insured by HUD.  Owner/Landlord and
Tenant understand that the Lender and HUD are relying upon this Estoppel Certificate in connection
with making and insuring, respectively, the Mortgage Loan.

        A.    Certifications of Tenant. Tenant hereby represents and certifies to the Lender and HUD
and their respective successors and assigns that, except as set forth in Exhibit A attached hereto:

        1.    "Lease" means the following documents, true and correct copies of which are attached
hereto as Exhibit B:  Lease Agreement dated on or about August, 2008 by and between
Owner/Landlord and Tenant, as amended by a First Amendment to Lease Agreement dated effective
as of January 1, 2010 by and  between Owner/Landlord and Tenant and further amended by a Second
Amendment to Lease Agreement dated effective as of January 1, 2012 by and between
Owner/Landlord and Tenant;

        2.    Tenant is the tenant under the Lease and has not assigned, pledged, encumbered or
transferred any of its rights or obligations thereunder.  Tenant has not subleased all or any portion of
the Project.

        3.    The Lease sets forth the full and complete agreement between Owner/Landlord and
Tenant with respect to the Project.  The Lease has not been amended (except as may be shown in

Exhibit B), is in full force and effect according to its terms, and is valid and binding upon Tenant.

4.    Tenant is not in default under the Lease. No state of facts exists which, with the passage of time or the giving of notice, or both, could constitute a default by Tenant under the Lease. All rent, charges and other payments due to Owner/Landlord from Tenant under the Lease on or before the date hereof have been paid.

5.    To the best of Tenant's knowledge; (a) Owner/Landlord is not in default under the Lease and (b) no state of facts exist which, with the passage of time or the giving of notice, or both, could constitute a default by Owner/Landlord under the Lease.

6.    Tenant has not paid any rent, charges or other payments due to Owner/Landlord from Tenant under the Lease more than thirty (30) days in advance, nor has Tenant paid any security deposit under the Lease.

7.    To the best of Tenant's knowledge, all conditions under the Lease to be satisfied by Owner/Landlord or Tenant as of the date hereof have been satisfied.

8.    All improvements, alterations and other work, if any, to be performed or constructed by Owner/Landlord under the Lease have been completed and have been accepted by Tenant. All contributions, if any, required to be paid to Tenant by Owner/Landlord for improvements to the Project have been paid.

9.    There are no actions, voluntary or involuntary, pending against Tenant under any bankruptcy, receivership, insolvency or similar laws of the United States or any State thereof.

B.    Certifications of Owner/Landlord.    Owner/Landlord hereby represents and certifies to the Lender and HUD and their respective successors and assigns that, except as set forth in Exhibit A attached hereto:

1.    "Lease" means the following documents, true and correct copies of which are attached hereto as Exhibit B:    Lease Agreement dated on or about August, 2008 by and between Owner/Landlord and Tenant, as amended by a First Amendment to Lease Agreement dated effective as of January 1, 2010 by and between Owner/Landlord and Tenant and further amended by a Second Amendment to Lease Agreement dated effective as of January 1, 2012 by and between Owner/Landlord and Tenant;

2.    Owner/Landlord is the landlord under the Lease and has not assigned, pledged, encumbered or transferred any of its rights or obligations thereunder. Tenant is the tenant under the Lease. To the best of Owner/Landlord's knowledge, Tenant has not subleased all or any portion of the Project.

3.    The Lease sets forth the full and complete agreement between Owner/Landlord and Tenant with respect to the Project. The Lease has not been amended (except as may be shown in Exhibit B), is in full force and effect according to its terms, and is valid and binding upon Owner/Landlord.

-2-

4.    To the best of Owner/Landlord's knowledge; (a) Tenant is not in default under the Lease and (b) no state of facts exists which, with the passage of time or the giving of notice, or both, could constitute a default by Tenant under the Lease. All rent, charges and other payments due to Owner/Landlord from Tenant under the Lease on or before the date hereof have been paid.

5.    Owner/Landlord is not in default under the Lease. No state of facts exists which, with the passage of time or the giving of notice, or both, could constitute a default by Owner/Landlord under the Lease.

6.    Tenant has not paid any rent, charges or other payments due to Owner/Landlord from Tenant under the Lease more than thirty (30) days in advance nor has Tenant paid any security deposit under the Lease.

7.    To the best of Owner/Landlord's knowledge, all conditions under the Lease to be satisfied by Owner/Landlord or Tenant as of the date hereof have been satisfied.

8.    All improvements, alterations and other work, if any, to be performed or constructed by Owner/Landlord under the Lease have been completed and have been accepted by Tenant. All contributions, if any, required to be paid to Tenant by Owner/Landlord for improvements to the Project have been paid.

9.    There are no actions, voluntary or involuntary, pending against Owner/Landlord under any bankruptcy, receivership, insolvency or similar laws of the United States or any State thereof.

DATED as of January 26, 2012.

TENANT:

**WHITEHALL MANOR, INC.,**
a Pennsylvania corporation

By: _____
    Nimita Kapoor Atiyeh, President

OWNER/LANDLORD:

**WHITEHALL FIDUCIARY, LLC,**
**AS TRUSTEE OF WHITEHALL TRUST**
**u/t/a dated August 1, 2007**

By: _____
    Abraham R. Atiyeh, Manager

-3-

**Exhibit A**

Exceptions:

**None**

-4-

**Exhibit B**

(Copy of Lease and all supplements, amendments or modifications thereto and assignments thereof—attached hereto)

1/17/2012 12725814

-5-

# EXHIBIT 9



# Report

**Current Through:** June 10, 2025

| Parcel: | 549893788632-2 | | Address: | 1177 6th Street, Whitehall Township, PA | | | | County: | Lehigh |
|---|---|---|---|---|---|---|---|---|---|

| File No. | Year & Type of Claim | Notes | Docket Nos. | Face, Penalty, and Other | Interest | Attorney Fees | Costs | Balance Due |
|---|---|---|---|---|---|---|---|---|
| **Claims due the Township of Whitehall** | | | | | | | | |
| 25-07700-0 | 2024 township real estate taxes | *‡~ | N/A | $21,316.28 | $0.00 | $0.00 | $25.00 | $21,341.28 |
| **Claims due Whitehall-Coplay School District** | | | | | | | | |
| 24-09443-0 | 2023 school real estate taxes | *^† | 2024-ML-2553 | $117,397.14 | $5,465.62 | $675.00 | $165.15 | $123,702.91 |
| 25-54260-0 | 2024 school real estate taxes | *‡~ | N/A | $122,625.63 | $0.00 | $0.00 | $25.00 | $122,650.63 |
| | *Parcel Balance* | | | *$261,339.05* | *$5,465.62* | *$675.00* | *$215.15* | *$267,694.82* |

| |
|---|
| * Face, Penalty, and Other for this file includes any delinquent amount turned over by the agency to Portnoff Law Associates for collection, as well as any Notice Expense due, less any payments received. |
| ^ Balance is subject to interest which accrues on a daily basis. |
| † If it is necessary to proceed with legal action with respect to this delinquent account, the current balance due may increase as the result of the addition of attorney fees, interest, or costs. |
| ‡ If it is necessary to proceed with legal action with respect to this delinquent account, the current balance due may increase as the result of the addition of attorney fees or costs. |
| ~ Should a lien be filed, interest in accordance with 53 P.S. § 7143 of the Municipal Claims and Tax Liens Act will begin to accrue on the date of the filing of the lien and will continue to accrue on a daily basis, increasing the amount of the balance due. |

| **TOTAL CURRENT BALANCE** | Face, Penalty, and Other | Interest | Attorney Fees | Costs | Balance Due |
|---|---|---|---|---|---|
| | *$261,339.05* | *$5,465.62* | *$675.00* | *$215.15* | *$267,694.82* |



# Report

**Current Through:** June 10, 2025

| Parcel: | Q7SW2A 1 3 0715 | | **Address:** | 1050 Main Street, Hellertown, PA | | | | County: | Northampton |
|---|---|---|---|---|---|---|---|---|---|

| File No. | Year & Type of Claim | Notes | Docket Nos. | Face, Penalty, and Other | Interest | Attorney Fees | Costs | Balance Due |
|---|---|---|---|---|---|---|---|---|
| | | | **Claims due Saucon Valley School District** | | | | | |
| 24-08397-0 | 2023 school real estate taxes | *^† | C-48-CV-2024-06488 | $120,296.94 | $14,166.35 | $1,680.00 | $2,895.50 | $139,038.79 |
| 25-11014-0 | 2024 school real estate taxes | *‡~ | N/A | $121,500.54 | $0.00 | $175.00 | $25.00 | $121,700.54 |
| | *Parcel Balance* | | | *$241,797.48* | *$14,166.35* | *$1,855.00* | *$2,920.50* | *$260,739.33* |

\* Face, Penalty, and Other for this file includes any delinquent amount turned over by the agency to Portnoff Law Associates for collection, as well as any Notice Expense due, less any payments received.

^ Balance is subject to interest which accrues on a daily basis.

† If it is necessary to proceed with legal action with respect to this delinquent account, the current balance due may increase as the result of the addition of attorney fees, interest, or costs.

‡ If it is necessary to proceed with legal action with respect to this delinquent account, the current balance due may increase as the result of the addition of attorney fees or costs.

~ Should a lien be filed, interest in accordance with 53 P.S. § 7143 of the Municipal Claims and Tax Liens Act will begin to accrue on the date of the filing of the lien and will continue to accrue on a daily basis, increasing the amount of the balance due.

| **TOTAL CURRENT BALANCE** | Face, Penalty, and Other | Interest | Attorney Fees | Costs | Balance Due |
|---|---|---|---|---|---|
| | *$241,797.48* | *$14,166.35* | *$1,855.00* | *$2,920.50* | *$260,739.33* |